**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**
RECEIVED

| | |
|---|---|
| ALDARESS CARTER, INDIVIDUALLY, AND FOR A CLASS OF SIMILARLY SITUATED PERSONS OR ENTITIES, | ) ) ) |
| | ) 2015 AUG -3 P 1: 35 |
| **Plaintiffs** | ) DEBRA P. HACKETT, CLK |
| **v.** | ) U.S. DISTRICT COURT CIVIL ACTION NO.: ) MIDDLE DISTRICT ALA |
| | ) 2:15-CV-555-WHA-CSC |
| THE CITY OF MONTGOMERY and BRANCH D. KLOESS. | ) ) ) |
| | ) **CLASS ACTION** |
| | ) **DEMAND FOR JURY TRIAL** |
| **Defendants.** | ) |

**COMPLAINT**

COMES NOW, Aldaress Carter (hereinafter "Plaintiff"), individually and on behalf of those similarly situated, upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, by and through his undersigned counsel, files this complaint as follows:

**JURISDICTION**

1.      The Court has jurisdiction over this matter because it concerns a controversy arising under the Constitution of the United States.  28 U.S.C. §1331.  This is a civil rights action brought under 42 U.S.C. §§ 1983 and 1988. This Court also has jurisdiction of this action by virtue of 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), authorizing jurisdiction of claims brought under 42 U.S.C. § 1983 to enforce civil rights guaranteed by the United States Constitution.  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2.      This action also seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2022.

3.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 (b) and

(c).

## PARTIES TO THE COMPLAINT

4.    The Plaintiff Aldaress Carter is an individual resident of Montgomery,

Montgomery County, Alabama.

5.    The classes which the individual Plaintiff seeks to represent consist of:

All individuals who have been in the past assigned by the
Montgomery Municipal Court to "probation" with Judicial
Correction Services (JCS) for the collection of fines.

AND

All individuals who, despite their indigency, were incarcerated,
without consideration of their indigency for failure to pay fines,
charges and fees to Montgomery.

6.    The City of Montgomery, Alabama, ("Montgomery") is a municipal corporation

located within Montgomery County, Alabama.  The City Council and Mayor control the

policy making for Montgomery. The Mayor also hires the municipal court judges, the public

defenders to provide legal representation for indigent offenders, and contracted for the

services of JCS, a private probation company, to collect its municipal court fines[1]. (Exhibit

1)

7.    Branch D. Kloess, ("Kloess") is an individual and a licensed attorney located

within Montgomery County, Alabama. Kloess entered into an agreement with the City of

Montgomery to provide "competent legal representation and services for indigent

defendants charged with the violation of the municipal ordinances and laws before the

---

[1]JCS's contract with Montgomery was not renewed in 2014 when the contract renewal date
expired.

2

Municipal Court of the City of Montgomery." He has not provided competent legal representation. Rather, he has a policy and practice of not requesting indigency hearings for the indigents he represents. As such, he has participated in the City's scheme to extort money from poor citizens he purportedly represents while gaining financially from not seeking indigency status for them. (Exhibit 2)

## FACTS

8.      The Plaintiff brings this action because the policy and practices of Montgomery have violated and continue to violate the Plaintiff's statutory and constitutional rights and those of persons similarly situated.

9.      The treatment of the Plaintiff was caused by and is representative of the City's policies and practices employed to collect debts from the fines, fees, costs, and surcharges that the City assesses, usually for traffic tickets. These facts are similar to those alleged in the Amended Complaints in cases 2013-cv-732-MEF (Doc. 10), 2013-cv-733-MEF (Doc. 9) and 2014-cv-186-MEF (Doc.26) which describe additional people whose rights were violated by the same policies and practices.

10.      The policies and practices of the City of Montgomery are strikingly similar to the unconstitutional practices by which the City of Ferguson, Missouri, operated its courts and police department. These unconstitutional policies placed priority on generating cash for the City without regard to constitutional precepts. The Department of Justice's Civil Rights Division outlined the unconstitutional practices it discovered at the City of Ferguson

3

in its March 4, 2015 report. (Exhibit 3)[2]

11.    Montgomery has contracted with JCS which operates a "for profit" enterprise that markets its services to various municipal governments and has contracted with over 100 cities and towns throughout Alabama. JCS's marketing approach to these cities emphasizes that its fees will be paid by the "offender" and that its efforts will improve collection of court fines and costs at no cost to the city.

12.    The JCS approach is highly systemized and uniform throughout the Alabama municipal courts in which it operates, including Montgomery - until July 1, 2014.

13.    Under the system implemented by Montgomery, it does not require JCS employees to have criminal justice or legal training, nor are they required to have any social work education or meet any minimum law enforcement standards as is required of state probation officers.  Instead, the only requirements of a JCS employee who is referred to as a "Probation Officer" is that the employee be 21 years old, a non felon, with two years of college who complete 40 hours of JCS training on its processes.  On satisfying those requirements, JCS employees are then labeled "Probation Officers"[3] and previously permitted to carry the JCS issued badge in collecting its fees, court fines and costs.

14.    Montgomery by contract and practice unlawfully delegated to JCS many administrative and judicial functions of its municipal court, clothing it with the color of state law for the collection of court fines, costs and the JCS private fees.

---

[2] Due to the many similarities between Montgomery's policies and practices that are coordinated through the city police and the city courts, sections of the DOJ report are referenced by footnotes for the court's review.

[3] In contrast, even a judicial volunteer is required to meet greater and more specific qualifications, careful screening, specific training and continual oversight established by the Administrative Office of Courts ('AOC').  See Ala. Rule of Judicial Administration Rule 42.

4

15. The agreement between Montgomery and JCS and signed by the city mayor attests that the Montgomery municipal "*court agrees that each court order shall provide* for the following:

a probation fee of $40.00 per month flat fee

one time probationer set up fee of $10.00. . . . " (*emphasis added*).

16. Montgomery, through its mayor Charles Jinright and council, approved the agreement with JCS, the City and its court beginning in March 19, 2009 and continued the relationship, by and through its City Council and Mayor, Todd Strange, until the summer of 2014. Throughout this period, the City police, City courts, and City hired public defenders who fully participated in the practices and system with JCS.

17. Montgomery also approved the employment of it municipal court judges including its Presiding Judge, Armstead Lester Hayes, III.

18. Montgomery also hired attorneys to represent indigent defendants in its City courts under a contract which provides that "A defendant's status as "indigent" shall be determined by the Judge in the said Court, in accordance with the criteria set forth in Code of Alabama (1975), Sections 15-12-5 and 15-12-20." Yet, despite the fact that offenders are designated as indigent for purposes of getting an appointed attorney, routinely the . attorneys never introduce themselves to the client they purportedly represent and do not advocate on the client's behalf before the judge, which results in indigent people being fined, assessed court costs, put on the JCS 'payment plan' which costs them an additional $40/month and are threatened with jail if payments are missed.

19. These 'public defenders' do not request *Bearden* hearings or inquire into the offender's ability to pay, or fill out hardship forms requesting community service or other

5

alternatives due to their client's poverty.[4] Nor, do they even maintain files on their "clients."

20.　Rather, the 'public defender' upholds the City's practice of prioritizing profits over public welfare and safety by requiring their clients to 'pay or stay' and demanding court costs and full payment of fines for those they "represent."

21.　The contract between the City and the 'public defender' mandates that the attorneys will be paid out of the 'Fair Tax Trial Fund' which is funded through the collection of court costs levied and collected on convictions. This payment policy creates a conflict of interest as the City is not required to pay the attorneys more than it has collected in any one month.

In fact, Section Five of its public defender contract says:

SECTION FIVE. Under the terms of this agreement, on or after the last day of each month during the period of this agreement, Kloess shall submit to the Clerk of Court for approval, a request for payment from the Fair Trial Tax fund not to exceed the sum of Ten Thousand and 00/100 Dollars ($10,000.00) per month, for services to be performed hereunder for the period of the agreement. **Provided, in no event shall the City be required to pay more than the amount deposited in the Fair Trial Tax Fund for a particular month.**

(Exhibit 2 pg. 2)**(emphasis added)**

22.　For a number of years, Montgomery has participated in implementing the JCS system. That system and JCS's "Probation Tracker" software used at Montgomery was highly systemized and focused on collections of fines and its fees -- not traditional probation services. For instance, the "probation officer" does not visit the probationer's home, job or family, and has contact with them only at the JCS office in collecting fees and fines.

---

[4] See DOJ Report pg. 53.

That collection focus allows the "offenders" to mail in payments if they live 30 miles from the JCS office.  *See* Exhibit 4. The training manual used by JCS instructs its employees on the use of its computer systems in tracking the payments made by the "offenders" and provides court forms to order probation and payments to JCS. The JCS training system also provides sample letters for use after probation is ordered, threatening the "offender" that failure to report to JCS "as directed may result in a warrant being issued for your arrest" and that their "court date cannot and will not be reset." *See* Exhibits 5 and 6. Similar JCS forms instruct the "offender" that they can avoid the court date if they pay an amount determined by JCS. *See* Exhibit 7. Notice to the offender of these JCS set "court dates" was handled by JCS by regular mail with no proof of service and no consideration of returned mail showing no receipt. Similarly, the setting for any hearing on petitions instituted by JCS was done by JCS and listed on a separate "JCS Docket" which JCS established and which Montgomery then adopts. Finally, the JCS manual instructs its employees on the issuance of warrants of arrest and provides forms for that purpose. *See* Exhibit 8.

23.      Once on probation to collect the fines, "offenders" who cannot keep up their payments at Montgomery are arrested typically based upon FTA or FTOCO rather than probation violation. These codes stand for "Failure to Appear" and "Failure to Obey Court Order."  Warrants are issued by the City based upon a report that the offender failed to appear as directed at the JCS established date after notice from JCS. Similarly, FTOCO arrests result from JCS reporting that the "offender" failed to comply with their probation order – that is, they failed to pay or appear at the JCS offices as JCS directed. There is no ordinance or statute establishing Failure to Obey Court Order as an offense.  The arrests and incarceration on these charges occur without any determination of contempt

or willfulness in these arrests and the additional costs are added without any finding whatsoever. Under this system, the "offender" arrested is jailed for an undetermined period of time with bond set by the city magistrate to approximate the money claims to be owed on the balance at JCS. Unlike legitimate probation systems where a probationer would be entitled to a finding of the reasons for revocation, appointed counsel and, at worse, suffer jail time equating to the original sentence, the system at Montgomery ignores all those safeguards.

24. The City Council and Mayor control the policy making for Montgomery and also hire the municipal court judges, hire the public defenders and contract for services of JCS at the municipal court. The contract was a no bid contract and provided JCS with an exclusive franchise at the City. The decision to use this JCS system was an administrative decision of Montgomery, by and through its mayor, and not a decision of the municipal court judge or the Chief Justice, or any other employee of the Administrative Office of Courts ('AOC').

25. Montgomery, through its contract, pattern and practice, clothed JCS with the appearance of state authority and has previously even allowed JCS employees to carry badges. The JCS employees attend each municipal court session and are referred to as "probation officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes. Under this system, JCS "offenders" were not permitted to pay fines at the City payment window, but were required to make all payments, including those for fines, restitution, probation fees and court costs, to JCS.

26. This public ruse was maintained by Montgomery for purposes of imposing and collecting fines, fees and costs from citizens such as the Plaintiff, and was

8

accomplished by allowing JCS to control the money, determine how much each municipal court "offender" must pay each month, how much JCS would keep for its own fees for collection "services" each month, and how much of the payment JCS would rebate to Montgomery toward the fines adjudged.

27.     This system, as a matter of routine, violates the rights of persons such as the Plaintiff and the class he seeks to represent by imposing fines, fees and surcharges to indigent persons with no hearing or consideration of their indigency and by converting fines to jail time.

28.     Despite the lack of authority to do so, Montgomery allowed JCS to use threats of revoking probation, arrest, increased fines and costs and jail time for purposes of collection. Under the system operated by Montgomery, JCS's determination to incarcerate an individual and/or impose unreasonable bond requirements was routinely accepted by City personnel as a matter of policy without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency.

29.     The lack of indigency or *Bearden* hearing is especially disturbing as the court records show many indigent people were supposedly represented by attorneys paid by the City (through the "Fair Trial Tax Fund" funded by court fees). All of the court personnel hired by Montgomery have a significant financial stake in the proceedings.

30.     The collective actions of Montgomery and its agents, including JCS and Kloess, are inextricably interwoven with each other and routinely result in court costs and fines which exceed the statutory maximum of $500 for municipal courts. Similarly, the periods of "probation" imposed for purposes of collecting fines and fees routinely exceed

9

the two-year statutory maximum, all of which results in Montgomery taking action to detain and otherwise incarcerate individuals without any jurisdiction to do so. Additionally, Montgomery approves routinely adding to the "offender" probation balance any unpaid fines it can resurrect from old traffic tickets or fines, even though those predate the "probation."

31.    After improperly imposing probation even when no jail sentence is involved, incarceration then follows if the fine, together with the fees added by JCS, are not paid as dictated.  The collection purpose of this system is emphasized by the fact that probation is terminated once full payment is made.

32.    Under the Montgomery system, JCS had a monetary interest to conduct its role as "probation officer" in a way that maximized its personal profit and not as a neutral court officer.

33.    Under the scheme implemented by Montgomery, its agent JCS decided whether to initiate probation revocation proceedings, and made recommendations to the city judge about that revocation, and charges of failure to appear or failure to obey court order – all while financially interested in the outcome of these strong-arm collection efforts.

34.    Under the scheme implemented by Montgomery, JCS did not undertake determination of the reasons for nonpayment, and did not consider such things as the Plaintiff' disability, unemployment or assets, in regard to the nonpayment of the fines and routinely sought collection from exempt income such as Social Security Disability payments.

35.    Under the scheme implemented by Montgomery, JCS denied any responsibility to determine indigency, and provided no instruction to its employees for the

10

consideration of indigency.

36.     Under the scheme implemented by Montgomery, after simple fines are converted to "probation" for payment, jail often resulted for the "offender" who did not meet the payment schedule. This system used JCS's conclusion of a "probation violation" or "failure to obey court order" to incarcerate individuals who, had they been financially able to pay, would have paid only a fine with no probation whatsoever.

37.     If a person is unable to make a full payment, JCS, often took out the amount owed to JCS first so that JCS was paid even if a person's debt to the City was not reduced.

38.     Many people have made payments to the City and to JCS, only to learn later that there was no record of those payments and to be ordered to make them again.

39.     If a person missed payments or paid less than required, JCS had the purported contractual authority and discretion to decide whether to petition the City for "revocation" of probation. JCS also has a policy of placing people who cannot make full payments – from whom the company has difficulty making a profit – on "warrant status," which could result in warrants issued for their arrest by the City and which constituted a JCS determination that JCS would not accept the person for future probation supervision. JCS communicated this decision to the City, and the City's policy and practice was to agree not to place such people back on probation, requiring instead that those people pay in full or go to jail.

40.     In other cases in which a person was making substantial payments, JCS, had a personal financial interest in extending a person's probation and in keeping the person on a payment plan for as long as possible so that it could profit from the collection of more monthly fees.

11

41.     Thus, under the City's scheme, JCS, was allowed not only to decide whether to initiate judicial revocation proceedings, but could also decide whether a person was put on probation and what judicially ordered conditions were imposed. JCS would also make other recommendations to the City judge concerning how JCS believed the person had faired on probation, whether the person should be placed on probation, whether JCS considered the person "eligible" for probation, what the amount of monthly court-ordered payments should be, and a variety of other case-related decisions.

42.     JCS had a personal financial interest to conduct its role as a probation officer in a way that maximized its personal profit and not necessarily as a neutral public court officer.

43.     JCS used a "probation" room inside the City building that also houses the Municipal Court, directly across from the Municipal courtroom. A JCS employee often sat in the courtroom near the judge and advised the judge about how to handle the cases of "probationers" and potential "probationers."

44.     The City enforced a policy and practice of initiating and issuing warrants when a person missed a payment or failed to make sufficient payments without considering the person's ability to pay[5]—even when the City or its agent, JCS, had knowledge that the person was indigent – and without providing notice and validly summoning the person to court for a hearing.

45.     Instead, City policy allows the City to issue and execute warrants,[6] and City

---

[5] See DOJ Report pp.54-55

[6] See DOJ Report pg. 55

12

officers go to the homes of traffic debtors to arrest them. The City policy and practice is also therefore to deprive people of their liberty without any prior notice and opportunity to be heard and without any basic inquiry into whether the debt is owed, actually unpaid, or still valid.

46.     The City often chooses to execute these warrants prior to or over the weekend, which results in a person serving needless extra time in jail prior to the next available court date.

47.     People placed on "probation" because they cannot afford to pay their fines, fees, costs, and surcharges immediately were also forced to abide by additional restrictions on their liberty, which the City called "conditions" of probation, which were imposed solely because of their wealth status.  These restrictions include: 1) not changing residence or employment without notifying JCS, 2) avoiding "injurious or vicious habits," 3) not using alcohol or visiting places where "intoxicants, drugs, or dangerous substances are sold, dispensed or used, 4) working diligently at a lawful occupation, 5) "truthfully answer all inquiries" by the JCS employees and "comply with all instructions" the JCS employee gives. In addition to these unlawful constraints, the order states in bold type. **"You are subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly."**

48.     When warrants are issued and executed, the City adds fees, costs, and surcharges to the amounts of debt already owed. In addition to court fees and JCS fees and costs, the City routinely adds surcharges for warrants, a "solicitor" fee, and even a 30% debt-collection fee.

13

49. The City's policy and practice was to conduct no inquiry into the person's ability to pay, and the City's policy and practice also refused to use even the state-issued Affidavit of Substantial Hardship that is available for courts to use to determine indigence. As such, the offenders had no opportunity to present evidence concerning their ability to pay or concerning any other relevant question.[7]

50. If family members were present, the City's practice was to call them up to the bench and to ask them to pay as much of their family member's debts as they could on the threat that the person who allegedly owes the money would be jailed if the family members did not pay.

51. The City did not conduct any meaningful inquiry into the person's ability to pay and did not even explain to people how they might claim indigency through standard forms issued by the State of Alabama.

52. The amount of debt announced to debtors by the judge in open court often differed from the amount listed on the paperwork that they received on their return to the jail. The paperwork amount is usually less than the open court amount, meaning that debtors would often have a balance remaining after they "served out" their fines, leading to their placement back on a payment plan and their continued supervision.[8] The City appears to refer to this as "reopening" their cases, although this "reopening" and the corresponding modifications that it entails are not performed at any formal hearing or even in the person's presence. Once people returned to the jail from City court, they were told

---

[7] See DOJ Report pg.58

[8] See DOJ Report pp. 59-61

14

of the City's policy of "working off" an extra $25 per day of their debts if the person agreed to labor in the City jail while being imprisoned.

53.    Inmates desperate to return to their families by "working off" their debts more quickly competed on a daily basis to be selected by City jail employees for a limited number of difficult, unsanitary, and demeaning daily labor tasks. These tasks included cleaning the offices of City employees in the Municipal Court building, the bathrooms in the City police department and Municipal Court, and cells and bathrooms in the City's overcrowded jail.

54.    The City's debt collection practices are enormously profitable, especially in getting family members with no legal obligation to pay any money to the City to come up with money to get their loved ones released from jail and in getting low-income people to forgo basic necessities of life in order to pay JCS and the City in an attempt to avoid jail.

55.    For example, the 2013 City of Birmingham budget reflects approximately $2.8 million from court and traffic citations, the City of Mobile approximately $2 million, and the City of Huntsville approximately $2.5 million. In contrast, the City of Montgomery budget reflects revenue of $15.9 million from municipal court "fines and forfeitures."

56.    The City uses the money collected through these procedures to fund the City jail, to pay Municipal Court judicial salaries, to pay City Attorney's Office salaries, and to fund other portions of the City budget.

57.    The City's recent "Amnesty Day" program starkly demonstrates its practice of jailing persons who are unable to pay debts to the City. In May 2013, Montgomery Mayor Todd Strange and City Municipal Court Administrator Kenneth Nixon (who is also a member of the Mayor's cabinet), announced that the City would offer an "Amnesty"

program on the first two Saturdays in June. Under this program, the City announced that it would remove certain fees, eliminate arrest warrants, and institute a payment plan if individuals were unable to pay the full amount to which the City claimed it was entitled.

58.    However, at least 15 people were arrested on the first day of the "Amnesty" program because they had too much debt allegedly outstanding (greater than $2,500) or because they did not bring at least $150 (or 10% of what was owed, if greater) to pay the City. These people were arrested pursuant to a City policy that required the arrest and jailing of people whose debts met these criteria regardless of a person's ability to pay or financial circumstances.

59.    The City's publicly available budget does not itemize "fines and forfeitures" in as much detail as do the budgets of some other cities, which makes it difficult for the public to know the exact source of these funds. But, the "fines and forfeitures" collected by the City of Montgomery appear substantially higher than those collected by any other major Alabama City, even those cities are larger than Montgomery. These policies and practices have created a culture of fear among the City's poorest residents[9] who are afraid even to appear in City court to explain their indigence because they know they will be jailed by the City without any meaningful process. Indeed, Mr. Nixon, the court administrator, reported to the Montgomery Advertiser that many residents were jailed during the amnesty program because they owed too much and could not pay even 10% of what they owed. Mr. Nixon

---

[9] See DOJ Report pg. 48 "There are also historical reasons, of which the City is well aware, that many Ferguson residents may not appear in court. **Some individuals fear that if they cannot immediately pay the fines they owe, they will be arrested and sent to jail.** Ferguson court staff members told us that they believe the high number of missed court appearances in their court is attributable, in part, to this popular belief. **These fears are well founded." (Emphasis added)**

16

publicly acknowledged that the arrests probably scared others from participating in the "Amnesty" program.

60. The same fear motivates many very poor City residents to sacrifice expenditures on food, clothing, utilities, sanitary home repairs, and other basic necessities of life in order to scrape together money to pay traffic debt to the City.

61. Mr. Nixon warned that, following the 2013 Amnesty Program, the City would be "stricter" about arresting people for unpaid debt. The City also has a policy of referring unpaid debt to the Montgomery County District Attorney's Office, which will send letters to debtors on the City's behalf threatening imminent arrest if they do not pay their debts. A surcharge of 30% of the value of the debt is added to the debt to compensate the District Attorney's Office for its participation in the City's debt collection. The City purports to have the authority to arrest and jail indigent people when they cannot pay even these additional surcharges.

62. The City has stated that it seeks to use these collection programs and tactics to go after old traffic debt, including debt dating back to the 1980s.

63. As in the Plaintiff's case, the City's policy is to modify orders of incarceration outside of any formal judicial process. These modifications include: decreasing a person's jail time from what was announced in open court so that a person is released with a remaining balance owed; allowing a person's release without any hearing if the person or family members present some money to the City clerk; and allowing City employees to reduce the time a person is ordered to be in jail based on labor performed in the jail without any judicial involvement.

64. Plaintiff and witnesses have observed numerous other similar violations of

17

basic constitutional rights in the Montgomery Municipal Court within the past year.

65.     Under its scheme, Montgomery, which is also financially interested, takes advantage of its control over its police force and jail facilities to deny these "offender"/debtors the statutory and constitutional protections that every other Alabama debtor may invoke against a private creditor by allowing JCS to use or threaten debtors of the City with arrest and jail as coercion for payment.

66.     Under this scheme, it was the policy and practice of Montgomery to jail people when they could not afford to pay debts owed to the City resulting from prior traffic tickets or fines and to do so without any inquiry into the person's ability to pay and without considering alternatives to imprisonment.

**THE PLAINTIFF**

67.     Plaintiff and others similarly situated are individuals who were unable to fully pay fines, fees, costs and surcharges levied by the Montgomery Municipal Court, and who, as a result, were assigned to JCS for "probation" under JCS for purposes of collecting the fine. Plaintiff and many like him are currently or were formerly indigent and, despite that indigency, were incarcerated for failure to pay charges and fees for services allegedly rendered by JCS to Montgomery with which it contracted.

**ALDARESS CARTER**

68.     Aldaress Carter ('Mr. Carter') is over the age of nineteen (19) and is a resident of Montgomery, Alabama.

69.     On January 24, 2014, Mr. Carter was riding home from work, and the driver of the car in which he was a passenger was pulled over for a broken tail light.

18

70.     The officer asked Mr. Carter, a passenger, his name and proceeded to run his name through the police records' database.[10] The officer then informed Mr. Carter that he was under arrest, informing him that there were ten capias warrants outstanding on him.

71.     This was the first Mr. Carter had heard of the warrants, and at that time he did not know what the warrants could be related to.

72.     Mr. Carter was surprised that he did not know of these warrants because he was on supervised probation with the state and he regularly reported to his probation officer. Despite regularly communicating with his state probation officer and finding work, he was now being told that Montgomery had ten active arrest warrants that no one else knew about.[11]

73.     The private company -- Judicial Correction Services, ('JCS') - Montgomery -- hired to collect outstanding fines, had requested that these warrants be issued for unpaid fines, fees and costs relating to traffic tickets Mr. Carter had incurred several years earlier. When Mr. Carter first received those tickets, he had been fined by the Montgomery Municipal Court for the charges but did not receive a jail sentence.[12]

---

[10] See DOJ Report pg. 56,57 "We have found that FPD officers frequently check individuals for warrants, even when the person is not reasonably suspected of engaging in any criminal activity, and, if a municipal warrant exists, will often make an arrest. City officials have told us that the decision to arrest a person for an outstanding warrant is "highly discretionary" and that officers will frequently not arrest unless the person is "ignorant." Records show, however, that officers do arrest individuals for outstanding municipal warrants with considerable frequency...Similarly, data collected during vehicle stops shows that, during a larger period of time between October 2012 and October 2014, FPD arrested roughly 460 individuals following a vehicle stop solely because they had outstanding warrants."

[11] See DOJ Report pg. 61 "As with "warrant warning letters" described above, our investigation has been unable to verify that the court *consistently* sends bond forfeiture warning letters. And, as with warrant warning letters, bond forfeiture warning letters are sometimes returned to the court, but court staff members do not appear to make any further attempt to contact the intended recipient."

[12] See DOJ Report pg. 55 "The large number of warrants issued by the court, by any count, is due exclusively to the fact that the court uses arrest warrants and the threat of arrest as its primary tool for

74.    Mr. Carter was unable to pay the fines and costs in full when levied and, on or around 2011, was ordered to be on "probation" with JCS and to pay JCS an additional $40 per month.

75.    However, Mr. Carter was and has been indigent at all relevant times. At times, Mr. Carter paid what little money he could toward his fines and JCS fees, but eventually stopped paying when his money ran out.

76.    Mr. Carter was not able to pay all the fines and fees, but, in accordance with the policy and practice of Montgomery which was established in its contract with JCS, neither the Montgomery Municipal Court nor JCS ever made any inquiry into his inability to pay at the time of levying the fine or thereafter.

77.    Montgomery's agent, JCS, sent Mr. Carter a "failure to report" letter dated March 29, 2012, but Mr. Carter did not receive this letter and it was returned to JCS and scanned into its files.

78.    Montgomery's agent, JCS, sent Mr. Carter another "failure to report" letter to the same bad address. Mr. Carter did not receive this letter and it was returned to JCS and scanned into its files. The date 4/23/12 is handwritten on the returned letter.

79.    Because Mr. Carter failed to pay his City fines and JCS fees, on December 6, 2012 JCS requested that his "probation" be revoked.  The City itself sent no notice to Mr. Carter and delegated that to its agent JCS.

---

collecting outstanding fines for municipal code violations. With extremely limited exceptions, every warrant issued by the Ferguson municipal court was issued because: 1) a person missed consecutive court appearances, or 2) a person missed a single required fine payment as part of a payment plan. Under current court policy, the court issues a warrant in every case where either of those circumstances arises—regardless of the severity of the code violation that the case involves. Indeed, the court rarely issues a warrant for any other purpose."

80.     In its revocation petition, JCS does not mention that letters notifying Mr. Carter of JCS requests have been returned nor does it mention the fact that Mr. Carter is indigent and unable pay, nor does it mention the meager payments Mr. Carter has made.

81.     Mr. Carter did not receive a copy of JCS's petition for revocation and did not attend the court hearing because he had no notice of the hearing.

82.     Despite the fact that Mr. Carter did not receive notice of the hearing, a warrant for his arrest was issued by the City and a new charge of "Failure to Appear" ('FTA') was assessed to Mr. Carter on January 30, 2013.

83.     This common scheme of revoking probation and assessing new charges of FTA benefitted both JCS and the City as it resulted in higher fees and fines owed to the City and it enabled JCS to keep probationers in their system longer which resulted in higher profits to the private company.

84.     Mr. Carter had no notice of the original court hearing or the warrant that was issued for his purported "Failure to Appear" and the City made no effort to give him notice.

85.     After he was arrested on January 24, 2014, Mr. Carter was then taken to the Montgomery City jail where he learned for the first time that he had been arrested for old, unpaid traffic tickets.

86.     Mr. Carter sat in jail for three days and then appeared in the Montgomery Municipal Court on Monday, January 27, 2014 -- along with sixty-seven (67) other jailed inmates.

87.     Before appearing in court, the jailed inmates were told by a man who did not introduce himself that they needed to "Pay or they would Stay." It was later determined that this man was Branch Kloess, a "Public Defender" hired by the City.

21

88.    Despite being in jail and being indigent as shown by his inability to bond out of jail, Mr. Carter appeared before the judge and was ordered to pay $915 for the fines and fees on his unpaid traffic tickets, after which he could be released. Otherwise, the court informed Mr. Carter that he must stay in jail and receive $50 in credit per day toward the payment of his fines and fees.

89.    Mr. Carter had recently obtained new employment, a job that had taken him a long time to acquire, and he knew he would be fired if he was forced to stay in jail. However, Mr. Carter had no money with which to pay his fines and was left with no option but to stay in jail. Mr. Carter's girlfriend offered to pay all the money she had, which totaled $120, to secure his release from jail so that he could go to work. This offer was refused and Mr. Carter was sent back to jail. Throughout the day, the amount demanded to secure Mr. Carter's release from jail changed several times without any court intervention or consideration. Mr. Carter's mother continued to call the jail to find out how she could get him out and finally learned that if a family member or friend could pay $452, then Mr. Carter would be released and the unpaid fines and JCS fees he owed would be cleared.

90.    Mrs. Carter was able to borrow the money to get her son out of jail so that he could go to work. She paid the $452 to one of the clerks at the court window and they called the jail to get Mr. Carter released.

91.    On January 30, Mr. Carter was released from jail when his mother paid $452.

92.    Throughout this period of time, JCS provided no services to Mr. Carter and has acted merely as a collection agency charging additional fees, and despite knowledge that Mr. Carter was unable to pay these fines and was indigent, JCS sought to collect and has taken actions to incarcerate Mr. Carter without any due process.

22

93.    Mr. Carter was incarcerated without any formal probation revocation hearing or any hearing on the issue of his indigency, but simply incarcerated and later released based upon the determination of the City of Montgomery pursuant to its policy and contract with JCS.

94.    Mr. Carter later learned that the public defender had entered a notice of appearance on Mr. Carter's behalf despite the fact that Mr. Carter did not know who he/she was nor had the public defender introduced himself to Mr. Carter or advocated on Mr. Carter's behalf.

95.    Mr. Carter's mother discovered that the public defender that supposedly represented her son was Mr. Branch Kloess and called Kloess who rudely questioned her about how she found out he was her son's attorney and then stated he was no longer his attorney. When she told her son that he had counsel appointed to him, her son was surprised because no one stood up and spoke on his behalf to the judge.

96.    Later when Mr. Carter's girlfriend saw a picture of Mr. Kloess, she recognized him as the man that was seated in the courtroom but had no contact with either her or Mr. Carter. Mr. Kloess did not appear before the judge to plead Mr. Carter's indigency or request that the judge reduce his sentence based on his inability to pay, nor did he meet with Mr. Carter and file any pleading raising the issue of his indigency.

97.    In fact, despite the fact that Mr. Kloess was being paid to represent indigent people, Mr. Carter was sent back to jail until his family could somehow get enough money to get him released so he could go back to work and, hopefully, not lose his job.

98.    Montgomery's agents and employees all participate in this revenue revitalization program that preys on the poor despite the fact that their actions violate state

23

and federal constitutional freedoms.

## Plaintiff's CLASS ALLEGATIONS

99.    The Classes which the named Plaintiff seeks to represent consist of:

All individuals who have been assigned by the Montgomery Municipal Court to "probation" with JCS for the collection of fines.

AND

All individuals who, despite their indigency, were incarcerated, without consideration of their indigency for failure to pay fines, fees, costs and charges and levied by the Montgomery Municipal Court.

100.    The members of the Classes and subclasses are so numerous that joinder of all members is impracticable.

101.    As of this time, the exact number in the Classes is unknown but would be more than one thousand and is ascertainable.

102.    Plaintiff's treatment by the Defendants is typical of the members of the Classes and subclasses and is ongoing.

103.    Plaintiff will fairly and adequately protect the interests of the Classes and has retained counsel who are competent and experienced in class litigation. Plaintiff has no interests that are adverse or antagonistic to the Classes.

104.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by many Class members may be small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged.

105.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether policy and practice of automatically placing on "probation" at additional cost all municipal offenders who cannot immediately pay fines and costs is legal;

b.    Whether the policy and practice of converting unpaid fines and costs to days of incarceration, without any determination concerning an individual's ability to pay, is legal;

c.    Whether the policy and practice of requiring every order of the municipal court to require probation fees for JCS is legal;

d.    Whether the policy and practice of incarcerating individuals for failure to pay fines and costs with no finding of willfulness is legal;

e.    Whether the policy and practice of incarcerating individuals for failure to appear when no notice of the hearing was provided by the court is legal;

f.    Whether the policy and practice of incarcerating individuals for Failure to Obey Court Order when no such ordinance exist and with no finding of willful contempt is legal;

g.    Whether the policy and practice of failing to appoint counsel for indigent defendants when a jail sentence is involved is legal;

h.    Whether the policy and practice of failing to make any inquiry into indigency before imposing fines and costs is legal;

i.    Whether the policy and practice of failing to give adequate notice of

25

the charge and nature of a probation revocation hearing, failing to provide a probation revocation hearing, failing to make written findings concerning the reasons for revoking probation and the evidence relied upon, failing to hold a hearing to determine indigency before revoking probation and otherwise imposing incarceration, failing to make written findings concerning an individual's willful nonpayment of fines and costs before imposing incarceration for nonpayment, is legal;

j.      Whether the policy and practice of charging incarcerated municipal defendants a daily fee for each day the person is incarcerated is legal;

k.      Whether the policy and practice of imposing fines and court costs that exceed that statutory maximum for municipal is legal;

l.      Whether the policy and practice of extending "probation" for municipal offenses beyond 24 months is legal;

m.      Whether the policy and practice which fails to give any credit for time spent incarcerated is legal;

n.      Whether the policy and practice of adding unpaid fines that predate probation to the balance to be paid during probation is legal;

o.      Whether a municipality can legally enter a contract binding upon its municipal court;

p.      Whether a municipality can enter into a no bid contract to grant an exclusive franchise to a private probation company to operate in its municipal court;

q.      Whether setting bond based upon a fine balance owed the city is legal;

r.      Whether the policy of demanding a cash bond for release from jail without inquiry into ones' financial situation or offense is legal.

106.    Montgomery has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

107.    Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a Class Action. The data concerning the Class members and the transaction details and amounts on each charge are largely computerized by Montgomery and by JCS.

108.    The names and addresses of the Class members are a matter of public record and are also kept by JCS and notice can be provided to the Class members via First Class U.S. Mail or other appropriate means as may be directed by the Court.

**COUNT ONE**
**DENIAL OF DUE PROCESS**
**AGAINST THE CITY OF MONTGOMERY AND KLOESS**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

109.    The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has denied him his right to due process and the rights of the Class members.

110.    By contract, Montgomery delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

111. That no bid agreement was signed by the City mayor and bound Montgomery and its municipal court requiring that its municipal "*court agrees that each court order shall provide* for the following:

a probation fee of $40.00 per month flat fee

One time probationer set up fee of $10.00. . . . " (*emphasis added*).

112. Montgomery, through its mayor and/or council, approved the agreements with JCS.

113. Montgomery, through its mayor and council, also approved the employment of the judges of its municipal court and its public defenders.

114. Municipalities are prohibited from laws, ordinances and policies which are in conflict with state law. *See Ala Code* Section 11-45-1. *Also see, Ala. Const.* Article 4 Section 89.

115. State law also dictates a separation of the branches of government. *Ala Const.* Article 3, Section 43.[13] Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, *Ala. Code,* Section 11-43-43, while the mayor of the city is responsible for executive duties. *Ala. Code,* Section 11-43-83. If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama. *Ala. Code,* Section 12-2-7 *et. seq.*; *Ala Const.,* Article 6, Section 139.

116. Municipal mayors have the executive power to execute and enforce

---

[13]Ala. Const. Art. III, Section 43 states:

In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.

contracts[14] and the city councils have the legislative power to enact regulations and ordinances,[15] but neither the mayor nor the council has the power to invade the administration of its judiciary.

117.    Montgomery has exceeded its statutory authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, it agreed with JCS to bind its municipal court to include probation and fees for JCS in every court order entered by its hired judge. That action essentially sold the court process for purposes of increasing income to the City.

118.    The illegal agreement and policy of Montgomery invaded and overrode the judicial authority and court administration reserved to the municipal judges and the Chief Justice.

119.    Probation is only appropriate when an individual has been sentenced to jail time and not when only a fine has been assessed as is the case with the Plaintiff and Class members. As a result, the Montgomery policy and contract to include probation in every court order mandated a judicial practice that continually deprived indigent misdemeanants of their constitutional rights.

120.    The policy and practice of Montgomery also violated the Alabama

---

[14]Ala. Code Section 11-43-83 - The mayor shall see that all contracts with the town or city are faithfully kept or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf of the city or town and no sureties shall be required on such bond. He shall perform such other executive duties, in addition to those prescribed in this article, as may be required of him by the council.

[15]Ala. Code Section 11-43-43 - All legislative powers and other powers granted to cities and towns shall be exercised by the council, except those powers conferred on some officers by law or ordinance. The council shall perform the duties required by this title and other applicable provisions of law.

29

Constitution. Article I, Section 20 *Ala. Const.* specifically prohibits imprisonment for the payment of debts, yet the policy enforced at Montgomery regularly jailed misdemeanants upon the recommendation of its agent JCS for failure to pay fines, fees and costs. Article I, Section 16 *Ala. Const.* requires that all persons shall before conviction be bailable by sufficient surety, but despite this prohibition, misdemeanants were regularly jailed without lawful conviction under any contempt proceedings or probation violation.

121.   The Plaintiff and some Class members were imprisoned, and some repeatedly, under these policies of Montgomery for their failure to pay fines, costs and the added fees mandated by the illegal contract between Montgomery and JCS. The Plaintiff was not accorded any hearing or consideration of his indigency before being jailed, nor was he provided any notice of charges, a hearing on charges levied that might result in imprisonment, or provided meaningful assistance of counsel before being imprisoned.

122.   At the Montgomery Municipal Court, a person unable to fully pay fines and costs when levied was automatically placed on probation. The Montgomery system used JCS orders and forms even when no jail sentence was adjudicated. This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs. The orders supplied by JCS under the agreement with Montgomery then required the individual to make payments to JCS, rather than the City clerk, of the fines, costs and additional monthly fees.

123.   Montgomery, through its city clerks, actively enforced these requirements as part of the policy and procedures established under this contract and refused to accept payments of fines and costs referring those payers such as the Plaintiff instead to the JCS office.

124.    Montgomery, through its contract, practice and policy, clothed its agent JCS with the appearance of state authority and has previously allowed JCS employees to carry badges.[16] Under these practices and policies, JCS employees were allowed to attend each municipal court session and were referred to "probation officers" in the operation of the municipal court and in the City clerk's office, though none ever had such authority under Alabama statutes.

125.    Under this system at Montgomery, "offenders" are not permitted to pay fines at the City clerk's office, but are instead directed to make all payments, including those for fines, restitution, probation fees and court costs, to JCS at the JCS office at hours and locations set by JCS.

126.    Montgomery's policy and practice also allowed JCS to control the money collected from persons such as Plaintiff and to determine how much each such municipal court "offender" must pay each month.

127.    Montgomery's policy and practice also allowed JCS to determine how much of the collected sums will be credited to the collection "services" of JCS each month and how much it will rebate to Montgomery toward the municipal court fines adjudged.

128.    This system, as a matter of routine, violated the rights of persons such as the Plaintiff and the class he seeks to represent by imposing fines and charging fees to

---

16



31

indigent persons with no hearing or consideration of their indigency.

129.    Despite the lack of authority to do so, Montgomery, by its practice and policy, permitted, approved and conspired with JCS, a private actor with a financial stake in the outcome, to play the role of a neutral probation office and, at its discretion, to use threats of revoking probation, increased fines and costs, arrest and jail time for purposes of collection.

130.    Under this system, should an individual fail to pay to the satisfaction of JCS, Montgomery permitted and approved JCS setting payment and reporting schedules and determining when the individual's "probation" should be revoked, or when to impose additional fines and costs.

131.    Under the system operated at Montgomery, JCS's determination to incarcerate an individual and/or impose unreasonable release requirements was routinely accepted by city personnel without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency despite the fact that city-paid 'public defenders' were assigned to many of these indigent folks, yet they were still subject to punitive action.

132.    Montgomery permitted and conspired with JCS allowing it to control and dictate these functions and, as a consequence, this routinely resulted in court costs and fines which exceed the statutory maximum of $500 for municipal courts and imposed additional "jail fees" determined by the city clerk for the costs of any incarceration. Similarly, the periods of "probation" imposed for purposes of collecting fines and fees at Montgomery routinely exceeded the two-year statutory maximum, all of which result in action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

133.    The municipal court judges employed by Montgomery did no investigation of indigency as a matter of policy.

134.    Despite the fact that many people are assigned a 'public defender,' these indigent people are not adequately represented and many times do not even know that an attorney has been assigned to their case. In fact, many times the 'public defender' never introduced himself/herself to their 'client' and did not speak to the court on the "'clients'" behalf and kept no files on their "clients."

135.    Under the system at Montgomery, after simple fines are illegally converted to "probation" for payment, jail often resulted for the "offender" who did not meet the payment schedule set by JCS and enforced by Montgomery. This system used and accepted JCS's conclusion of a "probation violation" or "failure to obey court order" and employed JCS recommendations for the issuance of a warrant of arrest to incarcerate individuals whose original obligation was only the payment of a fine.

136.    Under this system at Montgomery, the Plaintiff was first fined, but then automatically placed on "probation" though no jail sentence was adjudicated. Though the Plaintiff was indigent, Montgomery made no investigation of that matter -- despite the fact that, unknown to him, Montgomery paid a 'public defender' to represent him. When the Plaintiff was unable to pay the fines, costs and additional JCS fees that Montgomery agreed to levy, recommendations from JCS were made and followed by Montgomery to incarcerate him for undetermined time unless a cash bond was made in amounts closely approximating the sums sought by JCS's collection efforts.

137.    Many individuals who cannot pay their fines and added fees, such as the Plaintiff and Class members, were jailed for charges against them for "failure to obey court

order," though there is no such state statute or city ordinance which defines this as a criminal act.

138.   Though a determination of willful refusal to obey a court order as required by *Ala. Code* §15-18-62 can lawfully lead to incarceration, no such determinations were made under the system at Montgomery.

139.   Montgomery adopted and implemented JCS's conclusion of a "probation violation" or "failure to obey court order" and issued arrest warrants to incarcerate individuals whose original case had only been a fine.

140.   In this process of converting fines to jail time, Montgomery did not give adequate notice to the "offender" of the nature of any lawful charge, it failed to conduct hearings, failed to make written findings concerning the reasons for any probation revocation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

141.   Under this policy and practice at Montgomery, when a simple fine was transformed into a jail sentence of an undetermined time, the City failed to provide adequate counsel for the "offenders." In fact, like the Plaintiff, many people are jailed for nonpayment despite the fact that 'public defenders' are retained by the City to represent the indigent,[17] are listed as attorneys on their case, and are paid to supposedly represent them. Those public defenders like Kloess are paid from fines collected on convictions, do not routinely oppose the charges made, and do not raise issues of indigency nor request

---

[17] See Exhibit 2 - contract for Kloess.

hearings for that purpose.

142.    The public defenders have a policy and practice of not requesting indigency hearings despite the fact that the only clients they represent under the contract with the City are indigents. This policy and practice of not requesting indigency hearings benefits both the City and the 'public defender,' as all are enriched by avoiding the constitutional due process requirements and demanding money from the poor.

143.    After jailing an "offender," Montgomery acted to further violate the Plaintiff's constitutional rights by arbitrarily granting early release to some individuals while denying it to others under similar circumstances without any rational basis other than payments it has secured.  As a result, there was no consistent standard of review or logical system under which those incarcerated were granted release.

144.    Under the practice and policies used at Montgomery, after an adjudication under which a fine is levied, additional fees, costs, and other charges are added to the "offender" bill for each new arrest, alleged probation violation, or contempt proceeding including, in some cases, those relating to charges years earlier.

145.    As a proximate consequence of this deprivation of due process, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

### COUNT TWO
### VIOLATION OF THE FOURTH AMENDMENT
### CITY OF MONTGOMERY

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

146.   The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has violated their Fourth Amendment rights and the rights of the Class members to be free from unreasonable seizure.

147.   By no bid contract as discussed in detail above, Montgomery illegally delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

148.   In addition to a denial of due process guaranteed the Plaintiff under the Fourteenth Amendment, the arrest and detainment of these "offenders" who could not pay the fine imposed under this system constitutes a "seizure" in violation of the Fourth Amendment as well.

149.   Under Alabama law, a simple fine can only be converted into jail time if the court makes findings under *Ala. Code,* Section 15-18-62 (1975) that a defendant has willfully failed to pay the fines.

150.   Montgomery's policy and practice of including probation with JCS in every municipal court order created the process by which misdemeanants were incarcerated without a willfulness hearing as required by *Ala. Code,* Section 15-18-62, and in violation of Alabama case law, the Alabama Constitution and the U.S. Constitution.

151.   Under Alabama case law, the Alabama Constitution and the U.S. Constitution, an indigent defendant cannot be required to serve jail time for nonpayment

of fines or costs.[18]

152.    Despite longstanding legal precedent prohibiting incarceration for one's inability to pay a fine/debt, Montgomery's personnel, working in conjunction with JCS, unlawfully arrested and jailed the Plaintiff for his inability to pay a simple fine with added fees and costs dictated by the Montgomery contract with JCS.

153.    Montgomery's police, municipal court processes and jail access all became tools of collection under forms and processes issued by its agent JCS and which were routinely followed by Montgomery. Montgomery's policy and practice, after clothing its agent JCS with the appearance of state actor acting on their behalf, allowed JCS to threaten arrest or revocation of probation and/or incarceration in order to coerce these indigents to pay the city fines and fees for misdemeanor offenses not otherwise subject to jail time under the original adjudication.

154.    When these threats failed to produce sufficiently, Montgomery police, clerks and other personnel, cooperated with JCS to arrest and jail the Plaintiff class members

---

[18]It is clear as a matter of constitutional law that an indigent defendant cannot be required to serve jail time for nonpayment of fine and costs. *Tate v. Short*, 401 U.S. 395 (1971); *Lingle v. State*, 51 Ala.App. 210, 283 So.2d 660 (1973); Smith v. State 51 Ala.App. 212, 283 So.2d 662 (1973). "To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." *Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir.1977). This is not a case of a defendant who, though capable of paying a fine, refuses or neglects to do so.

Although Section 15-22-52, *Alabama Code* 1975, states that payment of fine and costs may be made a condition of suspension of sentence or probation, in *State v. Esdale*, 253 Ala. 550, 45 So.2d 865 (1950), our Supreme Court indicated that such a condition was contrary to our constitution.
"These benefits (probation and suspension of sentence) are not the subject of bargain
and sale to be conditioned on the payment of costs and fees assessed as an incident to
the prosecution and trial and to condition these benefits on the payment of such costs and
fees violate the letter and spirit of Section 13 of the Constitution of 1901 which provides
that 'justice shall be administered without sale, denial or delay.'" *Esdale*, 253 Ala. at 553.

*Crutcher v. State,* 439 So. 2d 725; 726 (Ala. Crim. App. 1983)

such as Aldaress Carter.

155.   The jailing of class members by Montgomery, as described under the specific facts stated above, constitutes unlawful seizures in violation of the Fourth Amendment.[19]

156.   As a proximate consequence of this unlawful seizure, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, all while being indigent.

**COUNT THREE**
**VIOLATION OF THE SIXTH AMENDMENT**
**CITY OF MONTGOMERY**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

157.   The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has violated his Sixth Amendment rights and the rights of the Class members.

158.   By a no bid contract as discussed in detail above, Montgomery illegally delegated many administrative and judicial functions of their municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

159.   Under the policy and practice at Montgomery, when a simple fine was

---

[19] "Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." (internal quotation marks and emphasis omitted)); *Oliver*, 510 U.S. at 274 (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

transformed into a jail sentence of an undetermined time, adequate counsel was not provided for the indigent "offenders."

160. The Plaintiff was initially ordered to pay only a fine at the Montgomery Municipal Court, but due to his inability to pay, he was placed on "probation" under JCS pursuant to JCS form orders and the contract approved by Montgomery.

161. The no bid contract signed by Montgomery approved a "probation" process as essentially a collection vehicle for the City to collect its fines. That agreement, as discussed above, conflicts with state statutes, violates state constitutional requirements for separation of power in the branches of government, and exceeds the authority of the mayor and council.

162. Under that agreement, Montgomery allowed JCS to add monthly fees to the "offender" who had already disclosed an inability to pay the fine when adjudicated and despite the fact that JCS provided no services to them.

163. Under the agreement and with the knowledge and approval of Montgomery, JCS represented itself as acting on behalf of the City which clothed it with that appearance.

164. Under this agreement, Montgomery unlawfully invaded the province of the municipal court and mandated that each order there contain provisions for fees to JCS.

165. By this agreement, simple fines without jail sentences were automatically and illegally converted to 'probation' through JCS if the offender could not promptly pay the entire fine and costs.

166. After this conversion from a fine to 'probation,' threats of jail were used by JCS with the approval of Montgomery and actual incarceration then takes place by police and other City personnel if the fines, fees and costs were not paid as scheduled.

167.   The jeopardy of jail time was not present when the simple fines were adjudicated against the Plaintiff and the Class members and would not have been present but for Montgomery's policy and practice adopting and using the JCS collection system in the administration of its court system illegally requiring "probation" for simple fines.

168.   With the Plaintiff's inability to pay and the JCS focus on collections, charges are routinely initiated claiming "probation violation" or "failure to appear" or "failure to obey court order." These are initiated by JCS under its system and then approved by Montgomery personnel.

169.   At that point, jail sentences become potential jeopardy for the "offenders" such as the Plaintiff on charges that have never before been subjected to meaningful adversarial testing. Nevertheless, neither JCS nor Montgomery routinely provided adequate counsel for those "offenders."

170.   At the point when jail sentences become potential, Montgomery does not provide notice of charges, nor are findings made as required for conviction. Similarly, though JCS also regularly proposes a charge of "failure to obey court order" which Montgomery then pursues, that is not a valid offense.  If willful failure to pay under state statutes such as *Ala. Code* Section 15-18-62 is used as the basis, under the City's system with JCS, there is no finding or hearing on the issue of willfulness.

171.   The named Plaintiff, Aldaress Carter, while indigent, was unlawfully jailed by Montgomery under this JCS system and was not provided meaningful assistance of counsel. In fact, Mr. Carter was surprised to learn that Mr. Kloess was appointed to his case that resulted in his incarceration. Mr. Kloess never identified himself to Mr. Carter, never met with him and, despite being paid to represent indigents, Mr. Kloess never

advocated to the court on Mr. Carter's behalf to raise any issue of his indigency as a bar to incarceration for failure to pay.

172. These actions constitute a denial of the Plaintiff's rights secured by the Sixth Amendment.

173. As a proximate consequence of this violation of their Sixth Amendment rights, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

## COUNT FOUR
### VIOLATION OF THE EIGHTH AMENDMENT
### CITY OF MONTGOMERY

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

174. The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has violated the Eighth Amendment prohibition against excessive fines, excessive bail and cruel and unusual punishment in its actions with the Plaintiff and Class members.

175. As discussed in detail above, Montgomery has illegally delegated many administrative and judicial functions of their municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

176. The Eighth Amendment prohibits cruel and unusual punishment and, as

41

such, limits the kinds of punishment that can be imposed on those convicted of crimes, proscribes punishment grossly disproportionate to the severity of the crime and imposes substantive limits on what can be made criminal and punished as such and prohibits excessive bail.

177.   Under Alabama law, a municipal court has no authority to award a fine on any particular charge over $500, *Ala. Code §* 13A-5-12(a)(3), and even lawful probation for misdemeanors cannot, by statute, extend beyond a two-year period. *See Ala. Code §* 15-22-54(a).

178.   As mentioned above, *Ala. Code §* 15-18-62 is the only statutory method under which a fine levied by a court on adjudication can be converted to imprisonment, but that can legally occur **only** where the court finds willful nonpayment of the fine and cost.

179.   Even upon proper notice and a finding of willful nonpayment under § 15-18-62, the conversion of fine to imprisonment has a specific ratio such that a fine not to exceed $500 shall result in no more than 20 days. *See Ala. Code §* 15-18-62(2).

180.   Rule 26.11 of the Alabama Rules of Criminal Procedure provides the method for dealing with fines, restitution and the failure to pay under a variety of circumstances, none of which were followed by Montgomery.

181.   Under these facts, Montgomery illegally contracted and conspired with JCS to add monthly fees and costs to each municipal court order.  This agreement increased the substantial fines levied against indigent persons such as the Plaintiff.

182.   Neither Montgomery, nor its agent JCS, made inquiries into the indigency of the "offenders" in the system.  As a result, the Plaintiff's failure to make payments as

dictated resulted in threats of arrests. If threats failed to produce the demanded payments, arrest and incarceration followed under the process based upon JCS's representation that the offender had "failed to obey a court order" or had "failed to appear" or had violated "probation."

183.   These fines exceeded the statutory limits of the municipal court and the incarceration periods imposed for the failure to pay exceeded those in *Ala. Code* §15-18-62.

184.   The practice and policy of imposing jail time for an inability to pay its fees, fines and costs violates the Eighth Amendment prohibition against excessive fines and cruel and unusual punishment.

185.   The named Plaintiff was at all pertinent times indigent and yet was incarcerated by City personnel for his inability to pay fines, fees and costs.

186.   After being arrested, JCS, with the City, calculates the amount claimed to be owed for fines, fees and costs which is then used as the bail required for release without consideration of factors justifying release on recognizance or other factors provided for under *Ala Rule Crim Pro.* 7.2.   This practice results in excessive bail requirements in violation of the Eighth Amendment.

187.   As a result of the violation of the Eighth Amendment, the Plaintiff was subjected to excessive fines, fees, and costs beyond the jurisdictional limits of the municipality and violation of the prohibition against excessive fines and cruel and unusual punishment and excessive bail.

188.   As a proximate consequence of this violation of his Eighth Amendment rights, the Plaintiff and Class members suffered injuries, including having fines converted to jail

43

sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

### COUNT FIVE
### DENIAL OF EQUAL PROTECTION
### CITY OF MONTGOMERY

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

189.    Montgomery has acted under color of state law in violation of 42 U.S.C. § 1983 to deny the Plaintiff and Class members' rights to equal protection secured by the Fourteenth Amendment.

190.    This was accomplished by the illegal contractual agreement Montgomery had with JCS. Under that agreement, the actions of its agent JCS were inextricably intertwined in a practice and policy at Montgomery. That practice and policy automatically required "probation" for any person who, despite having no jail sentence, was financially unable to fully pay the fine and costs when levied by the municipal court. That probation requirement was part of the agreement between Montgomery and JCS and was part of every printed order at the municipal court and required payment of monthly fees to JCS.

191.    Persons who are financially able to fully pay the levied fine and costs at Montgomery are not placed on "probation." As a result, those persons are not charged any fees for JCS and are not subjected to threats of arrest and incarceration in the collection process.

44

192.    For those such as the Plaintiff who were unable to fully pay the fine and costs when levied by the municipal court, not only were they required to come to court for traffic tickets, were charged court costs, they were also put on "probation" with JCS.

193.    This requirement was part of the Montgomery contract with JCS. That no bid contract, as mentioned above, exceeded the statutory and constitutional authority of municipalities and imposed on the municipal court an agreement in violation of the separation of powers doctrine between the branches of government.

194.    Once on "probation" for purposes of paying a fines and costs, this policy and practice at Montgomery routinely imposed incarceration and additional costs on individuals who are unable to pay fines and costs, without any determination of willfulness as would lawfully be required under Alabama statutes. See *Ala Code* Section 15-18-62.

195.    This disparate treatment based upon the wealth of the "offender" before the municipal court is a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

196.    This inequality of treatment is also beyond the authority of the municipal court which is required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines. *See Ala. Code* Section 12-14-8. The policy at Montgomery was not uniform with the procedures established by the Alabama Administrative Office of Courts because it added fees only to "offenders" who could not pay immediately and created its own "rules" for penalizing individuals who could not pay as directed.

197.    These additional JCS fines resulted in disparate treatment between those who could immediately pay the fine from those who were unable to immediately pay the

fine. Furthermore, those "offenders" at Montgomery with its JCS arrangement were processed and fined differently than "offenders" in jurisdictions that have not allowed JCS to charge additional fees to those who cannot pay. There is no state authority for such disparate treatment.

198.   By its policies, agreement and conspiratorial actions with JCS, the City has also deprived Carter and the Class members of all the civil debt protections available to others.

199.   The Plaintiff Aldaress Carter and the Class members were required to pay the additional costs and fees under this disparate system and many like Aldaress Carter were unlawfully jailed for their inability to pay as demanded.

200.   As a proximate consequence of this denial of the right to equal protection under the Fourteenth Amendment, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

**COUNT SIX**
**DECLARATORY AND INJUNCTIVE RELIEF**
**CITY OF MONTGOMERY**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

201.   A real controversy exists between these parties concerning several issues, including the validity of Montgomery's attempt to bind its municipal court and the legality of the actions taken under the contract with JCS, such that declaratory relief is appropriate.

**Contract between the City and JCS is void**

202.   Plaintiff requests the Court to declare that Montgomery had no authority to contractually bind their municipal court.

**City does not have the power to bind the Court**

203.   Montgomery entered into an agreement with JCS that exceeded both its statutory and constitutional limitations on municipalities.  Furthermore, that agreement violated the separation of powers doctrine embodied in the Alabama Constitution.  See *Ala. Const.,* Article 3, Section 43.   As a result, that agreement is void and due to be declared a nullity.

204.   Alabama state law also dictates a separation of the branches of government. *Ala. Const.,* Article 3, Section 43.   Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, *Ala. Code* Section 11-43-43, while the mayor of the city is responsible for executive duties.   *Ala. Code,* Section 11-43-83.   If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama.  *Ala. Code* Section 12-2-7 *et. seq.*; *Ala. Const.,* Art. 6, Section 139.

205.   A city's mayor, such as Montgomery's mayor, has the executive power to execute and enforce contracts and the city council has the legislative power to enact regulations and ordinances, but neither the mayor nor the council has the power to invade the administration of its judiciary.

206.   Montgomery has exceeded its statutory authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, they agreed to require its municipal court to include probation and fees for JCS in every court order

47

entered by its hired judge.  That action essentially sold the court process for purposes of increasing income to the City.

### Contract violates statutory limitation regarding traffic citations and municipal fines

207.    That agreement also violates the uniformity required by statute for processing traffic infractions and penalties for misdemeanors in accordance with specified maximum fines. *See Ala. Code* Section 12-14-8.

208.    The process at Montgomery is not uniform with the procedures established by the Alabama Administrative Office of Courts because it adds fees only to "offenders" who cannot pay immediately and creates other "rules" for further penalizing individuals who cannot pay as directed. "Offenders" who are able to immediately pay the fine are charged one rate, but those that are unable to immediately pay for the same offense are charged the fine and required to pay JCS monthly fees that accumulate each month that passes.

209.    The "offenders" at Montgomery are processed and fined differently than "offenders" in municipal jurisdictions which have not contracted for JCS to charge its fees to those who cannot pay and, as a result, violates uniformity requirements of *Ala. Code* Section 12-14-8.

### Contract overrides judicial authority and administration of municipal courts reserved to the Chief Justice

210.    The illegal agreement and policy of Montgomery invades and overrides the judicial authority and court administration reserved to the municipal judge and the Chief Justice.

**Contract is an exclusive franchise**

211.    The contract between JCS and the City of Montgomery grants an exclusive franchise for provision of probation services.

212.    The contract was not competitively bid as required by Ala. Const. Art. I,§ 22 and Ala. Code 1975, §41-16-50.

213.    Because the contract was not bid, it is void and unenforceable.

214.    Plaintiff requests the Court to declare the actions of Montgomery under this contract to be unconstitutional under the premises discussed above.  Under this void agreement, Montgomery has implemented policies and practices to prosecute persons such as the Plaintiff where there is no jurisdiction or authority to do so under Alabama law, doing so intentionally in an effort to extort the payment of fines and costs from indigent people.  These efforts have resulted in the illegal prosecution and incarceration of the Plaintiff and the Class beyond the limited jurisdiction of the municipal courts.

215.    Further, Montgomery has added increased punishment, fines and costs after adjudication and even where there has been no adjudication of guilt, all without jurisdiction or authority for such under Alabama law.

216.    Montgomery has systematically applied *Ala. Code* § 15-18-62 in an unconstitutional fashion, denying the Plaintiff and the Class he seeks to represent constitutionally protected rights.

217.    Section 15-18-62 provides for the imprisonment for the failure to pay fines

and costs in limited circumstances and only upon the finding of a willful nonpayment.[20]

218.    Under the policies and practices at Montgomery, "offenders" before the municipal court, such as the Plaintiff and the Class he seeks to represent, are systematically imprisoned for nonpayment with no determination of willfulness and with no consideration of their indigency or ability to pay.

219.    Furthermore, once imprisoned, the requirements of time to be served under § 15-18-62 are ignored by the practice and policy of Montgomery.

220.    The result of this consistent systematic policy and practice of Montgomery is essentially a debtor's prison for fines and charges levied.

221.    Plaintiff requests the Court to enjoin the actions of Montgomery identified herein to prevent the continuation of these violations of statutory and constitutional prohibitions.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that the Court will take jurisdiction of this cause and upon the final hearing:

a.    Certify this matter as a proper class action maintainable under Rule

---

[20]Section 15-18-62
**Imprisonment for failure to pay fines and costs.**

In cases of willful nonpayment of the fine and costs, the defendant shall either be imprisoned in the county jail or, at the discretion of the court, sentenced to hard labor for the county as follows:

(1) If the fine and costs do not exceed two hundred fifty dollars ($250), no more than 10 days;

(2) If the fine and costs exceed two hundred fifty dollars ($250) but do not exceed five hundred dollars ($500), no more than 20 days;

(3) If the fine and costs exceed five hundred dollars ($500), but do not exceed one thousand dollars ($1,000), no more than 30 days; and

(4) For every additional one hundred dollars ($100) or fractional part thereof, 4 days.

23 of the Federal Rules of Civil Procedure for a plaintiff class and for the defendant class;

b.  Award the Plaintiff such damages as this Court shall find the Plaintiff have sustained, together with punitive, or exemplary damages as the law shall permit;

c.  Enter an injunction and other declaratory relief which declares the Montgomery contract requiring fees to JCS to be void and in violation of the statutory and constitutional limitations on municipalities;

d.  Enter an injunction and other declaratory relief which enjoins Montgomery from engaging in the violations of law set forth hereinabove;

e.  Enter an injunction and other declaratory relief which prohibits Montgomery in the future from placing persons on probation for collection of fines and declares that any current probation and fees for simple fines is void;

f.  Enter an injunction and other declaratory relief which prohibits Montgomery in the future from assessing fines in excess of $500 and/or extending probation periods beyond 24 months and declare that any previously assessed fines and probationary periods in excess of these limits to be void;

g.  Enter an injunction and other declaratory relief which prohibits Montgomery in the future from imprisoning indigent persons for failure to pay fines and fees;

51

h.    Enter an injunction and other declaratory relief which prohibits Montgomery in the future from charging excessive bail established to collect claimed fines and fees;

i.    Award to the Plaintiff and Class members damages under 42 U.S.C. § 1983 equal to any amounts paid on fines and all fees to JCS and Montgomery that are found unconstitutional and/or unlawful (along with interest), and the annulment of any remaining unpaid fines and fees that are found unconstitutional and/or unlawful;

j.    Award to the Plaintiff and Class the cost of this matter, including a reasonable attorneys' fee;

k.    Award to the Plaintiff and the Class members such other, further and more general relief as the Court may deem appropriate under these circumstances including cost of these proceedings.

RESPECTFULLY SUBMITTED,

G. Daniel Evans
ASB-1661-N76G
Attorney for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com

Alexandria Parrish
ASB-2477-D66P
Attorney for the Plaintiffs
The Evans Law Firm, P.C.

52

1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: ap@evanslawpc.com

William M. Dawson
ASB-3976-S80W
Attorney for the Plaintiffs
Dawson Law Office
1736 Oxmoor Road
Birmingham, Alabama 35209
Telephone:  205-307-7021
E-Mail:  bill@billdawsonlaw.com

### JURY DEMAND

Plaintiffs demand trial by struck jury.


Plaintiff's address:

c/o The Evans Law Firm, P.C.

Defendants' addresses:

**CITY OF MONTGOMERY, ALABAMA**
c/o City Attorney's Office
Legal Department
103 North Perry Street
Montgomery, AL 36104

**BRANCH D. KLOESS**
8073 Lakeridge Drive
Montgomery, AL   36117-5141