**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ALDARESS CARTER, INDIVIDUALLY, AND FOR A CLASS OF SIMILARLY SITUATED PERSONS OR ENTITIES,** | ) ) ) | |
| | ) | |
| **Plaintiffs** | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | **2:15-cv-00555-WKW** |
| **THE CITY OF MONTGOMERY and** | ) | |
| **BRANCH D. KLOESS; JUDICIAL CORRECTIONAL** | ) | **CLASS ACTION** |
| **SERVICES, INC., a corporation; CORRECTIONAL** | ) | |
| **HEALTHCARE COMPANIES, INC., a corporation;** | ) | |
| **CHC COMPANIES, INC., a corporation.** | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | ) | |

**FIRST AMENDED AND RESTATED COMPLAINT**

COMES NOW, Aldaress Carter (hereinafter "Plaintiff"), individually and on behalf of those similarly situated, upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, by and through his undersigned counsel, files this First Amended and Restated Complaint as follows:

**JURISDICTION**

1.      The Court has jurisdiction over this matter because it concerns a controversy arising under the Constitution of the United States.  28 U.S.C. ' 1331.  This is a civil rights action brought under 42 U.S.C. ' ' 1983 and 1988 and pursuant to 18 U.S.C. 1962. This Court also has jurisdiction of this action by virtue of 28 U.S.C. ' ' 1343(a)(3) and 1343(a)(4), authorizing jurisdiction of claims brought under 42 U.S.C. ' 1983 to enforce civil rights guaranteed by the United States Constitution.  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. ' 1367.

2. This action also seeks a declaratory judgment pursuant to 28 U.S.C. ' ' 2201 and 2022.

3. Venue in this judicial district is proper pursuant to 28 U.S.C. ' 1391 (b) and (c).

**PARTIES TO THE COMPLAINT**

4. The Plaintiff Aldaress Carter is an individual resident of Montgomery, Montgomery County, Alabama.

5. The classes which the individual Plaintiff seeks to represent consist of:

> All individuals who have been in the past assigned by the Montgomery Municipal Court to "probation" with Judicial Correction Services (JCS) for the collection of fines.
>
> AND
>
> All individuals who, despite their indigency, were incarcerated, without consideration of their indigency for failure to pay fines, charges and fees to Montgomery.

6. The City of Montgomery, Alabama, ("Montgomery") is a municipal corporation located within Montgomery County, Alabama. The City Council and Mayor control the policy making for Montgomery. The Mayor also hires the municipal court judges, the public defenders to provide legal representation for indigent offenders, and contracted for the services of JCS, a private probation company, to collect its municipal court fines[1]. (Doc. 1-1)

7. Branch D. Kloess ("Kloess") is an individual and a licensed attorney located within Montgomery County, Alabama. Kloess entered into an agreement with the City of

[1] JCS's contract with Montgomery was not renewed in 2014 when the contract renewal date expired.

Montgomery to provide "competent legal representation and services for indigent defendants charged with the violation of the municipal ordinances and laws before the Municipal Court of the City of Montgomery." He has not provided competent legal representation. Rather, he has a policy and practice of not requesting indigency hearings for the indigents he represents. As such, he has participated in the City's scheme to extort money from poor citizens he purportedly represents while gaining financially from not seeking indigency status for them. (Doc 1-2)

8.     The defendant Judicial Corrections Services, Inc. (hereinafter "JCS") is a Delaware corporation, registered as a foreign corporation and doing business in the State of Alabama and in this District which markets itself as "not a social service agency," but a "for profit"company which offers services to governmental entities "free of charge" to the cities as "an offender paid system."  At all times, JCS has operated under the color of state law.

9.     The defendant Correctional Healthcare Companies, Inc. ('CHC') (also hereinafter "JCS") is a Delaware corporation,  registered as a foreign corporation and doing business in the State of Alabama. It appears to be the successor of JCS, having purchased or otherwise acquired it, continuing to do business as JCS and operating the same.

10.     The Defendant CHC Companies, Inc. ('CHCC') (also hereinafter "JCS") is a Delaware corporation, registered as a foreign corporation and doing business in the State of Alabama. JCS and Correctional Healthcare Companies, Inc. are, upon information and belief, wholly-owned and fully integrated corporations of CHC Companies, Inc. CHC Companies, Inc. also does business under the name of Correctional Healthcare Companies and employs and/or directs and controls employees in the JCS operations.

3

**FACTS**

11.     The Plaintiff brings this action because the policy and practices of Montgomery and its agents JCS, CHC and CHCC (hereinafter 'JCS') and Kloess have violated the Plaintiff's statutory and constitutional rights and those of persons similarly situated.

12.     The treatment of the Plaintiff was caused by and is representative of the City's policies and practices employed to collect debts from the fines, fees, costs, and surcharges that the City assesses, usually for traffic tickets. These facts are similar to those alleged in the Amended Complaints in cases 2013-cv-732-MEF (Doc. 10), 2013-cv-733-MEF (Doc. 9) and 2014-cv-186-MEF (Doc.26) which describe additional people whose rights were violated by the same policies and practices.

13.     The policies and practices of the City of Montgomery are strikingly similar to the unconstitutional practices by which the City of Ferguson, Missouri, operated its courts and police department.  These unconstitutional policies placed priority on generating cash for the City without regard to constitutional precepts. The Department of Justice's Civil Rights Division outlined the unconstitutional practices it discovered at the City of Ferguson in its March 4, 2015 report. (Doc1-3)[2]

14.     Montgomery has contracted with JCS which operates a "for profit" enterprise that markets its services to various municipal governments and has contracted with over 100 cities and towns throughout Alabama. JCS's marketing approach to these cities

---

[2] Due to the many similarities between Montgomery's policies and practices that are coordinated through the city police and the city courts, sections of the DOJ report are referenced by footnotes for the court's review.

emphasizes that its fees will be paid by the "offender" and that its efforts will improve collection of court fines and costs at no cost to the City.

15.     The JCS approach is highly systemized and uniform throughout the Alabama municipal courts in which it operates, including Montgomery - until July 1, 2014.

16.     Under the system implemented by Montgomery, it does not require JCS employees to have criminal justice or legal training, nor are they required to have any social work education or meet any minimum law enforcement standards as is required of state probation officers.  Instead, the only requirements of a JCS employee who is referred to as a "Probation Officer" is that the employee be 21 years old, a non felon, with two years of college who complete 40 hours of JCS training on its processes.  On satisfying those requirements, JCS employees are then labeled "Probation Officers"[3] and previously permitted to carry the JCS issued badge in collecting its fees, court fines and costs.

17.     Montgomery by contract and practice, unlawfully delegated to JCS many administrative and judicial functions of its municipal court, clothing it with the color of state law for the collection of court fines, costs and the JCS private fees.

18.     The agreement between Montgomery and JCS and signed by the city mayor attests that the Montgomery municipal "***court agrees that each court order shall provide*** for the following:

> a probation fee of $40.00 per month flat fee
>
> one time probationer set up fee of $10.00. . . . " (***emphasis added***).

---

[3]In contrast, even a judicial volunteer is required to meet greater and more specific qualifications, careful screening, specific training and continual oversight established by the Administrative Office of Courts ('AOC').  See Ala. Rule of Judicial Administration Rule 42.

19.     Montgomery, through its Mayor, Charles Jinright, and Council, approved the agreement with JCS, the City and its court beginning in March 19, 2009 and continued the relationship, by and through its City Council and Mayor, Todd Strange, until the summer of 2014. Throughout this period, the City police, City courts, and City hired public defenders fully participated in the practices and system with JCS.

20.     Montgomery also approved the employment of it municipal court judges including its Presiding Judge, Armstead Lester Hayes, III.

21.     Montgomery also hired attorneys to represent indigent defendants in its City courts under a contract which provides that "A defendant's status as 'indigent' shall be determined by the Judge in the said Court, in accordance with the criteria set forth in Code of Alabama (1975), Sections 15-12-5 and 15-12-20." Yet, despite the fact that offenders are designated as indigent for purposes of getting an appointed attorney, routinely the attorneys never introduce themselves to the client they purportedly represent and do not advocate on the client's behalf before the judge, which results in indigent people being fined, assessed court costs, put on the JCS 'payment plan' which costs them an additional $40/month and are threatened with jail if payments are missed.

22.     These 'public defenders' do not request *Bearden* hearings or inquire into the offender's ability to pay, or fill out hardship forms requesting community service or other alternatives due to their client's poverty.[4] Nor, do they even maintain files on their "clients."

23.     Rather, the 'public defender' upholds the City's practice of prioritizing profits over public welfare and safety by requiring their clients to 'pay or stay' and demanding

---

[4] See DOJ Report pg. 53.

court costs and full payment of fines for those they "represent."

24.     The contract between the City and the 'public defender' mandates that the attorneys will be paid out of the 'Fair Tax Trial Fund' which is funded through the collection of court costs levied and collected on convictions. This payment policy creates a conflict of interest as the City is not required to pay the attorneys more than it has collected in any one month.

In fact, Section Five of its public defender contract says:

SECTION FIVE. Under the terms of this agreement, on or after the last day of each month during the period of this agreement, Kloess shall submit to the Clerk of Court for approval, a request for payment from the Fair Trial Tax fund not to exceed the sum of Ten Thousand and 00/100 Dollars ($10,000.00) per month, for services to be performed hereunder for the period of the agreement. **Provided, in no event shall the City be required to pay more than the amount deposited in the Fair Trial Tax Fund for a particular month.**

(Doc1-2 pg. 2)**(emphasis added)**

25.     For a number of years, Montgomery has participated in implementing the JCS system.  That system and JCS's "Probation Tracker" software used at Montgomery was highly systemized and focused on collections of fines and its fees -- not traditional probation services.  For instance, the "probation officer" does not visit the probationer's home, job or family, and has contact with them only at the JCS office in collecting fees and fines.

That collection focus allows the "offenders" to mail in payments if they live 30 miles from the JCS office.  (Doc 1-4). The training manual used by JCS instructs its employees on the use of its computer systems in tracking the payments made by the "offenders" and provides court forms to order probation and payments to JCS. The JCS training system also provides sample letters for use after probation is ordered, threatening the "offender"

that failure to report to JCS "as directed may result in a warrant being issued for your arrest" and that their "court date cannot and will not be reset." *See* (Docs. 1-5,1-6). Similar JCS forms instruct the "offender" that they can avoid the court date if they pay an amount determined by JCS. *(*Doc1-7). Notice to the offender of these JCS set "court dates" was handled by JCS by regular mail with no proof of service and no consideration of returned mail showing no receipt. Similarly, the setting for any hearing on petitions instituted by JCS was done by JCS and listed on a separate "JCS Docket" which JCS established and which Montgomery then adopts. Finally, the JCS manual instructs its employees on the issuance of warrants of arrest and provides forms for that purpose. (Doc.1-8).

26.    Once on probation to collect the fines, "offenders" who cannot keep up their payments at Montgomery are arrested typically based upon FTA or FTOCO rather than probation violation. These codes stand for "Failure to Appear" and "Failure to Obey Court Order." Warrants are issued by the City based upon a report that the offender failed to appear as directed at the JCS established date after notice from JCS. Similarly, FTOCO arrests result from JCS reporting that the "offender" failed to comply with their probation order – that is, they failed to pay or appear at the JCS offices as JCS directed. There is no ordinance or statute establishing Failure to Obey Court Order as an offense. The arrests and incarceration on these charges occur without any determination of contempt or willfulness in these arrests and the additional costs are added without any finding whatsoever. Under this system, the "offender" arrested is jailed for an undetermined period of time with bond set by the city magistrate to approximate the money claims to be owed on the balance at JCS. Unlike legitimate probation systems where a probationer would be entitled to a finding of the reasons for revocation, appointed counsel and, at worse, suffer

jail time equating to the original sentence, the system at Montgomery ignores all those safeguards.

27.     The City Council and Mayor control the policy making for Montgomery and also hire the municipal court judges, hire the public defenders and contract for services of JCS at the municipal court. The contract was a no bid contract and provided JCS with an exclusive franchise at the City.  The decision to use this JCS system was an administrative decision of Montgomery, by and through its mayor, and not a decision of the municipal court judge or the Chief Justice, or any other employee of the Administrative Office of Courts ('AOC').

28.     Montgomery, through its contract, pattern and practice, clothed JCS with the appearance of state authority and has previously even allowed JCS employees to carry badges.  The JCS employees attend each municipal court session and are referred to as "probation officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes.  Under this system, JCS "offenders" were not permitted to pay fines at the City payment window, but were required to make all payments, including those for fines, restitution, probation fees and court costs, to JCS.

29.     This public ruse was maintained by Montgomery for purposes of imposing and collecting fines, fees and costs from citizens such as the Plaintiff, and was accomplished by allowing JCS to control the money, determine how much each municipal court "offender" must pay each month, how much JCS would keep for its own fees for collection "services" each month, and how much of the payment JCS would rebate to Montgomery toward the fines adjudged.

30.     This system, as a matter of routine, violates the rights of persons such as the

9

Plaintiff and the class he seeks to represent by imposing fines, fees and surcharges to indigent persons with no hearing or consideration of their indigency and by converting fines to jail time.

31.     Despite the lack of authority to do so, Montgomery allowed JCS to use threats of revoking probation, arrest, increased fines and costs and jail time for purposes of collection.   Under the system operated by Montgomery, JCS's determination to incarcerate an individual and/or impose unreasonable bond requirements was routinely accepted by City personnel as a matter of policy without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency.

32.     The lack of indigency or *Bearden* hearing is especially disturbing as the court records show many indigent people were supposedly represented by attorneys paid by the City (through the "Fair Trial Tax Fund" funded by court fees). All of the court personnel hired by Montgomery have a significant financial stake in the proceedings.

33.     The collective actions of Montgomery and its agents, including JCS and Kloess, are inextricably interwoven with each other and routinely result in court costs and fines which exceed the statutory maximum of $500 for municipal courts.   Similarly, the periods of "probation" imposed for purposes of collecting fines and fees routinely exceed the two-year statutory maximum, all of which results in Montgomery taking action to detain and otherwise incarcerate individuals without any jurisdiction to do so. Additionally, Montgomery approves routinely adding to the "offender" probation balance any unpaid fines it can resurrect from old traffic tickets or fines, even though those predate the "probation."

10

34.    After improperly imposing probation even when no jail sentence is involved, incarceration then follows if the fine, together with the fees added by JCS, are not paid as dictated.  The collection purpose of this system is emphasized by the fact that probation is terminated once full payment is made.

35.    Under the Montgomery system, JCS had a monetary interest to conduct its role as "probation officer" in a way that maximized its personal profit and not as a neutral court officer.

36.    Under the scheme implemented by Montgomery, its agent JCS decided whether to initiate probation revocation proceedings, and made recommendations to the city judge about that revocation, and charges of failure to appear or failure to obey court order – all while financially interested in the outcome of these strong-arm collection efforts.

37.    Under the scheme implemented by Montgomery, JCS did not undertake determination of the reasons for nonpayment, and did not consider such things as the Plaintiff' disability, unemployment or assets, in regard to the nonpayment of the fines and routinely sought collection from exempt income such as Social Security Disability payments.

38.    Under the scheme implemented by Montgomery, JCS denied any responsibility to determine indigency, and provided no instruction to its employees for the consideration of indigency.

39.    Under the scheme implemented by Montgomery, after simple fines are converted to "probation" for payment, jail often resulted for the "offender" who did not meet the payment schedule.  This system used JCS's conclusion of a "probation violation" or "failure to obey court order" to incarcerate individuals who, had they been financially able

11

to pay, would have paid only a fine with no probation whatsoever.

40.     If a person is unable to make a full payment, JCS, often took out the amount owed to JCS first so that JCS was paid even if a person's debt to the City was not reduced.

41.     Many people have made payments to the City and to JCS, only to learn later that there was no record of those payments and to be ordered to make them again.

42.     If a person missed payments or paid less than required, JCS had the purported contractual authority and discretion to decide whether to petition the City for "revocation" of probation. JCS also has a policy of placing people who cannot make full payments – from whom the company has difficulty making a profit – on "warrant status," which could result in warrants issued for their arrest by the City and which constituted a JCS determination that JCS would not accept the person for future probation supervision. JCS communicated this decision to the City, and the City's policy and practice was to agree not to place such people back on probation, requiring instead that those people pay in full or go to jail.

43.     In other cases in which a person was making substantial payments, JCS, had a personal financial interest in extending a person's probation and in keeping the person on a payment plan for as long as possible so that it could profit from the collection of more monthly fees.

44.     Thus, under the City's scheme, JCS, was allowed not only to decide whether to initiate judicial revocation proceedings, but could also decide whether a person was put on probation and what judicially ordered conditions were imposed. JCS would also make other recommendations to the City judge concerning how JCS believed the person had faired on probation, whether the person should be placed on probation, whether JCS

considered the person "eligible" for probation, what the amount of monthly court-ordered payments should be, and a variety of other case-related decisions.

45.   JCS had a personal financial interest to conduct its role as a probation officer in a way that maximized its personal profit and not necessarily as a neutral public court officer.

46.   JCS used a "probation" room inside the City building that also houses the Municipal Court, directly across from the Municipal courtroom. A JCS employee often sat in the courtroom near the judge and advised the judge about how to handle the cases of "probationers" and potential "probationers."

47.   The City enforced a policy and practice of initiating and issuing warrants when a person missed a payment or failed to make sufficient payments without considering the person's ability to pay[5]—even when the City or its agent, JCS, had knowledge that the person was indigent – and without providing notice and validly summoning the person to court for a hearing.

48.   Instead, City policy allows the City to issue and execute warrants,[6] and City officers go to the homes of traffic debtors to arrest them. The City policy and practice is also therefore to deprive people of their liberty without any prior notice and opportunity to be heard and without any basic inquiry into whether the debt is owed, actually unpaid, or still valid.

49.   The City often chooses to execute these warrants prior to or over the

_____

[5] See DOJ Report pp.54-55

[6] See DOJ Report pg. 55

weekend, which results in a person serving needless extra time in jail prior to the next available court date.

50.     People placed on "probation" because they cannot afford to pay their fines, fees, costs, and surcharges immediately were also forced to abide by additional restrictions on their liberty, which the City called "conditions" of probation, which were imposed solely because of their wealth status.  These restrictions include: 1) not changing residence or employment without notifying JCS, 2) avoiding "injurious or vicious habits," 3) not using alcohol or visiting places where "intoxicants, drugs, or dangerous substances are sold, dispensed or used, 4) working diligently at a lawful occupation, 5) "truthfully answer all inquiries" by the JCS employees and "comply with all instructions" the JCS employee gives. In addition to these unlawful constraints, the order states in bold type. "**You are subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly.**"

51.     When warrants are issued and executed, the City adds fees, costs, and surcharges to the amounts of debt already owed. In addition to court fees and JCS fees and costs, the City routinely adds surcharges for warrants, a "solicitor" fee, and even a 30% debt-collection fee.

52.     The City's policy and practice was to conduct no inquiry into the person's ability to pay, and the City's policy and practice also refused to use even the state-issued Affidavit of Substantial Hardship that is available for courts to use to determine indigence. As such, the offenders had no opportunity to present evidence concerning their ability to

14

pay or concerning any other relevant question.[7]

53.     If family members were present, the City's practice was to call them up to the bench and to ask them to pay as much of their family member's debts as they could on the threat that the person who allegedly owes the money would be jailed if the family members did not pay.

54.     The City did not conduct any meaningful inquiry into the person's ability to pay and did not even explain to people how they might claim indigency through standard forms issued by the State of Alabama.

55.     The amount of debt announced to debtors by the judge in open court often differed from the amount listed on the paperwork that they received on their return to the jail. The paperwork amount is usually less than the open court amount, meaning that debtors would often have a balance remaining after they "served out" their fines, leading to their placement back on a payment plan and their continued supervision.[8] The City appears to refer to this as "reopening" their cases, although this "reopening" and the corresponding modifications that it entails are not performed at any formal hearing or even in the person's presence.  Once people returned to the jail from City court, they were told of the City's policy of "working off" an extra $25 per day of their debts if the person agreed to labor in the City jail while being imprisoned.

56.     Inmates desperate to return to their families by "working off" their debts more quickly competed on a daily basis to be selected by City jail employees for a limited

---

[7] See DOJ Report pg.58

[8] See DOJ Report pp. 59-61

number of difficult, unsanitary, and demeaning daily labor tasks. These tasks included cleaning the offices of City employees in the Municipal Court building, the bathrooms in the City police department and Municipal Court, and cells and bathrooms in the City's overcrowded jail.

57.     The City's debt collection practices are enormously profitable, especially in getting family members with no legal obligation to pay any money to the City to come up with money to get their loved ones released from jail and in getting low-income people to forgo basic necessities of life in order to pay JCS and the City in an attempt to avoid jail.

58.     For example, the 2013 City of Birmingham budget reflects approximately $2.8 million from court and traffic citations, the City of Mobile approximately $2 million, and the City of Huntsville approximately $2.5 million. In contrast, the City of Montgomery budget reflects revenue of $15.9 million from municipal court "fines and forfeitures."

59.     The City uses the money collected through these procedures to fund the City jail, to pay Municipal Court judicial salaries, to pay City Attorney's Office salaries, and to fund other portions of the City budget.

60.     The City's recent "Amnesty Day" program starkly demonstrates its practice of jailing persons who are unable to pay debts to the City. In May 2013, Montgomery Mayor Todd Strange and City Municipal Court Administrator Kenneth Nixon (who is also a member of the Mayor's cabinet), announced that the City would offer an "Amnesty" program on the first two Saturdays in June. Under this program, the City announced that it would remove certain fees, eliminate arrest warrants, and institute a payment plan if individuals were unable to pay the full amount to which the City claimed it was entitled.

61.     However, at least 15 people were arrested on the first day of the "Amnesty"

16

program because they had too much debt allegedly outstanding (greater than $2,500) or because they did not bring at least $150 (or 10% of what was owed, if greater) to pay the City. These people were arrested pursuant to a City policy that required the arrest and jailing of people whose debts met these criteria regardless of a person's ability to pay or financial circumstances.

62.     The City's publicly available budget does not itemize "fines and forfeitures" in as much detail as do the budgets of some other cities, which makes it difficult for the public to know the exact source of these funds. But, the "fines and forfeitures" collected by the City of Montgomery appear substantially higher than those collected by any other major Alabama City, even those cities are larger than Montgomery. These policies and practices have created a culture of fear among the City's poorest residents[9] who are afraid even to appear in City court to explain their indigence because they know they will be jailed by the City without any meaningful process. Indeed, Mr. Nixon, the court administrator, reported to the Montgomery Advertiser that many residents were jailed during the amnesty program because they owed too much and could not pay even 10% of what they owed. Mr. Nixon publicly acknowledged that the arrests probably scared others from participating in the "Amnesty" program.

63.     The same fear motivates many very poor City residents to sacrifice expenditures on food, clothing, utilities, sanitary home repairs, and other basic necessities

---

[9] See DOJ Report pg. 48 "There are also historical reasons, of which the City is well aware, that many Ferguson residents may not appear in court. **Some individuals fear that if they cannot immediately pay the fines they owe, they will be arrested and sent to jail.** Ferguson court staff members told us that they believe the high number of missed court appearances in their court is attributable, in part, to this popular belief. **These fears are well founded**." **(Emphasis added)**

of life in order to scrape together money to pay traffic debt to the City.

64.    Mr. Nixon warned that, following the 2013 Amnesty Program, the City would be "stricter" about arresting people for unpaid debt. The City also has a policy of referring unpaid debt to the Montgomery County District Attorney's Office, which will send letters to debtors on the City's behalf threatening imminent arrest if they do not pay their debts. A surcharge of 30% of the value of the debt is added to the debt to compensate the District Attorney's Office for its participation in the City's debt collection. The City purports to have the authority to arrest and jail indigent people when they cannot pay even these additional surcharges.

65.    The City has stated that it seeks to use these collection programs and tactics to go after old traffic debt, including debt dating back to the 1980s.

66.    As in the Plaintiff's case, the City's policy is to modify orders of incarceration outside of any formal judicial process. These modifications include: decreasing a person's jail time from what was announced in open court so that a person is released with a remaining balance owed; allowing a person's release without any hearing if the person or family members present some money to the City clerk; and allowing City employees to reduce the time a person is ordered to be in jail based on labor performed in the jail without any judicial involvement.

67.    Plaintiff and witnesses have observed numerous other similar violations of basic constitutional rights in the Montgomery Municipal Court within the past year.

68.    Under its scheme, Montgomery, which is also financially interested, takes advantage of its control over its police force and jail facilities to deny these "offender"/debtors the statutory and constitutional protections that every other Alabama

18

debtor may invoke against a private creditor by allowing JCS to use or threaten debtors of the City with arrest and jail as coercion for payment.

69.     Under this scheme, it was the policy and practice of Montgomery to jail people when they could not afford to pay debts owed to the City resulting from prior traffic tickets or fines and to do so without any inquiry into the person's ability to pay and without considering alternatives to imprisonment.

**THE PLAINTIFF**

70.     Plaintiff and others similarly situated are individuals who were unable to fully pay fines, fees, costs and surcharges levied by the Montgomery Municipal Court, and who, as a result, were assigned to JCS for "probation" under JCS for purposes of collecting the fine. Plaintiff and many like him are currently or were formerly indigent and, despite that indigency, were incarcerated for failure to pay charges and fees for services allegedly rendered by JCS to Montgomery with which it contracted.

**ALDARESS CARTER**

71.     Aldaress Carter ('Mr. Carter') is over the age of nineteen (19) and is a resident of Montgomery, Alabama.

72.     On January 24, 2014, Mr. Carter was riding home from work, and the driver of the car in which he was a passenger was pulled over for a broken tail light.

73.     The officer asked Mr. Carter, a passenger, his name and proceeded to run his name through the police records' database.[10] The officer then informed Mr. Carter that

---

[10] See DOJ Report pg. 56,57 "We have found that FPD officers frequently check individuals for warrants, even when the person is not reasonably suspected of engaging in any criminal activity, and, if a municipal warrant exists, will often make an arrest. City officials have told us that the decision to arrest a person for an outstanding warrant is "highly discretionary" and that officers will frequently not arrest unless the person is "ignorant." Records show, however, that officers do arrest individuals for outstanding

he was under arrest, informing him that there were ten capias warrants outstanding on him.

74.    This was the first Mr. Carter had heard of the warrants, and at that time he did not know what the warrants could be related to.

75.    Mr. Carter was surprised that he did not know of these warrants because he was on supervised probation with the state and he regularly reported to his probation officer. Despite regularly communicating with his state probation officer and finding work, he was now being told that Montgomery had ten active arrest warrants that no one else knew about.[11]

76.    The private company -- Judicial Correction Services, ('JCS') - Montgomery -- hired to collect outstanding fines, had requested that these warrants be issued for unpaid fines, fees and costs relating to traffic tickets Mr. Carter had incurred several years earlier. When Mr. Carter first received those tickets, he had been fined by the Montgomery Municipal Court for the charges but did not receive a jail sentence.[12]

77.    Mr. Carter was unable to pay the fines and costs in full when levied and, on

_____

municipal warrants with considerable frequency...Similarly, data collected during vehicle stops shows that, during a larger period of time between October 2012 and October 2014, FPD arrested roughly 460 individuals following a vehicle stop solely because they had outstanding warrants."

[11] See DOJ Report pg. 61 "As with "warrant warning letters" described above, our investigation has been unable to verify that the court *consistently* sends bond forfeiture warning letters. And, as with warrant warning letters, bond forfeiture warning letters are sometimes returned to the court, but court staff members do not appear to make any further attempt to contact the intended recipient."

[12] See DOJ Report pg. 55 "The large number of warrants issued by the court, by any count, is due exclusively to the fact that the court uses arrest warrants and the threat of arrest as its primary tool for collecting outstanding fines for municipal code violations. With extremely limited exceptions, every warrant issued by the Ferguson municipal court was issued because: 1) a person missed consecutive court appearances, or 2) a person missed a single required fine payment as part of a payment plan. Under current court policy, the court issues a warrant in every case where either of those circumstances arises—regardless of the severity of the code violation that the case involves. Indeed, the court rarely issues a warrant for any other purpose."

or around 2011, was ordered to be on "probation" with JCS and to pay JCS an additional $40 per month.

78.     However, Mr. Carter was and has been indigent at all relevant times. At times, Mr. Carter paid what little money he could toward his fines and JCS fees, but eventually stopped paying when his money ran out.

79.     Mr. Carter was not able to pay all the fines and fees, but, in accordance with the policy and practice of Montgomery which was established in its contract with JCS, neither the Montgomery Municipal Court nor JCS ever made any inquiry into his inability to pay at the time of levying the fine or thereafter.

80.     Montgomery's agent, JCS, sent Mr. Carter a "failure to report" letter dated March 29, 2012, but Mr. Carter did not receive this letter and it was returned to JCS and scanned into its files.

81.     Montgomery's agent, JCS, sent Mr. Carter another "failure to report" letter to the same bad address. Mr. Carter did not receive this letter and it was returned to JCS and scanned into its files. The date 4/23/12 is handwritten on the returned letter.

82.     Because Mr. Carter failed to pay his City fines and JCS fees, on December 6, 2012 JCS requested that his "probation" be revoked.  The City itself sent no notice to Mr. Carter and delegated that to its agent JCS.

83.     In its revocation petition, JCS does not mention that letters notifying Mr. Carter of JCS requests have been returned nor does it mention the fact that Mr. Carter is indigent and unable pay, nor does it mention the meager payments Mr. Carter has made.

84.     Mr. Carter did not receive a copy of JCS's petition for revocation and did not attend the court hearing because he had no notice of the hearing.

21

85.     Despite the fact that Mr. Carter did not receive notice of the hearing, a warrant for his arrest was issued by the City and a new charge of "Failure to Appear" ('FTA') was assessed to Mr. Carter on January 30, 2013.

86.     This common scheme of revoking probation and assessing new charges of FTA benefitted both JCS and the City as it resulted in higher fees and fines owed to the City and it enabled JCS to keep probationers in their system longer which resulted in higher profits to the private company.

87.     Mr. Carter had no notice of the original court hearing or the warrant that was issued for his purported "Failure to Appear" and the City made no effort to give him notice.

88.     After he was arrested on January 24, 2014, Mr. Carter was then taken to the Montgomery City jail where he learned for the first time that he had been arrested for old, unpaid traffic tickets.

89.     Mr. Carter sat in jail for three days and then appeared in the Montgomery Municipal Court on Monday, January 27, 2014 -- along with sixty-seven (67) other jailed inmates.

90.     Before appearing in court, the jailed inmates were told by a man who did not introduce himself that they needed to "Pay or they would Stay."  It was later determined that this man was Branch Kloess, a "Public Defender" hired by the City.

91.     Despite being in jail and being indigent as shown by his inability to bond out of jail, Mr. Carter appeared before the judge and was ordered to pay $915 for the fines and fees on his unpaid traffic tickets, after which he could be released. Otherwise, the court informed Mr. Carter that he must stay in jail and receive $50 in credit per day toward the payment of his fines and fees.

92.     Mr. Carter had recently obtained new employment, a job that had taken him a long time to acquire, and he knew he would be fired if he was forced to stay in jail. However, Mr. Carter had no money with which to pay his fines and was left with no option but to stay in jail. Mr. Carter's girlfriend offered to pay all the money she had, which totaled $120, to secure his release from jail so that he could go to work. This offer was refused and Mr. Carter was sent back to jail. Throughout the day, the amount demanded to secure Mr. Carter's release from jail changed several times without any court intervention or consideration. Mr. Carter's mother continued to call the jail to find out how she could get him out and finally learned that if a family member or friend could pay $452, then Mr. Carter would be released and the unpaid fines and JCS fees he owed would be cleared.

93.     Mrs. Carter was able to borrow the money to get her son out of jail so that he could go to work. She paid the $452 to one of the clerks at the court window and they called the jail to get Mr. Carter released.

94.     On January 30, 2014, Mr. Carter was released from jail when his mother paid $452.

95.     Throughout this period of time, JCS provided no services to Mr. Carter and has acted merely as a collection agency charging additional fees, and despite knowledge that Mr. Carter was unable to pay these fines and was indigent, JCS sought to collect and has taken actions to incarcerate Mr. Carter without any due process.

96.     Mr. Carter was incarcerated without any formal probation revocation hearing or any hearing on the issue of his indigency, but simply incarcerated and later released based upon the determination of the City of Montgomery pursuant to its policy and contract with JCS.

23

97.     Mr. Carter later learned that the public defender had entered a notice of appearance on Mr. Carter's behalf despite the fact that Mr. Carter did not know who he/she was nor had the public defender introduced himself to Mr. Carter or advocated on Mr. Carter's behalf.

98.     Mr. Carter's mother discovered that the public defender that supposedly represented her son was Mr. Branch Kloess and called Kloess who rudely questioned her about how she found out he was her son's attorney and then stated he was no longer his attorney. When she told her son that he had counsel appointed to him, her son was surprised because no one stood up and spoke on his behalf to the judge.

99.     Later when Mr. Carter's girlfriend saw a picture of Mr. Kloess, she recognized him as the man that was seated in the courtroom but had no contact with either her or Mr. Carter. Mr. Kloess did not appear before the judge to plead Mr. Carter's indigency or request that the judge reduce his sentence based on his inability to pay, nor did he meet with Mr. Carter and file any pleading raising the issue of his indigency.

100.    In fact, despite the fact that Mr. Kloess was being paid to represent indigent people, Mr. Carter was sent back to jail until his family could somehow get enough money to get him released so he could go back to work and, hopefully, not lose his job.

101.    Montgomery's agents and employees all participate in this revenue revitalization program that preys on the poor despite the fact that their actions violate state and federal constitutional freedoms.

### Plaintiff's CLASS ALLEGATIONS

102.    The Classes which the named Plaintiff seeks to represent consist of:

        All individuals who have been assigned by the Montgomery

24

Municipal Court to "probation" with JCS for the collection of fines.

AND

All individuals who, despite their indigency, were incarcerated, without consideration of their indigency for failure to pay fines, fees, costs and charges and levied by the Montgomery Municipal Court.

103.   The members of the Classes and subclasses are so numerous that joinder of all members is impracticable.

104.   As of this time, the exact number in the Classes is unknown but would be more than one thousand and is ascertainable.

105.   Plaintiff's treatment by the Defendants is typical of the members of the Classes and subclasses and is ongoing.

106.   Plaintiff will fairly and adequately protect the interests of the Classes and has retained counsel who are competent and experienced in class litigation.  Plaintiff has no interests that are adverse or antagonistic to the Classes.

107.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by many Class members may be small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged.

108.   Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether policy and practice of automatically placing on "probation" at

25

additional cost all municipal offenders who cannot immediately pay fines and costs is legal;

b.      Whether the policy and practice of converting unpaid fines and costs to days of incarceration, without any determination concerning an individual's ability to pay, is legal;

c.      Whether the policy and practice of requiring every order of the municipal court to require probation fees for JCS is legal;

d.      Whether the policy and practice of incarcerating individuals for failure to pay fines and costs with no finding of willfulness is legal;

e.      Whether the policy and practice of incarcerating individuals for failure to appear when no notice of the hearing was provided by the court is legal;

f.      Whether the policy and practice of incarcerating individuals for Failure to Obey Court Order when no such ordinance exist and with no finding of willful contempt is legal;

g.      Whether the policy and practice of failing to appoint counsel for indigent defendants when a jail sentence is involved is legal;

h.      Whether the policy and practice of failing to make any inquiry into indigency before imposing fines and costs is legal;

i.      Whether the policy and practice of failing to give adequate notice of the charge and nature of a probation revocation hearing, failing to provide a probation revocation hearing, failing to make written findings concerning the reasons for revoking probation and the evidence relied upon, failing to hold a hearing to determine indigency before revoking probation and otherwise

26

imposing incarceration, failing to make written findings concerning an individual's willful nonpayment of fines and costs before imposing incarceration for nonpayment, is legal;

j.      Whether the policy and practice of charging incarcerated municipal defendants a daily fee for each day the person is incarcerated is legal;

k.      Whether the policy and practice of imposing fines and court costs that exceed that statutory maximum for municipal is legal;

l.      Whether the policy and practice of extending "probation" for municipal offenses beyond 24 months is legal;

m.      Whether the policy and practice which fails to give any credit for time spent incarcerated is legal;

n.      Whether the policy and practice of adding unpaid fines that predate probation to the balance to be paid during probation is legal;

o.      Whether a municipality can legally enter a contract binding upon its municipal court;

p.      Whether a municipality can enter into a no bid contract to grant an exclusive franchise to a private probation company to operate in its municipal court;

q.      Whether setting bond based upon a fine balance owed the city is legal;

r.      Whether the policy of demanding a cash bond for release from jail without inquiry into ones' financial situation or offense is legal.

109.    Montgomery has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect

27

to the Class as a whole.

110.    Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a Class Action. The data concerning the Class members and the transaction details and amounts on each charge are largely computerized by Montgomery and by JCS.

111.    The names and addresses of the Class members are a matter of public record and are also kept by JCS and notice can be provided to the Class members via First Class U.S. Mail or other appropriate means as may be directed by the Court.

## COUNT ONE
## DENIAL OF DUE PROCESS
## AGAINST THE CITY OF MONTGOMERY AND KLOESS

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

112.    The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has denied him his right to due process and the rights of the Class members.

113.    By contract, Montgomery delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

114.    That no bid agreement was signed by the City mayor and bound Montgomery and its municipal court requiring that its municipal "***court agrees that each court order shall provide*** for the following:

a probation fee of $40.00 per month flat fee

28

One time probationer set up fee of $10.00. . . . " (**emphasis added**).

115.    Montgomery, through its mayor and/or council, approved the agreements with JCS.

116.    Montgomery, through its mayor and council, also approved the employment of the judges of its municipal court and its public defenders.

117.    Municipalities are prohibited from laws, ordinances and policies which are in conflict with state law.  *See Ala Code* Section 11-45-1.  *Also see, Ala. Const.* Article 4 Section 89.

118.    State law also dictates a separation of the branches of government.  *Ala Const.* Article 3, Section 43.[13]   Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, *Ala. Code,* Section 11-43-43, while the mayor of the city is responsible for executive duties.  *Ala. Code,* Section 11-43-83.  If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama.  *Ala. Code,* Section 12-2-7 *et. seq.*; *Ala Const.,* Article 6, Section 139.

119.    Municipal mayors have the executive power to execute and enforce contracts[14] and the city councils have the legislative power to enact regulations and

---

[13]Ala. Const. Art. III, Section 43 states:
In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.

[14]Ala. Code Section 11-43-83 - The mayor shall see that all contracts with the town or city are

faithfully kept or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf of performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf of the city or town and no sureties shall be required on such bond. He shall perform such other executive duties, in addition to those prescribed in this article, as may be required of him by the council.

ordinances,[15] but neither the mayor nor the council has the power to invade the administration of its judiciary.

120.   Montgomery has exceeded its statutory  authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, it agreed with JCS to bind its municipal court to include probation and fees for JCS in every court order entered by its hired judge.  That action essentially sold the court process for purposes of increasing income to the City.

121.   The illegal agreement and policy of Montgomery invaded and overrode the judicial authority and court administration reserved to the municipal judges and the Chief Justice.

122.   Probation is only appropriate when an individual has been sentenced to jail time and not when only a fine has been assessed as is the case with the Plaintiff and Class members.  As a result, the Montgomery policy and contract to include probation in every court order mandated a judicial practice that continually deprived indigent misdemeanants of their constitutional rights.

123.   The policy and practice of Montgomery also violated the Alabama Constitution.  Article I, Section 20 *Ala. Const.* specifically prohibits imprisonment for the payment of debts, yet the policy enforced at Montgomery regularly jailed misdemeanants upon the recommendation of its agent JCS for failure to pay fines, fees and costs.  Article I, Section 16 *Ala. Const.* requires that all persons shall before conviction be bailable by

---

[15]Ala. Code Section 11-43-43 - All legislative powers and other powers granted to cities and towns shall be exercised by the council, except those powers conferred on some officers by law or ordinance. The council shall perform the duties required by this title and other applicable provisions of law.

sufficient surety, but despite this prohibition, misdemeanants were regularly jailed without lawful conviction under any contempt proceedings or probation violation.

124.    The Plaintiff and some Class members were imprisoned, and some repeatedly, under these policies of Montgomery for their failure to pay fines, costs and the added fees mandated by the illegal contract between Montgomery and JCS.  The Plaintiff was not accorded any hearing or consideration of his indigency before being jailed, nor was he provided any notice of charges, a hearing on charges levied that might result in imprisonment, or provided meaningful assistance of counsel before being imprisoned.

125.    At the Montgomery Municipal Court, a person unable to fully pay fines and costs when levied was automatically placed on probation. The Montgomery system used JCS orders and forms even when no jail sentence was adjudicated. This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs.  The orders supplied by JCS under the agreement with Montgomery then required the individual to make payments to JCS, rather than the City clerk, of the fines, costs and additional monthly fees.

126.    Montgomery, through its city clerks, actively enforced these requirements as part of the policy and procedures established under this contract and refused to accept payments of fines and costs referring those payers such as the Plaintiff instead to the JCS office.

127.    Montgomery, through its contract, practice and policy, clothed its agent JCS with the appearance of state authority and has previously allowed JCS employees to carry

badges.[16]  Under these practices and policies, JCS employees were allowed to attend each municipal court session and were referred to "probation officers" in the operation of the municipal court and in the City clerk's office, though none ever had such authority under Alabama statutes.

128.    Under this system at Montgomery, "offenders" are not permitted to pay fines at the City clerk's office, but are instead directed to make all payments, including those for fines, restitution, probation fees and court costs, to JCS at the JCS office at hours and locations set by JCS.

129.    Montgomery's policy and practice also allowed JCS to control the money collected from persons such as Plaintiff and to determine how much each such municipal court "offender" must pay each month.

130.    Montgomery's policy and practice also allowed JCS to determine how much of the collected sums will be credited to the collection "services" of JCS each month and how much it will rebate to Montgomery toward the municipal court fines adjudged.

131.    This system, as a matter of routine, violated the rights of persons such as the Plaintiff and the class he seeks to represent by imposing fines and charging fees to indigent persons with no hearing or consideration of their indigency.

132.    Despite the lack of authority to do so, Montgomery, by its practice and policy,

---

16



permitted, approved and conspired with JCS, a private actor with a financial stake in the outcome, to play the role of a neutral probation office and, at its discretion, to use threats of revoking probation, increased fines and costs, arrest and jail time for purposes of collection.

133.    Under this system, should an individual fail to pay to the satisfaction of JCS, Montgomery permitted and approved JCS setting payment and reporting schedules and determining when the individual's "probation" should be revoked, or when to impose additional fines and costs.

134.    Under the system operated at Montgomery, JCS's determination to incarcerate an individual and/or impose unreasonable release requirements was routinely accepted by city personnel without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency despite the fact that city-paid 'public defenders' were assigned to many of these indigent folks, yet they were still subject to punitive action.

135.    Montgomery permitted and conspired with JCS allowing it to control and dictate these functions and, as a consequence, this routinely resulted in court costs and fines which exceed the statutory maximum of $500 for municipal courts.  Similarly, the periods of "probation" imposed for purposes of collecting fines and fees at Montgomery routinely exceeded the two-year statutory maximum, all of which result in action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

136.    The municipal court judges employed by Montgomery did no investigation of indigency as a matter of policy.

137.    Despite the fact that many people are assigned a 'public defender,' these

33

indigent people are not adequately represented and many times do not even know that an attorney has been assigned to their case. In fact, many times the 'public defender' never introduced himself/herself to their 'client' and did not speak to the court on the "'clients'" behalf and kept no files on their "clients."

138.    Under the system at Montgomery, after simple fines are illegally converted to "probation" for payment, jail often resulted for the "offender" who did not meet the payment schedule set by JCS and enforced by Montgomery. This system used and accepted JCS's conclusion of a "probation violation" or "failure to obey court order" and employed JCS recommendations for the issuance of a warrant of arrest to incarcerate individuals whose original obligation was only the payment of a fine.

139.    Under this system at Montgomery, the Plaintiff was first fined, but then automatically placed on "probation" though no jail sentence was adjudicated.  Though the Plaintiff was indigent, Montgomery made no investigation of that matter -- despite the fact that, unknown to him, Montgomery paid Kloess a 'public defender' to represent him.  When the Plaintiff was unable to pay the fines, costs and additional JCS fees that Montgomery agreed to levy, recommendations from JCS were made and followed by Montgomery to incarcerate him for undetermined time unless a cash bond was made in amounts closely approximating the sums sought by JCS's collection efforts.

140.    Many individuals who cannot pay their fines and added fees, such as the Plaintiff and Class members, were jailed for charges against them for "failure to obey court order," though there is no such state statute or city ordinance which defines this as a criminal act.

141.    Though a determination of willful refusal to obey a court order as required by

34

*Ala. Code* §15-18-62 can lawfully lead to incarceration, no such determinations were made under the system at Montgomery.

142.   Montgomery adopted and implemented JCS's conclusion of a "probation violation" or "failure to obey court order" and issued arrest warrants to incarcerate individuals whose original case had only been a fine.

143.   In this process of converting fines to jail time, Montgomery did not give adequate notice to the "offender" of the nature of any lawful charge, it failed to conduct hearings, failed to make written findings concerning the reasons for any probation revocation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

144.   Under this policy and practice at Montgomery, when a simple fine was transformed into a jail sentence of an undetermined time, the City failed to provide adequate counsel for the "offenders." In fact, like the Plaintiff, many people are jailed for nonpayment despite the fact that 'public defenders' are retained by the City to represent the indigent,[17] are listed as attorneys on their case, and are paid to supposedly represent them.  Those public defenders like Kloess are paid from fines collected on convictions, do not routinely oppose the charges made, and do not raise issues of indigency nor request hearings for that purpose.

145.   The public defenders have a policy and practice of not requesting indigency hearings despite the fact that the only clients they represent under the contract with the

---

[17] See Doc. 1-2 - contract for Kloess.

35

City are indigents. This policy and practice of not requesting indigency hearings benefits both the City and the 'public defender,' as all are enriched by avoiding the constitutional due process requirements and demanding money from the poor.

146.    After jailing an "offender," Montgomery acted to further violate the Plaintiff's constitutional rights by arbitrarily granting early release to some individuals while denying it to others under similar circumstances without any rational basis other than payments it has secured.  As a result, there was no consistent standard of review or logical system under which those incarcerated were granted release.

147.    Under the practice and policies used at Montgomery, after an adjudication under which a fine is levied, additional fees, costs, and other charges are added to the "offender" bill including, in some cases, those relating to charges from years earlier.

148.     As a proximate consequence of this deprivation of due process, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

## COUNT TWO
## DENIAL OF DUE PROCESS AGAINST JCS, CHC and CHCC ('JCS')

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

149.    The Plaintiff avers that JCS, acting under color of state law in violation of 42 U.S.C. § 1983, has denied her right to due process and has denied those rights to the

class members and has done so in concert and by agreement conspiring with Montgomery.

150.   JCS operates a "for profit" enterprise that markets its services to various municipal and county governments and has contracted with over 100 cities and towns throughout Alabama including Montgomery. JCS' marketing approach to these cities emphasizes that its fees will be paid by the "offender" before the municipal court and that its efforts will improve collection of court fines and costs at no cost to the City.

151.   JCS routinely uses a form contract to establish its relationship with its customer cities and similarly trains its employees using a training manual replete with forms for court use and for contacting the "offenders" from whom it is seeking collection.  As a result, the JCS approach is highly systemized and uniform.

152.   Under the system established by JCS, its employees are not required to have criminal justice or legal training, nor are they required to have any social work education or meet any minimum law enforcement standards as is required of state probation officers. Instead, JCS requires only that its employees be 21 years old, a non felon, with two years of college who complete 40 hours of training by JCS on its processes.  On satisfying those requirements, JCS employees are then labeled "Probation Officers" and were permitted to carry the JCS issued badge in collecting its fees, court fines and costs.

153.   Under this system and by agreement with Montgomery, many administrative and judicial functions of Montgomery's municipal court were unlawfully delegated to JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

154.   The agreement drafted by JCS and signed by the Montgomery mayor and JCS attests that the Montgomery municipal "***court agrees that each court order shall provide*** for the following:

37

a probation fee of $40.00 per month flat fee

One time probationer set up fee of $10.00. . . . " (***emphasis added***).

155.    JCS was, by virtue of this no bid contract with Montgomery, clothed with the appearance of a state actor and its actions were inextricably interwoven with those of Montgomery with which it conspired and acted in concert.  Under its contract and its operations with Montgomery, JCS employees represented itself to the Plaintiff and class members to be "probation officers" acting as agent "on behalf of City of Montgomery."

156.    The JCS system at Montgomery provided "Order of Probation" forms to the municipal court with the printed requirement on each form that the "offender" pay JCS $40 per month plus $10 for a file set up charge. The orders supplied by JCS required the individual to make payments to JCS of the fines, costs and additional monthly fees as required under its contract with the City.

157.    Under the JCS contract and procedures, the resulting policy and practice at Montgomery's municipal court automatically required "probation" for any person who, despite having no jail sentence, was unable to fully pay the fine and costs when levied by the municipal court.

158.    The Plaintiff was initially placed on "probation" with JCS under this practice despite the fact that he had not been sentenced to any jail time.

159.    That "probation" requirement, under agreement between JCS and Montgomery, was required to be part of every printed order at Montgomery's municipal court and also required payment of monthly fees to JCS.

160.    The policy and practice method of JCS, after requiring probation orders for those unable to immediately pay their fines, and adding additional, monthly fees for JCS,

also imposed incarceration for a failure to pay fines, fees and costs when payment was not forthcoming as JCS demanded.

161.    Incarceration of individuals who could not pay their fines and added fees, such as the Plaintiff and class members, was accomplished by JCS leveling charges against them for "failure to obey court order," though there is no such state statute or city ordinance which defines this as a criminal act or by petition to revoke the "probation" based upon JCS's conclusion that the person had not paid as directed.

162.    Though a determination of willful refusal to obey a court order as required by *Ala. Code* §15-18-62 can lawfully lead to incarceration, no such determinations were made under the JCS system and Montgomery's policy.

163.    JCS expressly denies any responsibility to determine indigency of the "offenders" such as the Plaintiff or to determine any reasons for an inability to pay the fine. Therefore, when an "offender" is unable to pay the fine and additional fees required by JCS, JCS and Montgomery cooperated with each other to issue arrest warrants requested by JCS based upon claims of "failure to obey court order."

164.    The Plaintiff was indigent at the time the traffic fines were levied against him in Montgomery. His indigency was also evidenced by the fact that he could not pay the cash bond Montgomery demanded for his release from jail. The Plaintiff and the class members were all unable to pay the fines and fees demanded by JCS due to their indigency and some were incarcerated as stated in detail in the above facts upon JCS's recommendation to its conspirator Montgomery which then used its police force to carry out the arrest.

165.    The incarceration process used by JCS includes the use of JCS drafted

forms that it sent to "probationers" and JCS forms it used to request that a person be jailed.

166.    JCS's recommendations to jail people until a certain sum of money was paid were then approved by administrative personnel at Montgomery without a hearing to determine indigency.

167.    The JCS system and its "Probation Tracker" software is highly systemized and focuses on collections of fines and its fees -- not traditional probation services. That collection focus allows the "offenders" to mail in payments if they live 30 miles from the JCS office. *See* Doc. 1-5. The training manual used by JCS instructs its employees on the use of its computer systems in tracking the payments made by the "offenders" and provides court forms to order probation and payments to JCS. The JCS training system also provided sample letters for use after probation was ordered, threatening the "offender" that "a warrant will be issued for your arrest" and that their "court date cannot and will not be reset." *See* Docs. 1-6 and 1-7.  Similar JCS forms instructed the "offender" that they could avoid the court date if they paid an amount determined by JCS.  *See* Doc 1-8. Notice to the offender of these JCS set "court dates" was, with the City's knowledge, handled by JCS by regular mail with no proof of service and no consideration of returned mail showing no receipt. Similarly, the setting for any hearing on petitions instituted by JCS was done by JCS and listed on a separate "JCS Docket" which JCS established and which Montgomery then adopted. Finally, the JCS manual instructs its employees on the issuance of warrants of arrest and provides forms for that purpose.  *See* Doc.1-9.

168.    The agreement and forms drafted by JCS are uniformly used by it and were used at Montgomery.

169.    Clothing JCS with the color of state law and authority was purposely

40

structured under the JCS system for it to extort and collect its fees, fines and costs from citizens such as the Plaintiff, and is accomplished by providing JCS control over the money collected, the payment amount required, schedule of appointments, the location where the money must be paid  and control over how much will be credited for each payment to the collection "services" of JCS each month as opposed to how much of it would be rebated to Montgomery toward the fines adjudged.

170.    Despite the lack of authority to do so but in concert with Montgomery, JCS, at its discretion, used threats of revoking probation, increased fines and costs and jail time for purposes of collection.   Under this system, when an individual failed to pay to the satisfaction of JCS, JCS would determine that the individual's "probation" should be revoked.  Under the system operated jointly by Montgomery and JCS, JCS' determination to  incarcerate an individual was routinely accepted without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency or appointment of counsel before taking such punitive action.

171.    The actions and efforts of JCS routinely resulted in court costs, fines and fees which exceed the jurisdictional maximum of $500 for municipal courts.   Similarly, the periods of "probation" imposed for purposes of collecting fines and fees for JCS routinely exceed the two-year statutory maximum, all of which resulted in JCS taking action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

172.    This system at Montgomery used JCS' conclusion of a "probation violation" or "failure to obey court order" and employed JCS recommendation for the issuance of warrants to incarcerate individuals whose original case had only been a fine.

173.    In this process of converting fines to jail time, JCS and Montgomery did not

41

give adequate notice of the nature of any lawful charge, failed to conduct hearings, failed to make written findings concerning the reasons for revoking probation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

174.   Under this joint policy and practice of JCS and Montgomery, when a simple fine was transformed into a jail sentence of an undetermined time, JCS and Montgomery also failed to provide counsel for the "offenders."

175.   After jailing an "offender," JCS and Montgomery acted to further violate the Plaintiff and class members' constitutional rights by arbitrarily granting early release to some individuals while denying it to others under similar circumstances without any rational basis based upon the whim of JCS and payments it has secured.  As a result, there was no consistent standard of review or logical system under which those incarcerated were granted release.

176.   Under the practice and policy of JCS used at Montgomery, after a fine is levied, additional fees, costs and other charges were added including, in some cases, those relating to charges years earlier.

177.   The Plaintiff and some Class members were imprisoned, and some repeatedly, under the JCS system implemented at Montgomery for their failure to pay fines, costs and the added fees mandated by the illegal contract between Montgomery and JCS. The Plaintiff was not accorded any hearing or consideration of his indigency before being jailed, nor was he provided any notice of charges, a hearing on charges levied that might result in imprisonment, or provided meaningful assistance of counsel before being imprisoned.

42

178.    At the City of Montgomery, under the JCS system, a person unable to fully pay fines and costs when levied was automatically placed on probation. The JCS system used at Montgomery used JCS orders and forms even when no jail sentence was adjudicated. This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs. The orders supplied by JCS under the agreement with Montgomery then required the individual to make payments to JCS, rather than the City clerk, of the fines, costs and additional monthly fees.

179.    As part of the JCS system and procedures established under this contract with Montgomery, the city refused to accept payments of fines and costs, referring those payers such as the Plaintiff instead to the JCS office.

180.    Once clothed with the appearance of state authority, JCS allowed its employees to carry badges,[18] attended each municipal court session and referred to themselves as "probation officers" and agents for the City, though none ever had such authority as "probation officers" under Alabama statutes.

181.    Under the JCS system, persons such as the plaintiffs are directed to make all payments, including those for fines, restitution, probation fees and court costs, to JCS at the JCS office at hours and locations set by JCS.

182.    This system gave control the money collected from persons such as Plaintiff

---

[18]



43

to JCS which then determined how much each such municipal court "offender" must pay each month and how much would be credited to the collection "services" of JCS each month and how much it will rebate to Montgomery toward the municipal court fines adjudged.

183.    This system, as a matter of routine, violated the rights of persons such as the Plaintiff and the class he seeks to represent by imposing fines and charging fees to indigent persons with no hearing or consideration of their indigency.

184.    Despite the lack of authority to do so, JCS, a private actor with a financial stake in the outcome, playing the role of a neutral probation office, at its discretion, used threats of revoking probation, increased fines and costs, arrest and jail time for purposes of extorting the collection.

185.    Under this system, JCS set payment amounts and reporting schedules and recommended when the individual's "probation" should be revoked, or when to impose additional fines and costs.

186.    Under the system operated at Montgomery, JCS's determination to incarcerate an individual and/or impose unreasonable release requirements was routinely accepted by city personnel without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency despite the fact that city-paid 'public defenders' were assigned to many of these indigent folks, yet they were still subject to punitive action.

187.    JCS conspired with Montgomery to control and dictate these functions and, as a consequence, this routinely resulted in court costs and fines which exceed the statutory maximum of $500 for municipal courts.  Similarly, the periods of "probation"

44

imposed for purposes of collecting fines and fees at Montgomery routinely exceeded the two-year statutory maximum, all of which result in action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

188.   JCS nor, the municipal court judges or public defenders employed by Montgomery did any investigation of indigency as a matter of policy.

189.   Despite the fact that many people are assigned a 'public defender,' these indigent people are not adequately represented and many times do not even know that an attorney has been assigned to their case. In fact, many times the 'public defender' never introduced himself/herself to their 'client' and did not speak to the court on the "'clients'" behalf and kept no files on their "clients."

190.   Under the JCS system at Montgomery, after simple fines are illegally converted to "probation" for payment, jail often resulted for the "offender" who did not meet the payment schedule set by JCS and which in turn is enforced by Montgomery. This system used and accepted JCS's conclusion of a "probation violation" or "failure to obey court order" and employed JCS's recommendations for the issuance of a warrant of arrest to incarcerate individuals whose original obligation was only the payment of a fine.

191.   Under the JCS system at Montgomery, the Plaintiff was first fined, but then automatically placed on "probation" though no jail sentence was adjudicated.  Though the Plaintiff was indigent, neither JCS nor Montgomery made any investigation of that matter -- despite the fact that, unknown to him, Montgomery paid a 'public defender' to represent him.  When the Plaintiff was unable to pay the fines, costs and additional JCS fees, recommendations from JCS were made and followed by Montgomery to incarcerate him for undetermined time unless a cash bond was made in amounts closely approximating the

45

sums sought by JCS's collection efforts.

192.    Under this policy and practice at Montgomery, when a simple fine was transformed into a jail sentence of an undetermined time, the City failed to provide adequate counsel for the "offenders." In fact, like the Plaintiff, many people are jailed for nonpayment despite the fact that 'public defenders' are retained by the City to represent the indigent,[19] are listed as attorneys on their case, and are paid to supposedly represent them.  Those public defenders like Kloess are paid from fines collected on convictions, do not routinely oppose the charges made, and do not raise issues of indigency nor request hearings for that purpose.

193.    The public defenders have a policy and practice of not requesting indigency hearings despite the fact that the only clients they represent under the contract with the City are indigents. This policy and practice of not requesting indigency hearings benefits both the City and the 'public defender', as well as JCS, since all are enriched by avoiding the constitutional due process requirements and demanding money from the poor.

194.    As a proximate consequence of this deprivation of due process, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

**COUNT THREE**
**VIOLATION OF THE FOURTH AMENDMENT**

---

[19] (Doc.1-2) - contract for Kloess.

## CITY OF MONTGOMERY

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

195.   The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has violated their Fourth Amendment rights and the rights of the Class members to be free from unreasonable seizure.

196.   By a no bid contract as discussed in detail above, Montgomery illegally delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

197.   In addition to a denial of due process guaranteed the Plaintiff under the Fourteenth Amendment, the arrest and detainment of these "offenders" who could not pay the fine imposed under this system constitutes a "seizure" in violation of the Fourth Amendment as well.

198.   Under Alabama law, a simple fine can only be converted into jail time if the court makes findings under *Ala. Code,* Section 15-18-62 (1975) that a defendant has willfully failed to pay the fines.

199.   Montgomery's policy and practice of including probation with JCS in every municipal court order created the process by which misdemeanants were incarcerated without a willfulness hearing as required by *Ala. Code,* Section 15-18-62, and in violation of Alabama case law, the Alabama Constitution and the U.S. Constitution.

200.   Under Alabama case law, the Alabama Constitution and the U.S. Constitution, an indigent defendant cannot be required to serve jail time for nonpayment

47

of fines or costs.[20]

201.    Despite longstanding legal precedent prohibiting incarceration for one's inability to pay a fine/debt, Montgomery's personnel, working in conjunction with JCS, unlawfully arrested and jailed the Plaintiff for his inability to pay a simple fine with added fees and costs dictated by the Montgomery contract with JCS.

202.    Montgomery's police, municipal court processes and jail access all became tools of collection under forms and processes issued by its agent JCS and which were routinely followed by Montgomery. Montgomery's policy and practice, after clothing its agent JCS with the appearance of state actor acting on their behalf, allowed JCS to threaten arrest or revocation of probation and/or incarceration in order to coerce these indigents to pay the city fines and fees for misdemeanor offenses not otherwise subject to jail time under the original adjudication.

203.    When these threats failed to produce sufficiently, Montgomery police, clerks and other personnel, cooperated with JCS to arrest and jail the Plaintiff class members

---

[20]It is clear as a matter of constitutional law that an indigent defendant cannot be required to serve jail time for nonpayment of fine and costs. *Tate v. Short*, 401 U.S. 395 (1971); *Lingle v. State*, 51 Ala.App. 210, 283 So.2d 660 (1973); Smith v. State 51 Ala.App. 212, 283 So.2d 662 (1973). "To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." *Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir.1977). This is not a case of a defendant who, though capable of paying a fine, refuses or neglects to do so.

Although Section 15-22-52, *Alabama Code* 1975, states that payment of fine and costs may be made a condition of suspension of sentence or probation, in *State v. Esdale*, 253 Ala. 550, 45 So.2d 865 (1950), our Supreme Court indicated that such a condition was contrary to our constitution.
"These benefits (probation and suspension of sentence) are not the subject of bargain and sale to be conditioned on the payment of costs and fees assessed as an incident to the prosecution and trial and to condition these benefits on the payment of such costs and fees violate the letter and spirit of Section 13 of the Constitution of 1901 which provides that 'justice shall be administered without sale, denial or delay.'" *Esdale*, 253 Ala. at 553.

*Crutcher v. State,* 439 So. 2d 725; 726 (Ala. Crim. App. 1983)

48

such as Aldaress Carter.

204.   The jailing of class members by Montgomery, as described   under the specific facts stated above, constitutes unlawful seizures in violation of the Fourth Amendment.[21]

205.   As a proximate consequence of this unlawful seizure, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, all while being indigent.

## COUNT FOUR
## VIOLATION OF THE FOURTH AMENDMENT BY JCS, CHC and CHCC ('JCS')

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

206.   The Plaintiff avers that JCS, acting under color of state law in violation of 42 U.S.C. § 1983, violated his Fourth Amendment rights and the rights of the class members to be free from unreasonable seizure and has done so in concert and by agreement conspiring with Montgomery.

207.   By no bid contract as discussed in detail above, Montgomery illegally delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

208.   In addition to a denial of due process guaranteed the Plaintiff under the

---

[21] "Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." (internal quotation marks and emphasis omitted)); *Oliver*, 510 U.S. at 274 (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

Fourteenth Amendment, the arrest and detainment of these "offenders" who could not pay the fine imposed under this system constitutes a "seizure" in violation of the Fourth Amendment as well.

209.    Under Alabama law, a simple fine can only be converted into jail time if the court makes findings under *Ala. Code,* Section 15-18-62 (1975) that a defendant has willfully failed to pay the fines.

210.    Under the system created and implemented by JCS at Montgomery including probation with JCS in every municipal court order created the process by which misdemeanants were incarcerated without a willfulness hearing as required by *Ala. Code,* Section 15-18-62, and in violation of Alabama case law, the Alabama Constitution and the U.S. Constitution.

211.    Under Alabama case law, the Alabama Constitution and the U.S. Constitution, an indigent defendant cannot be required to serve jail time for nonpayment of fines or costs.[22]

---

[22]It is clear as a matter of constitutional law that an indigent defendant cannot be required to serve jail time for nonpayment of fine and costs. *Tate v. Short,* 401 U.S. 395 (1971); *Lingle v. State,* 51 Ala.App. 210, 283 So.2d 660 (1973); Smith v. State 51 Ala.App. 212, 283 So.2d 662 (1973). "To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." *Barnett v. Hopper,* 548 F.2d 550, 554 (5th Cir.1977). This is not a case of a defendant who, though capable of paying a fine, refuses or neglects to do so.

Although Section 15-22-52, *Alabama Code* 1975, states that payment of fine and costs may be made a condition of suspension of sentence or probation, in *State v. Esdale,* 253 Ala. 550, 45 So.2d 865 (1950), our Supreme Court indicated that such a condition was contrary to our constitution.
"These benefits (probation and suspension of sentence) are not the subject of bargain and sale to be conditioned on the payment of costs and fees assessed as an incident to the prosecution and trial and to condition these benefits on the payment of such costs and fees violate the letter and spirit of Section 13 of the Constitution of 1901 which provides that 'justice shall be administered without sale, denial or delay.'" *Esdale*, 253 Ala. at 553.

*Crutcher v. State,* 439 So. 2d 725; 726 (Ala. Crim. App. 1983)

212.    Despite longstanding legal precedent prohibiting incarceration for one's inability to pay a fine/debt, JCS instituted the issuance of arrest warrants for the plaintiff and many class members when JCS knew these people could not pay the fines and fees JCS demanded and despite the fact that many had no jail time assessed on their original conviction.

213.    Montgomery's police, municipal court processes and jail access all became tools of collection under forms and processes issued by its agent JCS and which were routinely followed by Montgomery. Montgomery's policy and practice, after clothing its agent JCS with the appearance of state actor acting on their behalf, allowed JCS to threaten arrest or revocation of probation and/or incarceration in order to coerce these indigents to pay the city fines and fees for misdemeanor offenses not otherwise subject to jail time under the original adjudication.

214.    Unless prompt payment of its fees and fines was made as determined by JCS, JCS took steps to have the "probation" revoked or initiated charges for "failure to obey court order" beginning the process of incarcerating an individual who otherwise would never have seen jail under the original adjudication.[23]

215.    Many of the class members were unlawfully jailed at Montgomery under the JCS process as described and under the specific facts as stated above all of which constitute unlawful seizures in violation of the Fourth Amendment.[24]

_____

[23] "Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." (internal quotation marks and emphasis omitted)); *Oliver*, 510 U.S. at 274 (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

[24] "Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." (internal quotation marks and emphasis omitted)); *Oliver*, 510 U.S. at 274 (plurality opinion) ("The Framers considered the matter of pretrial deprivations of

216.    As a proximate consequence of this unlawful seizure, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, all while being indigent.

<div align="center">

**COUNT FIVE**
**VIOLATION OF THE SIXTH AMENDMENT**
**CITY OF MONTGOMERY**

</div>

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

217.    The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has violated his Sixth Amendment rights and the rights of the Class members.

218.    By a no bid contract as discussed in detail above, Montgomery illegally delegated many administrative and judicial functions of their municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

219.    Under the policy and practice at Montgomery, when a simple fine was transformed into a jail sentence of an undetermined time, adequate counsel was not provided for the indigent "offenders."

220.    The Plaintiff was initially ordered to pay only a fine at the Montgomery Municipal Court, but due to his inability to pay, he was placed on "probation" under JCS pursuant to JCS form orders and the contract approved by Montgomery.

---

liberty and drafted the Fourth Amendment to address it.").

221.    The no bid contract signed by Montgomery approved a "probation" process as essentially a collection vehicle for the City to collect its fines. That agreement, as discussed above, conflicts with state statutes, violates state constitutional requirements for separation of power in the branches of government, and exceeds the authority of the mayor and council.

222.    Under that agreement, Montgomery allowed JCS to add monthly fees to the "offender" who had already disclosed an inability to pay the fine when adjudicated and despite the fact that JCS provided no services to them.

223.    Under the agreement and with the knowledge and approval of Montgomery, JCS represented itself as acting on behalf of the City which clothed it with that appearance.

224.    Under this agreement, Montgomery unlawfully invaded the province of the municipal court and mandated that each order there contain provisions for fees to JCS.

225.    By this agreement, simple fines without jail sentences were automatically and illegally converted to 'probation' through JCS if the offender could not promptly pay the entire fine and costs.

226.    After this conversion from a fine to 'probation,' threats of jail were used by JCS with the approval of Montgomery and actual incarceration then takes place by police and other City personnel if the fines, fees and costs were not paid as scheduled.

227.    The jeopardy of jail time was not present when the simple fines were adjudicated against the Plaintiff and the Class members and would not have been present but for Montgomery's policy and practice adopting and using the JCS collection system in the administration of its court system illegally requiring "probation" for simple fines.

228.    With the Plaintiff's inability to pay and the JCS focus on collections, charges

are routinely initiated claiming "probation violation" or "failure to appear" or "failure to obey court order." These are initiated by JCS under its system and then approved and enforced by Montgomery personnel.

229.    At that point, jail sentences become potential jeopardy for the "offenders" such as the Plaintiff on charges that have never before been subjected to meaningful adversarial testing. Nevertheless, neither JCS nor Montgomery routinely provided adequate counsel for those "offenders."

230.    At the point when jail sentences become potential, Montgomery does not provide notice of charges, nor are findings made as required for conviction. Similarly, though JCS also regularly proposes a charge of "failure to obey court order" which Montgomery then pursues, that is not a valid offense.  If willful failure to pay under state statutes such as *Ala. Code* Section 15-18-62 is used as the basis, under the City's system with JCS, there is no finding or hearing on the issue of willfulness.

231.    The named Plaintiff,  Aldaress Carter, while indigent, was unlawfully jailed by Montgomery under this JCS system and was not provided meaningful assistance of counsel. In fact, Mr. Carter was surprised to learn that Mr. Kloess was appointed to his case that resulted in his incarceration. Mr. Kloess never identified himself to Mr. Carter, never met with him and, despite being paid to represent indigents, Mr. Kloess never advocated to the court on Mr. Carter's behalf to raise any issue of his indigency as a bar to incarceration for failure to pay.  This lack of representation by Kloess is indicative of his conflicted position under a contract which pays him for costs taxed on convictions.  His position as "indigent defense counsel" has become essentially another part of the collection process utilized by the city and does not present adequate representation for the

54

indigent class members such as Mr. Carter.

232.    These actions constitute a denial of the Plaintiff's rights secured by the Sixth Amendment.

233.    As a proximate consequence of this violation of their Sixth Amendment rights, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

<div align="center">

**COUNT SIX**
**VIOLATION OF THE SIXTH AMENDMENT BY JCS, CHC and CHCC ('JCS')**

</div>

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

234.    The Plaintiff avers that JCS, acting under color of state law in violation of 42 U.S.C. § 1983, has violated his Sixth Amendment rights and the rights of the Class members.

235.    By a no bid contract as discussed in detail above, Montgomery illegally delegated many administrative and judicial functions of their municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.  JCS performed those functions in a manner which violated the rights of the Class members.

236.    Under this joint policy and practice of JCS at Montgomery, when a simple fine was transformed into a jail sentence of an undetermined time, adequate counsel was not

<div align="center">55</div>

provided for the indigent "offenders."

237.    The Plaintiff was initially ordered to pay only a fine at the Montgomery Municipal Court, but due to his inability to pay, he was placed on "probation" under JCS pursuant to JCS form orders and the contract approved by Montgomery.

238.    The JCS "probation" process is essentially a collection vehicle for the City to collect its fines which adds monthly fees to the "offender" who had already disclosed an inability to pay the fine.  JCS provided no services to the Plaintiff, but represents itself as acting on behalf of  which clothed it with that appearance.

239.    Under that process at Montgomery, JCS has added monthly fees to "offenders" who had already disclosed an inability to pay the fine when levied and despite the fact that JCS provided no services to them.

240.    Though representing itself as an agent of the City, JCS denies any responsibility to investigate the indigency of the "offenders" and thus took no action to determine or consider disabilities, employment status or other reasons justifying non payment.

241.    Simple fines without jail sentences were automatically and illegally converted to "probation" under the JCS system used at Montgomery if the offender could not promptly pay the entire fine and costs.

242.    After this conversion from a fine to probation, JCS makes threats of jail and actual incarceration if the fines, fees and costs were not paid as demanded by JCS.

243.    Under its illegal agreement with Montgomery, simple fines without jail sentences were automatically and illegally converted to 'probation' through JCS if the offender could not promptly pay the entire fine and costs.

56

244.    After this conversion from a fine to 'probation,' threats of jail were used by JCS with the approval of Montgomery and actual incarceration then takes place by police and other City personnel if the fines, fees and costs were not paid as scheduled.

245.    The jeopardy of jail time was not present when the simple fines were adjudicated against the Plaintiff and the Class members and would not have been present but for the JCS collection system used at Montgomery.

246.    With the Plaintiff's inability to pay and the JCS focus on collections, charges are routinely initiated claiming "probation violation" or "failure to appear" or "failure to obey court order." These are initiated by JCS under its system and then approved by Montgomery personnel.

247.    At that point, jail sentences become potential jeopardy for the "offenders" such as the Plaintiff on charges that have never before been subjected to meaningful adversarial testing. Nevertheless, neither JCS nor Montgomery routinely provided adequate counsel for those "offenders."

248.    Though JCS also regularly proposes a charge of "failure to obey court order" which Montgomery then pursues, that is not a valid offense.  If willful failure to pay under state statutes such as *Ala. Code* Section 15-18-62 is used as the basis, under the City's system with JCS, there is no finding or hearing on the issue of willfulness.

249.    The named Plaintiff,  Aldaress Carter, while indigent, was unlawfully jailed by Montgomery under this JCS system and was not provided meaningful assistance of counsel. In fact, Mr. Carter was surprised to learn that Mr. Kloess was appointed to his case that resulted in his incarceration. Mr. Kloess never identified himself to Mr. Carter, never met with him and, despite being paid to represent indigents, Mr. Kloess never

advocated to the court on Mr. Carter's behalf to raise any issue of his indigency as a bar to incarceration for failure to pay.  This lack of representation by Kloess is indicative of his conflicted position under a contract which pays him for costs taxed on convictions.  His position as "indigent defense counsel" has become essentially another part of the collection process utilized by the city and did not provide adequate representation for the indigent class members such as Mr. Carter.

250.    These actions constitute a denial of the Plaintiff's rights secured by the Sixth Amendment.

251.    As a proximate consequence of this violation of their Sixth Amendment rights, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent. Incarceration of Class members routinely followed the decision by JCS to institute proceedings to coerce payments.

**COUNT SEVEN**
**VIOLATION OF THE EIGHTH AMENDMENT**
**CITY OF MONTGOMERY**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

252.    The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, violated the Eighth Amendment prohibitions against excessive fines, cruel and unusual punishment and excessive bail, in its actions with the

Plaintiff and Class members and has done so in concert and by agreement conspiring with JCS.

253.   As discussed in detail above, Montgomery has illegally delegated many administrative and judicial functions of their municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

254.   The Eighth Amendment prohibits cruel and unusual punishment and, as such, limits the kinds of punishment that can be imposed on those convicted of crimes, proscribes punishment grossly disproportionate to the severity of the crime and imposes substantive limits on what can be made criminal and punished as such and prohibits excessive bail.

255.   Under Alabama law, a municipal court has no authority to award a fine on any particular charge over $500, *Ala. Code §* 13A-5-12(a)(3), and even lawful probation for misdemeanors cannot, by statute, extend beyond a two-year period. *See Ala. Code §* 15-22-54(a).

256.   As mentioned above, *Ala. Code* § 15-18-62 is the only statutory method under which a fine levied by a court on adjudication can be converted to imprisonment, but that can legally occur **only** where the court finds willful nonpayment of the fine and cost.

257.   Even upon proper notice and a finding of willful nonpayment under § 15-18-62, the conversion of fine to imprisonment has a specific ratio such that a fine not to exceed $500 shall result in no more than 20 days. *See  Ala. Code* § 15-18-62(2).

258.   Rule 26.11 of the Alabama Rules of Criminal Procedure provides the method for dealing with fines, restitution and the failure to pay under a variety of circumstances,

none of which were followed by Montgomery.

259.    Under these facts, Montgomery illegally contracted and conspired with JCS to add monthly fees and costs to each municipal court order.  This agreement increased the substantial fines levied against indigent persons such as the Plaintiff.

260.    Neither Montgomery, nor its agent JCS, made inquiries into the indigency of the "offenders" in the system.  As a result, the Plaintiff's failure to make payments as dictated resulted in threats of arrests.  If threats failed to produce the demanded payments, arrest and incarceration followed under the process based upon JCS's representation that the offender had "failed to obey a court order" or had "failed to appear" or had violated "probation."

261.    These fines exceeded the statutory limits of the municipal court and the incarceration periods imposed for the failure to pay exceeded those in *Ala. Code* §15-18-62.

262.    The practice and policy of imposing jail time for an inability to pay its fees, fines and costs violate the Eighth Amendment prohibition against excessive fines and cruel and unusual punishment.

263.    The named Plaintiff was at all pertinent times indigent and yet was incarcerated by City personnel for his inability to pay fines, fees and costs.

264.    After being arrested, JCS, with the City, calculates the amount claimed to be owed for fines, fees and costs which is then used as the bail required for release without consideration of factors justifying release on recognizance or other factors provided for under *Ala Rule Crim Pro.* 7.2.  This practice results in excessive bail requirements in violation of the Eighth Amendment.

60

265.    As a result of the violation of the Eighth Amendment, the Plaintiff was subjected to excessive fines, fees, and costs beyond the jurisdictional limits of the municipality and violation of the prohibition against excessive fines and cruel and unusual punishment and excessive bail.

266.    As a proximate consequence of this violation of his Eighth Amendment rights, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

**COUNT EIGHT**
**VIOLATION OF THE EIGHTH AMENDMENT BY JCS, CHC and CHCC ('JCS')**

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

267.    The Plaintiff avers that JCS, acting under color of state law in violation of 42 U.S.C. § 1983, has violated the Eighth Amendment prohibition against excessive fines, excessive bail and cruel and unusual punishment in its actions with the Plaintiff and Class members and has done so in concert and by agreement conspiring with Montgomery.

268.    As discussed in detail above, Montgomery has illegally delegated many administrative and judicial functions of their municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

269.    The Eighth Amendment prohibits cruel and unusual punishment and, as such, limits the kinds of punishment that can be imposed on those convicted of crimes,

proscribes punishment grossly disproportionate to the severity of the crime and imposes substantive limits on what can be made criminal and punished as such and prohibits excessive bail.

270.    Under Alabama law, a municipal court has no authority to award a fine on any particular charge over $500, *Ala. Code §* 13A-5-12(a)(3), and even lawful probation for misdemeanors cannot, by statute, extend beyond a two-year period. *See Ala. Code §* 15-22-54(a).

271.    As mentioned above, *Ala. Code* § 15-18-62 is the only statutory method under which a fine levied by a court on adjudication can be converted to imprisonment, but that can legally occur **only** where the court finds willful nonpayment of the fine and cost.

272.    Even upon proper notice and a finding of willful nonpayment under § 15-18-62, the conversion of fine to imprisonment has a specific ratio such that a fine not to exceed $500 shall result in no more than 20 days. *See  Ala. Code* § 15-18-62(2).

273.    Rule 26.11 of the Alabama Rules of Criminal Procedure provides the method for dealing with fines, restitution and the failure to pay under a variety of circumstances, none of which were followed by Montgomery.

274.    Under these facts, JCS, operating under an illegal contract with Montgomery, increased the financial burden on the plaintiffs by adding additional monthly fees and costs to their balance after fines were levied against these indigent persons.  For many class members, the total amounts demanded by JCS regularly exceeded the $500 limitation on the municipal court authority.

275.    Under the JCS extortion system at Montgomery, though JCS made no inquiry

into the indigency of the "offenders" in the system or the reason for their failure to make payments, JCS increased the amount demanded from the Plaintiffs to the point that even partial payments could not be made.

276.    As a result, the Plaintiff's failure to make payments as dictated resulted in threats of arrests.  If threats failed to produce the demanded payments, arrest and incarceration followed under the process based upon JCS's representation that the offender had "failed to obey a court order" or had "failed to appear" or had violated "probation."

277.    These fines exceeded the statutory limits of the municipal court and the incarceration periods imposed for the failure to pay exceeded those in *Ala. Code* §15-18-62.

278.    The practice and policy of imposing jail time for an inability to pay its fees, fines and costs violate the Eighth Amendment prohibition against excessive fines and cruel and unusual punishment.

279.    The named Plaintiff was at all pertinent times indigent and yet was incarcerated by City personnel for his inability to pay fines, fees and costs.

280.    After being arrested, JCS, with the City, calculates the amount claimed to be owed for fines, fees and costs which is then used as the bail required for release without consideration of factors justifying release on recognizance or other factors provided for under *Ala. Rule Crim. Pro.* 7.2.  This practice results in excessive bail requirements in violation of the Eighth Amendment.

281.    As a result of the violation of the Eighth Amendment, the Plaintiff was subjected to excessive fines, fees, and costs beyond the jurisdictional limits of the

municipality and violation of the prohibition against excessive fines and cruel and unusual punishment and excessive bail.

282.    As a proximate consequence of this violation of his Eighth Amendment rights, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

<div align="center">

**COUNT NINE**
**DENIAL OF EQUAL PROTECTION**
**CITY OF MONTGOMERY**

</div>

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

283.    Montgomery has acted under color of state law in violation of 42 U.S.C. § 1983 to deny the Plaintiff and Class members' rights to equal protection secured by the Fourteenth Amendment and did so in concert by agreement conspiring with JCS.

284.    This was accomplished by the illegal contractual agreement Montgomery had with JCS. Under that agreement, the actions of its agent JCS were inextricably intertwined in a practice and policy at Montgomery. That practice and policy automatically required "probation" for any person who, despite having no jail sentence, was financially unable to fully pay the fine and costs when levied by the municipal court. That probation requirement was part of the agreement between Montgomery and JCS and was part of every printed order at the municipal court and required payment of monthly fees to JCS.

285.    Persons who are financially able to fully pay the levied fine and costs at Montgomery are not placed on "probation."  As a result, those persons are not charged any fees for JCS and are not subjected to threats of arrest and incarceration in the collection process.

286.    For those such as the Plaintiff who were unable to fully pay the fine and costs when levied by the municipal court, not only were they required to come to court for traffic tickets, were charged court costs, they were also put on "probation" with JCS.

287.    This requirement was part of the Montgomery contract with JCS.  That no bid contract, as mentioned above, exceeded the statutory and constitutional authority of municipalities and imposed on the municipal court an agreement in violation of the separation of powers doctrine between the branches of government.

288.    Once on "probation" for purposes of paying a fines and costs, this policy and practice at Montgomery routinely imposed incarceration and additional costs on individuals who are unable to pay fines and costs, without any determination of willfulness as would lawfully be required under Alabama statutes.  See *Ala Code* Section 15-18-62.

289.    This disparate treatment based upon the wealth of the "offender" before the municipal court is a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

290.    This inequality of treatment is also beyond the authority of the municipal court which is required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  *See Ala. Code* Section 12-14-8.  The policy at Montgomery was not uniform with the procedures established by the Alabama Administrative Office of Courts because it added fees only to "offenders" who

65

could not pay immediately and created its own "rules" for penalizing individuals who could not pay as directed.

291.    These additional JCS fines resulted in disparate treatment between those who could immediately pay the fine from those who were unable to immediately pay the fine. Furthermore, those "offenders" at Montgomery with its JCS system arrangement were processed and fined differently than "offenders" in jurisdictions that have not allowed JCS to charge additional fees to those who cannot pay.  There is no state authority for such disparate treatment.

292.    By its policies, agreement and conspiratorial actions with JCS, the City has also deprived Carter and the Class members of all the civil debt protections available to others.

293.    The Plaintiff Aldaress Carter and the Class members were required to pay the additional costs and fees under this disparate system and many like Aldaress Carter were unlawfully jailed for their inability to pay as demanded.

294.    As a proximate consequence of this denial of the right to equal protection under the Fourteenth Amendment, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

## COUNT TEN
## DENIAL OF EQUAL PROTECTION BY JCS, CHC and CHCC ('JCS')

Plaintiff incorporates by reference the previous paragraphs and makes them a part

hereof.

295.    JCS and Montgomery have acted jointly under color of state law in violation of 42 U.S.C. § 1983, to deny the Plaintiff and class members' rights to equal protection secured by the Fourteenth Amendment and have done so in concert and by agreement conspiring with Montgomery.

296.    JCS, though a private company, has been clothed with the color of state law by the specific actions of Montgomery all pursuant to an agreement between these parties.

297.    As referenced above, by agreement, JCS employees attended all municipal court sessions, collected city fines and costs, were labeled as "probation officers," carried badges and regularly represented themselves as acting "on behalf of the City of Montgomery." Additionally, the JCS forms were used at the municipal court and fees for JCS were included in every court order there.

298.    Under its illegal contractual agreement with Montgomery, the actions of JCS were inextricably intertwined with its co-conspirator Montgomery in a practice and policy at Montgomery. That practice and policy automatically required "probation" for any person who, despite having no jail sentence, was financially unable to fully pay the fine and costs when levied by the municipal court.  That probation requirement was part of the agreement between Montgomery and JCS and was part of every printed order at the municipal court and required payment of monthly fees to JCS.

299.    Persons who were financially able to fully pay the levied fine and costs at Montgomery were not placed on "probation."  As a result, those persons were not charged any JCS fees and were not subjected to threats of arrest and incarceration in the collection process.

67

300.    For those such as the Plaintiff who were unable to fully pay the fine and costs when levied by the municipal court, not only were they required to come to court for traffic tickets, were charged court costs, they were also put on "probation" with JCS.

301.    This requirement was part of the Montgomery contract with JCS.  That no bid contract, as mentioned above, exceeded the statutory and constitutional authority of municipalities and imposed on the municipal court an agreement in violation of the separation of powers doctrine between the branches of government.

302.    Once on "probation" for purposes of paying a fines and costs, this policy and practice at Montgomery routinely imposed incarceration and additional costs on individuals who are unable to pay fines and costs, without any determination of willfulness as would lawfully be required under Alabama statutes.  See *Ala Code* Section 15-18-62.

303.    This disparate treatment based upon the wealth of the "offender" before the municipal court is a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

304.    This inequality of treatment is also beyond the authority of the municipal court which is required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  *See Ala. Code* Section 12-14-8.  The policy at Montgomery was not uniform with the procedures established by the Alabama Administrative Office of Courts because it added fees only to "offenders" who could not pay immediately and created its own "rules" for penalizing individuals who could not pay as directed.

305.    These additional JCS fines resulted in disparate treatment between those who could immediately pay the fine from those who were unable to immediately pay the

fine. Furthermore, those "offenders" at Montgomery with its JCS arrangement were processed and fined differently than "offenders" in jurisdictions that have not allowed JCS to charge additional fees to those who cannot pay.  There is no state authority for such disparate treatment.  JCS was also illegally afforded the ability to exercise discretion over which persons to sanction or request warrant status, and such discrimination was applied in an effort to enhance revenue.

306.    By its policies, agreement and conspiratorial actions with the City, JCS has also deprived Carter and the Class members of all the civil debt protections available to other debtors.

307.    The Plaintiff Aldaress Carter and the Class members were required to pay the additional costs and fees under this disparate system and many like Aldaress Carter were unlawfully jailed for their inability to pay as demanded.

308.    As a proximate consequence of this denial of the right to equal protection under the Fourteenth Amendment, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

# RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT

## 18 U.S.C. § 1962(a)(b) (c) & (b)

### (Counts Eleven through Fourteen follow this  Background)

**RICO SCHEME - EXTORTION - MONEY FOR FREEDOM**

A.    THE ENTERPRISE

309.    JCS and the City of Montgomery constitute an association-in-fact, and therefore an enterprise within the meaning of 18 U.S.C. § 1961(4). Such RICO Enterprise was an ongoing business relationship with the common purpose of maximizing the collection of money without consideration of the individual's ability to pay.

310.    The enterprise was a result of the parties' conspiratorial agreement to use the city court's authority and police power to extort money from the poor. JCS and the City of Montgomery (hereinafter "RICO Defendants") conspired and jointly participated in this extortion scheme.

311.    JCS acted in concert with the City of Montgomery and the Montgomery Municipal Court by keeping their records separate from the City's records and never checking the probation orders against the original court order. This allowed JCS to demand money from "probationers" that was not verified against a valid court order or adjudication.

312.    Neither the City nor JCS checked or audited their files to ensure that their records matched records of an adjudicated offense.

313.    JCS shredded the probation orders after they were scanned into its Probation Tracker system.

314.    Montgomery used its police department as an integral participant within the Enterprise by arresting folks who were unable to pay and by demanding cash bonds for their release from jail without considering the nature of the underlying crime, probability of flight risk, representation by counsel, or the person's ability to post a cash bond.

315.    Additionally, Montgomery police would bring misdemeanants who were unable to pay the cash bond demanded for their release from jail to court each setting. The

prisoners were handcuffed, shackled, and dressed in their jail issued orange jumpsuit and directed to sit on the front row while court was held.

316.    The contract between the City of Montgomery and JCS (Doc. 1-2) states the roles of the participants in the enterprise. In that contract the Mayor agreed that "in consideration of the probation service provided by JCS, the ***court agrees that each court order shall provide*** for the following:

> a probation fee of $35.00 per month flat fee
>
> one time probationer set up fee of $10.00. . . . " (***emphasis added***).
>
> (Doc. 1-2)

317.    The Montgomery police enforced the illegal extraction of moneys after Montgomery sold its police power in this illegal contract. While JCS threatened jail for non payment, the city employees issued arrest warrants and jailed people in the city jail upon JCS's recommendation.

318.    JCS and Montgomery further oppressed these indigent misdemeanants by submitting requests to the Alabama Department of Transportation that their driver's licenses be revoked due to nonpayment of fines. These requests for revocation were made despite knowledge of the people's indigency, without offering community service or alternative methods of punishment as required under the Criminal Rules of Procedure and the Supreme Court's ruling in *Bearden*, and without a finding of willful nonpayment.

319.    This punitive revocation of the impoverished persons' driver's license resulted in their inability to travel, work, cash checks, and vote.

320.    JCS and Montgomery were both financially motivated to add fees and

71

charges to "probationer" accounts even when not substantiated by an adjudication or valid court order such as charges.  As a result, these amounts often exceeded statutory maximum fine amounts.

321.  Montgomery and JCS were engaged in interstate commerce in that their activities and transactions relating to the collection of fines, fees, and costs, and the movement of the profits received pursuant to this operation, frequently required movement and communications across state lines.

322.  JCS employees were also employees of CHCC after CHCC fully integrated its subsidiaries. JCS operates in Alabama, Florida, Georgia, and Mississippi and had its corporate office in Georgia.

323.  During this time, CHCC which jointly employed JCS employees and controlled their operations, had its corporate headquarters in Colorado while the money was extorted from people living in Alabama.

324.  Cash and money orders received from the extortion scheme were deposited into federally chartered banks in Alabama and the money was then accounted for and deposited into the accounts of JCS/CHCC and the City of Montgomery.

325.  Montgomery and JCS functioned as a continuing unit from the inception of their contract in 2009 until the contract was terminated in 2014.  This continuing unit worked to achieve a common objective of the Enterprise - increasing cash receipts - by extorting money, illegally using threats of jail, illegally adding extra costs JCS fees, and illegally adding bogus "probation violation" charges that had not been adjudicated or had a proper sentencing order to people's court records.

326.  Montgomery and JCS violated 18 U.S.C. § 1962(c) because they were

72

engaged in activities which affected interstate commerce and have directly conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

327.   Montgomery and JCS violated 18 U.S.C. § 1962(d) because they conspired with each other to violate 18 U.S.C. § 1962(c), as described in the previous paragraph.

328.   Specifically, Montgomery and JCS conducted and participated in and conspired to conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under §18 U.S.C. § 1961(1):

> a.    Extortion in violation of the Hobbes Act, 18 U.S.C. § 1951;
>
> b.    Extortion in violation of Ala. Code§ 13A-8-13; and
>
> c.    Extortion in violation of the Travel Act, 18 U.S.C. § 1952.

**B.    PREDICATE ACTS**

**Extortionate Acts Generally**

329.   Montgomery and JCS have, on their own and in conspiracy with each other, obtained by threat a $10 set-up fee and $35/40-per-month probation fee from Plaintiff and class members, with intent to deprive them of this money.

330.   These demands for money from poor people appearing in Montgomery's municipal court number into the thousands and many of these demands/threats were sent using United States Mail.

331.   Specifically, JCS, individually and in conspiracy with Montgomery, the other participant in the RICO Enterprise, threatened Plaintiff and class members that if they did not agree to pay the set-up and monthly fees and fines then they: (a) would be

incarcerated; (b) would have their probation revoked; (c) would be accused by JCS of violating an Order of Probation; and (d) would face testimony by JCS against them regarding nonpayment, but without any investigation into the reasons for nonpayment (including an inability to pay and indigency).

332.   The threats described above are inherently wrong because they were motivated to extort and used the unlawful threat of incarceration to extort money.

333.   The threats described above were wrong because, as a matter of law, the fees were being charged pursuant to an illegal contract between JCS and the City of Montgomery and because the fees JCS added were not justified as either court costs or fines.

334.   Because of the threats described above, Plaintiff and class members have paid some of the fees demanded by JCS and Montgomery.

335.   Because of the extortionate acts described above, Plaintiff and some class members have had warrants issued for their arrest due to their inability to pay.

336.   Because of the extortionate acts described above, some class members have been wrongfully incarcerated and been unable to pursue gainful employment while defending themselves against unjust charges while being wrongfully incarcerated.

**Extortion in violation of the Hobbes Act, 18 U.S.C. § 1951**

337.   JCS and Montgomery obtained fees from the Plaintiff and class members with their consent, which consent has been induced by the wrongful use of fear, in violation of 18 U.S.C. § 1951 (Hobbes Act).

338.   JCS and Montgomery obstructed, delayed and affected commerce, and the movement of articles and commodities in commerce, and attempted to do so by extortion,

74

in that they obtained and attempted to obtain money from the Plaintiff and class members which was not lawfully due them under color of official right in violation of Title 18, U.S.C., Section 1951(a).

339.    The proceeds of the extortionate activities were used in commerce and therefore affected commerce or the movement of any article or commodity in commerce, as these terms are understood by 18 U.S.C. § 1951(a).

340.    JCS and Montgomery were motivated to participate in the extortion scheme by the profits they expected to receive from the scheme.

**Extortion in violation of Ala. Code § 13A-8-13**

341.    JCS and Montgomery obtained by threat fees from the Plaintiff and class members with intent to deprive them of this money, in violation of Ala. Code§ 13A-8-13.

**Extortion in violation of the Travel Act, 18 U.S.C. § 1952**

342.    JCS and Montgomery obtained by threat fees from the Plaintiff and class members with intent to deprive them of this money, in violation of 18 U.S.C. § 1952 (Travel Act) and Ala. Code § 13A-8-13.

343.    In fact, JCS and Montgomery used letters sent through the U.S. Mail as a primary method to demand payment. (Docs 1-5 to 1-8)   Some of the most frequent mailings are - Delinquency Letter, petition to revoke probation letter, failure to report letter, Notice to Show Cause and violation of probation letter. These are form letters produced by JCS software system where they are stored.

344.    JCS kept copies of the form letters in their Probation Tracker system and has purportedly sent thousands of these letters to City of Montgomery "probationers."

345.    JCS has traveled in interstate commerce, and has used the mail and facilities in interstate commerce to distribute the proceeds of the extortionate scheme, specifically by operating a corporate entity that is based outside of Alabama but is operating the extortionate activities described herein within Montgomery, Alabama, in violation of 18 U.S.C. § 1952(a)(l).

346.    JCS has traveled in interstate commerce, and has used the mail and facilities in interstate commerce to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of an extortionate scheme, specifically by operating a corporate entity that is based outside of Alabama, but is operating the extortionate activities described herein within Montgomery, Alabama, in violation of 18 U.S.C. § 1952(a)(3).

347.    The City of Montgomery issued general obligation warrants using interstate commerce to secure financing at preferential rates. The low interest rates given to the City to repay these warrants was based on the strength of its audited financial statements. After instituting the joint enterprise with JCS, Montgomery City revenue from "court" fines and fees accounted for a substantial part of the City's total revenue. The City of Montgomery used the mail and wire services to perpetuate its extortion scheme and to borrow money on interstate exchanges at low rates.

## C.    PATTERN OF RELATED RACKETEERING ACTS

348.    JCS and Montgomery have engaged in the racketeering activity described in this Claim repeatedly starting in about 2009 and continuing through at least July 2014 with respect to thousands of persons appearing before the Montgomery Municipal Court. These racketeering acts are part of the enterprise's regular way of doing business.

349.    JCS and Montgomery relied on the racketeering acts described in this Complaint to conduct the regular business activities of the RICO Enterprise.

350.    JCS and Montgomery have a similar purpose: to maximize the collection of money without consideration of the individual's proper adjudication, guilt, or ability to pay.

351.    The racketeering acts of the RICO Defendants have yielded similar results and caused similar injuries to Plaintiff and class members: Plaintiff and class members have, *inter alia*, all been subjected to excessive fees paid to JCS, been labeled as "probationers," been subjected to required, frequent office visits, and lived in fear of arrest due to their inability to pay as demanded as a result of the unlawful conduct of Montgomery and JCS.

352.    As set forth in the preceding paragraphs, the racketeering acts have similar participants: JCS and the City of Montgomery which comprise the RICO Enterprise.

353.    As set forth in the preceding paragraphs, JCS and Montgomery directed their racketeering activities at similar victims: Plaintiff and the class members specifically, and also more generally, all Montgomery Municipal Court defendants who could not afford to pay the entirety of their fines, fees, restitution, and costs on the date that they were adjudicated and assessed fines, fees, costs, and restitution.

354.    As set forth in the preceding paragraphs, the racketeering acts of JCS and Montgomery have similar methods of commission, namely: extorting Plaintiff and class members specifically, and more generally extorting all Montgomery Municipal Court defendants who could not afford to pay their entire fine, fees, restitution, and costs on the date they were adjudicated and assigned, into paying probation fees to JCS.

77

D.    INJURY

355.    As a direct and proximate result of JCS's and Montgomery's willful, knowing, and intentional acts discussed in this Claim, Plaintiff and class members have suffered injuries to their property. Plaintiff and class members have all been subjected to probation fees paid to JCS, and have been forced to continue paying these fees even when they could not afford to do so and often after the fines had been paid in full, resulting in economic harm to themselves and their families.

356.    As a direct and proximate result of JCS's and Montgomery's willful, knowing, and intentional acts discussed in this Claim, Plaintiff and class members have also suffered injuries to their personal dignity. Plaintiff and class members have all been labeled 'probationers' due to their inability to completely pay the assessed fine or court costs when demanded.

357.    Plaintiff and class members have also incurred additional hardship by having to drive to the JCS office to make payments in order to satisfy JCS's appointment policy. JCS increased the frequency of the appointments when the Plaintiff and Class members could not pay the entire monthly amount JCS demanded. The required monthly payment was established by JCS in accordance with JCS policy and without consideration of the individual's ability to pay. This additional travel requirement burdened the class members making it difficult to keep and find employment.

358.    Plaintiff and class members suffered additional stress that was brought on by JCS's continued threats of jail if sufficient payment was not made. The fear of incarceration was a continual threat that increased the Plaintiff and class members' daily stress level as warrants for their arrest were made without any notice to them and without

any meaningful adversarial testing.

### COUNT ELEVEN – 18 U.S.C. § 1962(a)
### AGAINST ALL "RICO Defendants"
### (JCS, CHC, CHCC, ('JCS') and the City of Montgomery)

The Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

359.    18 U.S.C. § 1962(a) states in pertinent part:

(a)It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, or to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment and operation of, any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce…

360.    For purposes of this paragraph,  JCS and Montgomery are an "enterprise" as defined by 18 U.S.C. § 1961(4).

361.    As the enterprise, JCS and Montgomery were also the direct beneficiaries of the proceeds from the pattern of racketeering activity.

362.    JCS and Montgomery engaged in, and its activities have substantially affected, interstate commerce. JCS receives interstate disbursements of thousands of dollars in illegal fees from "probationers" in several states, it markets its services in several states, and commits or causes to be committed misstatements in municipal court proceedings in which it had a financial interest in the outcome. Specifically, though having a financial interest therein, JCS recommended that probations be revoked and that misdeamenants go to jail.  This enhanced the recoverable fees and the amounts collectable from relatives and others who had no obligation to pay, but who would pay to

free a relative or friend.   Furthermore, testimony and information it supplied to the court was often inaccurate, incomplete and biased, omitting and ignoring salient facts about an inability to pay, such that justice was perverted. The City of Montgomery used interstate exchanges to borrow money at low rates and used the interstate banking system to safeguard its deposits, enhancing its perceived financial strength based on its extortion scheme.

363.   The Plaintiffs and the class members have suffered a "racketeering injury" that flowed from the use of JCS and Montgomery's investment of racketeering income. The contract between the City of Montgomery and JCS states their intention to produce the racketeering income by agreeing that "each court order shall provide for the following:

> a probation fee of $40.00 per month flat fee
>
> one time probationer set up fee of $10.00. . . . "

(Doc. 1-2)

364.   Specifically, the class members were required to appear at JCS's office to pay the money JCS demanded. JCS would require them to appear once a month if they were able to pay the required monthly payment. Those who were unable to pay the monthly payment were required to come to the JCS office more frequently. These required appointments were sometimes only a few days apart. These onerous reporting requirements made it difficult for the class members to get and keep jobs.

365.   Additionally, the extortion scheme of JCS and Montgomery produced fear in the class members even in renewing their driver's license or obtaining valid identification over concerns of warrants issued for arrest for non payment. Without valid identification the class members were often unable to pursue gainful employment, cash checks, and

vote. Some class members have been wrongfully incarcerated and been unable to pursue gainful employment while defending themselves against unjust charges while being wrongfully incarcerated. All of these "racketeering injuries" were sustained by JCS and Montgomery's coordinated scheme to extort money from those in poverty.

366.    Had JCS and Montgomery not perpetuated its coordinated strategy to illegally demand and collect "probation" fees through the investment of racketeering income, a strategy that was conducted through the use of the mails, the Plaintiff and Class members would not have had arrest warrants issued, been jailed for non-payment, and would have been able to pay off the properly adjudicated fines and fees more quickly without the additional fear and harassment from JCS and Montgomery.

367.    Furthermore, the Plaintiff and class members suffered a cognizable "investment injury" that flowed from the use of JCS's investment of racketeering income, in that JCS used such income to undercut other legitimate debt collection services, thus preventing the Plaintiff and class members from treatment by properly trained and regulated debt collectors. Specifically, debt collectors which would not have charged illegal fees to the Plaintiff and class members and would not have used the threat of jail and jailing folks as an integral part of their collection process.

368.    Furthermore, the Plaintiff and class members suffered a cognizable "investment injury" that flowed from the use of the City of Montgomery's investment of racketeering income, in that money collected from Montgomery's "court" system accounted for a significant part of the City's total revenue encouraging the City to perpetuate the system.

369.    JCS and the City of Montgomery pursued their scheme to extort money from

the Plaintiff and class members by charging illegal fees, illegally using the City's police power of arrest and jail to demand payment, adding money due for charges that had never been pled or adjudicated, and falsely representing that they were providing "probation" services when they were only collecting debts. These coordinated policies consistently ignored constitutional precepts in order to increase profits.

370.   The Plaintiff and class members were harmed by these egregious practices of extortion and had no choice but to sign or agree to anything the RICO Defendants told them in an attempt to avoid jail.

371.   By implementing the Scheme as described herein, JCS and Montgomery violated 18 U.S.C. §1961 and 18 U.S.C. §1962(a).

<div align="center">

**COUNT TWELVE – 18 U.S.C. § 1962(b)**
**AGAINST ALL "RICO Defendants"**
**(JCS, CHC, CHCC, ('JCS') and the City of Montgomery)**

</div>

The Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

372.   18 U.S.C. § 1962 (b) states in pertinent part:

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

373.   For purposes of this paragraph, JCS and Montgomery are an "enterprise" as defined by 18 U.S.C. § 1961(4).

374.   As the enterprise, JCS and Montgomery were also the direct beneficiaries of the proceeds from the pattern of racketeering activity. The enterprise used or invested income derived from their pattern of racketeering activity, in part in acquiring an interest in

or operating the enterprise. Specifically, illegal fees and charges to "probationers" garnered by threats of jail were then used in acquiring an interest in and/or operating the enterprise.

375.    Specifically, the class members were required to appear at JCS's office to pay the money JCS demanded. JCS would require them to appear once a month if they were able to pay the required monthly payment. Those who were unable to pay the monthly payment were required to come to the JCS office more frequently. These required appointments were sometimes only a few days apart. These onerous reporting requirements made it difficult for the class members to get and keep jobs.

376.    Additionally, class members feared to update their driver's license and get valid identification due to the enterprise's policy of issuing warrants for arrest for non payment. Without valid identification, the class members were unable to pursue gainful employment, cash checks, and vote. Some class members have been wrongfully incarcerated and been unable to pursue gainful employment while defending themselves against unjust charges while being wrongfully incarcerated. All of these "racketeering injuries" were sustained by the enterprise's coordinated scheme to extort money from those in poverty.

377.    Furthermore, the Plaintiff and class members suffered a cognizable "investment injury" that flowed from the use of JCS's investment of racketeering income, in that JCS used such income to undercut other debt collection services by circumventing the restrictions and regulations on other collection services, thus preventing the Plaintiff and class members from treatment by properly trained debt collectors. Specifically, debt collectors which would not have charged illegal fees to the Plaintiff and class members and would not have used the threat of jail and jailing folks as a integral part of their collection

process.

378.   JCS and Montgomery pursued their scheme to extort money from the Plaintiff and class members by charging illegal fees, illegally using the City's police power of arrest and jail to demand payment, adding money due for charges that had never been pled or adjudicated, and falsely representing that they were providing "probation" services when they were only collecting debts. These coordinated policies consistently ignored constitutional precepts in order to increase profits.

379.   The Plaintiff and class members were harmed by these egregious practices of extortion and had no choice but to sign or agree to anything JCS and Montgomery told them in an attempt to avoid jail.

380.   By implementing the Scheme as described herein, JCS and Montgomery violated 18 U.S.C. §1961 and 18 U.S.C. §1962(b).

381.   Plaintiff and class members are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

### COUNT THIRTEEN – 18 U.S.C. § 1962(c)
### AGAINST ALL "RICO Defendants"
### (JCS, CHC, CHCC, ('JCS') and the City of Montgomery)

The Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

382.   RICO, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68, provides a private civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. §

1964(c).

383.    At all relevant times, the Plaintiff and class members were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

384.    Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

385.    At all relevant times, JCS and employees of the City of Montgomery were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

386.    At all relevant times, JCS and Montgomery, formed an association-in-fact enterprise as defined by 18 U.S.C. § 1961(4) that was and is engaged in activities which affect interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 196(c).

387.    The structure and purpose of the enterprise was to extort money from poor people who could not pay fines and fees for City misdemeanor offenses and caused injury to the property and business of the Plaintiff and the class members.

388.    Due to the fear that people had of being arrested and jailed, the enterprise profited from its activities. Each member of the association-in-fact enterprise had a common goal and purpose of making money by extorting from poor and unrepresented misdemeanants.

389.    At all relevant times, JCS and Montgomery, as a result of their position and control, were able to participate in the operation and management of the enterprise by directing its affairs.

390.    JCS and Montgomery worked together in extorting money from people as stated above.

85

391.    At all relevant times, JCS and Montgomery knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C.§ 1962(c). Specifically, JCS and Montgomery engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(A) by engaging in the acts set forth above. The acts set forth above constitute a violation of extortion and JCS and Montgomery each committed, directed or approved the commission of two or more of these acts of racketeering activity.

392.    Additionally, JCS and Montgomery participated in acts of mail or wire fraud, as set forth in the facts above, by threatening the misdemeanants in letters sent through the U.S. Mail system. The acts of mail and wire fraud were directed or approved by JCS and Montgomery and the letters and money received through the enterprise crossed state lines.

393.    JCS and Montgomery knowingly devised and participated in this scheme to extort money from the Plaintiff and class members, and did so willingly with an intent to misrepresent the true nature of their activities by presenting JCS as a probation service as opposed to a collection service which had no certification or training in probation services.

394.    JCS and Montgomery used the United States mails and interstate wires for the purpose of executing the scheme within the meaning of 18 U.S.C. § 1961(1)(B), specifically, mail and wire fraud, as defined in 18 U.S.C. §§ 1341 and 1343.

395.    The acts referred to constituted a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5) and the acts alleged were related to each other by virtue of common participants, common victims, a common method of commission

(threatening and arresting people who could not pay as demanded), and the common purpose and common result of the racketeering activities being interrelated by distinguishing characteristics.

396.   The predicate acts committed by JCS and Montgomery had the common purpose and common result of inducing the Plaintiff and class members to agree to anything JCS and Montgomery demanded in order to keep their freedom as long as possible.

### COUNT FOURTEEN – 18 U.S.C. § 1962(d)
### AGAINST ALL "RICO Defendants"
### (JCS, CHC, CHCC, ('JCS') and the City of Montgomery)

The Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

397.   The Plaintiff and class members allege that JCS and Montgomery's actions and conduct, and their agents' actions and conduct, as alleged herein were at all times known to the officers, directors, executives, supervisors, managers and authorized agents of JCS and Montgomery, and were at all times known to JCS and Montgomery, but, that JCS and Montgomery nevertheless engaged in such conduct.

398.   Further, JCS and Montgomery knowingly and intentionally permitted and acquiesced in such conduct on the part of each other, and in the conduct of the employees, servants, and agents of each other. The Plaintiff and class members allege that JCS and Montgomery knowingly participated in the extortion scheme and continued to allow and encourage such actions to continue by disregarding the constitutional rights of these people.

399.   As stated in the facts set forth above, JCS and Montgomery agreed to and

directed that the racketeering activity of extortion, mail and wire fraud would be conducted by the association-in-fact enterprise. Such agreement is evidenced by the contract between JCS and Montgomery and the form documents that JCS sent to the misdemeanants.

400.   Title 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity and Title 18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate [18 U.S.C. § 1962(c)]." Hence, 18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

401.   JCS and Montgomery conspired and agreed with each other to engage in the extortionate conduct, or attempted conduct, stated above, and also conspired and agreed to aid each other in the commission of the acts of mail and wire fraud as stated above.

402.   JCS and Montgomery conspired, planned and schemed to conduct the affairs of the association-in-fact enterprise through a pattern of racketeering activity by committing multiple acts of extortion and mail and wire fraud in violation of 18 U.S.C. § 1962(c).

403.   JCS and Montgomery combined, conspired and confederated with each other to commit a pattern of racketeering activity, and thereby violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

404.   As a direct and proximate cause of JCS and Montgomery's actions in violation of 18 U.S.C. § 1962(d), the Plaintiff and class members have been and continue to be injured in their business and property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which sum is to be duly trebled in accordance with 18 U.S.C. § 1964.

405.   Plaintiffs are entitled to recover and request reasonable attorneys' fees and

costs pursuant to 18 U.S.C. § 1964(c).

## COUNT FIFTEEN
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

406.   A real controversy exists between these parties concerning several issues, including the validity of Montgomery's attempt to bind its municipal court and the legality of the actions taken under the contract with JCS, such that declaratory relief is appropriate.

### Contract between the City and JCS is void

407.   Plaintiff requests the Court to declare that Montgomery had no authority to contractually bind their municipal court.

### City does not have the power to bind the Court

408.   Montgomery entered into an agreement with JCS that exceeded both its statutory and constitutional limitations on municipalities.   Furthermore, that agreement violated the separation of powers doctrine embodied in the Alabama Constitution.  See *Ala. Const.,* Article 3, Section 43.   As a result, that agreement is void and due to be declared a nullity.

409.   Alabama state law also dictates a separation of the branches of government. *Ala. Const.,* Article 3, Section 43.   Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, *Ala. Code* Section 11-43-43, while the mayor of the city is responsible for executive duties.   *Ala. Code,* Section 11-43-83.  If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama.  *Ala. Code* Section 12-2-7 *et. seq.*; *Ala. Const.,* Art. 6, Section 139.

410.    A city's mayor, such as Montgomery's mayor, has the executive power to execute and enforce contracts and the city council has the legislative power to enact regulations and ordinances, but neither the mayor nor the council has the power to invade the administration of its judiciary.

411.    Montgomery has exceeded its statutory authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, they agreed to require its municipal court to include probation and fees for JCS in every court order entered by its hired judge.  That action essentially sold the court process for purposes of increasing income to the City.

### Contract violates statutory limitation regarding traffic citations and municipal fines

412.    That agreement also violates the uniformity required by statute for processing traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  *See Ala. Code* Section 12-14-8.

413.    The process at Montgomery is not uniform with the procedures established by the Alabama Administrative Office of Courts because it adds fees only to "offenders" who cannot pay immediately and creates other "rules" for further penalizing individuals who cannot pay as directed.  "Offenders" who are able to immediately pay the fine are charged one rate, but those that are unable to immediately pay for the same offense are charged the fine and required to pay JCS monthly fees that accumulate each month that passes.

414.    The "offenders" at Montgomery are processed and fined differently than "offenders" in municipal jurisdictions which have not contracted for JCS to charge its fees to those who cannot pay and, as a result, violates uniformity requirements of *Ala. Code*

90

Section 12-14-8.

**Contract overrides judicial authority and administration of municipal courts reserved to the Chief Justice**

415.    The illegal agreement and policy of Montgomery invades and overrides the judicial authority and court administration reserved to the municipal judge and the Chief Justice.

**Contract is an exclusive franchise**

416.    The contract between JCS and the City of Montgomery grants an exclusive franchise for provision of probation services.

417.    The contract was not competitively bid as required by Ala. Const. Art. I,§ 22 and Ala. Code 1975, §41-16-50.

418.    Because the contract was not bid, it is void and unenforceable.

419.    Plaintiff requests the Court to declare the actions of Montgomery under this contract to be unconstitutional under the premises discussed above.  Under this void agreement, Montgomery has implemented policies and practices to prosecute persons such as the Plaintiff where there is no jurisdiction or authority to do so under Alabama law, doing so intentionally in an effort to extort the payment of fines and costs from indigent people.  These efforts have resulted in the illegal prosecution and incarceration of the Plaintiff and the Class beyond the limited jurisdiction of the municipal courts.

420.    Further, Montgomery has added increased punishment, fines and costs after adjudication and even where there has been no adjudication of guilt, all without jurisdiction or authority for such under Alabama law.

421.    Montgomery has systematically applied *Ala. Code* § 15-18-62 in an

91

unconstitutional fashion, denying the Plaintiff and the Class he seeks to represent constitutionally protected rights.

422.    Section 15-18-62 provides for the imprisonment for the failure to pay fines and costs in limited circumstances and only upon the finding of a willful nonpayment.[25]

423.    Under the policies and practices at Montgomery, "offenders" before the municipal court, such as the Plaintiff and the Class he seeks to represent, are systematically imprisoned for nonpayment with no determination of willfulness and with no consideration of their indigency or ability to pay.

424.    Furthermore, once imprisoned, the requirements of time to be served under § 15-18-62 are ignored by the practice and policy of Montgomery.

425.    The result of this consistent systematic policy and practice of Montgomery is essentially a debtor's prison for fines and charges levied.

426.    Plaintiff requests the Court to enjoin the actions of Montgomery identified herein to prevent the continuation of these violations of statutory and constitutional prohibitions.

---

[25]**Section 15-18-62**
 **Imprisonment for failure to pay fines and costs.**

In cases of willful nonpayment of the fine and costs, the defendant shall either be imprisoned in the county jail or, at the discretion of the court, sentenced to hard labor for the county as follows:

(1) If the fine and costs do not exceed two hundred fifty dollars ($250), no more than 10 days;

(2) If the fine and costs exceed two hundred fifty dollars ($250) but do not exceed five hundred dollars ($500), no more than 20 days;

(3) If the fine and costs exceed five hundred dollars ($500), but do not exceed one thousand dollars ($1,000), no more than 30 days; and

(4) For every additional one hundred dollars ($100) or fractional part thereof, 4 days.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that the Court will take jurisdiction of this cause and upon the final hearing:

a.   Certify this matter as a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure for a plaintiff class;

b.   Award the Plaintiff such damages as this Court shall find the Plaintiff have sustained, together with punitive, or exemplary damages as the law shall permit;

c.   Enter an injunction and other declaratory relief which declares the Montgomery contract requiring fees to JCS to be void and in violation of the statutory and constitutional limitations on municipalities;

d.   Enter an injunction and other declaratory relief which enjoins Montgomery from engaging in the violations of law set forth hereinabove;

e.   Enter an injunction and other declaratory relief which prohibits Montgomery in the future from placing persons on probation for collection of fines and declares that any current probation and fees for simple fines is void;

f.   Enter an injunction and other declaratory relief which prohibits Montgomery in the future from assessing fines in excess of $500 and/or extending probation periods beyond 24 months and declare that any previously assessed fines and probationary periods in excess of these limits to be void;

g.   Enter an injunction and other declaratory relief which prohibits

93

Montgomery in the future from imprisoning indigent persons for failure to pay fines and fees;

h.     Enter an injunction and other declaratory relief which prohibits Montgomery in the future from charging excessive bail established to collect claimed fines and fees;

i.     Award to the Plaintiff and Class members damages under 42 U.S.C. § 1983 equal to any amounts paid on fines and all fees to JCS and Montgomery that are found unconstitutional and/or unlawful (along with interest), and the annulment of any remaining unpaid fines and fees that are found unconstitutional and/or unlawful;

j.     Order that the culpable parties disgorge their ill-gotten gains derived from their unlawful conduct;

k.     Award to the Plaintiff and Class the cost of this matter, including a reasonable attorneys' fee;

l.     Award to the Plaintiff and the Class members such other, further and more general relief as the Court may deem appropriate under these circumstances including cost of these proceedings.

**JURY DEMAND**

Plaintiff demands a trial struck by jury.

RESPECTFULLY SUBMITTED,

s/ G. Daniel Evans _____
G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish

94

ASB-2477-D66P
Attorney for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com

William M. Dawson
ASB-3976-S80W
Attorney for the Plaintiffs
Dawson Law Office
1736 Oxmoor Road
Birmingham, Alabama 35209
Telephone:  205-795-3512
E-Mail:  bill@billdawsonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2015, I electronically filed the foregoing First
Amended and Restate Complaint with the Clerk of the Court using the CM/ECF system
which will send notification of such filing to the following:

Micheal S. Jackson
WEBSTER, HENRY, LYONS, BRADWELL,
COHAN & BLACK, P.C.
P. O. Box 239
Montgomery, AL 36101-0239

Shannon Holliday
Robert D. Segall
Joel Caldwell
COPELAND, FRANCO, SCREWS & GILL
P. O. Box 347
Montgomery, AL 36101-0347

s/ G. Daniel Evans
G. Daniel Evans

**DEFENDANTS' ADDRESSES:**

**JUDICIAL CORRECTION SERVICES, INC.**
**SERVE REGISTERED AGENT:**
**CORPORATE CREATIONS NETWORK, INC.**
**6 OFFICE PARK CIRCLE #100**
**MOUNTAIN BROOK, AL 35223**

**CORRECTIONAL HEALTHCARE COMPANIES, INC.**
**SERVE REGISTERED AGENT:**
**CORPORATE CREATIONS NETWORK, INC.**
**3411 SILVERSIDE RD #104 RODNEY BUILDING**
**WILMINGTON, DE  19810                    PLEASE SERVE BY CERTIFIED MAIL**

**CHC COMPANIES, INC.**
**SERVE REGISTERED AGENT:**
**CORPORATE CREATIONS NETWORK, INC.**
**6 OFFICE PARK CIRCLE #100**
**MOUNTAIN BROOK, AL 35223**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2015 AUG -3  P 1: 35

DEBRA P HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

ALDARESS CARTER, INDIVIDUALLY, AND FOR )
A CLASS OF SIMILARLY SITUATED PERSONS )
OR ENTITIES, )
)
      **Plaintiffs** )
**v.** )
)
**THE CITY OF MONTGOMERY and** )
**BRANCH D. KLOESS.** )
)
      **Defendants.** )

**CIVIL ACTION NO.:**

2:15-CV-555-WHA-CSC

**CLASS ACTION**
**DEMAND FOR JURY TRIAL**

## COMPLAINT

COMES NOW, Aldaress Carter (hereinafter "Plaintiff"), individually and on behalf

of those similarly situated, upon personal knowledge as to himself and his own acts, and

upon information and belief as to all other matters, by and through his undersigned

counsel, files this complaint as follows:

### JURISDICTION

1.      The Court has jurisdiction over this matter because it concerns a controversy

arising under the Constitution of the United States.  28 U.S.C. §1331.  This is a civil rights

action brought under 42 U.S.C. §§ 1983 and 1988. This Court also has jurisdiction of this

action by virtue of 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), authorizing jurisdiction of claims

brought under 42 U.S.C. § 1983 to enforce civil rights guaranteed by the United States

Constitution.  The Court also has supplemental jurisdiction over the state law claims

pursuant to 28 U.S.C. § 1367.

2.      This action also seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201

and 2022.

3.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 (b) and

(c).

## PARTIES TO THE COMPLAINT

4.     The Plaintiff Aldaress Carter is an individual resident of Montgomery,

Montgomery County, Alabama.

5.     The classes which the individual Plaintiff seeks to represent consist of:

> All individuals who have been in the past assigned by the
> Montgomery Municipal Court to "probation" with Judicial
> Correction Services (JCS) for the collection of fines.
>
> AND
>
> All individuals who, despite their indigency, were incarcerated,
> without consideration of their indigency for failure to pay fines,
> charges and fees to Montgomery.

6.     The City of Montgomery, Alabama, ("Montgomery") is a municipal corporation

located within Montgomery County, Alabama.  The City Council and Mayor control the

policy making for Montgomery. The Mayor also hires the municipal court judges, the public

defenders to provide legal representation for indigent offenders, and contracted for the

services of JCS, a private probation company, to collect its municipal court fines[1]. (Exhibit

1)

7.     Branch D. Kloess, ("Kloess") is an individual and a licensed attorney located

within Montgomery County, Alabama. Kloess entered into an agreement with the City of

Montgomery to provide "competent legal representation and services for indigent

defendants charged with the violation of the municipal ordinances and laws before the

---

[1] JCS's contract with Montgomery was not renewed in 2014 when the contract renewal date
expired.

2

Municipal Court of the City of Montgomery." He has not provided competent legal representation. Rather, he has a policy and practice of not requesting indigency hearings for the indigents he represents. As such, he has participated in the City's scheme to extort money from poor citizens he purportedly represents while gaining financially from not seeking indigency status for them. (Exhibit 2)

## FACTS

8.     The Plaintiff brings this action because the policy and practices of Montgomery have violated and continue to violate the Plaintiff's statutory and constitutional rights and those of persons similarly situated.

9.     The treatment of the Plaintiff was caused by and is representative of the City's policies and practices employed to collect debts from the fines, fees, costs, and surcharges that the City assesses, usually for traffic tickets. These facts are similar to those alleged in the Amended Complaints in cases 2013-cv-732-MEF (Doc. 10), 2013-cv-733-MEF (Doc. 9) and 2014-cv-186-MEF (Doc.26) which describe additional people whose rights were violated by the same policies and practices.

10.    The policies and practices of the City of Montgomery are strikingly similar to the unconstitutional practices by which the City of Ferguson, Missouri, operated its courts and police department. These unconstitutional policies placed priority on generating cash for the City without regard to constitutional precepts. The Department of Justice's Civil Rights Division outlined the unconstitutional practices it discovered at the City of Ferguson

3

in its March 4, 2015 report. (Exhibit 3)[2]

11.     Montgomery has contracted with JCS which operates a "for profit" enterprise that markets its services to various municipal governments and has contracted with over 100 cities and towns throughout Alabama. JCS's marketing approach to these cities emphasizes that its fees will be paid by the "offender" and that its efforts will improve collection of court fines and costs at no cost to the city.

12.     The JCS approach is highly systemized and uniform throughout the Alabama municipal courts in which it operates, including Montgomery - until July 1, 2014.

13.     Under the system implemented by Montgomery, it does not require JCS employees to have criminal justice or legal training, nor are they required to have any social work education or meet any minimum law enforcement standards as is required of state probation officers. Instead, the only requirements of a JCS employee who is referred to as a "Probation Officer" is that the employee be 21 years old, a non felon, with two years of college who complete 40 hours of JCS training on its processes. On satisfying those requirements, JCS employees are then labeled "Probation Officers"[3] and previously permitted to carry the JCS issued badge in collecting its fees, court fines and costs.

14.     Montgomery by contract and practice unlawfully delegated to JCS many administrative and judicial functions of its municipal court, clothing it with the color of state law for the collection of court fines, costs and the JCS private fees.

---

[2] Due to the many similarities between Montgomery's policies and practices that are coordinated through the city police and the city courts, sections of the DOJ report are referenced by footnotes for the court's review.

[3]In contrast, even a judicial volunteer is required to meet greater and more specific qualifications, careful screening, specific training and continual oversight established by the Administrative Office of Courts ('AOC'). See Ala. Rule of Judicial Administration Rule 42.

4

15.    The agreement between Montgomery and JCS and signed by the city mayor attests that the Montgomery municipal "*court agrees that each court order shall provide* for the following:

a probation fee of $40.00 per month flat fee

one time probationer set up fee of $10.00. . . . " (*emphasis added*).

16.    Montgomery, through its mayor Charles Jinright and council, approved the agreement with JCS, the City and its court beginning in March 19, 2009 and continued the relationship, by and through its City Council and Mayor, Todd Strange, until the summer of 2014. Throughout this period, the City police, City courts, and City hired public defenders who fully participated in the practices and system with JCS.

17.    Montgomery also approved the employment of it municipal court judges including its Presiding Judge, Armstead Lester Hayes, III.

18.    Montgomery also hired attorneys to represent indigent defendants in its City courts under a contract which provides that "A defendant's status as "indigent" shall be determined by the Judge in the said Court, in accordance with the criteria set forth in Code of Alabama (1975), Sections 15-12-5 and 15-12-20." Yet, despite the fact that offenders are designated as indigent for purposes of getting an appointed attorney, routinely the attorneys never introduce themselves to the client they purportedly represent and do not advocate on the client's behalf before the judge, which results in indigent people being fined, assessed court costs, put on the JCS 'payment plan' which costs them an additional $40/month and are threatened with jail if payments are missed.

19.    These 'public defenders' do not request *Bearden* hearings or inquire into the offender's ability to pay, or fill out hardship forms requesting community service or other

5

alternatives due to their client's poverty.[4] Nor, do they even maintain files on their "clients."

20.    Rather, the 'public defender' upholds the City's practice of prioritizing profits over public welfare and safety by requiring their clients to 'pay or stay' and demanding court costs and full payment of fines for those they "represent."

21.    The contract between the City and the 'public defender' mandates that the attorneys will be paid out of the 'Fair Tax Trial Fund' which is funded through the collection of court costs levied and collected on convictions. This payment policy creates a conflict of interest as the City is not required to pay the attorneys more than it has collected in any one month.

In fact, Section Five of its public defender contract says:

SECTION FIVE. Under the terms of this agreement, on or after the last day of each month during the period of this agreement, Kloess shall submit to the Clerk of Court for approval, a request for payment from the Fair Trial Tax fund not to exceed the sum of Ten Thousand and 00/100 Dollars ($10,000.00) per month, for services to be performed hereunder for the period of the agreement. **Provided, in no event shall the City be required to pay more than the amount deposited in the Fair Trial Tax Fund for a particular month.**

(Exhibit 2 pg. 2)**(emphasis added)**

22.    For a number of years, Montgomery has participated in implementing the JCS system. That system and JCS's "Probation Tracker" software used at Montgomery was highly systemized and focused on collections of fines and its fees -- not traditional probation services. For instance, the "probation officer" does not visit the probationer's home, job or family, and has contact with them only at the JCS office in collecting fees and fines.

---

[4] See DOJ Report pg. 53.

6

That collection focus allows the "offenders" to mail in payments if they live 30 miles from the JCS office.  *See* Exhibit 4. The training manual used by JCS instructs its employees on the use of its computer systems in tracking the payments made by the "offenders" and provides court forms to order probation and payments to JCS. The JCS training system also provides sample letters for use after probation is ordered, threatening the "offender" that failure to report to JCS "as directed may result in a warrant being issued for your arrest" and that their "court date cannot and will not be reset." *See* Exhibits 5 and 6.  Similar JCS forms instruct the "offender" that they can avoid the court date if they pay an amount determined by JCS.  *See* Exhibit 7.  Notice to the offender of these JCS set "court dates" was handled by JCS by regular mail with no proof of service and no consideration of returned mail showing no receipt.  Similarly, the setting for any hearing on petitions instituted by JCS was done by JCS and listed on a separate "JCS Docket" which JCS established and which Montgomery then adopts.  Finally, the JCS manual instructs its employees on the issuance of warrants of arrest and provides forms for that purpose. *See* Exhibit 8.

23.     Once on probation to collect the fines, "offenders" who cannot keep up their payments at Montgomery are arrested typically based upon FTA or FTOCO rather than probation violation.  These codes stand for "Failure to Appear" and "Failure to Obey Court Order."   Warrants are issued by the City based upon a report that the offender failed to appear as directed at the JCS established date after notice from JCS.  Similarly, FTOCO arrests result from JCS reporting that the "offender" failed to comply with their probation order – that is, they failed to pay or appear at the JCS offices as JCS directed.  There is no ordinance or statute establishing Failure to Obey Court Order as an offense.  The arrests and incarceration on these charges occur without any determination of contempt

7

or willfulness in these arrests and the additional costs are added without any finding whatsoever. Under this system, the "offender" arrested is jailed for an undetermined period of time with bond set by the city magistrate to approximate the money claims to be owed on the balance at JCS. Unlike legitimate probation systems where a probationer would be entitled to a finding of the reasons for revocation, appointed counsel and, at worse, suffer jail time equating to the original sentence, the system at Montgomery ignores all those safeguards.

24.     The City Council and Mayor control the policy making for Montgomery and also hire the municipal court judges, hire the public defenders and contract for services of JCS at the municipal court. The contract was a no bid contract and provided JCS with an exclusive franchise at the City. The decision to use this JCS system was an administrative decision of Montgomery, by and through its mayor, and not a decision of the municipal court judge or the Chief Justice, or any other employee of the Administrative Office of Courts ('AOC').

25.     Montgomery, through its contract, pattern and practice, clothed JCS with the appearance of state authority and has previously even allowed JCS employees to carry badges. The JCS employees attend each municipal court session and are referred to as "probation officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes. Under this system, JCS "offenders" were not permitted to pay fines at the City payment window, but were required to make all payments, including those for fines, restitution, probation fees and court costs, to JCS.

26.     This public ruse was maintained by Montgomery for purposes of imposing and collecting fines, fees and costs from citizens such as the Plaintiff, and was

8

accomplished by allowing JCS to control the money, determine how much each municipal court "offender" must pay each month, how much JCS would keep for its own fees for collection "services" each month, and how much of the payment JCS would rebate to Montgomery toward the fines adjudged.

27.     This system, as a matter of routine, violates the rights of persons such as the Plaintiff and the class he seeks to represent by imposing fines, fees and surcharges to indigent persons with no hearing or consideration of their indigency and by converting fines to jail time.

28.     Despite the lack of authority to do so, Montgomery allowed JCS to use threats of revoking probation, arrest, increased fines and costs and jail time for purposes of collection. Under the system operated by Montgomery, JCS's determination to incarcerate an individual and/or impose unreasonable bond requirements was routinely accepted by City personnel as a matter of policy without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency.

29.     The lack of indigency or Bearden hearing is especially disturbing as the court records show many indigent people were supposedly represented by attorneys paid by the City (through the "Fair Trial Tax Fund" funded by court fees). All of the court personnel hired by Montgomery have a significant financial stake in the proceedings.

30.     The collective actions of Montgomery and its agents, including JCS and Kloess, are inextricably interwoven with each other and routinely result in court costs and fines which exceed the statutory maximum of $500 for municipal courts. Similarly, the periods of "probation" imposed for purposes of collecting fines and fees routinely exceed

9

the two-year statutory maximum, all of which results in Montgomery taking action to detain and otherwise incarcerate individuals without any jurisdiction to do so. Additionally, Montgomery approves routinely adding to the "offender" probation balance any unpaid fines it can resurrect from old traffic tickets or fines, even though those predate the "probation."

31.     After improperly imposing probation even when no jail sentence is involved, incarceration then follows if the fine, together with the fees added by JCS, are not paid as dictated. The collection purpose of this system is emphasized by the fact that probation is terminated once full payment is made.

32.     Under the Montgomery system, JCS had a monetary interest to conduct its role as "probation officer" in a way that maximized its personal profit and not as a neutral court officer.

33.     Under the scheme implemented by Montgomery, its agent JCS decided whether to initiate probation revocation proceedings, and made recommendations to the city judge about that revocation, and charges of failure to appear or failure to obey court order – all while financially interested in the outcome of these strong-arm collection efforts.

34.     Under the scheme implemented by Montgomery, JCS did not undertake determination of the reasons for nonpayment, and did not consider such things as the Plaintiff' disability, unemployment or assets, in regard to the nonpayment of the fines and routinely sought collection from exempt income such as Social Security Disability payments.

35.     Under the scheme implemented by Montgomery, JCS denied any responsibility to determine indigency, and provided no instruction to its employees for the

10

consideration of indigency.

36.     Under the scheme implemented by Montgomery, after simple fines are converted to "probation" for payment, jail often resulted for the "offender" who did not meet the payment schedule. This system used JCS's conclusion of a "probation violation" or "failure to obey court order" to incarcerate individuals who, had they been financially able to pay, would have paid only a fine with no probation whatsoever.

37.     If a person is unable to make a full payment, JCS, often took out the amount owed to JCS first so that JCS was paid even if a person's debt to the City was not reduced.

38.     Many people have made payments to the City and to JCS, only to learn later that there was no record of those payments and to be ordered to make them again.

39.     If a person missed payments or paid less than required, JCS had the purported contractual authority and discretion to decide whether to petition the City for "revocation" of probation. JCS also has a policy of placing people who cannot make full payments – from whom the company has difficulty making a profit – on "warrant status," which could result in warrants issued for their arrest by the City and which constituted a JCS determination that JCS would not accept the person for future probation supervision. JCS communicated this decision to the City, and the City's policy and practice was to agree not to place such people back on probation, requiring instead that those people pay in full or go to jail.

40.     In other cases in which a person was making substantial payments, JCS, had a personal financial interest in extending a person's probation and in keeping the person on a payment plan for as long as possible so that it could profit from the collection of more monthly fees.

11

41.     Thus, under the City's scheme, JCS, was allowed not only to decide whether to initiate judicial revocation proceedings, but could also decide whether a person was put on probation and what judicially ordered conditions were imposed. JCS would also make other recommendations to the City judge concerning how JCS believed the person had faired on probation, whether the person should be placed on probation, whether JCS considered the person "eligible" for probation, what the amount of monthly court-ordered payments should be, and a variety of other case-related decisions.

42.     JCS had a personal financial interest to conduct its role as a probation officer in a way that maximized its personal profit and not necessarily as a neutral public court officer.

43.     JCS used a "probation" room inside the City building that also houses the Municipal Court, directly across from the Municipal courtroom. A JCS employee often sat in the courtroom near the judge and advised the judge about how to handle the cases of "probationers" and potential "probationers."

44.     The City enforced a policy and practice of initiating and issuing warrants when a person missed a payment or failed to make sufficient payments without considering the person's ability to pay[5]—even when the City or its agent, JCS, had knowledge that the person was indigent – and without providing notice and validly summoning the person to court for a hearing.

45.     Instead, City policy allows the City to issue and execute warrants,[6] and City

---

[5] See DOJ Report pp.54-55

[6] See DOJ Report pg. 55

12

officers go to the homes of traffic debtors to arrest them. The City policy and practice is also therefore to deprive people of their liberty without any prior notice and opportunity to be heard and without any basic inquiry into whether the debt is owed, actually unpaid, or still valid.

46.     The City often chooses to execute these warrants prior to or over the weekend, which results in a person serving needless extra time in jail prior to the next available court date.

47.     People placed on "probation" because they cannot afford to pay their fines, fees, costs, and surcharges immediately were also forced to abide by additional restrictions on their liberty, which the City called "conditions" of probation, which were imposed solely because of their wealth status. These restrictions include: 1) not changing residence or employment without notifying JCS, 2) avoiding "injurious or vicious habits," 3) not using alcohol or visiting places where "intoxicants, drugs, or dangerous substances are sold, dispensed or used, 4) working diligently at a lawful occupation, 5) "truthfully answer all inquiries" by the JCS employees and "comply with all instructions" the JCS employee gives. In addition to these unlawful constraints, the order states in bold type. **"You are subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly."**

48.     When warrants are issued and executed, the City adds fees, costs, and surcharges to the amounts of debt already owed. In addition to court fees and JCS fees and costs, the City routinely adds surcharges for warrants, a "solicitor" fee, and even a 30% debt-collection fee.

13

49.    The City's policy and practice was to conduct no inquiry into the person's ability to pay, and the City's policy and practice also refused to use even the state-issued Affidavit of Substantial Hardship that is available for courts to use to determine indigence. As such, the offenders had no opportunity to present evidence concerning their ability to pay or concerning any other relevant question.[7]

50.    If family members were present, the City's practice was to call them up to the bench and to ask them to pay as much of their family member's debts as they could on the threat that the person who allegedly owes the money would be jailed if the family members did not pay.

51.    The City did not conduct any meaningful inquiry into the person's ability to pay and did not even explain to people how they might claim indigency through standard forms issued by the State of Alabama.

52.    The amount of debt announced to debtors by the judge in open court often differed from the amount listed on the paperwork that they received on their return to the jail. The paperwork amount is usually less than the open court amount, meaning that debtors would often have a balance remaining after they "served out" their fines, leading to their placement back on a payment plan and their continued supervision.[8] The City appears to refer to this as "reopening" their cases, although this "reopening" and the corresponding modifications that it entails are not performed at any formal hearing or even in the person's presence.  Once people returned to the jail from City court, they were told

---

[7] See DOJ Report pg.58

[8] See DOJ Report pp. 59-61

14

of the City's policy of "working off" an extra $25 per day of their debts if the person agreed to labor in the City jail while being imprisoned.

53.    Inmates desperate to return to their families by "working off" their debts more quickly competed on a daily basis to be selected by City jail employees for a limited number of difficult, unsanitary, and demeaning daily labor tasks. These tasks included cleaning the offices of City employees in the Municipal Court building, the bathrooms in the City police department and Municipal Court, and cells and bathrooms in the City's overcrowded jail.

54.    The City's debt collection practices are enormously profitable, especially in getting family members with no legal obligation to pay any money to the City to come up with money to get their loved ones released from jail and in getting low-income people to forgo basic necessities of life in order to pay JCS and the City in an attempt to avoid jail.

55.    For example, the 2013 City of Birmingham budget reflects approximately $2.8 million from court and traffic citations, the City of Mobile approximately $2 million, and the City of Huntsville approximately $2.5 million. In contrast, the City of Montgomery budget reflects revenue of $15.9 million from municipal court "fines and forfeitures."

56.    The City uses the money collected through these procedures to fund the City jail, to pay Municipal Court judicial salaries, to pay City Attorney's Office salaries, and to fund other portions of the City budget.

57.    The City's recent "Amnesty Day" program starkly demonstrates its practice of jailing persons who are unable to pay debts to the City. In May 2013, Montgomery Mayor Todd Strange and City Municipal Court Administrator Kenneth Nixon (who is also a member of the Mayor's cabinet), announced that the City would offer an "Amnesty"

15

program on the first two Saturdays in June. Under this program, the City announced that it would remove certain fees, eliminate arrest warrants, and institute a payment plan if individuals were unable to pay the full amount to which the City claimed it was entitled.

58.     However, at least 15 people were arrested on the first day of the "Amnesty" program because they had too much debt allegedly outstanding (greater than $2,500) or because they did not bring at least $150 (or 10% of what was owed, if greater) to pay the City. These people were arrested pursuant to a City policy that required the arrest and jailing of people whose debts met these criteria regardless of a person's ability to pay or financial circumstances.

59.     The City's publicly available budget does not itemize "fines and forfeitures" in as much detail as do the budgets of some other cities, which makes it difficult for the public to know the exact source of these funds. But, the "fines and forfeitures" collected by the City of Montgomery appear substantially higher than those collected by any other major Alabama City, even those cities are larger than Montgomery. These policies and practices have created a culture of fear among the City's poorest residents[9] who are afraid even to appear in City court to explain their indigence because they know they will be jailed by the City without any meaningful process. Indeed, Mr. Nixon, the court administrator, reported to the Montgomery Advertiser that many residents were jailed during the amnesty program because they owed too much and could not pay even 10% of what they owed. Mr. Nixon

---

[9] See DOJ Report pg. 48 "There are also historical reasons, of which the City is well aware, that many Ferguson residents may not appear in court. **Some individuals fear that if they cannot immediately pay the fines they owe, they will be arrested and sent to jail.** Ferguson court staff members told us that they believe the high number of missed court appearances in their court is attributable, in part, to this popular belief. **These fears are well founded." (Emphasis added)**

16

publicly acknowledged that the arrests probably scared others from participating in the "Amnesty" program.

60.     The same fear motivates many very poor City residents to sacrifice expenditures on food, clothing, utilities, sanitary home repairs, and other basic necessities of life in order to scrape together money to pay traffic debt to the City.

61.     Mr. Nixon warned that, following the 2013 Amnesty Program, the City would be "stricter" about arresting people for unpaid debt. The City also has a policy of referring unpaid debt to the Montgomery County District Attorney's Office, which will send letters to debtors on the City's behalf threatening imminent arrest if they do not pay their debts. A surcharge of 30% of the value of the debt is added to the debt to compensate the District Attorney's Office for its participation in the City's debt collection. The City purports to have the authority to arrest and jail indigent people when they cannot pay even these additional surcharges.

62.     The City has stated that it seeks to use these collection programs and tactics to go after old traffic debt, including debt dating back to the 1980s.

63.     As in the Plaintiff's case, the City's policy is to modify orders of incarceration outside of any formal judicial process. These modifications include: decreasing a person's jail time from what was announced in open court so that a person is released with a remaining balance owed; allowing a person's release without any hearing if the person or family members present some money to the City clerk; and allowing City employees to reduce the time a person is ordered to be in jail based on labor performed in the jail without any judicial involvement.

64.     Plaintiff and witnesses have observed numerous other similar violations of

17

basic constitutional rights in the Montgomery Municipal Court within the past year.

65.     Under its scheme, Montgomery, which is also financially interested, takes advantage of its control over its police force and jail facilities to deny these "offender"/debtors the statutory and constitutional protections that every other Alabama debtor may invoke against a private creditor by allowing JCS to use or threaten debtors of the City with arrest and jail as coercion for payment.

66.     Under this scheme, it was the policy and practice of Montgomery to jail people when they could not afford to pay debts owed to the City resulting from prior traffic tickets or fines and to do so without any inquiry into the person's ability to pay and without considering alternatives to imprisonment.

**THE PLAINTIFF**

67.     Plaintiff and others similarly situated are individuals who were unable to fully pay fines, fees, costs and surcharges levied by the Montgomery Municipal Court, and who, as a result, were assigned to JCS for "probation" under JCS for purposes of collecting the fine. Plaintiff and many like him are currently or were formerly indigent and, despite that indigency, were incarcerated for failure to pay charges and fees for services allegedly rendered by JCS to Montgomery with which it contracted.

**ALDARESS CARTER**

68.     Aldaress Carter ('Mr. Carter') is over the age of nineteen (19) and is a resident of Montgomery, Alabama.

69.     On January 24, 2014, Mr. Carter was riding home from work, and the driver of the car in which he was a passenger was pulled over for a broken tail light.

18

70.     The officer asked Mr. Carter, a passenger, his name and proceeded to run his name through the police records' database.[10] The officer then informed Mr. Carter that he was under arrest, informing him that there were ten capias warrants outstanding on him.

71.     This was the first Mr. Carter had heard of the warrants, and at that time he did not know what the warrants could be related to.

72.     Mr. Carter was surprised that he did not know of these warrants because he was on supervised probation with the state and he regularly reported to his probation officer. Despite regularly communicating with his state probation officer and finding work, he was now being told that Montgomery had ten active arrest warrants that no one else knew about.[11]

73.     The private company -- Judicial Correction Services, ('JCS') - Montgomery -- hired to collect outstanding fines, had requested that these warrants be issued for unpaid fines, fees and costs relating to traffic tickets Mr. Carter had incurred several years earlier. When Mr. Carter first received those tickets, he had been fined by the Montgomery Municipal Court for the charges but did not receive a jail sentence.[12]

---

[10] See DOJ Report pg. 56,57 "We have found that FPD officers frequently check individuals for warrants, even when the person is not reasonably suspected of engaging in any criminal activity, and, if a municipal warrant exists, will often make an arrest. City officials have told us that the decision to arrest a person for an outstanding warrant is "highly discretionary" and that officers will frequently not arrest unless the person is "ignorant." Records show, however, that officers do arrest individuals for outstanding municipal warrants with considerable frequency...Similarly, data collected during vehicle stops shows that, during a larger period of time between October 2012 and October 2014, FPD arrested roughly 460 individuals following a vehicle stop solely because they had outstanding warrants."

[11] See DOJ Report pg. 61 "As with "warrant warning letters" described above, our investigation has been unable to verify that the court *consistently* sends bond forfeiture warning letters. And, as with warrant warning letters, bond forfeiture warning letters are sometimes returned to the court, but court staff members do not appear to make any further attempt to contact the intended recipient."

[12] See DOJ Report pg. 55 "The large number of warrants issued by the court, by any count, is due exclusively to the fact that the court uses arrest warrants and the threat of arrest as its primary tool for

19

74.     Mr. Carter was unable to pay the fines and costs in full when levied and, on or around 2011, was ordered to be on "probation" with JCS and to pay JCS an additional $40 per month.

75.     However, Mr. Carter was and has been indigent at all relevant times. At times, Mr. Carter paid what little money he could toward his fines and JCS fees, but eventually stopped paying when his money ran out.

76.     Mr. Carter was not able to pay all the fines and fees, but, in accordance with the policy and practice of Montgomery which was established in its contract with JCS, neither the Montgomery Municipal Court nor JCS ever made any inquiry into his inability to pay at the time of levying the fine or thereafter.

77.     Montgomery's agent, JCS, sent Mr. Carter a "failure to report" letter dated March 29, 2012, but Mr. Carter did not receive this letter and it was returned to JCS and scanned into its files.

78.     Montgomery's agent, JCS, sent Mr. Carter another "failure to report" letter to the same bad address. Mr. Carter did not receive this letter and it was returned to JCS and scanned into its files. The date 4/23/12 is handwritten on the returned letter.

79.     Because Mr. Carter failed to pay his City fines and JCS fees, on December 6, 2012 JCS requested that his "probation" be revoked. The City itself sent no notice to Mr. Carter and delegated that to its agent JCS.

---

collecting outstanding fines for municipal code violations. With extremely limited exceptions, every warrant issued by the Ferguson municipal court was issued because: 1) a person missed consecutive court appearances, or 2) a person missed a single required fine payment as part of a payment plan. Under current court policy, the court issues a warrant in every case where either of those circumstances arises—regardless of the severity of the code violation that the case involves. Indeed, the court rarely issues a warrant for any other purpose."

80. In its revocation petition, JCS does not mention that letters notifying Mr. Carter of JCS requests have been returned nor does it mention the fact that Mr. Carter is indigent and unable pay, nor does it mention the meager payments Mr. Carter has made.

81. Mr. Carter did not receive a copy of JCS's petition for revocation and did not attend the court hearing because he had no notice of the hearing.

82. Despite the fact that Mr. Carter did not receive notice of the hearing, a warrant for his arrest was issued by the City and a new charge of "Failure to Appear" ('FTA') was assessed to Mr. Carter on January 30, 2013.

83. This common scheme of revoking probation and assessing new charges of FTA benefitted both JCS and the City as it resulted in higher fees and fines owed to the City and it enabled JCS to keep probationers in their system longer which resulted in higher profits to the private company.

84. Mr. Carter had no notice of the original court hearing or the warrant that was issued for his purported "Failure to Appear" and the City made no effort to give him notice.

85. After he was arrested on January 24, 2014, Mr. Carter was then taken to the Montgomery City jail where he learned for the first time that he had been arrested for old, unpaid traffic tickets.

86. Mr. Carter sat in jail for three days and then appeared in the Montgomery Municipal Court on Monday, January 27, 2014 -- along with sixty-seven (67) other jailed inmates.

87. Before appearing in court, the jailed inmates were told by a man who did not introduce himself that they needed to "Pay or they would Stay." It was later determined that this man was Branch Kloess, a "Public Defender" hired by the City.

21

88.    Despite being in jail and being indigent as shown by his inability to bond out of jail, Mr. Carter appeared before the judge and was ordered to pay $915 for the fines and fees on his unpaid traffic tickets, after which he could be released. Otherwise, the court informed Mr. Carter that he must stay in jail and receive $50 in credit per day toward the payment of his fines and fees.

89.    Mr. Carter had recently obtained new employment, a job that had taken him a long time to acquire, and he knew he would be fired if he was forced to stay in jail. However, Mr. Carter had no money with which to pay his fines and was left with no option but to stay in jail. Mr. Carter's girlfriend offered to pay all the money she had, which totaled $120, to secure his release from jail so that he could go to work. This offer was refused and Mr. Carter was sent back to jail. Throughout the day, the amount demanded to secure Mr. Carter's release from jail changed several times without any court intervention or consideration. Mr. Carter's mother continued to call the jail to find out how she could get him out and finally learned that if a family member or friend could pay $452, then Mr. Carter would be released and the unpaid fines and JCS fees he owed would be cleared.

90.    Mrs. Carter was able to borrow the money to get her son out of jail so that he could go to work. She paid the $452 to one of the clerks at the court window and they called the jail to get Mr. Carter released.

91.    On January 30, Mr. Carter was released from jail when his mother paid $452.

92.    Throughout this period of time, JCS provided no services to Mr. Carter and has acted merely as a collection agency charging additional fees, and despite knowledge that Mr. Carter was unable to pay these fines and was indigent, JCS sought to collect and has taken actions to incarcerate Mr. Carter without any due process.

22

93.     Mr. Carter was incarcerated without any formal probation revocation hearing or any hearing on the issue of his indigency, but simply incarcerated and later released based upon the determination of the City of Montgomery pursuant to its policy and contract with JCS.

94.     Mr. Carter later learned that the public defender had entered a notice of appearance on Mr. Carter's behalf despite the fact that Mr. Carter did not know who he/she was nor had the public defender introduced himself to Mr. Carter or advocated on Mr. Carter's behalf.

95.     Mr. Carter's mother discovered that the public defender that supposedly represented her son was Mr. Branch Kloess and called Kloess who rudely questioned her about how she found out he was her son's attorney and then stated he was no longer his attorney. When she told her son that he had counsel appointed to him, her son was surprised because no one stood up and spoke on his behalf to the judge.

96.     Later when Mr. Carter's girlfriend saw a picture of Mr. Kloess, she recognized him as the man that was seated in the courtroom but had no contact with either her or Mr. Carter. Mr. Kloess did not appear before the judge to plead Mr. Carter's indigency or request that the judge reduce his sentence based on his inability to pay, nor did he meet with Mr. Carter and file any pleading raising the issue of his indigency.

97.     In fact, despite the fact that Mr. Kloess was being paid to represent indigent people, Mr. Carter was sent back to jail until his family could somehow get enough money to get him released so he could go back to work and, hopefully, not lose his job.

98.     Montgomery's agents and employees all participate in this revenue revitalization program that preys on the poor despite the fact that their actions violate state

23

and federal constitutional freedoms.

## Plaintiff's CLASS ALLEGATIONS

99.    The Classes which the named Plaintiff seeks to represent consist of:

All individuals who have been assigned by the Montgomery Municipal Court to "probation" with JCS for the collection of fines.

AND

All individuals who, despite their indigency, were incarcerated, without consideration of their indigency for failure to pay fines, fees, costs and charges and levied by the Montgomery Municipal Court.

100.    The members of the Classes and subclasses are so numerous that joinder of all members is impracticable.

101.    As of this time, the exact number in the Classes is unknown but would be more than one thousand and is ascertainable.

102.    Plaintiff's treatment by the Defendants is typical of the members of the Classes and subclasses and is ongoing.

103.    Plaintiff will fairly and adequately protect the interests of the Classes and has retained counsel who are competent and experienced in class litigation. Plaintiff has no interests that are adverse or antagonistic to the Classes.

104.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by many Class members may be small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged.

24

105.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether policy and practice of automatically placing on "probation" at additional cost all municipal offenders who cannot immediately pay fines and costs is legal;

b.      Whether the policy and practice of converting unpaid fines and costs to days of incarceration, without any determination concerning an individual's ability to pay, is legal;

c.      Whether the policy and practice of requiring every order of the municipal court to require probation fees for JCS is legal;

d.      Whether the policy and practice of incarcerating individuals for failure to pay fines and costs with no finding of willfulness is legal;

e.      Whether the policy and practice of incarcerating individuals for failure to appear when no notice of the hearing was provided by the court is legal;

f.      Whether the policy and practice of incarcerating individuals for Failure to Obey Court Order when no such ordinance exist and with no finding of willful contempt is legal;

g.      Whether the policy and practice of failing to appoint counsel for indigent defendants when a jail sentence is involved is legal;

h.      Whether the policy and practice of failing to make any inquiry into indigency before imposing fines and costs is legal;

i.      Whether the policy and practice of failing to give adequate notice of

25

the charge and nature of a probation revocation hearing, failing to provide a probation revocation hearing, failing to make written findings concerning the reasons for revoking probation and the evidence relied upon, failing to hold a hearing to determine indigency before revoking probation and otherwise imposing incarceration, failing to make written findings concerning an individual's willful nonpayment of fines and costs before imposing incarceration for nonpayment, is legal;

j.     Whether the policy and practice of charging incarcerated municipal defendants a daily fee for each day the person is incarcerated is legal;

k.     Whether the policy and practice of imposing fines and court costs that exceed that statutory maximum for municipal is legal;

l.     Whether the policy and practice of extending "probation" for municipal offenses beyond 24 months is legal;

m.     Whether the policy and practice which fails to give any credit for time spent incarcerated is legal;

n.     Whether the policy and practice of adding unpaid fines that predate probation to the balance to be paid during probation is legal;

o.     Whether a municipality can legally enter a contract binding upon its municipal court;

p.     Whether a municipality can enter into a no bid contract to grant an exclusive franchise to a private probation company to operate in its municipal court;

q.     Whether setting bond based upon a fine balance owed the city is legal;

26

r.      Whether the policy of demanding a cash bond for release from jail without inquiry into ones' financial situation or offense is legal.

106.    Montgomery has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

107.    Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a Class Action. The data concerning the Class members and the transaction details and amounts on each charge are largely computerized by Montgomery and by JCS.

108.    The names and addresses of the Class members are a matter of public record and are also kept by JCS and notice can be provided to the Class members via First Class U.S. Mail or other appropriate means as may be directed by the Court.

## COUNT ONE
## DENIAL OF DUE PROCESS
## AGAINST THE CITY OF MONTGOMERY AND KLOESS

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

109.    The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has denied him his right to due process and the rights of the Class members.

110.    By contract, Montgomery delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

27

111. That no bid agreement was signed by the City mayor and bound Montgomery and its municipal court requiring that its municipal "*court agrees that each court order shall provide* for the following:

> a probation fee of $40.00 per month flat fee
>
> One time probationer set up fee of $10.00. . . . " (*emphasis added*).

112. Montgomery, through its mayor and/or council, approved the agreements with JCS.

113. Montgomery, through its mayor and council, also approved the employment of the judges of its municipal court and its public defenders.

114. Municipalities are prohibited from laws, ordinances and policies which are in conflict with state law. *See Ala Code* Section 11-45-1. *Also see, Ala. Const.* Article 4 Section 89.

115. State law also dictates a separation of the branches of government. *Ala Const.* Article 3, Section 43.[13] Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, *Ala. Code,* Section 11-43-43, while the mayor of the city is responsible for executive duties. *Ala. Code,* Section 11-43-83. If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama. *Ala. Code,* Section 12-2-7 *et. seq.*; *Ala Const.,* Article 6, Section 139.

116. Municipal mayors have the executive power to execute and enforce

---

[13]Ala. Const. Art. III, Section 43 states:

In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.

28

contracts[14] and the city councils have the legislative power to enact regulations and ordinances,[15] but neither the mayor nor the council has the power to invade the administration of its judiciary.

117.    Montgomery has exceeded its statutory authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, it agreed with JCS to bind its municipal court to include probation and fees for JCS in every court order entered by its hired judge. That action essentially sold the court process for purposes of increasing income to the City.

118.    The illegal agreement and policy of Montgomery invaded and overrode the judicial authority and court administration reserved to the municipal judges and the Chief Justice.

119.    Probation is only appropriate when an individual has been sentenced to jail time and not when only a fine has been assessed as is the case with the Plaintiff and Class members. As a result, the Montgomery policy and contract to include probation in every court order mandated a judicial practice that continually deprived indigent misdemeanants of their constitutional rights.

120.    The policy and practice of Montgomery also violated the Alabama

---

[14]Ala. Code Section 11-43-83 - The mayor shall see that all contracts with the town or city are faithfully kept or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf of the city or town and no sureties shall be required on such bond. He shall perform such other executive duties, in addition to those prescribed in this article, as may be required of him by the council.

[15]Ala. Code Section 11-43-43 - All legislative powers and other powers granted to cities and towns shall be exercised by the council, except those powers conferred on some officers by law or ordinance. The council shall perform the duties required by this title and other applicable provisions of law.

29

Constitution. Article I, Section 20 *Ala. Const.* specifically prohibits imprisonment for the payment of debts, yet the policy enforced at Montgomery regularly jailed misdemeanants upon the recommendation of its agent JCS for failure to pay fines, fees and costs. Article I, Section 16 *Ala. Const.* requires that all persons shall before conviction be bailable by sufficient surety, but despite this prohibition, misdemeanants were regularly jailed without lawful conviction under any contempt proceedings or probation violation.

121.    The Plaintiff and some Class members were imprisoned, and some repeatedly, under these policies of Montgomery for their failure to pay fines, costs and the added fees mandated by the illegal contract between Montgomery and JCS. The Plaintiff was not accorded any hearing or consideration of his indigency before being jailed, nor was he provided any notice of charges, a hearing on charges levied that might result in imprisonment, or provided meaningful assistance of counsel before being imprisoned.

122.    At the Montgomery Municipal Court, a person unable to fully pay fines and costs when levied was automatically placed on probation. The Montgomery system used JCS orders and forms even when no jail sentence was adjudicated. This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs. The orders supplied by JCS under the agreement with Montgomery then required the individual to make payments to JCS, rather than the City clerk, of the fines, costs and additional monthly fees.

123.    Montgomery, through its city clerks, actively enforced these requirements as part of the policy and procedures established under this contract and refused to accept payments of fines and costs referring those payers such as the Plaintiff instead to the JCS office.

30

124. Montgomery, through its contract, practice and policy, clothed its agent JCS with the appearance of state authority and has previously allowed JCS employees to carry badges.[16] Under these practices and policies, JCS employees were allowed to attend each municipal court session and were referred to "probation officers" in the operation of the municipal court and in the City clerk's office, though none ever had such authority under Alabama statutes.

125. Under this system at Montgomery, "offenders" are not permitted to pay fines at the City clerk's office, but are instead directed to make all payments, including those for fines, restitution, probation fees and court costs, to JCS at the JCS office at hours and locations set by JCS.

126. Montgomery's policy and practice also allowed JCS to control the money collected from persons such as Plaintiff and to determine how much each such municipal court "offender" must pay each month.

127. Montgomery's policy and practice also allowed JCS to determine how much of the collected sums will be credited to the collection "services" of JCS each month and how much it will rebate to Montgomery toward the municipal court fines adjudged.

128. This system, as a matter of routine, violated the rights of persons such as the Plaintiff and the class he seeks to represent by imposing fines and charging fees to

---

16



31

indigent persons with no hearing or consideration of their indigency.

129.    Despite the lack of authority to do so, Montgomery, by its practice and policy, permitted, approved and conspired with JCS, a private actor with a financial stake in the outcome, to play the role of a neutral probation office and, at its discretion, to use threats of revoking probation, increased fines and costs, arrest and jail time for purposes of collection.

130.    Under this system, should an individual fail to pay to the satisfaction of JCS, Montgomery permitted and approved JCS setting payment and reporting schedules and determining when the individual's "probation" should be revoked, or when to impose additional fines and costs.

131.    Under the system operated at Montgomery, JCS's determination to incarcerate an individual and/or impose unreasonable release requirements was routinely accepted by city personnel without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency despite the fact that city-paid 'public defenders' were assigned to many of these indigent folks, yet they were still subject to punitive action.

132.    Montgomery permitted and conspired with JCS allowing it to control and dictate these functions and, as a consequence, this routinely resulted in court costs and fines which exceed the statutory maximum of $500 for municipal courts and imposed additional "jail fees" determined by the city clerk for the costs of any incarceration. Similarly, the periods of "probation" imposed for purposes of collecting fines and fees at Montgomery routinely exceeded the two-year statutory maximum, all of which result in action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

32

133. The municipal court judges employed by Montgomery did no investigation of indigency as a matter of policy.

134. Despite the fact that many people are assigned a 'public defender,' these indigent people are not adequately represented and many times do not even know that an attorney has been assigned to their case. In fact, many times the 'public defender' never introduced himself/herself to their 'client' and did not speak to the court on the "'clients'" behalf and kept no files on their "clients."

135. Under the system at Montgomery, after simple fines are illegally converted to "probation" for payment, jail often resulted for the "offender" who did not meet the payment schedule set by JCS and enforced by Montgomery. This system used and accepted JCS's conclusion of a "probation violation" or "failure to obey court order" and employed JCS recommendations for the issuance of a warrant of arrest to incarcerate individuals whose original obligation was only the payment of a fine.

136. Under this system at Montgomery, the Plaintiff was first fined, but then automatically placed on "probation" though no jail sentence was adjudicated. Though the Plaintiff was indigent, Montgomery made no investigation of that matter -- despite the fact that, unknown to him, Montgomery paid a 'public defender' to represent him. When the Plaintiff was unable to pay the fines, costs and additional JCS fees that Montgomery agreed to levy, recommendations from JCS were made and followed by Montgomery to incarcerate him for undetermined time unless a cash bond was made in amounts closely approximating the sums sought by JCS's collection efforts.

137. Many individuals who cannot pay their fines and added fees, such as the Plaintiff and Class members, were jailed for charges against them for "failure to obey court

33

order," though there is no such state statute or city ordinance which defines this as a criminal act.

138.    Though a determination of willful refusal to obey a court order as required by *Ala. Code* §15-18-62 can lawfully lead to incarceration, no such determinations were made under the system at Montgomery.

139.    Montgomery adopted and implemented JCS's conclusion of a "probation violation" or "failure to obey court order" and issued arrest warrants to incarcerate individuals whose original case had only been a fine.

140.    In this process of converting fines to jail time, Montgomery did not give adequate notice to the "offender" of the nature of any lawful charge, it failed to conduct hearings, failed to make written findings concerning the reasons for any probation revocation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

141.    Under this policy and practice at Montgomery, when a simple fine was transformed into a jail sentence of an undetermined time, the City failed to provide adequate counsel for the "offenders." In fact, like the Plaintiff, many people are jailed for nonpayment despite the fact that 'public defenders' are retained by the City to represent the indigent,[17] are listed as attorneys on their case, and are paid to supposedly represent them. Those public defenders like Kloess are paid from fines collected on convictions, do not routinely oppose the charges made, and do not raise issues of indigency nor request

---

[17] See Exhibit 2 - contract for Kloess.

34

hearings for that purpose.

142.    The public defenders have a policy and practice of not requesting indigency hearings despite the fact that the only clients they represent under the contract with the City are indigents. This policy and practice of not requesting indigency hearings benefits both the City and the 'public defender,' as all are enriched by avoiding the constitutional due process requirements and demanding money from the poor.

143.    After jailing an "offender," Montgomery acted to further violate the Plaintiff's constitutional rights by arbitrarily granting early release to some individuals while denying it to others under similar circumstances without any rational basis other than payments it has secured. As a result, there was no consistent standard of review or logical system under which those incarcerated were granted release.

144.    Under the practice and policies used at Montgomery, after an adjudication under which a fine is levied, additional fees, costs, and other charges are added to the "offender" bill for each new arrest, alleged probation violation, or contempt proceeding including, in some cases, those relating to charges years earlier.

145.    As a proximate consequence of this deprivation of due process, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

## COUNT TWO
## VIOLATION OF THE FOURTH AMENDMENT
## CITY OF MONTGOMERY

35

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

146.   The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has violated their Fourth Amendment rights and the rights of the Class members to be free from unreasonable seizure.

147.   By no bid contract as discussed in detail above, Montgomery illegally delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

148.   In addition to a denial of due process guaranteed the Plaintiff under the Fourteenth Amendment, the arrest and detainment of these "offenders" who could not pay the fine imposed under this system constitutes a "seizure" in violation of the Fourth Amendment as well.

149.   Under Alabama law, a simple fine can only be converted into jail time if the court makes findings under *Ala. Code,* Section 15-18-62 (1975) that a defendant has willfully failed to pay the fines.

150.   Montgomery's policy and practice of including probation with JCS in every municipal court order created the process by which misdemeanants were incarcerated without a willfulness hearing as required by *Ala. Code,* Section 15-18-62, and in violation of Alabama case law, the Alabama Constitution and the U.S. Constitution.

151.   Under Alabama case law, the Alabama Constitution and the U.S. Constitution, an indigent defendant cannot be required to serve jail time for nonpayment

36

of fines or costs.[18]

152.   Despite longstanding legal precedent prohibiting incarceration for one's inability to pay a fine/debt, Montgomery's personnel, working in conjunction with JCS, unlawfully arrested and jailed the Plaintiff for his inability to pay a simple fine with added fees and costs dictated by the Montgomery contract with JCS.

153.   Montgomery's police, municipal court processes and jail access all became tools of collection under forms and processes issued by its agent JCS and which were routinely followed by Montgomery. Montgomery's policy and practice, after clothing its agent JCS with the appearance of state actor acting on their behalf, allowed JCS to threaten arrest or revocation of probation and/or incarceration in order to coerce these indigents to pay the city fines and fees for misdemeanor offenses not otherwise subject to jail time under the original adjudication.

154.   When these threats failed to produce sufficiently, Montgomery police, clerks and other personnel, cooperated with JCS to arrest and jail the Plaintiff class members

---

[18]It is clear as a matter of constitutional law that an indigent defendant cannot be required to serve jail time for nonpayment of fine and costs. *Tate v. Short*, 401 U.S. 395 (1971); *Lingle v. State*, 51 Ala.App. 210, 283 So.2d 660 (1973); *Smith v. State* 51 Ala.App. 212, 283 So.2d 662 (1973). "To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." *Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir.1977). This is not a case of a defendant who, though capable of paying a fine, refuses or neglects to do so.

Although Section 15-22-52, *Alabama Code* 1975, states that payment of fine and costs may be made a condition of suspension of sentence or probation, in *State v. Esdale*, 253 Ala. 550, 45 So.2d 865 (1950), our Supreme Court indicated that such a condition was contrary to our constitution.
"These benefits (probation and suspension of sentence) are not the subject of bargain and sale to be conditioned on the payment of costs and fees assessed as an incident to the prosecution and trial and to condition these benefits on the payment of such costs and fees violate the letter and spirit of Section 13 of the Constitution of 1901 which provides that 'justice shall be administered without sale, denial or delay.'" *Esdale*, 253 Ala. at 553.

*Crutcher v. State,* 439 So. 2d 725, 726 (Ala. Crim. App. 1983)

37

such as Aldaress Carter.

155. The jailing of class members by Montgomery, as described under the specific facts stated above, constitutes unlawful seizures in violation of the Fourth Amendment.[19]

156. As a proximate consequence of this unlawful seizure, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, all while being indigent.

## COUNT THREE
## VIOLATION OF THE SIXTH AMENDMENT
## CITY OF MONTGOMERY

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

157. The Plaintiff avers that Montgomery, acting under color of state law in violation of 42 U.S.C. § 1983, has violated his Sixth Amendment rights and the rights of the Class members.

158. By a no bid contract as discussed in detail above, Montgomery illegally delegated many administrative and judicial functions of their municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

159. Under the policy and practice at Montgomery, when a simple fine was

---

[19] "Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." (internal quotation marks and emphasis omitted)); *Oliver*, 510 U.S. at 274 (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

38

transformed into a jail sentence of an undetermined time, adequate counsel was not provided for the indigent "offenders."

160. The Plaintiff was initially ordered to pay only a fine at the Montgomery Municipal Court, but due to his inability to pay, he was placed on "probation" under JCS pursuant to JCS form orders and the contract approved by Montgomery.

161. The no bid contract signed by Montgomery approved a "probation" process as essentially a collection vehicle for the City to collect its fines. That agreement, as discussed above, conflicts with state statutes, violates state constitutional requirements for separation of power in the branches of government, and exceeds the authority of the mayor and council.

162. Under that agreement, Montgomery allowed JCS to add monthly fees to the "offender" who had already disclosed an inability to pay the fine when adjudicated and despite the fact that JCS provided no services to them.

163. Under the agreement and with the knowledge and approval of Montgomery, JCS represented itself as acting on behalf of the City which clothed it with that appearance.

164. Under this agreement, Montgomery unlawfully invaded the province of the municipal court and mandated that each order there contain provisions for fees to JCS.

165. By this agreement, simple fines without jail sentences were automatically and illegally converted to 'probation' through JCS if the offender could not promptly pay the entire fine and costs.

166. After this conversion from a fine to 'probation,' threats of jail were used by JCS with the approval of Montgomery and actual incarceration then takes place by police and other City personnel if the fines, fees and costs were not paid as scheduled.

39

167. The jeopardy of jail time was not present when the simple fines were adjudicated against the Plaintiff and the Class members and would not have been present but for Montgomery's policy and practice adopting and using the JCS collection system in the administration of its court system illegally requiring "probation" for simple fines.

168. With the Plaintiff's inability to pay and the JCS focus on collections, charges are routinely initiated claiming "probation violation" or "failure to appear" or "failure to obey court order." These are initiated by JCS under its system and then approved by Montgomery personnel.

169. At that point, jail sentences become potential jeopardy for the "offenders" such as the Plaintiff on charges that have never before been subjected to meaningful adversarial testing. Nevertheless, neither JCS nor Montgomery routinely provided adequate counsel for those "offenders."

170. At the point when jail sentences become potential, Montgomery does not provide notice of charges, nor are findings made as required for conviction. Similarly, though JCS also regularly proposes a charge of "failure to obey court order" which Montgomery then pursues, that is not a valid offense. If willful failure to pay under state statutes such as *Ala. Code* Section 15-18-62 is used as the basis, under the City's system with JCS, there is no finding or hearing on the issue of willfulness.

171. The named Plaintiff, Aldaress Carter, while indigent, was unlawfully jailed by Montgomery under this JCS system and was not provided meaningful assistance of counsel. In fact, Mr. Carter was surprised to learn that Mr. Kloess was appointed to his case that resulted in his incarceration. Mr. Kloess never identified himself to Mr. Carter, never met with him and, despite being paid to represent indigents, Mr. Kloess never

40

advocated to the court on Mr. Carter's behalf to raise any issue of his indigency as a bar
to incarceration for failure to pay.

172.    These actions constitute a denial of the Plaintiff's rights secured by the Sixth
Amendment.

173.    As a proximate consequence of this violation of their Sixth Amendment rights,
the Plaintiff and Class members suffered injuries, including having fines converted to jail
sentences, being unlawfully incarcerated for undetermined periods of time with the loss of
their liberty and injury to their dignity, by having fines in excess of statutory limits levied
against them and by having other illegal charges for JCS fees, costs and restitution levied,
all while being indigent.

### COUNT FOUR
### VIOLATION OF THE EIGHTH AMENDMENT
### CITY OF MONTGOMERY

Plaintiff incorporates by reference the previous paragraphs and makes them a part
hereof.

174.    The Plaintiff avers that Montgomery, acting under color of state law in
violation of 42 U.S.C. § 1983, has violated the Eighth Amendment prohibition against
excessive fines, excessive bail and cruel and unusual punishment in its actions with the
Plaintiff and Class members.

175.    As discussed in detail above, Montgomery has illegally delegated many
administrative and judicial functions of their municipal court to its agent JCS, clothing it with
the color of state law for the collection of court fines, costs and private fees.

176.    The Eighth Amendment prohibits cruel and unusual punishment and, as

41

such, limits the kinds of punishment that can be imposed on those convicted of crimes, proscribes punishment grossly disproportionate to the severity of the crime and imposes substantive limits on what can be made criminal and punished as such and prohibits excessive bail.

177.   Under Alabama law, a municipal court has no authority to award a fine on any particular charge over $500, *Ala. Code § 13A-5-12(a)(3)*, and even lawful probation for misdemeanors cannot, by statute, extend beyond a two-year period. *See Ala. Code § 15-22-54(a)*.

178.   As mentioned above, *Ala. Code* § 15-18-62 is the only statutory method under which a fine levied by a court on adjudication can be converted to imprisonment, but that can legally occur **only** where the court finds willful nonpayment of the fine and cost.

179.   Even upon proper notice and a finding of willful nonpayment under § 15-18-62, the conversion of fine to imprisonment has a specific ratio such that a fine not to exceed $500 shall result in no more than 20 days. *See Ala. Code* § 15-18-62(2).

180.   Rule 26.11 of the Alabama Rules of Criminal Procedure provides the method for dealing with fines, restitution and the failure to pay under a variety of circumstances, none of which were followed by Montgomery.

181.   Under these facts, Montgomery illegally contracted and conspired with JCS to add monthly fees and costs to each municipal court order.  This agreement increased the substantial fines levied against indigent persons such as the Plaintiff.

182.   Neither Montgomery, nor its agent JCS, made inquiries into the indigency of the "offenders" in the system.  As a result, the Plaintiff's failure to make payments as

42

dictated resulted in threats of arrests. If threats failed to produce the demanded payments, arrest and incarceration followed under the process based upon JCS's representation that the offender had "failed to obey a court order" or had "failed to appear" or had violated "probation."

183. These fines exceeded the statutory limits of the municipal court and the incarceration periods imposed for the failure to pay exceeded those in *Ala. Code* §15-18-62.

184. The practice and policy of imposing jail time for an inability to pay its fees, fines and costs violates the Eighth Amendment prohibition against excessive fines and cruel and unusual punishment.

185. The named Plaintiff was at all pertinent times indigent and yet was incarcerated by City personnel for his inability to pay fines, fees and costs.

186. After being arrested, JCS, with the City, calculates the amount claimed to be owed for fines, fees and costs which is then used as the bail required for release without consideration of factors justifying release on recognizance or other factors provided for under *Ala Rule Crim Pro.* 7.2. This practice results in excessive bail requirements in violation of the Eighth Amendment.

187. As a result of the violation of the Eighth Amendment, the Plaintiff was subjected to excessive fines, fees, and costs beyond the jurisdictional limits of the municipality and violation of the prohibition against excessive fines and cruel and unusual punishment and excessive bail.

188. As a proximate consequence of this violation of his Eighth Amendment rights, the Plaintiff and Class members suffered injuries, including having fines converted to jail

43

sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

### COUNT FIVE
### DENIAL OF EQUAL PROTECTION
### CITY OF MONTGOMERY

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

189.   Montgomery has acted under color of state law in violation of 42 U.S.C. § 1983 to deny the Plaintiff and Class members' rights to equal protection secured by the Fourteenth Amendment.

190.   This was accomplished by the illegal contractual agreement Montgomery had with JCS. Under that agreement, the actions of its agent JCS were inextricably intertwined in a practice and policy at Montgomery. That practice and policy automatically required "probation" for any person who, despite having no jail sentence, was financially unable to fully pay the fine and costs when levied by the municipal court. That probation requirement was part of the agreement between Montgomery and JCS and was part of every printed order at the municipal court and required payment of monthly fees to JCS.

191.   Persons who are financially able to fully pay the levied fine and costs at Montgomery are not placed on "probation." As a result, those persons are not charged any fees for JCS and are not subjected to threats of arrest and incarceration in the collection process.

44

192.    For those such as the Plaintiff who were unable to fully pay the fine and costs when levied by the municipal court, not only were they required to come to court for traffic tickets, were charged court costs, they were also put on "probation" with JCS.

193.    This requirement was part of the Montgomery contract with JCS. That no bid contract, as mentioned above, exceeded the statutory and constitutional authority of municipalities and imposed on the municipal court an agreement in violation of the separation of powers doctrine between the branches of government.

194.    Once on "probation" for purposes of paying a fines and costs, this policy and practice at Montgomery routinely imposed incarceration and additional costs on individuals who are unable to pay fines and costs, without any determination of willfulness as would lawfully be required under Alabama statutes. See *Ala Code* Section 15-18-62.

195.    This disparate treatment based upon the wealth of the "offender" before the municipal court is a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

196.    This inequality of treatment is also beyond the authority of the municipal court which is required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines. *See Ala. Code* Section 12-14-8. The policy at Montgomery was not uniform with the procedures established by the Alabama Administrative Office of Courts because it added fees only to "offenders" who could not pay immediately and created its own "rules" for penalizing individuals who could not pay as directed.

197.    These additional JCS fines resulted in disparate treatment between those who could immediately pay the fine from those who were unable to immediately pay the

45

fine. Furthermore, those "offenders" at Montgomery with its JCS arrangement were processed and fined differently than "offenders" in jurisdictions that have not allowed JCS to charge additional fees to those who cannot pay. There is no state authority for such disparate treatment.

198.    By its policies, agreement and conspiratorial actions with JCS, the City has also deprived Carter and the Class members of all the civil debt protections available to others.

199.    The Plaintiff Aldaress Carter and the Class members were required to pay the additional costs and fees under this disparate system and many like Aldaress Carter were unlawfully jailed for their inability to pay as demanded.

200.    As a proximate consequence of this denial of the right to equal protection under the Fourteenth Amendment, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

### COUNT SIX
### DECLARATORY AND INJUNCTIVE RELIEF
### CITY OF MONTGOMERY

Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

201.    A real controversy exists between these parties concerning several issues, including the validity of Montgomery's attempt to bind its municipal court and the legality of the actions taken under the contract with JCS, such that declaratory relief is appropriate.

46

**Contract between the City and JCS is void**

202.    Plaintiff requests the Court to declare that Montgomery had no authority to contractually bind their municipal court.

**City does not have the power to bind the Court**

203.    Montgomery entered into an agreement with JCS that exceeded both its statutory and constitutional limitations on municipalities.  Furthermore, that agreement violated the separation of powers doctrine embodied in the Alabama Constitution. See *Ala. Const.,* Article 3, Section 43.   As a result, that agreement is void and due to be declared a nullity.

204.    Alabama state law also dictates a separation of the branches of government. *Ala. Const.,* Article 3, Section 43.   Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, *Ala. Code* Section 11-43-43, while the mayor of the city is responsible for executive duties.  *Ala. Code,* Section 11-43-83.  If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama. *Ala. Code* Section 12-2-7 *et. seq.*; *Ala. Const.,* Art. 6, Section 139.

205.    A city's mayor, such as Montgomery's mayor, has the executive power to execute and enforce contracts and the city council has the legislative power to enact regulations and ordinances, but neither the mayor nor the council has the power to invade the administration of its judiciary.

206.    Montgomery has exceeded its statutory authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, they agreed to require its municipal court to include probation and fees for JCS in every court order

47

entered by its hired judge.  That action essentially sold the court process for purposes of increasing income to the City.

### Contract violates statutory limitation regarding traffic citations and municipal fines

207.    That agreement also violates the uniformity required by statute for processing traffic infractions and penalties for misdemeanors in accordance with specified maximum fines. *See Ala. Code* Section 12-14-8.

208.    The process at Montgomery is not uniform with the procedures established by the Alabama Administrative Office of Courts because it adds fees only to "offenders" who cannot pay immediately and creates other "rules" for further penalizing individuals who cannot pay as directed.  "Offenders" who are able to immediately pay the fine are charged one rate, but those that are unable to immediately pay for the same offense are charged the fine and required to pay JCS monthly fees that accumulate each month that passes.

209.    The "offenders" at Montgomery are processed and fined differently than "offenders" in municipal jurisdictions which have not contracted for JCS to charge its fees to those who cannot pay and, as a result, violates uniformity requirements of *Ala. Code* Section 12-14-8.

### Contract overrides judicial authority and administration of municipal courts reserved to the Chief Justice

210.    The illegal agreement and policy of Montgomery invades and overrides the judicial authority and court administration reserved to the municipal judge and the Chief Justice.

48

**Contract is an exclusive franchise**

211.     The contract between JCS and the City of Montgomery grants an exclusive franchise for provision of probation services.

212.     The contract was not competitively bid as required by Ala. Const. Art. I,§ 22 and Ala. Code 1975, §41-16-50.

213.     Because the contract was not bid, it is void and unenforceable.

214.     Plaintiff requests the Court to declare the actions of Montgomery under this contract to be unconstitutional under the premises discussed above.  Under this void agreement, Montgomery has implemented policies and practices to prosecute persons such as the Plaintiff where there is no jurisdiction or authority to do so under Alabama law, doing so intentionally in an effort to extort the payment of fines and costs from indigent people.  These efforts have resulted in the illegal prosecution and incarceration of the Plaintiff and the Class beyond the limited jurisdiction of the municipal courts.

215.     Further, Montgomery has added increased punishment, fines and costs after adjudication and even where there has been no adjudication of guilt, all without jurisdiction or authority for such under Alabama law.

216.     Montgomery has systematically applied *Ala. Code* § 15-18-62 in an unconstitutional fashion, denying the Plaintiff and the Class he seeks to represent constitutionally protected rights.

217.     Section 15-18-62 provides for the imprisonment for the failure to pay fines

49

and costs in limited circumstances and only upon the finding of a willful nonpayment.[20]

218.    Under the policies and practices at Montgomery, "offenders" before the municipal court, such as the Plaintiff and the Class he seeks to represent, are systematically imprisoned for nonpayment with no determination of willfulness and with no consideration of their indigency or ability to pay.

219.    Furthermore, once imprisoned, the requirements of time to be served under § 15-18-62 are ignored by the practice and policy of Montgomery.

220.    The result of this consistent systematic policy and practice of Montgomery is essentially a debtor's prison for fines and charges levied.

221.    Plaintiff requests the Court to enjoin the actions of Montgomery identified herein to prevent the continuation of these violations of statutory and constitutional prohibitions.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that the Court will take jurisdiction of this cause and upon the final hearing:

> a.    Certify this matter as a proper class action maintainable under Rule

---

[20]**Section 15-18-62
Imprisonment for failure to pay fines and costs.**

In cases of willful nonpayment of the fine and costs, the defendant shall either be imprisoned in the county jail or, at the discretion of the court, sentenced to hard labor for the county as follows:

(1) If the fine and costs do not exceed two hundred fifty dollars ($250), no more than 10 days;

(2) If the fine and costs exceed two hundred fifty dollars ($250) but do not exceed five hundred dollars ($500), no more than 20 days;

(3) If the fine and costs exceed five hundred dollars ($500), but do not exceed one thousand dollars ($1,000), no more than 30 days; and

(4) For every additional one hundred dollars ($100) or fractional part thereof, 4 days.

50

23 of the Federal Rules of Civil Procedure for a plaintiff class and for the defendant class;

b.     Award the Plaintiff such damages as this Court shall find the Plaintiff have sustained, together with punitive, or exemplary damages as the law shall permit;

c.     Enter an injunction and other declaratory relief which declares the Montgomery contract requiring fees to JCS to be void and in violation of the statutory and constitutional limitations on municipalities;

d.     Enter an injunction and other declaratory relief which enjoins Montgomery from engaging in the violations of law set forth hereinabove;

e.     Enter an injunction and other declaratory relief which prohibits Montgomery in the future from placing persons on probation for collection of fines and declares that any current probation and fees for simple fines is void;

f.     Enter an injunction and other declaratory relief which prohibits Montgomery in the future from assessing fines in excess of $500 and/or extending probation periods beyond 24 months and declare that any previously assessed fines and probationary periods in excess of these limits to be void;

g.     Enter an injunction and other declaratory relief which prohibits Montgomery in the future from imprisoning indigent persons for failure to pay fines and fees;

51

h.      Enter an injunction and other declaratory relief which prohibits Montgomery in the future from charging excessive bail established to collect claimed fines and fees;

i.      Award to the Plaintiff and Class members damages under 42 U.S.C. § 1983 equal to any amounts paid on fines and all fees to JCS and Montgomery that are found unconstitutional and/or unlawful (along with interest), and the annulment of any remaining unpaid fines and fees that are found unconstitutional and/or unlawful;

j.      Award to the Plaintiff and Class the cost of this matter, including a reasonable attorneys' fee;

k.      Award to the Plaintiff and the Class members such other, further and more general relief as the Court may deem appropriate under these circumstances including cost of these proceedings.

RESPECTFULLY SUBMITTED,

G. Daniel Evans
ASB-1661-N76G
Attorney for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone: (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com

Alexandria Parrish
ASB-2477-D66P
Attorney for the Plaintiffs
The Evans Law Firm, P.C.

1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone: (205) 870-1970
Fax: (205) 870-7763
E-Mail: ap@evanslawpc.com

William M. Dawson
ASB-3976-S80W
Attorney for the Plaintiffs
Dawson Law Office
1736 Oxmoor Road
Birmingham, Alabama 35209
Telephone: 205-307-7021
E-Mail: bill@billdawsonlaw.com

## JURY DEMAND

Plaintiffs demand trial by struck jury.


Plaintiff's address:

c/o The Evans Law Firm, P.C.

Defendants' addresses:

**CITY OF MONTGOMERY, ALABAMA**
c/o City Attorney's Office
Legal Department
103 North Perry Street
Montgomery, AL 36104

**BRANCH D. KLOESS**
8073 Lakeridge Drive
Montgomery, AL  36117-5141

<div align="right">

# EXHIBIT 1

</div>



**JUDICIAL CORRECTION SERVICES, INC.**
**CLIENT AGREEMENT**

**CITY OF MONTGOMERY ALABAMA**               **COUNTY OF MONTGOMERY**

**THIS AGREEMENT** made and entered into this ___ day of ____July____, 2010, by and between the City of Montgomery, Alabama (the "City"), the City's Municipal Court (the "Court") and Judicial Correction Services, Inc., a Delaware corporation, ("JCS").

**RECITALS**

**WHEREAS**, the City, through its duly elected or appointed officials, is authorized to enter into a binding contract with a qualified vendor to provide probation supervision and related services for the benefit of the City and Court;

**WHEREAS**, JCS, who conducts probation services for various county and city entities and represents that it is a qualified vendor able and willing to provide these services to the City and Court;

**NOW, THEREFORE**, for and in consideration of the mutual covenants contained herein, and other good and valuable considerations, the receipt, adequacy and sufficiency of which is acknowledged by the parties hereto, the City and Court enter into this agreement with JCS to provide probation services upon the terms set forth below, including the following Exhibits:

> Exhibit A – Uniform Standards of Probation Supervision
> Exhibit B – Services Provided by JCS
> Exhibit C – Compensation to JCS

This agreement will initially extend for one year from the date of execution, and shall automatically renew in one-year increments thereafter unless terminated by either party with a thirty (30) day written notice.

Together with the attached addendum, the foregoing constitutes the entire agreement between the parties and supersedes any representation or agreement heretofore made. This agreement shall be governed by the laws of the State of Alabama and may be amended only by a document in writing signed by a duly authorized representative of the City and JCS.

**WITNESS** the hand and seal of the authorized representatives of the City and JCS effective as of the date first above written.

**CITY/COURT OF MONTGOMERY, Alabama**

By: _____

Title: _Mayor_____

**Judicial Correction Services, Inc.**

By: _____

Title: _President_____

**EXHIBIT A**

**UNIFORM STANDARDS OF PROBATION SUPERVISION**

1. All JCS probation officers will be at least 21 years of age at the time of appointment.

2. JCS will employ at least one supervisor of private probation officers with a minimum of five years experience in corrections, parole or probation services.

3. No person convicted of a felony will be employed as a private probation officer, use the title private probation officer or otherwise be responsible for the supervision of probationers.

4. JCS will complete record checks on all staff in accordance with its standard operating procedures.

5. JCS will supervise all probated cases sentenced by the Court. JCS will also supervise indigent cases when determined by the Court. These cases will not be charged the standard probation fee, but will still be offered all JCS services.

6. Probationers not complying with the terms set forth in the Court order will be returned to the Court, at which time the probation officer will testify as to the circumstances of the case, giving the probationer full opportunity to refute any or all points. The probation officer will then comply with the Court's ruling in reference to sentencing or possible revocation of probation.

7. Probationers who pay their entire fine and Court costs within one week of the sentencing date will not be charged a probation supervision fee by JCS, although they would be responsible for a $10 set-up fee.

8. JCS shall comply with all provisions of state and federal law.

**EXHIBIT B**
**SERVICES PROVIDED BY JCS**

1. Attend regularly scheduled court sessions for the purpose of obtaining sentencing information and personal history information for each offender placed on probation. Dates of regularly scheduled court sessions will be made available to JCS at least 30 days in advance.

2. Conduct an initial interview with each probationer at the time of his or her sentencing for purposes of explaining the scope of the court order relative to fines, fees, and/or restitution imposed as well as requirements and conditions for probation supervision.

3. Monitor offenders for compliance with terms and conditions of probation as required by the Court, notifying the Court of any non-compliance. The Court will decide when revocation of probation is necessary.

4. If requested by the Court to do so, collect from probationers Court ordered fines, restitutions and other costs associated with the Court, and disburse said monies as follows:

    (a) Restitution shall be paid to JCS who will disburse monies directly to the victim, or, the restitution may be paid to the Clerk of Court for distribution to the victim, as directed by the Court.

    (b) All fines, surcharges, and other fees shall be paid to JCS who will disburse monies to the City as directed by Court.

5. Prepare referrals and lend assistance to probationers either ordered to receive or desiring employment assistance or counseling.

6. Coordinate community service work as required as a condition of probation by the Court. The City/Court will define the work mission for all community service. JCS will coordinate only that community service work that is reasonably consistent with those duties performed by regular City employees.

7. Maintain case files on each probationer regarding compliance with the terms and conditions of probation, reporting dates, field contacts as they occur and in the amounts and dates of monies collected.

8. Provide reports to the Court regarding compliance and payment information as requested.

9. JCS shall supervise all persons assigned to probation by the Court with a ratio of probationers to staff of no greater than 300 to 1.

10. JCS shall maintain professional liability insurance in an amount not less than one million ($1,000,000) dollars.

11. Each probationer placed on probation under the supervision of JCS will be required to meet with their assigned probation officer at least every 30 days. Probationers that do not comply with the probation guidelines and the Court's order may be required to meet with their probation officer more than once a month (referred to as "intense" supervision).

12. Any modification to the original court sentence will be decided by the Court.

13. JCS may recommend to the Court early probation release if a probationer has fulfilled all Court ordered requirements and paid all fines. Any remaining fees will not be assessed against the probationer if the Court grants early release.

**EXHIBIT C**
**COMPENSATION TO JCS**

JCS agrees that it will not invoice the City or Court for its services. In consideration of the probation services provided by JCS, the Court agrees that each Court Order shall provide for the following:

1. Probation fee of $ 40.00 per month flat fee. (Basic or intensive supervision)

2. One time probationer set-up fee of $10.00. This set-up fee includes courtroom processing and data and digital image entry into JCS's proprietary ProbationTracker™ software system.

3. Community service insurance of $15.00 per 40 hours of community service assigned, if ordered by the Court. This insurance provides up to $10,000 of medical/death benefits if the probationer is injured or killed while performing community service.

4. JCS provides a wide array of other probation related services such as Electronic Monitoring. Should the Court decide that it would like to avail itself of any of these services, a representative of JCS will be glad to meet with the Court and discuss the fee structure(s). Certain services require a minimum caseload level.

**ADDENDUM TO JUDICIAL CORRECTION SERVICES, INC.**
**CLIENT AGREEMENT**

This Addendum together with the Client Agreement to which it is attached constitutes the entire agreement between the parties; and where there is a conflict between the addendum and the agreement, this Addendum shall prevail.

1. This agreement will initially extend for one year from the date of execution, and may be renewed by the City for an additional term of one year and annually thereafter in one year increments unless terminated by either party with a thirty (30) day written notice.

2. JCS shall and does assume responsibility and liability for damage, loss or injury (including death) of any kind whatsoever to persons or property, including employees and property of the City, caused by or resulting from any act or omission of JCS, its employees, agents, servants or employees or its subcontractors or any of their officers, agents, servants or employees, arising from the performance of the work under this Agreement. JCS shall indemnify and hold harmless the City of Montgomery, its officers, agents, servants and employees from and against any claims, loss, damage or charge caused by a resulting from such acts or omissions.

Witness the hand and seal of the authorized representatives of the City and JCS effective as of the date first written above.

**CITY/COURT OF**
**MONTGOMERY, ALABAMA**

By: _____

Title: Mayor _____

**JUDICIAL CORRECTION**
**SERVICES, INC.**

By: _____

Title: President, _____

EXHIBIT 2

**AGREEMENT BETWEEN KLOESS, PLLC
AND THE CITY OF MONTGOMERY
FOR INDIGENT DEFENSE SERVICES IN THE MUNICIPAL COURT**

STATE OF ALABAMA )
                        )
MONTGOMERY COUNTY )

      THIS AGREEMENT, made and entered into this _11th_ day of February, 2011, by and between the City of Montgomery, a municipal corporation in the state of Alabama (hereinafter called "the City"), and Branch D. Kloess (hereinafter called "Kloess");

**WITNESSETH:**

      FOR AND IN CONSIDERATION of the mutual covenants, promises and terms hereinafter stated, the City and Kloess do hereby agree as follows:

SECTION ONE. Kloess shall provide full, competent legal representation and services for indigent defendants charged with the violation of the municipal ordinances and laws before the Municipal Court of the City of Montgomery. A defendant's status as "indigent" shall be determined by the Judge in the said Court, in accordance with the criteria set forth in Code of Alabama (1975), Sections 15-12-5 and 15-12-20.

SECTION TWO. Kloess shall provide an attorney to be present and prepared to provide competent, indigent defense services in each division of Municipal Court of the City at and during each session of the Court, including arraignments and trial sessions, based upon the Court Schedule published by the Clerk of Court. Kloess shall, no later than the 25th day of each month, provide to the Clerk of Court a schedule of the attorneys assigned to each court Session for the following month.

SECTION THREE. Legal representation and service for indigent defendants as contemplated in Section One, above, shall not include representation of such defendants in any subsequent appeal proceedings before any Court.

SECTION FOUR. Kloess shall provide the said attorneys, administrative, secretarial and clerical personnel, office space, furniture, fixtures, equipment, library facilities and such other incidental expenses as it determines necessary to effectuate the purpose of the Agreement. Kloess, its attorneys and employees are independent contractors, and are not employees of the City. Kloess further agrees to maintain adequate records and accounts of monies expended by its personnel in effectuating the provisions of the agreement and to provide such information to the City as may be required by its Director of Finance. Said records and accounts shall be open to inspection by the City, and any other public or governmental agency having an interest in the fiscal, administrative or operational affairs of the Municipal Court including but not limited to the Clerk of Court, the Administrative Office of Courts or State Comptroller. Privileged matters covered by the attorney-client privilege shall not be divulged or open to inspection, except as otherwise authorized by law.

SECTION FIVE. Under the terms of this agreement, on or after the last day of each month during the period of this agreement, Kloess shall submit to the Clerk of Court for approval, a request for payment from the Fair Trial Tax fund not to exceed the sum of Ten Thousand and 00/100 Dollars ($10,000.00) per month, for services to be performed hereunder for the period of the agreement. Provided, in no event shall the City be required to pay more than the amount deposited in the Fair Trial Tax Fund for a particular month.

SECTION SIX. Kloess shall submit to the Clerk of the Municipal Court a statement for service rendered, in a form approved by the Administrative Office of Courts along with a billing summary, on or within five (5) days after the first of each calendar month. Such statement shall include services only for cases concluded during the calendar month covered by the statement. The Clerk of Court shall review the statement for accuracy and reasonableness, and upon the approval of the Presiding Judge the statement shall be forwarded to the City of Montgomery Finance Department for payment in the lesser amount of (1) the total amount of the approved statement not to exceed the amount specified in Section Five referenced herein or (2) the amount of the fair trial tax collected, during the month covered by the statement. The City shall make every reasonable effort to assure payment of the approved statement by the fifteenth (15th) day of the month next succeeding the month covered by the statement. Rates shall be billed at the approved State rate of $60.00 per hour for "In court Appearance" and $40.00 per hour for "Out-of-Court Preparation". An overhead rate of $25.00 per hour shall be allowed to be billed.

SECTION SEVEN. The City shall furnish to Kloess, prior to execution of this Agreement, written certification of the total amount of fair trail tax collected for each of the past two (2) fiscal years. The City warrants that it is aware of no factors, which will substantially affect in a negative way the amount of Fair Trail Tax to be collected during the term of this agreement. The City makes no other warranty or representation to Kloess as to the amount of fair trial tax to be collected by the city during the term of this Agreement.

SECTION EIGHT. The City shall have no obligation to Kloess except as expressly provided in terms of this Agreement.

SECTION NINE. The terms of this Agreement shall be and becomes effective March 1, 2011, and shall terminate at midnight on February 29, 2012, approved by the Mayor as provided by law. The foregoing notwithstanding, either party to this agreement may terminate said agreement for any reason by giving the other sixty (60) days advance written notice. Kloess shall work its first docket/court session beginning March 1, 2011.

SECTION TEN. Kloess may subcontract services to any other licensed attorney or attorneys in the performance of its duties under this Agreement, provided that prior written approval has been granted by the Clerk of Court. Kloess shall immediately notify the Clerk of Court upon knowledge of any conflict of interest arising pursuant to representation under this agreement. Upon the Court's granting of any motion to withdraw or other relief due to a conflict of interest, the Court shall appoint other counsel as authorized by law. Any attorney appointed because of a conflict of interest with Kloess, shall be paid from the Fair Trial Tax Fund pursuant to Title 15, Chapter 12, Code of Alabama (1975). Upon approval of a reasonable amount by the appointing

judge, the Presiding Judge shall order Kloess to pay said attorney the sum approved from the monies paid under this Agreement.

SECTION ELEVEN. Kloess shall, prior to the effective date of this Agreement, submit to the a certificate from an attorney whose opinion is acceptable to the City Attorney stating that Kloess is a lawful entity and is lawfully authorized to enter into this Agreement.

SECTION TWELVE. Kloess does hereby covenant and agree that in performing its obligations and responsibilities under this Agreement it will not discriminate on the basis of color, sex, race, religion, disability, age, national origin or any other basis in violation of any Local, State or Federal Law or Regulation.

   **IN WITNESS WHEREOF** the parties have executed this Agreement on the date first hereinabove written.

                                THE CITY OF MONTGOMERY, ALABAMA

                                By: _____
                                        Todd Strange, Mayor

**ATTEST:**

_____
King O. Fehl
City Attorney   2/15  11


                                _____
                                        Branch D. Kloess

EXHIBIT 3

# Investigation of the Ferguson Police Department



United States Department of Justice
Civil Rights Division

March 4, 2015

## TABLE OF CONTENTS

I. REPORT SUMMARY ................................................................................................ 1

II. BACKGROUND.......................................................................................................... 6

III. FERGUSON LAW ENFORCEMENT EFFORTS ARE FOCUSED  ON
GENERATING REVENUE ....................................................................................... 9

IV. FERGUSON LAW ENFORCEMENT PRACTICES VIOLATE THE LAW AND
UNDERMINE COMMUNITY TRUST, ESPECIALLY AMONG AFRICAN
AMERICANS ............................................................................................................ 15

A. Ferguson's Police Practices ........................................................................... 15

1. FPD Engages in a Pattern of Unconstitutional Stops and Arrests in Violation
of the Fourth Amendment ................................................................... 16

2. FPD Engages in a Pattern of First Amendment Violations ................... 24

3. FPD Engages in a Pattern of Excessive Force in Violation of the Fourth
Amendment .............................................................................................. 28

B. Ferguson's Municipal Court Practices .......................................................... 42

1. Court Practices Impose Substantial and Unnecessary Barriers to the
Challenge or Resolution of Municipal Code Violations........................ 43

2. The Court Imposes Unduly Harsh Penalties for Missed Payments or
Appearances ............................................................................................. 54

C. Ferguson Law Enforcement Practices Disproportionately Harm Ferguson's
African-American Residents and Are Driven in Part by Racial Bias ............ 62

1. Ferguson's Law Enforcement Actions Impose a Disparate Impact on African
Americans that Violates Federal Law ..................................................... 63

2. Ferguson's Law Enforcement Practices Are Motivated in Part by
Discriminatory Intent in Violation of the Fourteenth Amendment and Other
Federal Laws ............................................................................................ 70

D. Ferguson Law Enforcement Practices Erode Community Trust, Especially Among
Ferguson's African-American Residents, and Make Policing Less Effective, More
Difficult, and Less Safe .................................................................................. 79

1. Ferguson's Unlawful Police and Court Practices Have Led to Distrust and
Resentment Among Many in Ferguson ................................................... 79

2. FPD's Exercise of Discretion, Even When Lawful, Often Undermines
Community Trust and Public Safety......................................................... 81

3. FPD's Failure to Respond to Complaints of Officer Misconduct Further
Erodes Community Trust .......................................................................... 82

4. FPD's Lack of Community Engagement Increases the Likelihood of
Discriminatory Policing and Damages Public Trust................................ 86

i

5. Ferguson's Lack of a Diverse Police Force Further Undermines Community Trust ................................................................................. 88

V.  CHANGES NECESSARY TO REMEDY FERGUSON'S UNLAWFUL LAW ENFORCEMENT PRACTICES AND REPAIR COMMUNITY TRUST ................. 90

VI. CONCLUSION ............................................................................. 102

# I.  REPORT SUMMARY

The Civil Rights Division of the United States Department of Justice opened its investigation of the Ferguson Police Department ("FPD") on September 4, 2014.  This investigation was initiated under the pattern-or-practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d ("Safe Streets Act"), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI").  This investigation has revealed a pattern or practice of unlawful conduct within the Ferguson Police Department that violates the First, Fourth, and Fourteenth Amendments to the United States Constitution, and federal statutory law.

Over the course of the investigation, we interviewed City officials, including City Manager John Shaw, Mayor James Knowles, Chief of Police Thomas Jackson, Municipal Judge Ronald Brockmeyer, the Municipal Court Clerk, Ferguson's Finance Director, half of FPD's sworn officers, and others.  We spent, collectively, approximately 100 person-days onsite in Ferguson.  We participated in ride-alongs with on-duty officers, reviewed over 35,000 pages of police records as well as thousands of emails and other electronic materials provided by the police department.  Enlisting the assistance of statistical experts, we analyzed FPD's data on stops, searches, citations, and arrests, as well as data collected by the municipal court.  We observed four separate sessions of Ferguson Municipal Court, interviewing dozens of people charged with local offenses, and we reviewed third-party studies regarding municipal court practices in Ferguson and St. Louis County more broadly.  As in all of our investigations, we sought to engage the local community, conducting hundreds of in-person and telephone interviews of individuals who reside in Ferguson or who have had interactions with the police department.  We contacted ten neighborhood associations and met with each group that responded to us, as well as several other community groups and advocacy organizations.  Throughout the investigation, we relied on two police chiefs who accompanied us to Ferguson and who themselves interviewed City and police officials, spoke with community members, and reviewed FPD policies and incident reports.

We thank the City officials and the rank-and-file officers who have cooperated with this investigation and provided us with insights into the operation of the police department, including the municipal court.  Notwithstanding our findings about Ferguson's approach to law enforcement and the policing culture it creates, we found many Ferguson police officers and other City employees to be dedicated public servants striving each day to perform their duties lawfully and with respect for all members of the Ferguson community.  The importance of their often-selfless work cannot be overstated.

We are also grateful to the many members of the Ferguson community who have met with us to share their experiences.  It became clear during our many conversations with Ferguson residents from throughout the City that many residents, black and white, genuinely embrace Ferguson's diversity and want to reemerge from the events of recent months a truly inclusive, united community.  This Report is intended to strengthen those efforts by recognizing the harms caused by Ferguson's law enforcement practices so that those harms can be better understood and overcome.

Ferguson's law enforcement practices are shaped by the City's focus on revenue rather than by public safety needs. This emphasis on revenue has compromised the institutional character of Ferguson's police department, contributing to a pattern of unconstitutional policing, and has also shaped its municipal court, leading to procedures that raise due process concerns and inflict unnecessary harm on members of the Ferguson community. Further, Ferguson's police and municipal court practices both reflect and exacerbate existing racial bias, including racial stereotypes. Ferguson's own data establish clear racial disparities that adversely impact African Americans. The evidence shows that discriminatory intent is part of the reason for these disparities. Over time, Ferguson's police and municipal court practices have sown deep mistrust between parts of the community and the police department, undermining law enforcement legitimacy among African Americans in particular.

## Focus on Generating Revenue

The City budgets for sizeable increases in municipal fines and fees each year, exhorts police and court staff to deliver those revenue increases, and closely monitors whether those increases are achieved. City officials routinely urge Chief Jackson to generate more revenue through enforcement. In March 2010, for instance, the City Finance Director wrote to Chief Jackson that "unless ticket writing ramps up significantly before the end of the year, it will be hard to significantly raise collections next year. . . . Given that we are looking at a substantial sales tax shortfall, it's not an insignificant issue." Similarly, in March 2013, the Finance Director wrote to the City Manager: "Court fees are anticipated to rise about 7.5%. I did ask the Chief if he thought the PD could deliver 10% increase. He indicated they could try." The importance of focusing on revenue generation is communicated to FPD officers. Ferguson police officers from all ranks told us that revenue generation is stressed heavily within the police department, and that the message comes from City leadership. The evidence we reviewed supports this perception.

## Police Practices

The City's emphasis on revenue generation has a profound effect on FPD's approach to law enforcement. Patrol assignments and schedules are geared toward aggressive enforcement of Ferguson's municipal code, with insufficient thought given to whether enforcement strategies promote public safety or unnecessarily undermine community trust and cooperation. Officer evaluations and promotions depend to an inordinate degree on "productivity," meaning the number of citations issued. Partly as a consequence of City and FPD priorities, many officers appear to see some residents, especially those who live in Ferguson's predominantly African-American neighborhoods, less as constituents to be protected than as potential offenders and sources of revenue.

This culture within FPD influences officer activities in all areas of policing, beyond just ticketing. Officers expect and demand compliance even when they lack legal authority. They are inclined to interpret the exercise of free-speech rights as unlawful disobedience, innocent movements as physical threats, indications of mental or physical illness as belligerence. Police supervisors and leadership do too little to ensure that officers act in accordance with law and policy, and rarely respond meaningfully to civilian complaints of officer misconduct. The result is a pattern of stops without reasonable suspicion and arrests without probable cause in violation of the Fourth Amendment; infringement on free expression, as well as retaliation for protected

2

expression, in violation of the First Amendment; and excessive force in violation of the Fourth Amendment.

Even relatively routine misconduct by Ferguson police officers can have significant consequences for the people whose rights are violated. For example, in the summer of 2012, a 32-year-old African-American man sat in his car cooling off after playing basketball in a Ferguson public park. An officer pulled up behind the man's car, blocking him in, and demanded the man's Social Security number and identification. Without any cause, the officer accused the man of being a pedophile, referring to the presence of children in the park, and ordered the man out of his car for a pat-down, although the officer had no reason to believe the man was armed. The officer also asked to search the man's car. The man objected, citing his constitutional rights. In response, the officer arrested the man, reportedly at gunpoint, charging him with eight violations of Ferguson's municipal code. One charge, Making a False Declaration, was for initially providing the short form of his first name (e.g., "Mike" instead of "Michael"), and an address which, although legitimate, was different from the one on his driver's license. Another charge was for not wearing a seat belt, even though he was seated in a parked car. The officer also charged the man both with having an expired operator's license, and with having no operator's license in his possession. The man told us that, because of these charges, he lost his job as a contractor with the federal government that he had held for years.

## Municipal Court Practices

Ferguson has allowed its focus on revenue generation to fundamentally compromise the role of Ferguson's municipal court. The municipal court does not act as a neutral arbiter of the law or a check on unlawful police conduct. Instead, the court primarily uses its judicial authority as the means to compel the payment of fines and fees that advance the City's financial interests. This has led to court practices that violate the Fourteenth Amendment's due process and equal protection requirements. The court's practices also impose unnecessary harm, overwhelmingly on African-American individuals, and run counter to public safety.

Most strikingly, the court issues municipal arrest warrants not on the basis of public safety needs, but rather as a routine response to missed court appearances and required fine payments. In 2013 alone, the court issued over 9,000 warrants on cases stemming in large part from minor violations such as parking infractions, traffic tickets, or housing code violations. Jail time would be considered far too harsh a penalty for the great majority of these code violations, yet Ferguson's municipal court routinely issues warrants for people to be arrested and incarcerated for failing to timely pay related fines and fees. Under state law, a failure to appear in municipal court on a traffic charge involving a moving violation also results in a license suspension. Ferguson has made this penalty even more onerous by only allowing the suspension to be lifted after payment of an owed fine is made in full. Further, until recently, Ferguson also added charges, fines, and fees for each missed appearance and payment. Many pending cases still include such charges that were imposed before the court recently eliminated them, making it as difficult as before for people to resolve these cases.

The court imposes these severe penalties for missed appearances and payments even as several of the court's practices create unnecessary barriers to resolving a municipal violation. The court often fails to provide clear and accurate information regarding a person's charges or court obligations. And the court's fine assessment procedures do not adequately provide for a defendant to seek a fine reduction on account of financial incapacity or to seek alternatives to

3

payment such as community service. City and court officials have adhered to these court practices despite acknowledging their needlessly harmful consequences. In August 2013, for example, one City Councilmember wrote to the City Manager, the Mayor, and other City officials lamenting the lack of a community service option and noted the benefits of such a program, including that it would "keep those people that simply don't have the money to pay their fines from constantly being arrested and going to jail, only to be released and do it all over again."

Together, these court practices exacerbate the harm of Ferguson's unconstitutional police practices. They impose a particular hardship upon Ferguson's most vulnerable residents, especially upon those living in or near poverty. Minor offenses can generate crippling debts, result in jail time because of an inability to pay, and result in the loss of a driver's license, employment, or housing.

We spoke, for example, with an African-American woman who has a still-pending case stemming from 2007, when, on a single occasion, she parked her car illegally. She received two citations and a $151 fine, plus fees. The woman, who experienced financial difficulties and periods of homelessness over several years, was charged with seven Failure to Appear offenses for missing court dates or fine payments on her parking tickets between 2007 and 2010. For each Failure to Appear, the court issued an arrest warrant and imposed new fines and fees. From 2007 to 2014, the woman was arrested twice, spent six days in jail, and paid $550 to the court for the events stemming from this single instance of illegal parking. Court records show that she twice attempted to make partial payments of $25 and $50, but the court returned those payments, refusing to accept anything less than payment in full. One of those payments was later accepted, but only after the court's letter rejecting payment by money order was returned as undeliverable. This woman is now making regular payments on the fine. As of December 2014, over seven years later, despite initially owing a $151 fine and having already paid $550, she still owed $541.

## Racial Bias

Ferguson's approach to law enforcement both reflects and reinforces racial bias, including stereotyping. The harms of Ferguson's police and court practices are borne disproportionately by African Americans, and there is evidence that this is due in part to intentional discrimination on the basis of race.

Ferguson's law enforcement practices overwhelmingly impact African Americans. Data collected by the Ferguson Police Department from 2012 to 2014 shows that African Americans account for 85% of vehicle stops, 90% of citations, and 93% of arrests made by FPD officers, despite comprising only 67% of Ferguson's population. African Americans are more than twice as likely as white drivers to be searched during vehicle stops even after controlling for non-race based variables such as the reason the vehicle stop was initiated, but are found in possession of contraband 26% less often than white drivers, suggesting officers are impermissibly considering race as a factor when determining whether to search. African Americans are more likely to be cited and arrested following a stop regardless of why the stop was initiated and are more likely to receive multiple citations during a single incident. From 2012 to 2014, FPD issued four or more citations to African Americans on 73 occasions, but issued four or more citations to non-African Americans only twice. FPD appears to bring certain offenses almost exclusively against African Americans. For example, from 2011 to 2013, African Americans accounted for 95% of Manner of Walking in Roadway charges, and 94% of all Failure to Comply charges. Notably, with

4

respect to speeding charges brought by FPD, the evidence shows not only that African Americans are represented at disproportionately high rates overall, but also that the disparate impact of FPD's enforcement practices on African Americans is 48% larger when citations are issued not on the basis of radar or laser, but by some other method, such as the officer's own visual assessment.

These disparities are also present in FPD's use of force. Nearly 90% of documented force used by FPD officers was used against African Americans. In every canine bite incident for which racial information is available, the person bitten was African American.

Municipal court practices likewise cause disproportionate harm to African Americans. African Americans are 68% less likely than others to have their cases dismissed by the court, and are more likely to have their cases last longer and result in more required court encounters. African Americans are at least 50% more likely to have their cases lead to an arrest warrant, and accounted for 92% of cases in which an arrest warrant was issued by the Ferguson Municipal Court in 2013. Available data show that, of those actually arrested by FPD only because of an outstanding municipal warrant, 96% are African American.

Our investigation indicates that this disproportionate burden on African Americans cannot be explained by any difference in the rate at which people of different races violate the law. Rather, our investigation has revealed that these disparities occur, at least in part, because of unlawful bias against and stereotypes about African Americans. We have found substantial evidence of racial bias among police and court staff in Ferguson. For example, we discovered emails circulated by police supervisors and court staff that stereotype racial minorities as criminals, including one email that joked about an abortion by an African-American woman being a means of crime control.

City officials have frequently asserted that the harsh and disparate results of Ferguson's law enforcement system do not indicate problems with police or court practices, but instead reflect a pervasive lack of "personal responsibility" among "certain segments" of the community. Our investigation has found that the practices about which area residents have complained are in fact unconstitutional and unduly harsh. But the City's personal-responsibility refrain is telling: it reflects many of the same racial stereotypes found in the emails between police and court supervisors. This evidence of bias and stereotyping, together with evidence that Ferguson has long recognized but failed to correct the consistent racial disparities caused by its police and court practices, demonstrates that the discriminatory effects of Ferguson's conduct are driven at least in part by discriminatory intent in violation of the Fourteenth Amendment.

### Community Distrust

Since the August 2014 shooting death of Michael Brown, the lack of trust between the Ferguson Police Department and a significant portion of Ferguson's residents, especially African Americans, has become undeniable. The causes of this distrust and division, however, have been the subject of debate. Police and other City officials, as well as some Ferguson residents, have insisted to us that the public outcry is attributable to "outside agitators" who do not reflect the opinions of "real Ferguson residents." That view is at odds with the facts we have gathered during our investigation. Our investigation has shown that distrust of the Ferguson Police Department is longstanding and largely attributable to Ferguson's approach to law enforcement. This approach results in patterns of unnecessarily aggressive and at times unlawful policing;

5

reinforces the harm of discriminatory stereotypes; discourages a culture of accountability; and neglects community engagement. In recent years, FPD has moved away from the modest community policing efforts it previously had implemented, reducing opportunities for positive police-community interactions, and losing the little familiarity it had with some African-American neighborhoods. The confluence of policing to raise revenue and racial bias thus has resulted in practices that not only violate the Constitution and cause direct harm to the individuals whose rights are violated, but also undermine community trust, especially among many African Americans. As a consequence of these practices, law enforcement is seen as illegitimate, and the partnerships necessary for public safety are, in some areas, entirely absent.

Restoring trust in law enforcement will require recognition of the harms caused by Ferguson's law enforcement practices, and diligent, committed collaboration with the entire Ferguson community. At the conclusion of this report, we have broadly identified the changes that are necessary for meaningful and sustainable reform. These measures build upon a number of other recommended changes we communicated verbally to the Mayor, Police Chief, and City Manager in September so that Ferguson could begin immediately to address problems as we identified them. As a result of those recommendations, the City and police department have already begun to make some changes to municipal court and police practices. We commend City officials for beginning to take steps to address some of the concerns we have already raised. Nonetheless, these changes are only a small part of the reform necessary. Addressing the deeply embedded constitutional deficiencies we found demands an entire reorientation of law enforcement in Ferguson. The City must replace revenue-driven policing with a system grounded in the principles of community policing and police legitimacy, in which people are equally protected and treated with compassion, regardless of race.

## II. BACKGROUND

The City of Ferguson is one of 89 municipalities in St. Louis County, Missouri.[1] According to United States Census Data from 2010, Ferguson is home to roughly 21,000 residents.[2] While Ferguson's total population has stayed relatively constant in recent decades, Ferguson's racial demographics have changed dramatically during that time. In 1990, 74% of Ferguson's population was white, while 25% was black.[3] By 2000, African Americans became the new majority, making up 52% of the City's population.[4] According to the 2010 Census, the black population in Ferguson has grown to 67%, whereas the white population has decreased to 29%.[5] According to the 2009-2013 American Community Survey, 25% of the City's population lives below the federal poverty level.[6]

---

[1] See *2012 Census of Governments*, U.S. Census Bureau (Sept. 2013), *available at*
http://factfinder.census.gov/bkmk/table/1.0/en/COG/2012/ORG13.ST05P?slice=GEO~0400000US29 (last visited Feb. 26, 2015).
[2] See *2010 Census*, U.S. Census Bureau (2010), *available at*
http://factfinder.census.gov/bkmk/table/1.0/en/DEC/10_SF1/QTP3/1600000US2923986 (last visited Feb. 26, 2015).
[3] See *1990 Census of Population General Population Characteristics Missouri*, U.S. Census Bureau (Apr. 1992), *available at* ftp://ftp2.census.gov/library/publications/1992/dec/cp-1-27.pdf (last visited Feb. 26, 2015).
[4] See *Race Alone or in Combination: 2000*, U.S. Census Bureau (2000), *available at* http://factfinder.census.gov/ bkmk/table/1.0/en/DEC/00_SF1/QTP5/1600000US2923986 (last visited Feb. 26, 2015).
[5] *2010 Census*, *supra* note 2.
[6] See *Poverty Status in the Past 12 Months 2009-2013 American Community Survey 5-Year Estimates*, U.S. Census Bureau (2014), *available at*

6

Residents of Ferguson elect a Mayor and six individuals to serve on a City Council. The City Council appoints a City Manager to an indefinite term, subject to removal by a Council vote. *See* Ferguson City Charter § 4.1. The City Manager serves as chief executive and administrative officer of the City of Ferguson, and is responsible for all affairs of the City. The City Manager directs and supervises all City departments, including the Ferguson Police Department.

The current Chief of Police, Thomas Jackson, has commanded the police department since he was appointed by the City Manager in 2010. The department has a total of 54 sworn officers divided among several divisions. The patrol division is the largest division; 28 patrol officers are supervised by four sergeants, two lieutenants, and a captain. Each of the four patrol squads has a canine officer. While all patrol officers engage in traffic enforcement, FPD also has a dedicated traffic officer responsible for collecting traffic stop data required by the state of Missouri. FPD has two School Resource Officers ("SROs"), one who is assigned to the McCluer South-Berkeley High School and one who is assigned to the Ferguson Middle School. FPD has a single officer assigned to be the "Community Resource Officer," who attends community meetings, serves as FPD's public relations liaison, and is charged with collecting crime data. FPD operates its own jail, which has ten individual cells and a large holding cell. The jail is staffed by three non-sworn correctional officers. Of the 54 sworn officers currently serving in FPD, four are African American.

FPD officers are authorized to initiate charges—by issuing citations or summonses, or by making arrests—under both the municipal code and state law. Ferguson's municipal code addresses nearly every aspect of civic life for those who live in Ferguson, and regulates the conduct of all who work, travel through, or otherwise visit the City. In addition to mirroring some non-felony state law violations, such as assault, stealing, and traffic violations, the code establishes housing violations, such as High Grass and Weeds; requirements for permits to rent an apartment or use the City's trash service; animal control ordinances, such as Barking Dog and Dog Running at Large; and a number of other violations, such as Manner of Walking in Roadway. *See, e.g.*, Ferguson Mun. Code §§ 29-16 *et seq.*; 37-1 *et seq.*; 46-27; 6-5, 6-11; 44-344.

FPD files most charges as municipal offenses, not state violations, even when an analogous state offense exists. Between July 1, 2010, and June 30, 2014, the City of Ferguson issued approximately 90,000 citations and summonses for municipal violations. Notably, the City issued nearly 50% more citations in the last year of that time period than it did in the first. This increase in enforcement has not been driven by a rise in serious crime. While the ticketing rate has increased dramatically, the number of charges for many of the most serious offenses covered by the municipal code—e.g., Assault, Driving While Intoxicated, and Stealing—has remained relatively constant.[7]

---

http://factfinder.census.gov/bkmk/table/1.0/en/ACS/13_5YR/S1701/1600000US2923986 (last visited Feb. 26, 2015).

[7] This is evidenced not only by FPD's own records, but also by Uniform Crime Reports data for Ferguson, which show a downward trend in serious crime over the last ten years. *See Uniform Crime Reports*, Federal Bureau of Investigation, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s (last visited Feb. 26, 2015).

Because the overwhelming majority of FPD's enforcement actions are brought under the municipal code, most charges are processed and resolved by the Ferguson Municipal Court, which has primary jurisdiction over all code violations. Ferguson Mun. Code § 13-2. Ferguson's municipal court operates as part of the police department. The court is supervised by the Ferguson Chief of Police, is considered part of the police department for City organizational purposes, and is physically located within the police station. Court staff report directly to the Chief of Police. Thus, if the City Manager or other City officials issue a court-related directive, it is typically sent to the Police Chief's attention. In recent weeks, City officials informed us that they are considering plans to bring the court under the supervision of the City Finance Director.

A Municipal Judge presides over court sessions. The Municipal Judge is not hired or supervised by the Chief of Police, but is instead nominated by the City Manager and elected by the City Council. The Judge serves a two-year term, subject to reappointment. The current Municipal Judge, Ronald Brockmeyer, has presided in Ferguson for approximately ten years. The City's Prosecuting Attorney and her assistants officially prosecute all actions before the court, although in practice most cases are resolved without trial or a prosecutor's involvement. The current Prosecuting Attorney was appointed in April 2011. At the time of her appointment, the Prosecuting Attorney was already serving as City Attorney, and she continues to serve in that separate capacity, which entails providing general counsel and representation to the City. The Municipal Judge, Court Clerk, Prosecuting Attorney, and all assistant court clerks are white.

While the Municipal Judge presides over court sessions, the Court Clerk, who is employed under the Police Chief's supervision, plays the most significant role in managing the court and exercises broad discretion in conducting the court's daily operations. Ferguson's municipal code confers broad authority on the Court Clerk, including the authority to collect all fines and fees, accept guilty pleas, sign and issue subpoenas, and approve bond determinations. Ferguson Mun. Code § 13-7. Indeed, the Court Clerk and assistant clerks routinely perform duties that are, for all practical purposes, judicial. For example, documents indicate that court clerks have disposed of charges without the Municipal Judge's involvement.

The court officially operates subject to the oversight of the presiding judge of the St. Louis County Circuit Court (21st Judicial Circuit) under the rules promulgated by that Circuit Court and the Missouri Supreme Court. Notwithstanding these rules, the City of Ferguson and the court itself retain considerable power to establish and amend court practices and procedures. The Ferguson municipal code sets forth a limited number of protocols that the court must follow, but the code leaves most aspects of court operations to the discretion of the court itself. *See* Ferguson Mun. Code Ch. 13, Art. III. The code also explicitly authorizes the Municipal Judge to "make and adopt such rules of practice and procedure as are necessary to hear and decide matters pending before the municipal court." Ferguson Mun. Code § 13-29.

The Ferguson Municipal Court has the authority to issue and enforce judgments, issue warrants for search and arrest, hold parties in contempt, and order imprisonment as a penalty for contempt. The court may conduct trials, although it does so rarely, and most charges are resolved without one. Upon resolution of a charge, the court has the authority to impose fines, fees, and imprisonment when violations are found. Specifically, the court can impose imprisonment in the Ferguson City Jail for up to three months, a fine of up to $1,000, or a combination thereof. It is rare for the court to sentence anyone to jail as a *penalty* for a violation of the municipal code; indeed, the Municipal Judge reports that he has done so only once.

8

Rather, the court almost always imposes a monetary penalty payable to the City of Ferguson, plus court fees. Nonetheless, as discussed in detail below, the court issues arrest warrants when a person misses a court appearance or fails to timely pay a fine. As a result, violations that would normally not result in a penalty of imprisonment can, and frequently do, lead to municipal warrants, arrests, and jail time.

As the number of charges initiated by FPD has increased in recent years, the size of the court's docket has also increased. According to data the City reported to the Missouri State Courts Administrator, at the end of fiscal year 2009, the municipal court had roughly 24,000 traffic cases and 28,000 non-traffic cases pending. As of October 31, 2014, both of those figures had roughly doubled to 53,000 and 50,000 cases, respectively. In fiscal year 2009, 16,178 new cases were filed, and 8,727 were resolved. In 2014, by contrast, 24,256 new offenses were filed, and 10,975 offenses were resolved.

The court holds three or four sessions per month, and each session lasts no more than three hours. It is not uncommon for as many as 500 people to appear before the court in a single session, exceeding the court's physical capacity and leading individuals to line up outside of court waiting to be heard. Many people have multiple offenses pending; accordingly, the court typically considers 1,200-1,500 offenses in a single session, and has in the past considered over 2,000 offenses during one sitting. Previously there was a cap on the number of offenses that could be assigned to a particular docket date. Given that cap, and the significant increase in municipal citations in recent years, a problem developed in December 2011 in which more citations were issued than court sessions could timely accommodate. At one point court dates were initially scheduled as far as six months after the date of the citation. To address this problem, court staff first raised the cap to allow 1,000 offenses to be assigned to a single court date and later eliminated the cap altogether. To handle the increasing caseload, the City Manager also requested and secured City Council approval to fund additional court positions, noting in January 2013 that "each month we are setting new all-time records in fines and forfeitures," that this was overburdening court staff, and that the funding for the additional positions "will be more than covered by the increase in revenues."

## III.    FERGUSON LAW ENFORCEMENT EFFORTS ARE FOCUSED ON GENERATING REVENUE

City officials have consistently set maximizing revenue as the priority for Ferguson's law enforcement activity. Ferguson generates a significant and increasing amount of revenue from the enforcement of code provisions. The City has budgeted for, and achieved, significant increases in revenue from municipal code enforcement over the last several years, and these increases are projected to continue. Of the $11.07 million in general fund revenue the City collected in fiscal year 2010, $1.38 million came from fines and fees collected by the court; similarly, in fiscal year 2011, the City's general fund revenue of $11.44 million included $1.41 million from fines and fees. In its budget for fiscal year 2012, however, the City predicted that revenue from municipal fines and fees would increase over 30% from the previous year's amount to $1.92 million; the court exceeded that target, collecting $2.11 million. In its budget for fiscal year 2013, the City budgeted for fines and fees to yield $2.11 million; the court exceeded that target as well, collecting $2.46 million. For 2014, the City budgeted for the municipal court to generate $2.63 million in revenue. The City has not yet made public the actual revenue collected that year, although budget documents forecasted lower revenue than

9

was budgeted. Nonetheless, for fiscal year 2015, the City's budget anticipates fine and fee revenues to account for $3.09 million of a projected $13.26 million in general fund revenues.[8]

City, police, and court officials for years have worked in concert to maximize revenue at every stage of the enforcement process, beginning with how fines and fine enforcement processes are established. In a February 2011 report requested by the City Council at a Financial Planning Session and drafted by Ferguson's Finance Director with contributions from Chief Jackson, the Finance Director reported on "efforts to increase efficiencies and maximize collection" by the municipal court. The report included an extensive comparison of Ferguson's fines to those of surrounding municipalities and noted with approval that Ferguson's fines are "at or near the top of the list." The chart noted, for example, that while other municipalities' parking fines generally range from $5 to $100, Ferguson's is $102. The chart noted also that the charge for "Weeds/Tall Grass" was as little as $5 in one city but, in Ferguson, it ranged from $77 to $102. The report stated that the acting prosecutor had reviewed the City's "high volume offenses" and "started recommending higher fines on these cases, and recommending probation only infrequently." While the report stated that this recommendation was because of a "large volume of non-compliance," the recommendation was in fact emphasized as one of several ways that the code enforcement system had been honed to produce more revenue.

In combination with a high fine schedule, the City directs FPD to aggressively enforce the municipal code. City and police leadership pressure officers to write citations, independent of any public safety need, and rely on citation productivity to fund the City budget. In an email from March 2010, the Finance Director wrote to Chief Jackson that "unless ticket writing ramps up significantly before the end of the year, it will be hard to significantly raise collections next year. What are your thoughts? Given that we are looking at a substantial sales tax shortfall, it's not an insignificant issue." Chief Jackson responded that the City would see an increase in fines once more officers were hired and that he could target the $1.5 million forecast. Significantly, Chief Jackson stated that he was also "looking at different shift schedules which will place more officers on the street, which in turn will increase traffic enforcement per shift." Shortly thereafter, FPD switched to the 12-hour shift schedule for its patrol officers, which FPD continues to use. Law enforcement experience has shown that this schedule makes community policing more difficult—a concern that we have also heard directly from FPD officers. Nonetheless, while FPD heavily considered the revenue implications of the 12-hour shift and certain other factors such as its impact on overtime and sick time usage, we have found no evidence that FPD considered the consequences for positive community engagement. The City's 2014 budget itself stated that since December 2010, "the percent of [FPD] resources allocated to traffic enforcement has increased," and "[a]s a result, traffic enforcement related collections increased" in the following two years. The 2015 budget added that even after those initial increases, in fiscal year 2012-2013, FPD was once again "successful in increasing their proportion of resources dedicated to traffic enforcement" and increasing collections.

---

[8] Each of these yearly totals excludes certain court fees that are designated for particular purposes, but then nonetheless are paid directly to the City. For example, $2 of the court fee that accompanies every citation for a municipal code violation is set aside to be used for police training. That fee is used only by the City of Ferguson and is deposited in the City's general fund; nonetheless, the City's budget does not include that fee in its totals for "municipal court" revenue. In 2012 and 2013, the police training fee brought in, respectively, another $24,724 and $22,938 in revenue.

As directed, FPD supervisors and line officers have undertaken the aggressive code enforcement required to meet the City's revenue generation expectations. As discussed below in Part III.A., FPD officers routinely conduct stops that have little relation to public safety and a questionable basis in law. FPD officers routinely issue multiple citations during a single stop, often for the same violation. Issuing three or four charges in one stop is not uncommon in Ferguson. Officers sometimes write six, eight, or, in at least one instance, fourteen citations for a single encounter. Indeed, officers told us that some compete to see who can issue the largest number of citations during a single stop.

The February 2011 report to the City Council notes that the acting prosecutor—with the apparent approval of the Police Chief—"talked with police officers about ensuring all necessary summonses are written for each incident, i.e. when DWI charges are issued, are the correct companion charges being issued, such as speeding, failure to maintain a single lane, no insurance, and no seat belt, etc." The prosecutor noted that "[t]his is done to ensure that a proper resolution to all cases is being achieved and that the court is maintaining the correct volume for offenses occurring within the city." Notably, the "correct volume" of law enforcement is uniformly presented in City documents as related to revenue generation, rather than in terms of what is necessary to promote public safety.[9] Each month, the municipal court provides FPD supervisors with a list of the number of tickets issued by each officer and each squad. Supervisors have posted the list inside the police station, a tactic officers say is meant to push them to write more citations.

The Captain of FPD's Patrol Division regularly communicates with his Division commanders regarding the need to increase traffic "productivity," and productivity is a common topic at squad meetings. Patrol Division supervisors monitor productivity through monthly "self-initiated activity reports" and instruct officers to increase production when those reports show they have not issued enough citations. In April 2010, for example, a patrol supervisor criticized a sergeant for his squad only issuing 25 tickets in a month, including one officer who issued "a grand total" of 11 tickets to six people on three days "devoted to traffic stops." In November 2011, the same patrol supervisor wrote to his patrol lieutenants and sergeants that "[t]he monthly self-initiated activity totals just came out," and they "may want to advise [their] officers who may be interested in the open detective position that one of the categories to be considered when deciding on the eligibility list will be self-initiated activity." The supervisor continued: "Have any of you heard comments such as, why should I produce when I know I'm not getting a raise? Well, some people are about to find out why." The email concludes with the instruction to "[k]eep in mind, productivity (self-initiated activity) cannot decline for next year."

FPD has communicated to officers not only that they must focus on bringing in revenue, but that the department has little concern with how officers do this. FPD's weak systems of supervision, review, and accountability, discussed below in Part III.A., have sent a potent message to officers that their violations of law and policy will be tolerated, provided that officers

---

[9] FPD's financial focus has also led FPD to elevate municipal enforcement over state-law enforcement. Even where individuals commit violations of state law, if there is an analogous municipal code provision, the police department will nearly always charge the offense under municipal law. A senior member of FPD's command told us that all Ferguson police officers understand that, when a fine is the likely punishment, municipal rather than state charges should be pursued so that Ferguson will reap the financial benefit.

continue to be "productive" in making arrests and writing citations. Where officers fail to meet productivity goals, supervisors have been instructed to alter officer assignments or impose discipline. In August 2012, the Captain of the Patrol Division instructed other patrol supervisors that, "[f]or those officers who are not keeping up an acceptable level of productivity and they have already been addressed at least once if not multiple times, take it to the next level." He continued: "As we have discussed already, regardless of the seniority and experience take the officer out of the cover car position and assign them to prisoner pick up and bank runs. . . . Failure to perform *can* result in disciplinary action not just a bad review." Performance evaluations also heavily emphasize productivity. A June 2013 evaluation indicates one of the "Performance-Related Areas of Improvements" as "Increase/consistent in productivity, the ability to maintain an average ticket [sic] of 28 per month."

Not all officers within FPD agree with this approach. Several officers commented on the futility of imposing mounting penalties on people who will never be able to afford them. One member of FPD's command staff quoted an old adage, asking: "How can you get blood from a turnip?" Another questioned why FPD did not allow residents to use their limited resources to fix equipment violations, such as broken headlights, rather than paying that money to the City, as fixing the equipment violation would more directly benefit public safety.[10]

However, enough officers—at all ranks—have internalized this message that a culture of reflexive enforcement action, unconcerned with whether the police action actually promotes public safety, and unconcerned with the impact the decision has on individual lives or community trust as a whole, has taken hold within FPD. One commander told us, for example, that when he admonished an officer for writing too many tickets, the officer challenged the commander, asking if the commander was telling him not to do his job. When another commander tried to discipline an officer for over-ticketing, he got the same response from the Chief of Police: "No discipline for doing your job."

The City closely monitors whether FPD's enforcement efforts are bringing in revenue at the desired rate. Consistently over the last several years, the Police Chief has directly reported to City officials FPD's successful efforts at raising revenue through policing, and City officials have continued to encourage those efforts and request regular updates. For example, in June 2010, at the request of the City, the Chief prepared a report comparing court revenues in Ferguson to court revenues for cities of similar sizes. The Chief's email sending the report to the City Manager notes that, "of the 80 St. Louis County Municipal Courts reporting revenue, only 8, including Ferguson, have collections greater than one million dollars." In the February 2011 report referenced above, Chief Jackson discussed various obstacles to officers writing tickets in previous months, such as training, injury leave, and officer deployment to Iraq, but noted that those factors had subsided and that, as a result, revenues were increasing. The acting prosecutor echoed these statements, stating "we now have several new officers writing tickets, and as a result our overall ticket volume is increasing by 400-700 tickets per month. This increased volume will lead to larger dockets this year and should have a direct effect in increasing overall revenue to the municipal court."

---

[10] After a recommendation we made during this investigation, Ferguson has recently begun a very limited "correctable violation" or "fix-it" ticket program, under which charges for certain violations can be dismissed if corrected within a certain period of time.

Similarly, in March 2011, the Chief reported to the City Manager that court revenue in February was $179,862.50, and that the total "beat our next biggest month in the last four years by over $17,000," to which the City Manager responded: "Wonderful!" In a June 2011 email from Chief Jackson to the Finance Director and City Manager, the Chief reported that "May is the 6th straight month in which court revenue (gross) has exceeded the previous year." The City Manager again applauded the Chief's efforts, and the Finance Director added praise, noting that the Chief is "substantially in control of the outcome." The Finance Director further recommended in this email greater police and judicial enforcement to "have a profound effect on collections." Similarly, in a January 2013 email from Chief Jackson to the City Manager, the Chief reported: "Municipal Court gross revenue for calendar year 2012 passed the $2,000,000 mark for the first time in history, reaching $2,066,050 (not including red light photo enforcement)." The City Manager responded: "Awesome! Thanks!" In one March 2012 email, the Captain of the Patrol Division reported directly to the City Manager that court collections in February 2012 reached $235,000, and that this was the first month collections ever exceeded $200,000. The Captain noted that "[t]he [court clerk] girls have been swamped all day with a line of people paying off fines today. Since 9:30 this morning there hasn't been less than 5 people waiting in line and for the last three hours 10 to 15 people at all times." The City Manager enthusiastically reported the Captain's email to the City Council and congratulated both police department and court staff on their "great work."

Even as officers have answered the call for greater revenue through code enforcement, the City continues to urge the police department to bring in more money. In a March 2013 email, the Finance Director wrote: "Court fees are anticipated to rise about 7.5%. I did ask the Chief if he thought the PD could deliver 10% increase. He indicated they could try." Even more recently, the City's Finance Director stated publicly that Ferguson intends to make up a 2014 revenue shortfall in 2015 through municipal code enforcement, stating to Bloomberg News that "[t]here's about a million-dollar increase in public-safety fines to make up the difference."[11] The City issued a statement to "refute[]" the Bloomberg article in part because it "insinuates" an "over reliance on municipal court fines as a primary source of revenues when in fact they represented less than 12% of city revenues for the last fiscal year." But there is no dispute that the City budget does, in fact, forecast an increase of nearly a million dollars in municipal code enforcement fines and fees in 2015 as reported in the Bloomberg News report.

The City goes so far as to direct FPD to develop enforcement strategies and initiatives, not to better protect the public, but to raise more revenue. In an April 2014 communication from the Finance Director to Chief Jackson and the City Manager, the Finance Director recommended immediate implementation of an "I-270 traffic enforcement initiative" in order to "begin to fill the revenue pipeline." The Finance Director's email attached a computation of the net revenues that would be generated by the initiative, which required paying five officers overtime for highway traffic enforcement for a four-hour shift. The Finance Director stated that "there is nothing to keep us from running this initiative 1,2,3,4,5,6, or even 7 days a week. Admittedly at 7 days per week[] we would see diminishing returns." Indeed, in a separate email to FPD

---

[11] Katherine Smith, *Ferguson to Increase Police Ticketing to Close City's Budget Gap*, Bloomberg News (Dec. 12, 2014), http://www.bloomberg.com/news/articles/2014-12-12/ferguson-to-increase-police-ticketing-to-close-city-s-budget-gap.