**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ALDARESS CARTER, INDIVIDUALLY, AND FOR A CLASS OF SIMILARLY SITUATED PERSONS OR ENTITIES,** | ) ) ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | **Civil Action No.:** |
| **v.** | ) | **2:15-cv-555-RCL** |
| | ) | |
| **THE CITY OF MONTGOMERY and BRANCH D. KLOESS; JUDICIAL CORRECTION SERVICES, INC., a corporation; CORRECTIONAL HEALTHCARE COMPANIES, INC., a corporation; CHC COMPANIES, INC., a corporation.** | ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS TO STRIKE (DOCS. 156, 157, & 167)**

COMES NOW Plaintiff in the above-styled cause and submits this Response in Opposition to Defendants' Motions to Strike (Docs. 156, 157, & 167). Defendants' Motions are due to be denied for the reasons stated herein, and Plaintiff states as follows:

**I.     DOC. 118-1 IS A SUMMARY EXHIBIT PERMITTED UNDER FED. R. EVID. 1006 AND AN ADMISSIBLE PEDAGOGICAL EXHIBIT SUBMITTED TO AID THE COURT IN ITS CLASS CERTIFICATION ANALYSIS.**

Fed. R. Evid. 1006 states that a "proponent of evidence may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court." Fed. R. Evid. 1006.  Regarding the application of

Rule 1006, quantity and complexity of materials are considered, and "the point of the rule is to admit summaries of material that cannot conveniently be examined in court." 31 Fed. Prac. & Proc. Evid. § 8043 (1st ed.). In addition to composite exhibits under Fed. R. Evid. 1006, pedagogical summaries may be offered and admitted to help organize or explain evidentiary materials. The First Circuit has analyzed the interplay of Fed. R. Evid. 1006 and pedagogical exhibits:

> The Federal Rules of Evidence offer multiple options for an attorney who wishes to summarize complex evidence. . .
>
> Rule 1006 allows "[t]he contents of voluminous writings . . . which cannot conveniently be examined in court [to] be presented in the form of a chart, summary, or calculation." Fed. R. Evid. 1006. . . . "Most notably, Rule 1006 evidence normally is objectionable if the voluminous source material on which it is based is inadmissible." 31 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure § 8043, at 521-22 (2000). The proponent must show that the voluminous source materials are what the proponent claims them to be and that the summary accurately summarizes the source materials. *Id.* at 525.
>
> Under Rule 1006, the underlying documents must be made available to the other parties, and "[t]he court may order that they be produced in court." The discretion accorded the trial court to order production of the documents means that the evidence underlying Rule 1006 summaries need not be introduced into evidence, . . . , but nothing in the rule forecloses a party from doing so. . . .
>
> . . .
>
> . . .We agree with the Fifth Circuit, however, that "[t]he fact that the underlying documents are already in evidence does not mean that they can be 'conveniently examined in court.' " *Stephens*, 779 F.2d at 239 (quoting *Lemire*, 720 F.2d at 1347). Thus, in such instances, Rule 1006 still serves its purpose of allowing the jury to consider secondary evidence as a substitute for the originals.
>
> A trial judge also may allow use of a chart or other summary tool under Fed. R. Evid. 611(a), which gives the trial court "control over the mode ... [of] presenting evidence."[13] *See, e.g., United States v. Harms*, 442 F.3d 367, 375 (5th Cir.2006); *Janati*, 374 F.3d at 273; *United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir.1998). Such summaries most typically are used as "pedagogical devices" to "clarify and simplify complex testimony or other information and evidence or to assist counsel in the presentation of argument to the court or jury." *Bray*, 139 F.3d at 1111; *see also*

*Janati*, 374 F.3d at 273; 6 Weinstein's Federal Evidence § 1006.08[4]. . . .

The lines between these two types of summary documents are easily blurred. A summary that is admissible under Rule 1006 - and is thus most appropriately introduced under that rule - could properly be offered under Rule 611(a) if the supporting material has been admitted into evidence. Likewise, a chart that originally was offered as a jury aid to assist with review of voluminous underlying documents already in evidence - and which accurately summarizes those documents - alternatively could be admitted under Rule 1006 if the court concluded that the supporting documents could not be examined conveniently in court. . . .

In a case where voluminous underlying records are involved, the key difference between these various approaches appears to be the purpose for which the summaries are offered. Charts admitted under Rule 1006 are explicitly intended to reflect the contents of the documents they summarize and typically are substitutes in evidence for the voluminous originals. Consequently, they must fairly represent the underlying documents and be " 'accurate and nonprejudicial.' " *Bray*, 139 F.3d at 1111 (quoting *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.*, 803 F.2d 250, 257 (6th Cir.1986)); *see also Janati*, 374 F.3d at 272.

By contrast, a pedagogical aid that is allowed under Rule 611(a) to illustrate or clarify a party's position,. . ., may be less neutral in its presentation. Record support is necessary because such devices tend to be "more akin to argument than evidence," Weinstein's Federal Evidence § 1006.08[4]; *Bray*, 139 F.3d at 1111, and "may reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent," *Bray*, 139 F.3d at 1111; *see also Janati*, 374 F.3d at 273. In some cases, however, such pedagogical devices may be sufficiently accurate and reliable that they, too, are admissible in evidence, even though they do not meet the specific requirements of Rule 1006. *Bray*, 139 F.3d at 1112; 6 Weinstein's Federal Evidence § 1006.04[2].

*United States v. Milkiewicz*, 470 F.3d 390, 395–98 (1st Cir. 2006).

Here, Doc. 118-1 is both Rule 1006 evidence and an admissible pedagogical exhibit. The exhibit itself contains JCS' own business records, including charts and tables from ProbationTracker, information and excerpts from the JCS training manual in evidence (Doc. 73-3 p. 103 through 73-4 p. 106), and the JCS records for the named Plaintiff. In fact, 20 pages of the 52 page exhibit consists solely of the JCS case file report for the named Plaintiff, which was taken directly from JCS'

ProbationTracker.  Page 4 also provides an extensive index of the exhibits compiled from the JCS

business records including:

1.      APT Payment Types – printed from the JCS table PaymentTypes.

2.      APT Status Codes and Status Actions in ProbationTracker - printed from the JCS tables StatusCodes and StatusActions.

3.      APT Docs - Query of Documents scanned into ProbationTracker after August 28, 2010 that terminated JCS 'Probation' giving credit for time served.

4.      JCS Modification of Termination Forms signed by Montgomery judges showing the termination of probationers due to "credit for time served".

5.      APT Status Details Table - Status Action T - on or after Aug 28, 2010.

6.      JCS Termed Case Report printed from ProbationTracker listing Montgomery's JCS 'Probationers' terminated since August 28, 2010.

7.      Documents scanned into ProbationTracker for Aldaress Carter's two (2) JCS probations.

8.      APT_Employer table information where Employer is Like - SSI, disb, or unemp.

(Doc. 118-1, p.4). And, footnote 1 of Doc. 118-1 explains that:

"APT stands for Alabama Probation Tracker. This is the complete SQL database of the JCS ProbationTracker for the State of Alabama. This database was produced by JCS in 2015. SQL queries can be run from this database to obtain specific details as explained in this report." (Doc. 118-1, p. 4 fn. 1).

 Because Doc. 118-1 consists of JCS' own business records, the same are an exception to the

hearsay rule under Fed. R. Evid. 803(6) and are admissible.

Further, Doc. 118-1 does not proffer opinion or conclusions and, as a result, qualifies as Rule

4

1006 evidence.[1] However, if the Court finds that Doc. 118-1 is "more akin to argument than evidence," Doc. 118-1 also serves as an admissible demonstrative aid to help the Court by organizing and providing an understanding of the JCS ProbationTracker system, the JCS Training Manual, and the thousands of underlying documents organized there that are relevant to the Court's consideration of class certification. *See* 3 Newberg on Class Actions § 7:4 (5th ed.)(In order to prevent the class certification hearing from turning into a mini-trial on the merits, the court may "limit the number of witnesses, require depositions to be summarized, call for written statements of the direct evidence, and use other techniques … for nonjury proceedings."). For all of these reasons, Defendants' Motions to Strike  are due to be denied.

## III.    THE *RAY* EXPERT REPORT (DOC. 156-1) IS AVAILABLE FOR THE COURT'S CONSIDERATION.

Doc. 118-1 is not an expert report, but a "Composite Exhibit based upon the JCS private probation system data as applied in Montgomery's municipal court." (Doc. 118-1, p. 5).Ignoring this, Defendants harp on Fed. R. Evid. 702 and claim the Court is required to evaluate all experts in advance of class certification. (Doc. 156, p. 3). As a side note, experts for class certification are not required for a motion for class certification to be granted. Furthermore, to the extent that CHCC claims Plaintiff violated Fed. R. Civ. P. 37(c)(1), Doc. 118-1 is not an expert report; there is no scheduling order in this case setting disclosure deadlines; and Plaintiff has fully complied with Fed. R. Civ. P. 26.

Setting all of that aside, however, Defendants JCS and CHCC agreed to stipulate to the use

---

[1] It is worth noting that Rule 1006 evidence, itself, has been found to be an exception to the hearsay rule, as well. *United States v. DeBoer*, 966 F.2d 1066, 1069 (6th Cir. 1992)(". . .Fed. R. Evid. 1006, **an exception to the hearsay rule**, permits voluminous writings and records which cannot conveniently be examined in court be condensed into summaries.")

of the documents, depositions, and exhibits produced in *Ray v. JCS*. (Doc. 123, p.2). In fact, JCS has gone so far as to submit to this Court for its consideration and review the expert report filed by the plaintiffs in *Ray*. (Doc. 156-1). The *Ray* plaintiffs' expert report is over 120 pages and addresses statewide class certification based on the data and documents contained in JCS ProbationTracker. Furthermore, Judge Proctor in the Northern District found the *Ray* expert report to be helpful to the upcoming state-wide class certification proceedings in that case. (*See Ray* Doc. 632)[2]. As this Court is aware, the claims presented in *Ray* include some of those presented in this litigation. The *Ray* expert, Peter Coons, was deposed by Defendants JCS and CHCC for over ten hours regarding his opinions and findings, and JCS stipulated in this case to the use of Mr. Coons' deposition and exhibits in *Ray*. (Doc. 123, p. 2). Thus, while Doc. 118-1 is a composite exhibit that will be helpful to the Court in evaluating class certification, Plaintiff submits that the *Ray* expert report filed into the record here by JCS (Doc. 156-1) will also be useful to the Court, as the class certification analysis in that report subsumes a class for those in Montgomery. *See In re Scientific-Atlanta, Inc. Securities Litigation*, 571 F. Supp. 2d 1315, 1322 (N.D. Ga. 2007)(considering the entire record before the court in determining plaintiff's motion for class certification was due to be granted).

## III.  THE *CLEVELAND* AND *WATTS* DEPOSITION TESTIMONY & EXHIBITS ARE ADMISSIBLE.

Significantly, the *only* party objecting to the use of Exhibits 15, 16, Docs. 73-1 and 73-2 is CHCC.[3] Neither the City nor JCS objects to the use of these depositions and exhibits, and the City was in attendance at the depositions in issue. Therefore, all of the proffered depositions and exhibits

---

[2]This Court may take judicial notice of the *Ray* orders and filings. Fed. R. Evid. 201.

[3]While Montgomery's submission notes CHCC's objections, the City only "joins in the objection to Exhibit 1, and moves to strike that Exhibit filed by Plaintiff Carter in Support Motion for Class Certification. . ." (Doc. 167, p.1). Exhibit 1 is Doc. 118-1, and its admissibility is discussed above.

should – at the very least –  be considered regarding these two Defendants.

And, while CHCC was not in attendance or a party to the *Cleveland* and *Watts* actions, the depositions should nevertheless be admitted for the Court's full consideration. "The purpose of using prior depositions and testimony is to save the time, effort and money of the litigants and to expedite trials with a view to achieving substantial justice." *Hertz v. Graham,* 23 F.R.D. 17 (S.D. NY 1958). Here, numerous actions occurred across Alabama involving JCS' probation and CHCC's role therein. To require deposing and redeposing the same individuals, experts, and entities over and over again in each of these many actions would create a substantial waste of resources, time, and money of both counsel and of the courts. Plaintiff attempted to curb these concerns through the Joint Report filed in this case (Doc. 123) and by offering depositions and exhibits from prior actions that concern many of the same issues and parties here.[4] For use of the depositions from prior actions, ". . . a substantial identity of issues, rather than precisely the same subject matter, is all that is required." 8A Fed. Prac. & Proc. Civ. § 2150 (3d ed.). This requirement is satisfied here.

Also, CHCC's claim of its inability to "participate in the depositions" and "to protect its legal interest" rings hollow. (Doc. 157, p. 11). With the exception of the deposition of their own client, counsel for **CHCC has not asked a single question in any of the *Ray* depositions**, and over 20 depositions have been taken in that matter.[5] Thus, logic follows that even if CHCC had attended the

---

[4]The *Cleveland v. City of Montgomery, et al.,* 2:13-cv-732-MEF concerns a plaintiff being ordered to jail without the benefit of counsel when she was unable to pay fines and costs associated with various traffic tickets in the Montgomery Municipal Court. *Watts v. City of Montgomery, et al.,* 2:13-cv-733-MEF likewise concerns a plaintiff previously ordered to make payments on traffic tickets and misdemeanor charges to JCS and then later the Montgomery Municipal Court. When he was unable to make those payments due to his indigency, the plaintiff was incarcerated in the Montgomery Municipal jail. As the Court is aware, these issues are also central to this case.

[5]Indeed, CHCC has taken a similar approach in depositions taken in other related cases. For example, in *Woods v. Columbiana*, 2:15-cv-00493-RDP, CHCC only asked four questions total in the seven depositions that have been conducted. And although the seven-hour time limit was reached during Mr. Carter's deposition in this case, CHCC did not ask any questions of the named Plaintiff here.

depositions in issue, no questions would have been asked on CHCC's behalf. Furthermore, to the extent CHCC has questions to ask Judge Hayes, Nixon, and Westry, Plaintiff's Motion for Class Certification and Evidentiary Submission have been pending for well over a year now. At any point, CHCC could have sought nonparty discovery from these individuals, but it chose not to do so. Moreover, these same documents have been submitted by JCS, as well, yet CHCC has made no effort to strike the same. (Docs. 156-2 & 156-3). CHCC is not prejudiced by the submission of these depositions and its Motion to Strike is due to be denied.

## IV.    ALL OF THE BISHOP REPORTS SHOULD BE STRICKEN FROM THE RECORD.

As part of its Motion to Strike, JCS filed into this record an expert report and exhibits of Brad Bishop for the Court's consideration on class certification. (Docs. 156-2, 156-3).  CHCC has previously filed a prior expert report of Brad Bishop into this record (Docs. 79-2, 79-3), which is the subject of Plaintiff's October 26, 2016 Motion to Strike (Doc. 87). That Motion is still pending and Plaintiff adopts those arguments here. Both, Bishop's second,"updated" report filed in by JCS and the prior report submitted by CHCC are due to be stricken for the reasons stated below.

First, none of the Defendants have identified a class certification expert in this case. As argued by CHCC, failure to disclose a class certification expert implicates Rule 37(c)(1), which provides: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). For that reason alone, the reports should be stricken.

As the Court may know, JCS has identified and formally proffered Brad Bishop as its class expert in *Ray*. (*Ray* Doc. 406). After submitting his first expert report in that case, Mr. Bishop was

deposed in *Ray* on September 15, 2016. Thereafter, the *Ray* plaintiffs moved to strike the Bishop report[6] and his testimony on several grounds, including the fact that Bishop had no knowledge about JCS's operation in any court other than the one in which Bishop sat part time as judge. (*Ray* Doc. 444). Granting the motion in part, the *Ray* Court entered an order limiting Mr. Bishop's testimony to only "the standards for determining indigency or the propriety of trying minors for traffic offenses in municipal court. . ." (*Ray* Doc. 632, p. 14-15). The *Ray* Court also concluded that:

> . . .Bishop has sufficient knowledge to testify about his personal experiences with JCS and municipal courts over which he presided. But, Bishop has conceded that he has no personal experience with Probation Tracker and that he has not looked at Probation Tracker outside of the documents he reviewed for this case. Accordingly, Bishop lacks sufficient facts or data to testify about Probation Tracker records or the contents of the Probation Tracker data at this time.

(*Ray* Doc. 632, p. 16).

In light of these limitations, JCS then submitted in *Ray* an "updated" expert report from Mr. Bishop, which is extremely similar to the one submitted to this Court here. (*Compare Ray* Doc. 696-696-1-21 *to* Docs. 156-2, 156-3). In these "updated" reports, Mr. Bishop attempts to overcome his stated deficiencies in the *Ray* Court's ruling but to no avail. Neither the *Ray* plaintiffs nor the Plaintiff here have had the opportunity to depose Mr. Bishop on his new findings. Regardless, Mr. Bishop's opinions in all of his reports (Docs. 79-2, 79-3, 156-2, 156-3) are due to be stricken, and none should be considered here.

### A.    Factual Background

Mr. Bishop is law professor at Cumberland School of Law in Birmingham, Alabama, and serves part time as city judge for Hoover. In his deposition testimony, he candidly admitted that his

---

[6]Docs. 79-2 & 79-3 of this record.

"expertise" was comprised of his legal opinions and statements of his personal experience serving

as a city judge in Hoover.

> Q. So what you're telling me is that
> 10 your expertise really is being able to
> 11 describe your own personal experience with
> 12 JCS?
> 13 A. That's correct.
> 14 Q. And your own personal experience
> 15 as a municipal court judge?
> 16 A. That's correct.
> 17 Q. In reading your report, it appears
> 18 that you have quoted a great deal of law and
> 19 your conclusion on some legal issues. Is that
> 20 part of your proposed expertise too?
> 21 A. Yes, as they relate to any issues
> 22 that might arise in this case.
> 23 Q. So if the Judge is looking at
> 00036
> 1 whether you're an expert or not, he would be
> 2 looking at your personal experience with JCS,
> 3 your personal experience as a municipal court
> 4 judge, and your understanding of the law as it
> 5 applies there?
> 6 A. To municipal courts, yes.
> 7 Q. Anything else –
> 8 A. No, that's it.

(Doc. 87-1 at Depo pp. 35-6). Mr. Bishop admitted he was not an expert on all municipal courts in

Alabama, or on Probation Tracker, the JCS system in Alabama, or on private probation companies.

(Doc. 87-1 at Depo pp. 36-37). He did no tests. (Doc. 87-1 at Depo pp. 21-22) He had never used

Probation Tracker and did not know how to use it. (Doc. 87-1 at Depo p. 63) Though he has had

similar positions at Homewood and Pelham, he worked with JCS only at Hoover, where he

acknowledged JCS was used for collections of fines and costs. (Doc. 87-1 at Depo pp. 61,104).

> 18 A. I have not. My knowledge is
> 19 strictly based on the Hoover Municipal Court

10

20 relationship that I had with them.
21 Q. And, again, that is your personal
22 experience with –
23 A. That's right.
00062
1 Q. And that's really what you're
2 drawing on in your expert report here, isn't
3 it?
4 A. That's correct.
(Doc. 441-4 p. 16 at Depo pp. 61-2)

Mr. Bishop also acknowledged that only persons unable to pay their fines when assessed were sent

to JCS and they were then required to pay additional fees. (Doc. 87-1 at Depo p. 103) JCS was only

involved after adjudication. (Doc. 87-1 at Depo p.104) Mr. Bishop acknowledged that he has no

knowledge about any other city courts and has not visited any other city courts (Doc. 87-1 at Depo

p. 93)

Q. As far as JCS individuals at
14 Hoover, you've told me that was your level of
15 experience. Have you been in any other courts
16 where JCS was operating as well, any other
17 city court systems?
18 A. I have not. My knowledge is
19 strictly based on the Hoover Municipal Court
20 relationship that I had with them.
21 Q. And, again, that is your personal
22 experience with –
23 A. That's right.
00062
1 Q. And that's really what you're
2 drawing on in your expert report here, isn't
3 it?
4 A. That's correct.
(Doc. 87-1 at Depo pp. 61-2)

He does not know what other judges do. (Doc. 87-1 at Depo p. 135) And, he has no knowledge of

Probation Tracker or the data collected there:

11

> Q. As far as the Probation Tracker
> 23 use there at Hoover, did you have access to it
> 00063
> 1 or were you provided access to it?
> 2 A. I have never looked at Probation
> 3 Tracker, never been asked to, have never
> 4 wanted to, have never felt the need to.
> 5 Q. So certainly you don't know how to
> 6 use it as we sit –
> 7 A. That's correct.
> (Doc. 87-1 at Depo pp. 62-3)

Before reading the *Ray* plaintiffs' expert report of Peter Coons, Mr. Bishop did not know that

Probation Tracker was used statewide by JCS:

> 5 Q. And until you read Mr. Coons'
> 6 report, you didn't really know that that JCS
> 7 system is used statewide in all of the cities,
> 8 did you?
> 9 A. I did not.
> 10 Q. You know that now?
> 11 A. I do now.
> (Doc. 87-1 at Depo p. 105)

He had made no attempt to compare the operations of other courts which used JCS:

> 17 Q. (BY MR. EVANS) Mr. Bishop, we're
> 18 back on the record after a short break. I
> 19 think I know the answer to this, but I want to
> 20 make sure I've covered it. Did you do
> 21 anything in your review or study of this case
> 22 comparing cities statewide where JCS operated?
> 23 A. I did not.
> (Doc. 87-1 at Depo p. 103)

He had no idea what data is contained in ProbationTracker, nor what reports are available from it.

(Doc. 87-1 at Depo pp. 23, 62-3, 123) He acknowledged, however, that he would expect the JCS

personnel to have accurately collected the data therein and to follow the training in the manual. (Doc.

87-1 at Depo p. 65)

12

> 7 Q. Would you expect -- have any
> 8 reason to believe that the data they collected
> 9 in Probation Tracker would be anything other
> 10 than accurate?
> 11 A. I would not have any reason to
> 12 doubt that.
> (Doc. 87-1 at Depo p. 61)

His initial expert report in *Ray* was largely written by Mr. Logsdon, JCS' counsel, which he then

edited.

> 15 Q. But the document was presented to
> 16 you in a draft format?
> 17 A. Correct.
> 19 draft up?
> 20 A. No, I did not.
> (Doc. 87-1 at Depo p. 46)

He could not identify any method used in arriving at those opinions. (Doc. 87-1 at Depo pp. 76-78)

Instead, he stated he simply read the documents he was given and then stated his opinions as any

lawyer or judge could do. (Doc. 87-1 at Depo p. 77) He was unable to identify anything independent

of himself and his beliefs that could substantiate his opinions. (Doc. 87-1 at Depo pp. 78-9)

> 10 Q. After reviewing the items that
> 11 were selected for you, did you use any
> 12 particular method of analysis in arriving at
> 13 your opinions here?
> 14 MR. LOGSDON: Object to form.
> 15 A. I'm not sure I understand the
> 16 question, but -- particular analysis –
> 17 Q. (BY MR. EVANS) Any particular
> 18 method of analysis?
> 19 MR. LOGSDON: Object to form.
> 20 A. Again, I'm not sure I understand
> 21 the question.
> 22 Q. (BY MR. EVANS) Well, typically –
> 23 A. Analysis is just me analyzing what
> 00077
> 1 I read, yes.

13

2 Q. You reading it and determining
3 what you thought about it?
4 A. Right, and -- correct, whether I
5 thought it was accurate or not.
6 Q. Was there any particular method
7 that you looked at that experts would normally
8 use in coming to the conclusions you did?
9 A. I'm not sure, again, I understand
10 the question. If I read something in the
11 complaint that I thought was inaccurate, then
12 I would make a note in my mind that that was
13 inaccurate.
14 Q. Is that something that any trained
15 lawyer could do?
16 A. I would think so.
17 Q. And any judge could certainly do?

18 A. I would think so.
19 Q. There wasn't a particular
20 scientific method or approach that you applied
21 in arriving at the opinions that you reached?
22 MR. LOGSDON: Object to the form
23 of the question.
00078
1 Q. (BY MR. EVANS) You can answer.
2 MR. LOGSDON: Same objection.
3 A. No scientific approach, just my
4 own analysis.
5 Q. (BY MR. EVANS) And there wasn't
6 -- for instance, I couldn't go to a book or an
7 article to find a particular method that you
8 used in analyzing the data and coming up with
9 these opinions?
10 MR. LOGSDON: Object to the form
11 of the question as to what you could do or you
12 could find. He's not here to testify to what
13 you could do and your abilities.
14 MR. EVANS: That's a speaking
15 objection. You've made your objection.
16 Q. (BY MR. EVANS) You can answer.
17 A. Basically my analysis was based on
18 my knowledge of the law, my experience, and
19 that would be, I think, the only correct

14

20 answer to your question.
21 Q. So there's really not anything
22 independent of yourself or your beliefs that
23 could substantiate your opinions, is there?
00079
1 MR. LOGSDON: Object to form.
2 A. No.
(Doc. 87-1 at Depo pp. 76-79)

Mr. Bishop was not familiar with state requirements for probation officers, but acknowledged he was

certain it was more than collecting money like JCS did:

10 Q. And as far as this probation name
11 of the company, private probation company, are
12 you familiar with the requirements of a
13 probation officer in Alabama?
14 A. No, but I'm sure it's more than
15 collecting money.
16 Q. And that's essentially what JCS
17 did, wasn't it?
18 A. That's correct.
(Doc. 87-1 at Depo p. 91)

After JCS left Hoover, the City of Hoover still allowed payment plans for fines but did not charge

an extra fee. (Doc. 87-1 at Depo p. 92) Mr. Bishop confirmed, however, that while JCS was there,

only persons who could not pay their fines were sent to probation and charged extra fees:

1 Q. People that could pay in full or
2 at the point of assessment were never sent to
3 JCS?
4 A. That's correct. They were done.
5 They just had to pay, and that was it.
6 Q. But if you couldn't pay, you had
7 to pay JCS extra fees?
8 A. That is correct, and I made that
9 clear to them.
(Doc. 87-1 at Depo p. 103)

He also confirmed that if an individual had no jail sentence to suspend for their "probation," only

15

contempt of court could result in jail and then only for five days:

> 22 Q. If a person doesn't have an
> 21 initial jail sentence adjudicated and suspend-
> 22 ed at the point of revocation of a probation,
> 23 what are they to serve?
> 00124
> 1 MR. LOGSDON: Object to form.
> 2 A. If there is no suspended jail
> 3 sentence?
> 5 A. And JCS collects their fees –
> 6 Q. Or they're sent –
> 7 A. -- or tries to and they cannot and
> 8 their probation is revoked -- what's the
> 9 question?
> 10 Q. What are they supposed to serve as
> 11 far as jail sentence?
> 12 MR. LOGSDON: Object to form.
> 13 A. The maximum, I would think, would
> 14 be five days for contempt of court, and that
> 15 would be an option –
> 16 Q. And you would have to –
> 17 A. -- but it's not automatic, yes.
> 18 Q. And you would have to make the
> 19 appropriate findings of willfulness, the
> 20 ability to pay and refusal to pay, wouldn't
> 21 you?
> 22 MR. LOGSDON: Object to form.
> 23 A. Correct.
> 00125
> 1 Q. (BY MR. EVANS) And those would
> 2 have to be in writing, wouldn't they?
> 3 A. They should be, yes.
> 4 Q. Did you find any of that in this
> 5 case concerning any of the plaintiffs?
> 6 A. No.
> (Doc. 87-1 at Depo pp. 123-25)

Despite his prior deposition testimony, however, Mr. Bishop now opines in his "updated" report submitted here on the capabilities of the entire Probation Tracker system about which he previously admitted to knowing nothing. Now he states that "JCS does not appear even to have

records in its system from which one could make an informed decision on indigency status for any one probationer." (Doc. 156-2, p. 11) In addition to the grounds stated above, this assertion ignores the JCS data itself showing employer entries in which over 65,000 probationers have indicia of poverty listed in the employer data. (Exhibit 1 - employer like Unempl, Disabl or SSI). In fact, Mr. Bishop personally sent 2,659 people to the JCS payment plan who JCS listed as Unempl, Disabled or receiving SSI as the person's Employer (Exhibit 2) despite knowing that JCS was a collection scheme charging additional, monthly fees for its profit.

> 7 Q. But once JCS came on board, they
> 8 took care of that periodic pay-out procedure?
> 9 A. Correct.
> 10 Q. And as far as this probation name
> 11 of the company, private probation company, are
> 12 you familiar with the requirements of a
> 13 probation officer in Alabama?
> 14 A. No, but I'm sure it's more than
> 15 collecting money.
> 16 Q. And that's essentially what JCS
> 17 did, wasn't it?
> 18 A. That's correct.
> 19 Q. Were you aware that none of the
> 20 people working for JCS were even certified or
> 21 qualified as probation officers under the
> 22 State statute?
> 23 A. I have no reason to doubt that.
> 00092
> 1 Q. After JCS left for whatever the
> 2 reasons were, has Hoover instituted another
> 3 method for people to pay periodically when
> 4 they're unable to pay the full fine?
> 5 A. Yes. We have gone to what we call
> 6 the installment payment plan, and if a defen-
> 7 dant cannot pay at the time of sentencing, we
> 8 offer them the installment payment plan at no
> 9 -- there is no extra cost to it. They sign an
> 10 agreement with me. I ask them how much they
> 11 can pay, and I usually will go with what they

> 12 say they can pay a month.
> 13 Q. Now, unlike the system under JCS,
> 14 they don't have an additional monthly fee?
> 15 A. There are no additional fees at
> 16 all.
> 17 Q. And do you know that when JCS was
> 18 there there were additional monies paid?
> 19 A. Correct, I'm aware of that.

(Doc. 87-1 at Depo pp. 91,92).

In his reports, Mr. Bishop does not suggest that he is capable of data analysis for the extensive data contained in ProbationTracker – only that he can use that program – much like the JCS employees. That ability does not make him an "expert" in the JCS data across the state anymore than it would the JCS employee. Were it otherwise, reading a medical text would make the reader a medical expert. Essentially, JCS proposes allowing him to read its selected documents while being given the elevated posture of an expert witness. That ability, however, does not extrapolate to his personal knowledge about the operation of other Alabama courts using JCS about which he has admitted to have no personal knowledge whatsoever.

### B.   Legal Standard

The Eleventh Circuit has instructed that, in determining the admissibility of expert testimony, the court must "engage in a rigorous three-part inquiry," considering whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert [v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ]; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the

evidence or to determine a fact in issue.

*Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir.2011) (citations omitted, alteration in original). In evaluating the admissibility of proposed expert testimony, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 594–95.

### C.    Mr. Bishop's Opinions Do Not Meet the *Daubert* Standard.

To aid in determining reliability under Rule 702, courts look to the non-exclusive factors set forth in Daubert :

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.,* 704 F.3d 1338, 1341 (11th Cir.2013) (citing *Daubert,* 509 U.S. at 592–95); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 151 (1999) ("[*Daubert's*] list of factors was meant to be helpful, not definitive."). Under *Daubert,* "no single factor is necessarily dispositive of the reliability of a particular expert's testimony." Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amendments) (citations omitted). The notes to Rule 702 make clear that "[n]othing in [Rule 702] is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony." *Id.* The Rule "expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.* But, "[a]s gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or

19

methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1306 (11th Cir.2014) (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir.2010)).

"[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct," but must establish "by a preponderance of the evidence, it is reliable." *Allison v. McGhan Medical Corp*., 184 F.3d 1300, 1312 (11th Cir.1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994)). An expert's failure to satisfy any of the four reliability factors recognized in *Daubert* is sufficient to preclude the testimony of a causation expert from testifying at trial. *Daubert,* 509 U.S. at 593–94.

Mr. Bishop's opinions primarily focus on issues of law, which are not appropriate areas for an expert to opine. As the Eleventh Circuit has stated, " 'Domestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact.'" *United States v. House*, 684 F.3d 1173, 1209 (11th Cir.2012) (quoting *United States v. Oliveros*, 275 F.3d 1299, 1306–07 (11th Cir.2001)). It follows, therefore, that "[a]n expert may not ... merely tell the jury what result to reach," and "[a] witness also may not testify to the legal implications of conduct." *Montgomery v. Aetna Casualty & Surety Co.,* 898 F.2d 1537, 1541 (11th Cir.1990) (citations omitted, alterations supplied). Instead, "the court must be the jury's only source of law." *Id.* (citations omitted).

Further, Mr. Bishop did not use any methodology in his opinions. In *McCreless v. Global Upholstery Co., Inc.,* 500 F.Supp.2d 1350, 1357 (N.D.Ala.2007), the court excluded proposed expert testimony because "[t]he problem with the methods and procedures behind [the expert's opinion] is

that, as far as the court can detect, there were no methods or procedures employed." *Id.* at 1357. The same is true here. In fact, Mr. Bishop testified that he did not use any methodology in formulating his opinions and that any lawyer or judge could look at the data and formulate an opinion. He candidly admitted that his report consists of his legal opinions together with some statement about his personal experience as a part time city judge in Hoover.

### C.    Mr. Bishop's Opinions Do Not Satisfy Rule 702.

As this Court well knows, expert testimony is also governed by Federal Rule of Evidence 702. Rule 702 provides for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." In *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579 (1993), the Supreme Court held that scientific expert testimony is admissible only if the proffered testimony is both relevant and reliable. "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corporation,* 269 F.3d 865, 869 (7th Cir.2001); *see also U.S. v. Majors,* 196 F.3d 1206, 1215 (11th Cir.1999). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact
> to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Accordingly, under Rule 702, "this [c]ourt has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts." *Whatley v. Merit Distribution Services,* 166 F.Supp.2d 1350, 1353

(S.D.Ala.2001) (citations omitted). Although the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 594–95; *see McDowell v. Brown,* 392 F.3d 1283, 1298 (11th Cir.2004) (recognizing a trial judge "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate"). "But conclusions and methodology are not entirely distinct from one another"; neither *Daubert,* nor Federal Rule of Evidence 702, requires a trial judge "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). The Court's gatekeeping obligation requires that it evaluate a proposed expert's qualifications in light of what is necessary to explain a particular subject matter to the jury.

Mr. Bishop's recitation of his legal opinions and his personal experience in Hoover with JCS does not satisfy Rule 702:

> 9 Q. So what you're telling me is that
> 10 your expertise really is being able to
> 11 describe your own personal experience with
> 12 JCS?
> 13 A. That's correct.
> 14 Q. And your own personal experience
> 15 as a municipal court judge?
> 16 A. That's correct.
> 17 Q. In reading your report, it appears
> 18 that you have quoted a great deal of law and
> 19 your conclusion on some legal issues. Is that
> 20 part of your proposed expertise too?
> 21 A. Yes, as they relate to any issues
> 22 that might arise in this case.
> 23 Q. So if the Judge is looking at
> 00036
> 1 whether you're an expert or not, he would be
> 2 looking at your personal experience with JCS,
> 3 your personal experience as a municipal court
> 4 judge, and your understanding of the law as it
> 5 applies there?

6 A. To municipal courts, yes.
7 Q. Anything else --
8 A. No, that's it.

(Doc. 87-1 at Depo pp. 35-6). He also candidly admitted that he simply read the few materials

provided him and then decided what he believed to be true -- something he agreed any lawyer could

do:

> 6 Q. Was there any particular method
> 7 that you looked at that experts would normally
> 8 use in coming to the conclusions you did?
> 9 A. I'm not sure, again, I understand
> 10 the question. If I read something in the
> 11 complaint that I thought was inaccurate, then
> 12 I would make a note in my mind that that was
> 13 inaccurate.
> 14 Q. Is that something that any trained
> 15 lawyer could do?
> 16 A. I would think so.
> 17 Q. And any judge could certainly do?
> 18 A. I would think so.
> 19 Q. There wasn't a particular
> 20 scientific method or approach that you applied
> 21 in arriving at the opinions that you reached?
> 22 MR. LOGSDON: Object to the form
> 23 of the question.
> 00078
> 1 Q. (BY MR. EVANS) You can answer.
> 2 MR. LOGSDON: Same objection.
> 3 A. No scientific approach, just my
> 4 own analysis.

(Doc. 87-1 at Depo pp. 77-78). Mr. Bishop's reports and testimony fail to satisfy either *Daubert* or

Rule 702 and should not be considered by this Court. Mr. Bishop's limited experience at another city

court, his lack of understanding of JCS' operations elsewhere, and his lack of knowledge about the

contractual arrangements between the City and JCS preclude him from qualifying as an expert - or

even a fact witness - in this case.

23

> The importance of Daubert's gatekeeping requirement cannot be overstated. As the Supreme Court framed it in Kumho Tire: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152, 119 S.Ct. at 1176. The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991) ("Weinstein")). Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703.

*Vaughn* v. *Hyster Co.*, No. 4:09-CV-570-VEH, 2010 WL 9936530, at *3 (N.D. Ala. Dec. 3, 2010), aff'd sub nom. *Vaughn v. Nacco Materials Handling Grp., Inc.*, 440 F. App'x 821 (11th Cir. 2011). In addition to the fact that Defendants did not disclose a class certification expert, Mr. Bishop's report and testimony are not only irrelevant to the issues before the Court, both also fail to satisfy either *Daubert* or Rule 702. All of the Bishop reports in the record of this matter are therefore due to be stricken. (Docs. 79-2, 79-3, 156-2, 156-3).

## V.    CONCLUSION

In light of the foregoing, Plaintiff requests that this Court deny Defendants' Motions to Strike and to affirmatively strike the Bishop reports contained in the record (Docs. 79-2, 79-3, 156-2, 153), and for such other further and more general relief to which the Plaintiff may be entitled.

RESPECTFULLY SUBMITTED,


/s G. Daniel Evans
G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish

24

ASB-2477-D66P
Maurine C. Evans
ASB-4168-P16T
Attorneys for the Plaintiff
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com
E-Mail: mevans@evanslawpc.com

Leslie A. Bailey
Brian Hardingham
Public Justice
475 14th Street, Suite 610
Oakland, CA  94612
Telephone:  (510) 622-8150
E-Mail: bailey@publicjustice.net
E-Mail: bhardingham@publicjustice.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of October, 2018, I electronically filed the foregoing Plaintiff's Response in Opposition to Defendants' Motions to Strike (Docs. 156, 157, & 167) with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Shannon L. Holliday, Esquire
Robert D. Segall, Esquire
Richard H. Gill, Esquire
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347

Micheal S. Jackson, Esquire
WEBSTER, HENRY, LYONS, BRADWELL,
COHAN & BLACK, P.C.
P. O. Box 239
Montgomery, AL 36101-0239

F. Lane Finch, Jr., Esquire

Brian Richardson, Esquire
Swift Currie McGhee and Hiers, LLP
2 North 20th Street, Suite 1405
Birmingham, Alabama 35203

Michael L. Jackson, Esquire
Larry S. Logsdon, Esquire
Wallace, Jordan, Ratliff & Brandt, L.L.C.
P.O. Box 530910
Birmingham, Alabama 35253

Wilson F. Green, Esquire
Fleenor & Green LLP
1657 McFarland Blvd. N., Ste. G2A
Tuscaloosa, Alabama 35406

Kimberly O. Fehl, Esquire
CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, AL 36101-1111

s/ G. Daniel Evans
G. Daniel Evans