## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ALDARESS CARTER, | ) | |
| individually and for a class of all others | ) | |
| similarly situated, | ) | |
| | ) | |
|     Plaintiff; | ) | Civil Action No.: |
| | ) | |
| v. | ) | 2:15-cv-555-RCL |
| | ) | |
| THE CITY OF MONTGOMERY; | ) | |
| BRANCH D. KLOESS; JUDICIAL | ) | |
| CORRECTION SERVICES, INC.; | ) | |
| CORRECTIONAL HEALTHCARE | ) | |
| COMPANIES, INC.; CHC COMPANIES, INC., | ) | |
| | ) | |
|     Defendants. | ) | |

---

### PLAINTIFFS' BRIEF IN OPPOSITION TO
### BRANCH KLOESS'S MOTION FOR SUMMARY JUDGMENT

---

G. Daniel Evans
Alexandria Parrish
D. Patrick Evans
Maurine C. Evans
THE EVANS LAW FIRM, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, AL 35209
(205) 870-1970
gdevans@evanslawpc.com

Leslie A. Bailey
Brian Hardingham
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lbailey@publicjustice.net
(*admitted pro hac vice*)

*Counsel for Plaintiff and the Proposed Classes*

**TABLE OF CONTENTS**

INTRODUCTION AND FACTUAL BACKGROUND ................................................................2

RESPONSE TO KLOESS'S STATEMENT OF UNDISPUTED FACTS ...................................4

ARGUMENT ........................................................................................................................10

I.      Kloess's Conduct Violated the Sixth and Fourteenth Amendments.................................10

        A.      Kloess's failure to appear in court was a complete denial of Carter's right
                to counsel under *Cronic*. ...............................................................................10

        B.      Kloess's failure to move for indigency determinations was a constructive
                denial of the plaintiffs' right to counsel.............................................................11

        C.      There is no requirement to prove a pattern of violations. .....................................17

II.     KLOESS ACTED UNDER COLOR OF STATE LAW. ...................................................18

        A.      Subject only to narrow exceptions, all government employees— even
                independent contractors—act under color of state law.........................................18

        B.      Kloess acted under color of state law because he systemically failed to
                move for indigency hearings or file habeas petitions. ...........................................20

        C.      Kloess acted under color of state law because he did not act in accordance
                with his professional obligations as defense counsel.............................................21

III.    KLOESS IS NOT ENTITLED TO QUALIFIED IMMUNITY.......................................24

        A.      Kloess is not the kind of private party who can raise a qualified-immunity
                defense. ............................................................................................................25

        B.      Even if Kloess could raise a qualified-immunity defense, his inaction
                violated clearly-established law.........................................................................27

CONCLUSION......................................................................................................................30

## INTRODUCTION AND FACTUAL BACKGROUND[1]

Over fifty years after *Gideon v. Wainwright*, the right to counsel for poor people accused of crimes remains a promise unrealized and underfunded. Scores of articles and reports have bemoaned the pitiful state of indigent criminal defense.[2]

Branch Kloess exemplifies this problem. By a conservative estimate, he handled over 15,000 cases a year when working as a contract public defender in Montgomery Municipal Court.[3] This caseload exceeds the ABA's recommended case cap of 400 misdemeanor cases a year for full-time public defenders by a factor of nearly 50. And Kloess was only a part-time public defender. Working under such resource constraints, there is simply no way to zealously represent one's clients. And his testimony indicates that he didn't really consider his municipal court clients clients at all: he denied having any duty to them beyond representing them on a single day's docket when they appeared and he questioned whether they they he had an attorney-client relationship with them.

Kloess's representation of Aldaress Carter provides an object lesson in the kind of assembly-line representation one can expect under such circumstances. When he met Carter in a

---

[1]    Mr. Carter's separately filed Omnibus Counter-Statement of Facts (" Counter-Statement") provides the most complete account of the facts of the case presented and contains citations to the extensive factual record. Only the facts most relevant to Kloess's motion for summary judgment are included here.

[2] *See, e.g.*, Stephen B. Bright & Sia M. Sanneh, *Fifty Years of Defiance and Resistance After* Gideon v. Wainwright, 122 Yale L.J. 2150 (2013); National Right to Counsel Committee, *Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel* (2009); ABA Standing Committee on Legal Aid and Indigent Defendants, *Gideon's Broken Promise: America's Continuing Quest for Equal Justice* (2004). As one report summarizes: "Legal representation for indigents is absent in many [misdemeanor] cases. Even when an attorney is provided to defend a misdemeanor case, crushing workloads make it impossible for many defenders to effectively represent clients. . . . This forces even the most competent and dedicated attorneys to run afoul of their professional duties." Nat'l Assoc. of Criminal Defense Lawyers, *Minor Crimes, Massive Waste: The Terrible Toll of America's Broken Misdemeanor Courts* 14 (2009).

[3] Plaintiffs' Omnibus Counter-Statement of Facts in Opposition to Defendants' Motion for Summary Judgment ("Counter-Statement") ¶ 145; *see generally id.* part XI, ¶¶ 134-149. To avoid unnecessary duplication, references to the extensive evidentiary record are contained in the Counter-Statement.

holding cell, Kloess asked Carter only whether he was "paying or staying."[4] Then, by his own admission, Kloess did not even appear in court at Carter's side when Carter's case was called.[5] Carter's fines were thus "commuted" to a jail sentence without the "guiding hand of counsel"—or the ability-to-pay determination—that the Constitution requires. *See Bearden v. Georgia*, 461 U.S. 660, 672 (1983); *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963).

Several of Kloess's other clients also had their fines commuted to jail sentences that day.[6] But despite clear decisional and statutory law on point, Kloess did not even argue that the court could not jail Carter without first determining that his failure to pay stemmed from a willful refusal rather than an inability to pay.[7] *See* Ala. R. Crim. P. 26.11(i) ("Incarceration should be employed only after the court has examined the reasons for nonpayment. . . . . In no case shall an indigent defendant be incarcerated for inability to pay a fine or court costs or restitution."); *Bearden*, 461 U.S. at 667–68 ("[I]f the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it."); *id.* at 672 ("[I]n revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay. If the probationer willfully refused to pay . . . the court may revoke probation and sentence the defendant to imprisonment . . . .").

Kloess's representation of his municipal court clients thus fell far below the level of representation that his professional obligations required. *See Ala. Rules of Prof'l Conduct 1.1* ("A

---

[4] Counter-Statement ¶ 143.

[5] Counter-Statement ¶ 144.

[6] Counter-Statement ¶ 141.

[7] Counter-Statement ¶ 144.

lawyer shall provide competent representation to a client.").[8] And, more importantly, they fell far below the floor set by the Sixth and Fourteenth Amendments.[9] Eighty years ago, the Supreme Court made clear that "[t]he Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." *Avery v. Alabama*, 308 U.S. 444, 446 (1940). It remains true today.

Viewed in the light most favorable to the plaintiffs, the evidence shows that Kloess's actions—or inaction—deprived the plaintiffs of their right to counsel while he was acting under the color of law and that he is not entitled to qualified immunity. Accordingly, Kloess's motion for summary judgment should be denied.

### RESPONSE TO KLOESS'S STATEMENT OF UNDISPUTED FACTS

Carter responds to Kloess's statement of undisputed facts as follows:

1–17.   Not disputed.

18.     Not disputed that this is Kloess's understanding. Carter disputes that this arrangement is consistent with Kloess's ethical and constitutional obligations, however.

19.     Not disputed.

20.     Not disputed that Kloess testified to that.  His contract with the city however is specifically for the representation of indigent defendants.[10]

21.     Not disputed that Kloess testified to that.  His contract with the city however is specifically

---

[8] *See also, e.g.*, ABA, *Criminal Justice Standards for the Defense Function* 4.18 (4th Ed. 2017) ("Defense counsel should not carry a workload that, by reason of its excessive size or complexity, interferes with providing quality representation, endangers a client's interest in independent, thorough, or speedy representation, or has a significant potential to lead to the breach of professional obligations."); Nat'l Legal Aid & Defender Assoc. (NLADA), *Performance Guidelines for Criminal Defense Representation* 2.1 (2006) ("The attorney has an obligation to attempt to secure the pretrial release of the client . . . .").

[9] Though the right to counsel is found in the Sixth Amendment, it is incorporated against the states through the Fourteenth Amendment's Due Process Clause. *Gideon*, 372 U.S. at 342. This right, thus, sounds in both the Sixth and Fourteenth Amendments.

[10] Doc. 264, Kloss Statement of Undisputed Facts at 2 ¶ 21 (acknowledging his contract is for representation of indigent defendants).

for the representation of indigent defendants.[11]

22.     Not disputed that Kloess believed this but it is disputed that his client responsibility was so
limited.

23.     Not disputed that Kloess testified to this though his contract with the city is specifically for
the representation of indigent defendants.[12]

24.     Disputed. While it is hypothetically possible that Kloess represented a "millionaire," it is
difficult to imagine that anyone with means could have ended up in the Montgomery Jail.
The Bureau of Justice Statistics has estimated that over 80 percent of state criminal
defendants are indigent. Caroline Wolf Harlow, Defense Counsel in Criminal Cases 1
(2000), https://www.bjs.gov/content/pub/pdf/dccc.pdf.  The Montgomery Municipal Court
lacks authority to impose fines greater than $500—with most traffic violations carrying
even lower penalties.[13]

25.     Disputed; see no. 24 above and the City contract with Kloess (Doc. 253-1).

26-27. Carter disputes that Kloess met individually with his clients in a room next to the holding
cell. Rather, Kloess spoke to Carter through a window in the otherwise solid door of the
holding cell.[14]

28-31. Not disputed.

32.     Carter disputes that Kloess introduced himself by name or explained anything to his clients.

[11] Doc. 264, Kloss Statement of Undisputed Facts at 2 ¶ 21 (acknowledging his contract is for representation
of indigent defendants).

[12] Doc. 264, Kloss Statement of Undisputed Facts at 2 ¶ 21 (acknowledging his contract is for representation
of indigent defendants).

[13] Counter-Statement ¶ 40. And only those who could not afford to pay the entire amount in full within 30
days were put on JCS probation.

[14] Counter-Statement ¶ 143.

Kloess asked Carter only if he was "paying or staying."[15]

33.     Disputed. Kloess did not go out to court to present Carter's case, and did not appear in court with Carter.[16]

34-38. Not disputed.

39.     Disputed. Carter did not witness Kloess advocate in any way for him.

40.     Not disputed.

41.     Disputed in that Kloess admitted he knew the days were calculated based initially on $25 per day and later raised to $50 per day against the fines.[17]

42.     Disputed. The court did not inquire into whether Carter had made a good-faith effort to pay or had a reason for his failure to pay; instead, the court jailed Carter because he (and his girlfriend) did not have enough money to pay the entire sum due. In response to the investigation by the Alabama Judicial Inquiry Commission, presiding judge Lester Hayes stipulated to the fact that he had jailed many traffic offenders for failure to pay fines and costs without inquiring into their ability to pay.[18]  The city also affirmed that no indigency determinations were made before defendants were placed on JCS probation.[19]

43-44. Not disputed.

45.     Disputed that the Court would use state indigency forms in that Judge Westry, the current presiding judge in Montgomery testified he has not seen one as a judge and no one has presented one to him.[20]

---

[15] Counter-Statement ¶ 143.
[16] Counter-Statement ¶ 144.
[17] Doc. 265-1, Kloess Depo. 144-45.
[18] Counter-Statement ¶¶ 218-230.
[19] Doc. 270-1 at 9.
[20] Counter-Statement ¶ 64.

46.     Disputed insofar as it implies that Kloess gathered this information from Carter; disputed insofar as it implies that Kloess would orally request that the court conduct ability-to-pay determinations before jailing his clients. Kloess testified that he never filed a written motion for an indigency hearing.[21]

47.     Disputed that Carter was not indigent but not disputed that Kloess now claims he did not consider him indigent. Also disputed that Kloess asked Carter about his income and why he didn't pay. Kloess asked Carter only whether he was paying or staying.[22]

48.     Disputed. Carter's only statement to Kloess was that he wanted to pay and not stay.

49.     Disputed. Carter never witnessed Kloess advocate on his behalf.

50.     Disputed. Kloess asked Carter whether he was paying or staying.

51.     Disputed. Carter never witnessed Kloess advocate on his behalf and there is no record of this.

52.     Neither admitted nor disputed.

53.     Not disputed.

54.     Neither admitted nor disputed.

55.     Disputed. Carter did not have enough money to pay his previously adjudicated fines, as evidenced by the fact that he went on JCS probation. And Carter and Kloess did not discuss anything other than if Carter was paying or staying.

56.     Disputed. This conversation never took place. Further, Kloess's understanding of *Bearden* flips the case on its head. *Bearden* prohibits a *court* from incarcerating someone for failure to pay a fine unless the failure was willful; it does not place a burden on a *criminal*

---

[21] Counter-Statement ¶ 139.
[22] Counter-Statement ¶ 143.

*defendant* to make a bona fide effort to pay.

57.    Disputed. Kloess could not name a single person for whom he done so. As discussed below, given Kloess's crushing caseload and failure to file written *Bearden* motions or habeas petitions, a reasonable jury could disbelieve this assertion.

58.    Disputed. Carter never witnessed Kloess advocate on his behalf and there is no record of this.

59-60. Not disputed.

61.    Not disputed. But, as discussed above in no. 56, Carter disputes Kloess's understanding of *Bearden*. Carter also disputes Kloess's knowledge of *Bearden* prior to the settlement agreement entered on November 17, 2014 in *Mitchell v. City of Montgomery*, which required that the judges of the municipal court "train the Public Defenders regarding the requirements and holding of *Bearden v. Georgia*, 441 U.S. 660 (1983)." Case No. 2:14-cv-186-MHT-CSC (M.D. Ala.), Doc. 51-1 at 4 ¶ 5.

62.    Disputed. Carter never witnessed Kloess advocate on his behalf and there is no record of this.

63.    Disputed. Kloess is charged with at least a constructive knowledge of his contract with the City, which he signed, and which states that "in no event shall the City be required to pay [Kloess] more than the amount deposited in the Fair Trial Tax Fund for a particular month." Doc. 145-2 at 2 § 5.

64.    Disputed. This same contract specified that the "City shall furnish to Kloess . . . written certification of the total amount of fair trail [sic] tax collected for each of the past two (2) fiscal years." *Id.* § 7.

65.    Disputed insofar as this is an assertion of fact rather than Kloess's understanding. Carter

disputes that people were only placed on JCS if they "accepted and wanted to do it." The memoranda dealing with the "window procedure" make clear that everyone who could not immediately pay the fine for a scheduled offense and met certain criteria was placed on JCS probation.

66-69. Not disputed.

70.     Not disputed as a description of Kloess's ethical obligations. But disputed as a description of his actual practices, as further discussed below.

71–73. Not disputed.

74.     Not disputed that Carter told Kloess that he was going to try to pay some. Disputed insofar as it suggests that Carter knew the amount due, that Kloess told him the amount due, or they had any conversation about how much he could pay.

75.     Disputed insofar as it suggests that Carter left the holding cell when he spoke to Kloess. Kloess spoke to him through a window in the holding cell door.

76-97. Not disputed.

98.     Disputed insofar as it suggests that Kloess advocated on Carter's behalf.

99-104. Not disputed.

     For all other additional facts and relevant points, Carter relies on his Omnibus Counter-Statement of Facts in Response to the City of Montgomery, Judicial Correction Services, and Branch Kloess's Motions for Summary Judgment.

## ARGUMENT

## I.     Kloess's Conduct Violated the Sixth and Fourteenth Amendments.

The right to counsel is the right to the "effective assistance of counsel." *Evitts v. Lucy*, 469 U.S. 387, 395 (1985). When there has been either a complete or a constructive denial of this right, prejudice is presumed. *United States v. Cronic*, 466 U.S. 648, 659–60 (1984); *accord Strickland v. Washington*, 466 U.S. 668, 692 (1984).

The reason for this is simple: "An accused's right to be represented by counsel is a fundamental component of our criminal justice system. Lawyers in criminal cases are necessities, not luxuries." *Cronic*, 466 U.S. at 653 (citation and internal quotation marks omitted). When the adversarial system breaks down and those accused of crimes do not have "counsel acting as an advocate," then "a serious risk of injustice" infects the entire criminal proceeding. *Id.* at 656 (citations omitted).

### A.     Kloess's failure to appear in court was a complete denial of Carter's right to counsel under *Cronic*.

In this case, there was a complete denial of Carter's right to counsel at the proceeding at which his fines were commuted to days in jail.[23] Kloess himself admits that he did not appear with Carter when the judge converted Carter's unpaid fines into jail time.[24] Thus, at the crucial moment when the determination to jail Carter was made, counsel was not present. Such complete absence from a critical stage constitutes the total denial of counsel under *Cronic*. *See Golden v. Newsome*, 755 F.2d 1478, 1483 (11th Cir. 1985) (holding that the "total denial of counsel at a critical stage such as sentencing" was "presumptively prejudicial"); *see also, e.g.*, *French v. Jones*, 332 F.3d

---

[23] Because Kloess does not dispute that the right to counsel attached at this hearing, and it is blackletter law that defendants are, at a minimum, entitled to counsel at some point before being jailed, this issue will not be discussed here. To the extent that it is relevant, Carter relies on his briefing in his response to Montgomery's summary judgment motion.

[24] Counter-Statement ¶ 144.

430, 439 (6th Cir. 2003) (total denial of counsel where petitioner lacked counsel "at a critical stage of the proceedings"—the court's supplemental jury instruction); *Hunter v. Moore*, 304 F.3d 1066, 1070–71 & n. 4 (11th Cir. 2002) (reaffirming that "constitutional error exists without a showing of prejudice whenever" a defendant is denied "his right to counsel at a critical stage of the trial").

Even if Kloess's self-serving testimony that he was absent because the court called Carter's case without his knowledge can be credited at the stage of summary judgment—and it cannot—it would still be his responsibility to rectify this denial of counsel by requesting that the case be re-called and moving that the court inquire into whether Carter's failure to pay was willful before jailing him. *See Bearden*, 461 U.S. at 668, 672. But Kloess did not do so. A reasonable jury could thus conclude that Carter was completely denied his right to counsel under *Cronic*.

### B. Kloess's failure to move for indigency determinations was a constructive denial of the plaintiffs' right to counsel.

Moreover, viewing the evidence in the light most favorable to the plaintiffs, all of the individuals represented by Kloess in municipal court were constructively denied their right to counsel under *Cronic*. A reasonable jury could conclude that Kloess *never* took action to prevent his clients' unconstitutional jailing and that his crushing caseload prohibited him from effectively assisting any of his clients.

Kloess testified that he worked in municipal court as a public defender every other weekday during the relevant time period, though his assigned counsel work made up a relatively small part of his practice.[25] He also testified that he would represent everyone assigned to the municipal court's "jail docket," including those subject to probation revocation, as well as any other defendants who needed a lawyer.[26] He claimed, however, that this representation ended with the

---

[25] Counter-Statement ¶ 134.

[26] Counter-Statement ¶ 135.

day's docket ("[W]e're not assigned cases, we're assigned a day.").[27] In fact, Kloess disclaimed

any duties to his municipal court clients beyond representing them for *that day's* court session,

and even disputed that they had entered into an attorney-client relationship.[28] ("You say my

clients."). When asked "you understood that obligation and duty from you as a professional, as a

lawyer, was to an individual," Kloess responded "No." Perhaps realizing how that sounded, he

subsequently clarified, "*On the day that I'm in court*, yes, it's to that individual."[29]

On the day of Carter's hearing—January 27, 2014—there were 67 individuals on the jail

docket, all represented by Kloess.[30] Kloess's timesheet for that day, however, shows that he

worked three and one-half hours.[31] This means that he spent a little over three minutes per jailed

client. A reasonable jury could thus find that Carter's experience with Kloess's representation (or

lack thereof) was typical, and discredit Kloess's claim that he reviewed the case file for each one

of his assigned clients, discussed their case with them individually, and then (generally) appeared

with them in court.[32] Indeed, it is hard to understand how he could have done so in the time allotted.

The volume of cases Kloess handled that day was not unusual for him. By cross-referencing

the days that Kloess worked with the cases on the jail docket for the Montgomery municipal court,

counsel was able to determine that from January 1, 2012, to June 30, 2014, Kloess worked 45,486

jail cases.[33]  That means that during this two-and-a-half year period, Kloess was assigned over

---

[27] Counter-Statement ¶ 136.

[28] Counter-Statement ¶ 137

[29] Counter-Statement ¶ 138.

[30] Counter-Statement ¶ 142.

[31] *See* Parrish Decl. Exhibit C at 9.

[32] *See generally* Counter-Statement ¶¶ 134-149; Doc. 265-1, Kloess Dep. 119:20–120:4, 125:3–126:11, 168:6–168:11.

[33] Parrish Decl. ¶¶ 7-17 & exhibits. Some of these cases may be repeats, as some people may have appeared on the jail docket more than once for the same case. But this figure is also underinclusive: it does not include any individuals represented by Kloess who were not on the jail docket. And while some defendants had

15,000 cases a year while working on a part-time basis. This figure dwarfs the American Bar Association's recommendation that a full-time public defender handle no more than 400 misdemeanor cases a year. ABA, *Ten Principles for a Public Defense System* n.19 (2002) (adopting the 1973 recommendation of the DOJ-funded National Advisory Commission on Criminal Justice Standards and Goals). A review of Kloess's municipal court affidavits from January 1, 2012, through June 30, 2014, shows that Kloess never billed the City for out-of-court work.[34]

It thus comes as little surprise that Kloess testified that he did not recall *ever* filing a written request for a *Bearden* hearing, despite also testifying that his clients had been jailed for unpaid fines during most of his time as a public defender.[35] Kloess did claim that he had orally argued to the court that some defendants were indigent and should not have their fines converted into jail sentences, but a reasonable jury could disbelieve this claim given that he could not name *a single person* for whom he had demanded an ability-to-pay determination.[36] This is particularly striking given that four of Kloess's clients who had their fines commuted to jail sentences were later represented by other attorneys who represented them in a federal case in which they obtained an injunction against the practice.[37]

Carter's testimony further illustrates the quality of representation that Kloess provided his numerous clients. Taking the evidence in the light most favorable to the plaintiffs, the only thing

---

multiple cases per day, recommendations as to case caps refer to the number of cases an attorney can reasonably handle—not the number of clients.

[34] See Parrish Decl. ¶¶ 7–10 & Exhibits A–C.

[35] Counter-Statement ¶ 139.

[36] Counter-Statement ¶ 140.

[37] Doc. 265-1 at 177:8–180: 15; *Mitchell v. City of* Montgomery, 2:14-cv-186-MHT, 2014 WL 11099432 (M.D. Ala. Nov. 17, 2014).

that Kloess did is ask Carter whether he was "paying or staying." That's all he said . . . , 'Pay or stay,' and that was that."[38] Kloess did not ask whether Carter had enough money to pay his outstanding fines and fees, *id.*, even though the undisputed evidence is that he did not. *See* Kloess Statement of Undisputed Facts ¶¶ 85, 93. Kloess also did not appear at Carter's side during the proceeding at which his fines were commuted to jail.[39] And Kloess did not object to Carter's jailing or ask that the court inquire into his means before jailing him.[40] In short, Kloess failed to play his role as an advocate and thus failed to provide the assistance required by the Sixth Amendment. *See Cronic*, 466 U.S. at 654–56. "To hold otherwise 'could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel.'" *Id.* at 654 (quoting *Avery*, 304 U.S. at 446); *see also Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122, 1131 (W.D. Wash. 2013) ("Mere appointment of counsel . . . is not enough to satisfy the Sixth Amendment's promise of the assistance of counsel.").

The district court's decision in *Wilbur* is instructive on the question of when excessive caseloads amount to the constructive denial of counsel under *Cronic*. The court concluded after a bench trial "that indigent criminal defendants in [the cities of] Mount Vernon and Burlington are systematically deprived of the assistance of counsel at critical stages of the prosecution." 989 F. Supp. 2d at 1124. Defendants were deprived of the opportunity "to confer with appointed counsel in a confidential setting," there was "almost no evidence" that defense counsel conducted investigations "in any of their thousands of cases, nor is there any suggestion that they did legal analysis regarding the elements of the crime charged or possible defenses or that they discussed

---

[38] Counter-Statement ¶ 143,

[39] Counter-Statement ¶ 144.

[40] *Id.*

such issues with their clients." *Id.* The court concluded: "The appointment of counsel was, for the most part, little more than a formality . . . . To the extent that 'adequate representation' presumes a certain basic representational relationship, there was a systemic failure . . . . This situation was the natural, foreseeable, and expected result of the caseloads the attorneys handled." *Id.*[41] Though the number of cases alone does not establish a constitutional violation, the overwhelming caseload faced by the contract attorneys resulted in "truncated case handling procedures that have deprived indigent criminal defendants . . . of private attorney/client consultation, reasonable investigation and advocacy, and the adversarial testing of the prosecutor's case." *Id.* at 1133; *see also Tucker v. State*, 394 P.3d 54, 63–64 (Idaho 2017) (holding that plaintiffs sufficiently alleged a denial of counsel under *Cronic* due to public defenders' excessive caseloads and lack of resources); *Kuren v. Luzerne Cty.*, 146 A.3d 715, 736, 747–49 (Pa. 2016) (same); *Hurrell-Harring v. State*, 930 N.E.2d 217, 222, 225 (N.Y. 2010) (same).

Kloess is responsible for this constitutional deprivation. This is not a case where the court failed to appoint counsel for indigent criminal defendants. Instead, it is a case where counsel was appointed and failed to carry out his duty to meaningfully communicate with his clients and advocate on their behalf.

Nor is it a defense that the City, not Kloess, effectively determined Kloess's overwhelming workload by having him staff the municipal court alone. Certainly, as discussed in Carter's response to Montgomery's motion for summary judgment, the City is independently liable for systemically failing to fulfill its obligation to provide defendants with the effective assistance of

---

[41] It bears noting that these caseloads were nowhere near Kloess's numbers: "Sybrandy and Witt, both of whom also had private practices . . . each closed approximately 1,000 public defense cases per year . . . and often spent less than an hour on each case." *Wilbur*, 989 F. Supp. 2d at at 1124.

counsel. But Kloess also had an ethical and constitutional duty to either withdraw from taking municipal court cases or to request the aid of additional attorneys. *See Ala. Rules of Prof'l Conduct 1.3 comment.* ("A lawyer's workload should be controlled so that each matter can be handled adequately."); ABA Comm. on Ethics and Prof 'l Responsibility, *Formal Op. 06-441* (2006) ("If workload prevents a lawyer from providing competent and diligent representation to existing clients, she must not accept new clients."); *see also Pub. Def., Eleventh Judicial Circuit of Fla. v. State*, 115 So. 3d 261, 279 (Fla. 2013) (permitting public defenders to refuse or withdraw from cases where their excessive caseload impairs their ability to provide effective assistance); *State ex rel. Missouri Pub. Def. Comm'n v. Waters*, 370 S.W.3d 592, 607–08 (Mo. 2012) (same); *State v. Peart*, 621 So. 2d 780, 791 (La. 1993) (finding that underfunding created a rebuttable presumption of ineffective assistance). It is thus no defense to a claim that Kloess denied his clients' right to the effective assistance of counsel that no attorney could have provided effective assistance under the circumstances.

Kloess suggests he cannot be held liable for failing to request ability-to-pay determinations for his clients in the absence of proof that Carter and his other clients "would have been declared indigent if an indigency hearing was requested." Kloess Br., Doc. 264, at 14. He is mistaken. As explained above, where a defendant is denied her right to counsel at a critical stage, "constitutional error exists without a showing of prejudice." *Hunter*, 304 F.3d at 1071. To the extent that Kloess's argument is relevant to damages, it still fails. As the Sixth Circuit held in a case with extremely similar facts, "[w]ithout the Public Defender stepping forward to alert the court to [his client's] alleged indigency, the court had no way of knowing that indigency was an issue germane to its sentencing determination." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 611 (6th Cir. 2007). By failing to do so, "the Public Defender left the municipal judge with the misleading

16

impression that [his client's] financial circumstances did not need to be investigated prior to incarcerating him." *Id.* Thus, the court's actions were not a superseding act cutting off the chain of causation, and the public defender's failure to request a *Bearden* hearing was the proximate cause of his client's jailing. *Id.* at 610–11. The same is true here.

A reasonable jury could conclude from this evidence that the overwhelming caseload handled by Kloess and his ensuing failure to move for indigency determinations before his clients' jailing constructively denied his clients' right to counsel under *Cronic*. Viewing the evidence in the light most favorable to the plaintiffs, Kloess's clients were systemically deprived of meaningful attorney-client consultation and meaningful advocacy. An attorney who asks defendants only whether you're "paying or staying" and then does not object when a judge converts your unpaid fines into a jail sentence is no better than no attorney at all.

### C.  There is no requirement to prove a pattern of violations.

Finally, Kloess's argument that "42 U.S.C. § 1983 requires proof of the existence of a clear and persistent pattern of violating federal rights," Kloess Br. at 13–15, conflates the requirements for municipal liability and individual liability. Unlike with claims of city or county liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), individual liability under § 1983 requires only that a defendant violated "a right secured by the Constitution and laws of the United States" while "acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Indeed, the sole case that Kloess cites in the second point of his brief—*Doe v. Clairborne Cty.*, 103 F.3d 495 (6th Cir. 1996)—involved a *Monell* claim. For present purposes, it is sufficient that, viewing the evidence in the light most favorable to the plaintiffs, Kloess violated the plaintiffs' right to counsel.

17

## II.     KLOESS ACTED UNDER COLOR OF STATE LAW.

Kloess also argues that he was not acting under color of state law because he was "an independent contractor, not an employee of the City of Montgomery," and "[h]is duty is to his client, not the City." Doc. 264 at 11. But Kloess's claim that he could not act under color of state law because he was not a city employee misstates the law. Independent contractors who are working under contract with the government act under color of state law. And his claim that "his duty and loyalty are only to [his] client, *id.* at 13, while correct as a matter of legal ethics, is a wildly misleading account of his actions. As explained below, Kloess acted under color of state law because he systematically failed to live up to his professional obligations.

### A.     Subject only to narrow exceptions, all government employees— even independent contractors—act under color of state law.

Generally speaking, "a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West*, 487 U.S. at 50. This is true even if they are part-time or contract employees. The defendant in *West*, for example, was a private physician who also had a contract with the state to conduct orthopedic surgeries and operate two clinics weekly at a prison hospital. *Id.* at 44. Nonetheless, the Court held that he "acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury." *Id.* at 54. "The fact that the State employed [Atkins] pursuant to a contractual arrangement that did not generate the same benefits or obligations applicable to other 'state employees' does not alter the analysis." *Id.* at 55-56. Accordingly, that Kloess was an independent contractor rather than a salaried employee and that he had a private practice is irrelevant to the question of whether he was acting under color of state law. *Contra* Kloess Br. at 11–12.

As Kloess notes, there is an exception to this rule: "[A] public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a

18

criminal proceeding." *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981). But this exception is a narrow one. The Court subsequently made clear in *West* that its decision in *Polk County* "turned on the particular professional obligation of the criminal defense attorney to be an adversary of the State," implying that where public defenders fail to play this role they act under color of state law. 487 U.S. at 52. The Court later elaborated, "*Polk County* did not hold that the adversarial relationship of a public defender with the State precludes a finding of state action . . . . Instead, *the determination whether a public defender is a state actor for a particular purpose depends on the nature and context of the function he is performing*." *Georgia v. McCollum*, 505 U.S. 42, 44 (1992) (emphasis added).

*Polk County* itself left open the possibility that a public defender "would act under color of state law while performing certain administrative and possibly investigative functions." 454 U.S. at 325. Courts have subsequently relied on this language to hold that public defenders act under color of state law when they act in a systemic fashion. In *Powers*, for example, the Sixth Circuit held that allegations that "the Public Defender engages in an across-the-board policy or custom of doing nothing to protect its indigent clients' constitutional rights not to be jailed as a result of their inability to pay court-ordered fines" fell within *Polk County*'s exception for "administrative" functions. 501 F.3d at 612. Though the *Powers* court "acknowledge[d] that requesting indigency hearings is within a lawyer's 'traditional functions,'" it found that "the conduct complained of is nonetheless 'administrative' in character" because "Powers maintains that the Public Defender's inaction is systemic and therefore carries the imprimatur of administrative approval." *Id.*

This court has already found *Powers* to be persuasive, and cited it when holding that a plaintiff sufficiently allege alleged that a public defender was acting under color of state law by alleging that he systemically failed to move for indigency hearings. Mem. Op., Doc. 97, at 8. And

19

other courts have adopted the same reasoning in similar circumstances. *See, e.g., Miranda v. Clark Cty., Nevada*, 319 F.3d 465, 469 (9th Cir. 2003) (en banc) (holding that the public defender's policy of allocating resources to clients based on the results of a polygraph was "administrative" within the meaning of *Polk County* and thus was under color of state law);

In this case, viewing the evidence in the light most favorable to the plaintiffs, Kloess acted under color of state law for two independent reasons.

### B. Kloess acted under color of state law because he systemically failed to move for indigency hearings or file habeas petitions.

First—as this Court already determined at the motion-to-dismiss stage, *see* Mem. Op., Doc. 97, at 8–9—Kloess acted under color of state law because he "engage[d] in an across-the-board policy or custom of doing nothing to protect [his] indigent clients' constitutional rights not to be jailed as a result of their inability to pay court-ordered fines." *Powers*, 501 F.3d at 612. A reasonable jury could conclude from the fact that Kloess denied filing written *Bearden* motions or habeas petitions, and could not name anyone for whom he made an oral application not to be jailed for failure to pay fines and fees, that Kloess systemically failed to protect his clients' right not to be jailed for inability to pay fines and fees. Though Kloess is a single attorney, not an office, he was nonetheless responsible for representing half the indigent defendants in Montgomery municipal court—over 15,000 jail cases alone per year. Failing to request indigency hearings for this many people amounts to systemic inaction just as in *Powers*. Thus, viewing the evidence in the light most favorable to the plaintiffs, Kloess acted under color of state law because his actions fell within *Polk County*'s "administrative exception," like in *Powers*. *Id.* at 611–13.

This Court previously found the Sixth Circuit's reasoning in *Powers* "persuasive." *See* Mem. Op., Doc. 97, at 8 ("The Court also finds the reasoning in *Powers* . . . to be persuasive. . . . There, the court held that public defenders could be liable under § 1983 for constitutional

violations. Indeed, the facts in question were strikingly similar to those presented here as they concerned the liability of a public defender who failed to move for an indigency hearing."). And Kloess provides no reason for the Court to change its mind, other than rehashing conclusory assertions that "*the district court* in *Powers* was wrong and the case is not precedent." Doc. 264 at 12 (emphasis added). This Court is certainly not bound by its prior decisions when the evidence differs from one procedural stage to another, but here it does not: Kloess's own testimony supports the allegations in the complaint that Kloess systemically failed to move for indigency hearings.[42]

### C.   Kloess acted under color of state law because he did not act in accordance with his professional obligations as defense counsel.

Second, Kloess acted under color of state law because a reasonable jury could conclude from an evaluation of "the nature and context of the function he [was] performing," *McCollum*, 505 U.S. at 44, that he was not "performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk Cty.*, 454 U.S. at 325. Taking the evidence in the light most favorable to the plaintiffs, Kloess did not fulfill his "professional obligation [as a] criminal defense attorney to be an adversary of the State." *West*, 487 U.S. at 52. Instead, he effectively helped the court process cases and extract payment from indigent criminal defendants, not even raising an objection when his clients were unconstitutionally jailed. As alleged in the complaint, the evidence shows that "Kloess was an active participant in the City's 'pay or stay' program that gave indigent defendants the option of paying fines they could not afford or remaining incarcerated." Mem. Op., Doc. 97, at 8.

A criminal defense attorney's "principal responsibility is to serve the undivided interests

---

[42] To the extent that Kloess argues that the claims against him in the operative complaint were brought only on behalf of Carter and not a putative class, these same allegations disprove the point. *See* Second Am. Compl. ¶¶ 144–45, Doc. 145 ([P]ublic defenders like Kloess are paid from fines collected on convictions, do not routinely oppose the charges made, and do not raise issues of indigency nor request hearings for that purpose. The public defenders have a policy and practice of not requesting indigency hearings . . . .").

of his client. Indeed, an indispensable element of the effective performance of his responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation." *Ferri v. Ackerman*, 444 U.S. 193, 204 (1979); *accord Polk Cty.*, 454 U.S. at 318–19. As one law professor—and former public defender—puts it: "The criminal defense lawyer's role as zealous partisan occupies a position unique in the legal profession. The duty of the criminal defense lawyer toward her client has been called one of singular devotion; the lawyer is devoted to the client and the client only." John D. King, *Candor, Zeal, and the Substitution of Judgment: Ethics and the Mentally Ill Criminal Defendant*, 58 Am. U. L. Rev. 207, 209 (2008) (citation and internal quotation marks omitted).

There is ample evidence in the record, viewing it in the light most favorable to the plaintiffs, to support a conclusion that Kloess failed to play this part in an adversarial system. According to Carter's testimony, Kloess asked him only whether he was "paying or staying," and then did not appear by his side when Carter stood in front of the judge. Carter was left to fend for himself in court, without an attorney. Far from being a zealous advocate, Kloess effectively abandoned his client. And the sheer number of individuals that Kloess represented, along with his failure to file written *Bearden* motions or habeas petitions, supports a reasonable inference that Kloess failed to play his assigned role as advocate for any of his clients.

Kloess himself admits that he did not appear with Carter in court. And even his self-serving testimony supports the conclusion that he did not act in accordance with his professional obligations. Kloess disclaimed any duties to his assigned municipal court clients beyond representing them for *that day's* court session, and disputed the premise that they had entered into an attorney-client relationship. When asked "you understood that obligation and duty from you as

a professional, as a lawyer, was to an individual," Kloess responded "No."[43]

As well, according to his own testimony, Kloess never filed a written request for a *Bearden* hearing or a habeas petition for *any* municipal court client. Further, though Kloess claimed he had orally asked for indigency hearings, he could not name a single Montgomery Municipal Court client for whom he had done so. This is telling given that the Alabama Judicial Inquiry Commission found that presiding Municipal Court Judge Hayes was routinely jailing poor people for failure to pay court debt, in violation of state and federal law. *See In re Hayes*, Doc. 253–37 at 2 (stipulating that "[o]n many occasions prior to 2014, Judge Hayes incarcerated traffic offenders for failure to pay fines and costs" in violation of Alabama Rule of Criminal Procedure 26.11). Viewing the evidence in the light most favorable to the plaintiffs, Kloess did not protest or take any action on behalf of his clients who were jailed without an ability-to-pay or willfulness hearing and despite their indigency.

It is axiomatic that a criminal defense attorney should not allow her clients to be illegally jailed without objecting. *Cf.* ABA, *Criminal Justice Standards for the Defense Function 4-3.2* (4th Ed. 2017) ("In every case where the client is detained, defense counsel should . . . determine whether release, a change in release conditions, or less restrictive custodial conditions, should be sought. Counsel should be aware of applicable statutes and rules . . . ."). And both statute and decisional law forbid courts from jailing people merely because they cannot afford to pay fines and fees. *See, e.g.* Ala. R. Crim. P. 26.11; *Bearden*, 461 U.S. at 667–68, 672.

Kloess's failure to request indigency hearings or file habeas petitions when his clients were jailed for failing to pay court debt was thus an abandonment of his professional duties as a criminal defense attorney. Because Kloess failed to fulfill his "professional obligation . . . to be an

---

[43] Counter-Statement ¶ 138.

adversary of the State," he was thus acting under color of state law. *See West*, 487 U.S. at 52; *see also McCollum*, 505 U.S. at 44; *Harbeck v. Smith*, 814 F. Supp. 2d 608, 620 (E.D. Va. 2011) (noting that the question is whether a public defender's "inactions were serving a state interest").

### III.   KLOESS IS NOT ENTITLED TO QUALIFIED IMMUNITY.

Kloess also argues in a cursory fashion that he is entitled to qualified immunity. *See* Kloess Br. 15–16. His arguments fall short in three separate ways.

First, Kloess argues that he is immune from suit because Carter "does not allege any intentional acts were done by Kloess." Doc. 264 15. This is simply recycling an argument that this Court has already rejected. Mem. Op., Doc. 97, at 9 ("[P]laintiffs do allege that Kloess acted intentionally."). And, if Kloess means to argue that the accusations against him are only about his inaction, it is hornbook law that qualified immunity can be defeated by inaction just as much as action. *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1331 (11th Cir. 2007) (holding that jail guard's inaction violated "the well established right of prisoners to timely treatment for serious medical conditions," and reversing the grant of qualified immunity). It is no defense, then, that Kloess is accused only of failing to meaningfully communicate with his clients, move for indigency hearings, or even appear in court.

Second, Kloess argues he is entitled to qualified immunity because whether to request an indigency hearing "was a judgment call." Doc. 264 at 16. But qualified immunity does not attach just because something is a "matter of judgment" and "not a 'ministerial' or 'administrative' act," as he claims. *Contra id.* The issue is instead whether Kloess's actions or inaction "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."

24

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As discussed below, they did.[44]

Finally, Kloess errs by taking the facts in the light most favorable to him. He argues that he is entitled to qualified immunity because, he now claims, he "did challenge the commutation order." Doc. 264 at 16. But in ruling on questions of qualified immunity at the stage of summary judgment, like with any other summary judgment issue, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Rather, courts must "draw[] inferences in favor of the nonmovant even when . . . a court decides only the clearly-established prong of the standard." *Id.* at 657. Here, Carter's testimony was that he never witnessed Kloess advocate in any way on his behalf—Kloess wasn't even in the courtroom. It is thus an issue of disputed fact whether Kloess challenged the commutation order. The Court cannot rely on Kloess's version of the facts in ruling on his motion for summary judgment.

At any rate, Kloess fares no better under the correct legal standard. As explained below, he is not the type of private actor who is entitled to raise a qualified immunity defense. And even if he was, his inaction violated clearly established law—failing to move for indigency hearings or file habeas petitions when his clients were being jailed for failure to pay fines violated the plaintiffs' clearly established right to the effective assistance of counsel.

### A.    Kloess is not the kind of private party who can raise a qualified-immunity defense.

In a trio of cases, the Supreme Court has made clear that private actors (such as independent

---

[44] Kloess's argument appears to be based on the only qualified immunity case he cites in his brief, *Does v. Covington County School Board of Education*, 930 F. Supp. 554 (M.D. Ala. 1996). But even this case does not support his contentions. Kloess claims that *Does* means that "[a] state actor is entitled to qualified immunity if he is acting within the scope of his discretionary authority." Kloess Br. 15. But, in fact, *Does* says that *if* a defendant is acting "within the scope of his [or her] discretionary authority," *then* "the plaintiff must show either that the official's actions violated clearly established constitutional law or a federal statute." 930 F. Supp. at 575 (citation and internal quotation marks omitted).

contractors) acting under color of state law can only sometimes raise a qualified-immunity defense to a § 1983 suit. In fact, in two of the three cases, the Court held that they could not. *See Filarsky v. Delia*, 566 U.S. 377, 393–94 (2012) (holding that a private attorney retained part-time to conduct a municipal investigation could invoke qualified immunity); *Richardson v. McKnight*, 521 U.S. 399, 412 (1999) (holding that private actor couldn't raise a qualified-immunity defense)*; Wyatt v. Cole*, 504 U.S. 158, 168–69 (1992) (same). In determining whether qualified immunity is available to non-public employees sued under § 1983, courts are to "look to the 'general principles of tort immunities and defenses' applicable at common law, and the reasons we have afforded protection from suit under § 1983." Filarsky, 566 U.S. at 384 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)).[45]

Both of these *Filarsky* factors indicate that Kloess is not entitled to raise a defense of qualified immunity either. First, there is no common law tradition of qualified immunity for those appointed to represent indigent defendants. "Under our precedent, the inquiry begins with the common law as it existed when Congress passed § 1983 in 1871." *Filarsky*, 566 U.S. at 384. And "[n]o immunity for public defenders, as such, existed at common law in 1871 because there was, of course, no such office or position in existence at that time." *Tower*, 467 U.S. at 921.

Second, none of the reasons for "afford[ing] protection from suit under § 1983," *Filarsky*, 566 U.S. at 384, counsel in favor of qualified immunity. *Filarsky* lists three: (1) "avoiding

---

[45] Analyzing this question, the Eleventh Circuit has also twice held that private parties cannot raise a qualified-immunity defense despite being subject to suit under § 1983 for acting under color of state law. *See Hinson v. Edmond*, 192 F.3d 1342, 1347 & n.5 (11th Cir. 1999); *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 970 F.2d 785, 796 (11th Cir. 1992); *see also McDuffie v. Hopper*, 982 F. Supp. 817, 822–25 (M.D. Ala. 1997). So have numerous cases from other circuits. *See, e.g.*, *Bracken v. Okura*, 869 F.3d 771, 776–78 (9th Cir 2017) (off-duty cop working as private security officer); *Rasho v. Elyea*, 856 F.3d 469, 479 (7th Cir. 2017) (doctors in private prison); *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 479–83 (6th Cir. 2014) (private animal welfare officer); *Gregg v. Ham*, 678 F.3d 333, 339–41 (4th Cir. 2012) (bail bondsmen); *McCullum v. Tepe*, 693 F.3d 696, 699–704 (6th Cir. 2012) (private physician working part-time as prison psychiatrist).

'unwarranted timidity' on the part of those engaged in the public's business," *id.* at 390 (quoting *Richardson*, 521 U.S. at 409); (2) "[t]he government's need to attract talented individuals" to public service, *id.*; and (3) "[t]he public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits," *id.* at 391. But there is no reason to fear that appointed counsel will suffer from "unwarranted timidity" if they are not allowed to raise a qualified immunity defense, because as long as they take available action to protect the established constitutional rights of their clients in accordance with their professional obligations in an adversarial system, they are not subject to suit under § 1983 "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk Cty.*, 454 U.S. at 325. For similar reasons, denying appointed counsel a qualified immunity defense will not discourage talented attorneys from taking court-appointed cases because, again, they will not be subject to suit under § 1983 if they represent their clients in accordance with their clients' established constitutional rights and with their professional obligations in an adversarial system. Finally, although lawsuits may well distract appointed counsel from their duties, "the risk of 'distraction' alone cannot be sufficient grounds for an immunity." *Richardson*, 521 U.S. at 411. This is particularly so when appointed counsel like Kloess have a simple and foolproof method of avoiding suit—representing their clients in accordance with established constitutional rights.

In sum, neither the common law nor policy considerations support a conclusion that Kloess can raise a qualified-immunity defense. The only factor supporting extending qualified immunity to private appointed counsel is the risk of distraction, but *Richardson* makes clear that this, standing alone, is not enough. *Id.*

**B.**  **Even if Kloess could raise a qualified-immunity defense, his inaction violated clearly-established law.**

Even if Kloess could properly raise a qualified immunity defense, viewing the evidence in

the light most favorable to the plaintiffs, this defense fails because Kloess's inaction violated their clearly established right to counsel. As further explained below, the combination of *Cronic* and *Bearden* provides fair warning that Kloess's failure to request ability-to-pay hearings or object to the jailing of his clients for failing to pay fines violated his client's constitutional rights.

Qualified immunity offers individual defendants no shield from liability when a § 1983 plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This does not require that "the very action in question has previously been held unlawful . . . , but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson*, 483 U.S. at 640). "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan*, 572 U.S. at 656 (quoting *Hope*, 536 U.S. at 541) (alterations in original).

In the Eleventh Circuit, plaintiffs can show that the law is clearly established by pointing "to a broader, clearly established principle [that] should control the novel facts [of the] situation. To succeed under this approach, the principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Leslie v. Hancock Cty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013) (citations and quotation marks omitted) (alterations in original). Plaintiffs can also prevail on the clearly-established prong by showing that "the conduct involved in the case . . . so obviously violate[s] the constitution that prior case law is

unnecessary." *Id.* at 1346 (citation omitted). Here, the unlawfulness of Kloess's conduct was clearly established under both tests.

First, Kloess's conduct violated Carter's clearly established right to the effective assistance of counsel under *Cronic*. Unlike in Fourth Amendment cases, where the question of whether there was a constitutional violation is fact intensive, *see District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018), *Cronic* establishes a general principle that is readily applicable to novel sets of facts— the complete or constructive denial of counsel violates the Sixth and Fourteenth Amendments.

Both decisional and statutory law make it clear that Kloess's inaction was a constructive denial of counsel under *Cronic*. The Supreme Court held in *Bearden* that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it." 461 U.S. at 667–668. It also held that "in revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay." *Id.* at 672. Alabama has codified these principles, making even clearer that "[i]ncarceration should be employed only after the court has examined the reasons for nonpayment" and "[i]n no case shall an indigent defendant be incarcerated for inability to pay a fine . . . ." Ala. R. Crim. P. 26.11. Therefore, a public defender's "failure to request an inquiry into [a defendant's] ability to pay the court-ordered fine before he was jailed" violates the Sixth and Fourteenth Amendments. *Powers*, 501 F.3d at 607–08. This is a simple application of *Cronic*: if the right to the effective assistance of counsel means anything, it means the right to have counsel object to your illegal jailing.

Second, under *Leslie*'s alternate test, it is "obvious" that Kloess's inaction violated his clients' rights. *See Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 (11th Cir. 2017) (holding that it was "obvious" that the force used was excessive and thus violated the Fourth Amendment); *Fils*

*v. City of Aventura*, 647 F.3d 1272, 1292 (11th Cir. 2011) (same); *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002) (same). There are few principles more basic in our law then that no one should be jailed for inability to pay a debt. Forty-one states—including Alabama—have enacted constitutional prohibitions of debtors' prisons; the other nine have enacted statutes outlawing debtors' prisons. Note, *State Bans on Debtors' Prisons and Criminal Justice Debt*, 129 Harv. L. Rev. 1024, 1035 & nn. 95–99 (2016). If it is rare to see a case holding that public defenders have a duty to move for indigency hearings on behalf of clients who are being jailed for failing to pay fines and fees, that is because this is such an established part of the adequate assistance of counsel that few attorneys would contend otherwise.

## CONCLUSION

For the foregoing reasons, Branch Kloess's motion for summary judgment should be denied in its entirety.[46]

RESPECTFULLY SUBMITTED,

THE EVANS LAW FIRM, P.C.
PUBLIC JUSTICE
Attorneys for the Plaintiffs


/s/ Leslie A. Bailey


Leslie A. Bailey (admitted *pro hac vice*)
Brian Hardingham (admitted *pro hac vice*)
PUBLIC JUSTICE
475 14th Street, Suite 610
(510) 622-8150
Oakland, CA 94612
Email:  lbailey@publicjustice.net
Email:  bhardingham@publicjustice.net

---

[46] Carter is raising only constitutional claims against Kloess, not state-law malpractice claims. He therefore will not respond to Point IV of Kloess's brief.

30

G. Daniel Evans (ASB-1661-N76G)
Alexandria Parrish (ASB-2477-D66P)
Maurine C. Evans (ASB-4168-P16T)
THE EVANS LAW FIRM, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone: (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com

31

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February 2020, I electronically filed the foregoing PLAINTIFFS' BRIEF IN OPPOSITION TO BRANCH KLOESS'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Shannon L. Holliday, Esquire
Robert D. Segall, Esquire
Richard H. Gill, Esquire
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347

Micheal S. Jackson, Esquire
WEBSTER, HENRY, LYONS, BRADWELL, COHAN & BLACK, P.C.
P. O. Box 239
Montgomery, AL 36101-0239

F. Lane Finch, Jr., Esquire
Brian Richardson, Esquire
SWIFT CURRIE MCGHEE AND HIERS, LLP
2 North 20th Street, Suite 1405
Birmingham, Alabama 35203

Michael L. Jackson, Esquire
Larry S. Logsdon, Esquire
Wesley K. Winborn, Esquire
WALLACE, JORDAN, RATLIFF & BRANDT, L.L.C.
P.O. Box 530910
Birmingham, Alabama 35253

Wilson F. Green, Esquire
FLEENOR & GREEN LLP
1657 McFarland Blvd. N., Ste. G2A
Tuscaloosa, Alabama 35406

Kimberly O. Fehl, Esquire
CITY OF MONTGOMERY LEGAL DEPT.
Post Office Box 1111
Montgomery, AL 36101-1111

s/ Leslie A. Bailey
Leslie A. Bailey