# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ALDARESS CARTER, | ) | |
| individually and for a class of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiff; | ) | Civil Action No.: |
| | ) | |
| v. | ) | 2:15-cv-555-RCL |
| | ) | |
| THE CITY OF MONTGOMERY; | ) | |
| BRANCH D. KLOESS; JUDICIAL | ) | |
| CORRECTION SERVICES, INC.; | ) | |
| CORRECTIONAL HEALTHCARE | ) | |
| COMPANIES, INC.; CHC COMPANIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO THE CITY OF MONTGOMERY'S
## MOTION FOR SUMMARY JUDGMENT

---

G. Daniel Evans
Alexandria Parrish
D. Patrick Evans
Maurine C. Evans
THE EVANS LAW FIRM, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, AL 35209
(205) 870-1970
gdevans@evanslawpc.com

Leslie A. Bailey
Brian Hardingham
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lbailey@publicjustice.net
(*admitted pro hac vice*)

*Counsel for Plaintiff and the Proposed Classes*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

    A.    Montgomery contracted with JCS to use the company's "offender paid" probation system to collect court debt from and impose probation fees on people who could not pay court fines. ....................................................................2

    B.    The City delegated its authority over probation services to JCS, and JCS operated with no oversight by City policymakers. ................................................5

    C.    Municipal Court personnel, acting for the City, established the administrative Window Procedure to assign large numbers of debtors to JCS probation without seeing a judge.....................................................................6

    D.    The City's Public Defender program in Municipal Court .......................................7

    E.    JCS's probation system increased City revenue from collection of court fines..............................................................................................................8

    F.    The City kept renewing its contract with JCS even after City policymakers were on notice of the constitutional problems with the JCS probation system. .............................................................................................................10

ARGUMENT.......................................................................................................................14

I.    Summary Judgment Standard .............................................................................14

II.    Legal Framework ................................................................................................14

    A.    Framework for Municipal Liability Under Section 1983 and *Monell* ..................14

    B.    Under Alabama Law, the City of Montgomery Had the Authority to Provide Probation Services. ...................................................................................15

III.    The City is Liable for the Policies and Practices That Were a Moving Force Behind Plaintiff's Constitutional Harms............................................................20

    A.    The City is Responsible for Putting the Contract in Place, Which Was a Moving Force Behind the *Bearden* Constitutional Violations (Counts 1 and 9). ......................................................................................................20

        1.    The JCS-Montgomery Contract effectively bound the Municipal Court to use JCS probation and impose JCS's fees. .................................21

2.    The City adopted a policy of using JCS-supervised probation to collect fines from all defendants who could not pay, not only from defendants who received suspended jail sentences....................23

B.    Alternatively, a reasonable jury could find that the City's deliberate indifference to Plaintiff's constitutional rights was a moving force behind the *Bearden* violations. ..........................................26

IV.    The City Is Liable for the Constitutional Violations that Resulted from Its Delegation to JCS of Final Policymaking Authority Over the Provision of Probation Services. ..............................................28

V.    The City Is Liable for the Due Process Violations that Resulted from Its Policies and Practices of Municipal Court Administration ..............................32

A.    The Window Procedure policy by which pay window clerks were instructed to charge scheduled fines and put defendants on supervised probation without a court appearance violated due process. ...............................32

B.    Because the court personnel and judge who instituted the Window Procedure were acting in their administrative capacities on behalf of the City, not their judicial capacities on behalf of the State, the City is liable for constitutional violations caused by the Window Procedure............................33

VI.    The City is Responsible for Failing to Provide Adequate Indigent Defense Services (Count 5)................................................37

A.    Plaintiff's right to counsel had attached..............................38

1.    The right to counsel attached at sentencing to JCS probation. .................38

2.    At the very least, there is a right to counsel before being jailed...............39

B.    Plaintiff's right to counsel was violated..............................40

1.    Plaintiff was denied his right to counsel at sentencing. .............................40

2.    Plaintiff was constructively denied his right to counsel at the commutation proceedings. ..........................................42

C.    The City is liable for this violation under *Monell*.................................45

1.    The City had a statutory duty to provide counsel. ....................................45

2.    The City's policies caused the constitutional deprivation ........................47

VII.    Plaintiff's claims are not barred by *Heck v. Humphrey* or *Rooker-Feldman*....................50

VIII.    Plaintiff's claims are not barred by the Statute of Limitations. ........................50

CONCLUSION..................................................................................................................50

**INTRODUCTION**

As Plaintiff explained in opposition to Judicial Correction Services' motion for summary judgment, JCS is liable under Section 1983 and *Monell* for the unconstitutional policies and practices it put in place under color of state law. The City of Montgomery is also responsible for several constitutional violations. *First*, the City is directly responsible for its own policymaking officials' decisions and express policies. The City, together with JCS, created an unconstitutional debt-collection scheme using its power under Alabama law to provide "probation services." Through in its contract with JCS, the City enacted a policy requiring the Municipal Court to assess fees against individuals put on probation with JCS (who, by definition, could not afford to pay their court debts). The City's Municipal Court personnel, acting administratively as policymakers for the City, instituted an unconstitutional window procedure whereby people were placed on probation without any judicial process. And the City entered into a contract for indigent defense services that directly and foreseeably deprived people of constitutionally-adequate counsel.

*Second*, the City is responsible for the unconstitutional policies and practices that JCS put in place using the City's delegated policymaking authority over probation services. As a result of the City's JCS-made policies and practices, probationers were denied indigence and ability-to-pay determinations, charged fees without respect to their ability to pay, and even jailed for non-payment without any finding of willfulness.[1]

---

[1] Plaintiff is not opposing the City's motion on Counts 3 (Fourth Amendment) and Count 7 (Eighth Amendment). Accordingly, this brief does not respond to the City's arguments concerning those claims.

The City's brief also devotes substantial space to attacking the same allegations in the Second Amended Complaint that the City vehemently *opposed* permitting Plaintiff to correct based on discovery produced by the City in Fall 2019. *Compare, e.g.*, Doc. 266-1 at 5 & n.4, 8, 32 & n.21-22, *with* Doc. 242 at 2-3, 9-10, 15 & Addendum (ECF pp. 27-30) (detailing allegations Plaintiff sought leave to remove). This brief will not further address those straw man arguments. *See Patten v. Vertical Fitness Group*, LLC, No. 12-cv-1614, 2013 WL 12069031, at *4 (S.D. Cal. Nov. 8, 2013) (defendant's preference for less clear complaint that is "easier to oppose" is not valid reason to disallow amendment).

The City's primary argument for summary judgment is that any unconstitutional policies and practices belonged to its Municipal Court acting as an arm of the State of Alabama (a party not before the Court), and not to the City or to JCS (the parties whose conduct is at issue in this litigation). *See, e.g.,* Doc. 266-1 (City Br.) at 4. This defense relies entirely on the City's assumption that every challenged act was judicial, and therefore taken by the Municipal Court on behalf of the State. *See id.* (arguing, by analogy to the claims in another case, *McCullough v. Finley*, 907 F.3d 1324, 1331 (11th Cir. 2018)) that the Municipal Court served on behalf of the State as the sole policymaker for "every wrongful alleged action").

But the City fails to address many of the wrongful actions alleged against it in *this case*. As set forth below, Plaintiff does not challenge any judicial acts, but only the City's own policies and practices concerning government functions over which the City itself had authority under state law, including policies and practices instituted by JCS using City-delegated policymaking authority. Because those City policies and practices were moving forces behind Plaintiff's constitutional violations, his claims should proceed and the City's motion should be denied.

## FACTUAL BACKGROUND

Mr. Carter's separately filed Omnibus Counter-Statement of Facts provides the most complete account of the facts and contains all citations to the evidentiary record. For the sake of brevity and efficiency, Plaintiff adopts herein, as if fully set forth, Plaintiff's brief in opposition to JCS's motion for summary judgment filed contemporaneously herewith. The factual allegations related to the underlying Due Process and Equal Protection violations are set out in that brief.

### A. Montgomery contracted with JCS to use the company's "offender paid" probation system to collect court debt from and impose probation fees on people who could not pay court fines.

In 2009, the City of Montgomery entered into a contract with Judicial Correction Services,

Inc. ("JCS"), a private, for-profit probation company.[2] By entering into the contract, the City hired and authorized JCS to use supervised probation—a restrictive quasi-criminal system normally reserved for defendants who are released from jail or sentenced to a suspended jail sentence—to collect traffic ticket fines and other municipal court debt for the City. Accordingly, under the contract, JCS was charged with monitoring and collecting probationers' payments and ensuring that people paid their court debts.[3]

Pursuant to the contract, the City paid JCS nothing for JCS's services.[4] Instead, as compensation to JCS, the City expressly agreed that (1) "all" debtors assigned to probation in the Montgomery Municipal Court would be "supervise[d]" by JCS; and (2) the City's municipal court "shall" order each "probationer" to pay JCS a one-time startup fee of $10 and then $40 every month for the entire duration of the debtor's probation.[5] JCS's marketing brochure explained, "It costs the city or county nothing. Not a dime. We are an offender paid system. Simply the offender pays a monthly supervision fee during the term of their probation."[6] Under this "offender-funded" system, JCS would make 100% of its profits solely from the fees it collected from probationers.[7]

Montgomery's acting Mayor signed the contract on behalf of the "CITY/COURT OF MONTGOMERY, Alabama." Montgomery renewed the contract in 2010, this time with Mayor Todd Strange signing on behalf of the City ("and Court"), and JCS operated in Montgomery under

---

[2] Plaintiff's Omnibus Counter-Statement of Facts in Opposition to Defendants' Motion for Summary Judgment ("Counter-Statement") ¶4; *see generally id.* ¶¶ 1-23. To avoid unnecessary duplication, references to the extensive evidentiary record are contained in the Counter-Statement.

[3] Counter-Statement ¶¶ 4, 9-10.

[4] Counter-Statement ¶¶ 12-14.

[5] Counter-Statement ¶¶ 13, 15, 17.

[6] Counter-Statement ¶ 14.

[7] Counter-Statement ¶¶ 13-14.

that contract until the City terminated it on June 2, 2014.[8] Prior to contracting with JCS, the City had used a different private probation company.[9]

By entering into the contract with JCS, Montgomery adopted a policy of placing and keeping individuals on supervised probation not for any legitimate penal purpose, but rather solely because they could not pay court debt within a short time frame. Ability to pay determined whether a municipal court defendant in Montgomery ended up on JCS-supervised probation in two ways. First, pursuant to Montgomery policy, debtors who could not pay their court fines in full within 30 days were assigned to JCS probation, whereas those who could afford to pay their fine within 30 days simply paid and had their cases closed.[10] Second, pursuant to the JCS-City Contract, probationers who could not "pay their entire fine and Court costs within one week of sentencing" would be responsible for both the $10 set-up fee and the "standard probation fee" of $40 per month for the duration of their probation, while any probationer who *could* pay their court debt off within a week would be responsible only for the $10 set-up fee.[11] The contract provided that JCS would not charge its standard monthly probation fee for "indigent cases when determined by the Court," but did not provide any explanation of how a probationer might avail himself of that relief.[12] Likewise, the contract provided that JCS would perform other optional "related services" such as overseeing community service and electronic monitoring with additional "fee structure(s)."[13] But it was clear to everyone involved that JCS's sole responsibility in Montgomery was the collection

---

[8] Counter-Statement ¶ 22.

[9] Counter-Statement ¶ 3.

[10] Counter-Statement ¶¶ ¶¶ 30, 3-33, 45.

[11] Counter-Statement ¶ 16.

[12] Counter-Statement ¶ 18.

[13] Counter-Statement ¶ 19.

of fines, and there is no indication that these optional terms were ever invoked.[14]

### B. The City delegated its authority over probation services to JCS, and JCS operated with no oversight by City policymakers.

After the Mayor signed the JCS contract, the City left the administration of the probation system up to JCS and exercised virtually no meaningful oversight or supervision.[15] Left to its own devices, JCS had free rein over virtually every aspect of the probation scheme. The actions JCS took with that authority are described in detail in Plaintiff's opposition to JCS's motion, which is incorporated here by reference in full.

The City admits that it "was never involved in or sought to oversee JCS's activities," choosing instead to turn a blind eye to how JCS ran its system. Doc. 266-1 at 28; *see also* Doc. 260 (JCS Br.) at 63 (City did not have "any continuing involvement" in JCS's probation system "beyond entry into the two contracts"). Mayor Strange admitted that he never caused the City to investigate JCS and claimed not to even know "whether they did a good job or a bad job."[16] Ken Nixon confirmed that the City never audited JCS, and said that the City simply expected JCS do its job under the contract: "collect those moneys . . . and remit those collections."[17] In short, after delegating enormous control and discretion over how the probation system was run to JCS, a private, for-profit corporation, City policymakers conducted no meaningful review of how the probation system was operating or how probationers were being treated.

---

[14] Counter-Statement ¶¶ 9, 36.

[15] See Counter-Statement part XIV, ¶¶ 207-210.

[16] Counter-Statement ¶¶ 207.

[17] Counter-Statement ¶¶ 208.

**C. Municipal Court personnel, acting for the City, established the administrative Window Procedure to assign large numbers of debtors to JCS probation without seeing a judge.**

In June 2009, shortly after JCS began operating in Montgomery, Municipal Court Operations Supervisor Debbie Murphy issued a directive to municipal court staff titled "Procedures for JCS at Pay Window."[18] That document advised court staff working the court's pay window that with a supervisor's approval they could grant people who owed $150 or less a one-time 30-day extension, and that people who owed less than $1,500 in fines "may be approved for JCS at the pay window" without seeing a judge at all.[19] JCS's written standard operating procedures for its operations in Montgomery confirm that when the window procedure was used, clerks initially placed the defendant on JCS probation, and the defendant then knocked on a door down the hall in the court building to complete the process. The JCS intake officer retrieved the partially completed Order of Probation from the clerk's office, and as the defendant filled out a sheet with his or her contact information on it, the JCS intake officer "prepare[d] the Order of Probation for the Defendant to sign."[20]

Clerks at the pay window were never authorized to impose a jail sentence (suspended or otherwise). They could only impose a fine based on the fine schedule laid out in Rule 20 of the Alabama Rules of Judicial Administration.[21] There were no instructions in the memo to advise defendants that they were entitled to counsel or an ability-to-pay determination, or that JCS fees could be waived for indigent defendants. [22]

---

[18] Counter-Statement ¶ 45; *see generally id.* at part V.A.

[19] *Id.*

[20] Counter-Statement ¶ 51.

[21] Counter-Statement ¶ 47.

[22] Counter-Statement ¶ 45.

On February 7, 2013, Judge Hayes issued a standing order, General Order No. 2013-1, stating that "pursuant to my directive implemented in June 2009," any individual owing less than $250 could get one 30-day extension, and that any individual who owed less than $1,500 and who was either not on JCS or in good standing with JCS could be placed on JCS probation without first seeing a judge.[23] This 2013 general order was the first time a judge issued a written directive concerning the sentencing of municipal court defendants to JCS probation through the window procedure, with no involvement whatsoever from a judge at the time.[24] As with Ms. Murphy's 2009 memo on the same topic, the standing order contained no instructions to advise defendants that they were entitled to counsel or an ability-to-pay determination, or that JCS fees could be waived for indigent defendants.[25]

The evidence in the record shows that in 2012 (the only year for which records were produced), on average more than 100 people every week were assigned to through the window— several times more cases than all the judges put together.[26] Every one of them was put on JCS-supervised probation without a suspended jail sentence and without appearing before a municipal court judge.[27]

### D. The City's Public Defender program in Municipal Court

To comply with its statutory obligation to provide indigent defense in municipal court, Montgomery used contract public defenders. The contract was split between Branch Kloess and

---

[23] Counter-Statement ¶ 48.

[24] *Id.*

[25] *Id.*

[26] Counter-Statement ¶ 68.

[27] Counter-Statement ¶ 47.

the firm of Barfoot & Schoettker.[28] Each worked every other weekday.[29] Kloess testified that he would represent everyone assigned to the municipal court's "jail docket," including those subject to probation revocation, as well as any other defendants who needed a lawyer.[30]

A review of the municipal court's docket from January 3, 2012, to July 2, 2014, shows that there were 99,429 cases on the court's jail docket during this two-and-a-half year period—almost 40,000 a year. Kloess alone was assigned 45,486 jail cases.[31] That means that Kloess was assigned over 15,000 cases a year while working on a part-time basis.

Kloess testified that he did not recall *ever* filing a written request for a *Bearden* hearing, despite also testifying that his clients had been jailed for unpaid fines during most of his time as a public defender.[32] He could not name a single client for whom he had sought an indigency determination to prevent their fines from being commuted into jail sentences.[33] He likewise never appealed a single Municipal Court commutation decision or submit any an indigence waivers on behalf of any clients to make such an appeal possible.[34]

### E. JCS's probation system increased City revenue from collection of court fines.

JCS marketed its system to municipalities as a way to "collect more money faster" and

---

[28] Counter-Statement ¶ 134; *see generally id.* at part XI, ¶¶ 134-149.

[29] *Id.*

[30] Counter-Statement ¶ 135.

[31] Parrish Decl. ¶¶ 7-17 & exhibits. Some of these cases may be repeats, as some people may have appeared on the jail docket more than once for the same case. But this figure is also underinclusive: it does not include any individuals represented by Kloess who were not on the jail docket. And while some defendants had multiple cases per day, recommendations as to case caps refer to the number of cases an attorney can reasonably handle—not the number of clients.

[32] Counter-Statement ¶ 139.

[33] Counter-Statement ¶ 140.

[34] *Id.*

dramatically increase collection of outstanding fines.[35] Montgomery began to reap the financial benefits of JCS's probation-collection system right way. The JCS-City Contract was inked in March 2009, and JCS began operations in Montgomery that Spring. In May 2009, Court Administrator Ken Nixon reported to Mayor Todd Strange that "the program that began Monday (5/4/2009) with JCS . . . was implemented as planned" and was "proceeding better than expected."[36] Nixon explained that since JCS had begun operations, 403 cases had been "referred to JCS." He said, "The clerks working the windows are reporting that numerous citizens are electing to pay their tickets as opposed to going on a payment plan with JCS." He also predicted that the "new procedure should result in an increase in monthly revenues, in that citizens are only given extensions on a limited basis (approved by a supervisor)." Nixon told the Mayor, "I will keep you updated on further progress with JCS."[37] The system was working well ("better than expected"): those who could afford to pay their tickets were doing so in order to avoid being put on JCS probation, and that was increasing monthly revenues.[38]

As of August 2001, Nixon confirmed to a City employee that fine collection under JCS had risen at least 20% a month.[39] All in all, before JCS's arrival in Montgomery, the city's fine and forfeiture revenues hovered between $5.5 million and $6.8 million each year. From 2009 to 2014, while JCS was operating, those revenues shot up to between $7.8 million and $9.8 million. Then, after the City cancelled its contract with JCS, revenues went back down to between $4.8

---

[35] Counter-Statement ¶¶ 24-26; *see generally id.* at part II.

[36] Counter-Statement ¶ 36.

[37] *Id.*

[38] *Id.*

[39] Counter-Statement ¶ 37.

million and $5.3 million. [40]

### F. The City kept renewing its contract with JCS even after City policymakers were on notice of the constitutional problems with the JCS probation system.

City officials were on notice as early as 2009 that the JCS probation system was being implemented in a way that would lead to constitutional violations. First, as explained above, Mayor Strange was informed soon after JCS started, in May 2009, that people who could not pay their fines were being put on probation by "clerks working the windows."[41] The Mayor was thus on notice that people who owed only fines, and had not received a suspended jail sentence, were being put on supervised probation with JCS without ever seeing a judge.[42]

Then, by 2012, the first lawsuits were filed.[43] In July 2012, Coleen Ray, the head of JCS's operations in Alabama, emailed Ken Nixon, who reported directly to Mayor Strange, to notify him of the decision in *Burdette v. Town of Harpersville*, in which the circuit court for Shelby County had concluded that the JCS system was full of "egregious abuses" such as defendants being put on probation with no underlying jail sentence; defendants being placed on probation solely because they were unable to pay the court fines immediately; defendants jailed for violating their probation without receiving an ability-to-pay determination, and "unconscionable" fees.[44] Then in August 2012, the *Thurman v. JCS* case was filed, alleging that JCS had illegally coerced payments from debtors using form documents that purported to be lawfully Montgomery Municipal court orders but were not lawful probation orders.[45] The City was on notice of that lawsuit as well, with Nixon

---

[40] Counter-Statement ¶ 38.

[41] Counter-Statement ¶¶ 36, 57.

[42] Counter-Statement ¶¶ 36, 47, 57.

[43] Counter-Statement ¶¶ 211-13; *see generally id.* at part XV, ¶¶ 211-17.

[44] Counter-Statement ¶¶ 212, 203.

[45] Counter-Statement ¶ 213.

communicating with JCS about its obligation to provide probation orders in response to a third-party subpoena.[46]

By August 2013, the City was defending itself in Section 1983 lawsuits brought by two JCS probationers alleging violations of their Fourteenth and Sixth Amendment rights—*Cleveland v. City of Montgomery*, and *Watts v. Montgomery*.[47] And in March 2014, the *Mitchell v. Montgomery* case was filed, alleging that the City of Montgomery and its four municipal court were liable under section 1983 for constitutional violations.[48] More lawsuits followed.[49]

In addition to the lawsuits, in March 2013, the City received an alarming letter from JCS's founder and former C.E.O., Dennis Sanders, warning that the company had begun to implement a new policy throughout Alabama of allocating *half of every payment* received from a probationer to probation fees.[50] This was a drastic shift from the previous ratio of allocating 70% of each payment to the probationer's underlying fine. Sanders explained that JCS had been purchased by a private equity firm that would have only "one reason to invest in probation…money." He also noted that the fee increase had been prompted by JCS's involvement in "several lawsuits" that had been expensive.[51]

Despite mounting evidence of major constitutional issues with the JCS system, Montgomery took no action to address these issues, maintaining its hands-off approach.

---

[46] *Id.*

[47] Counter-Statement ¶ 214.

[48] Counter-Statement ¶ 215.

[49] Counter-Statement ¶¶ 216-17.

[50] Counter-Statement ¶ 95. This letter was sent to Ken Nixon, who forwarded it to City Attorney Kim Fehl. *See id.*

[51] *Id.*

Finally, in June 2014, the City cancelled its contract with JCS.[52] Many other Alabama cities followed suit in the wake of state-wide litigation against JCS and the cities and towns that contracted to use its probation scheme.[53] And in November 2014, the City settled the *Mitchell* lawsuit, agreeing among other things "not to hire, contract with, or otherwise use any private probation company . . . for a period of not less than three years[.]"[54] The City also agreed that its public defenders would inform clients of the right to an indigency determination and a waiver of the cost of appeal.[55]

In 2016, Alabama's Judicial Inquiry Commission ("JIC") filed a 91-page complaint against Lester Hayes, who was at that time the Presiding Judge of the Montgomery Municipal Court.[56] The complaint charged Judge Hayes with ethics violations related to the operation of the Montgomery Municipal Court and JCS's collection of fines for the City.[57] It alleged, among other things, that the court routinely jailed indigent traffic offenders and misdemeanants for "failure and/or inability to pay."[58] The JIC complaint alleged that in Montgomery, "In exchange for providing debt-collection services to the City free of charge, JCS was permitted to charge 'probationers' a $10 start-up fee and a $40-per-month 'supervision' fee."[59] The complaint also noted that, between 2010 and 2014, Montgomery had "revenue significantly disproportionate to the population of the municipality and significantly disproportionate to revenues collected by other

---

[52] Counter-Statement ¶ 22.

[53] Counter-Statement ¶ 211

[54] Counter-Statement ¶¶ 215.

[55] *Id.*

[56] Counter-Statement ¶ 218.

[57] Counter-Statement ¶ 219.

[58] Counter-Statement ¶ 220.

[59] Counter-Statement ¶ 224.

major Alabama municipal court systems."[60] Hayes stipulated to the JIC's findings, including that the court had been jailing JCS probationers without an ability-to-pay determination and that people had been put on probation without suspended jail sentences.[61] He was found guilty and suspended without pay.[62]

After Judge Hayes's suspension, Mayor Strange recommended that the City Council reinstate him on the municipal court for another four-year term.[63] Several concerned citizens attended the City Council meeting on March 6, 2018 to speak out, urging the City not to reinstate Hayes. They argued that a judge who had "brought in $14 million dollars off the backs of poor black people" and "jail[ed] poor people" should not be put "right back in the same position that he was in in the first place."[64] The City Council voted 7-2 to reinstate Hayes for another four-year term, and he remains on the Montgomery Municipal Court bench today.[65]

Montgomery has since implemented a new policy permitting people who were unable to pay their court fines to go on a payment plan without being on supervised probation. Pursuant to that new policy, citizens have the option of paying $25 a month or doing community service.[66] The City also appears to have made arrangements with the Montgomery County District Attorney's office whereby the D.A. collects delinquent fines in exchange for tacking on a 30% collection fee to the underlying debt. *See* Complaint, *Rudolph v. City of Montgomery*, No. 2:16-cv-00057-RCL-SMD (Doc. 1 at 1-5).

---

[60] Counter-Statement ¶ 221.

[61] Counter-Statement ¶ 226.

[62] Counter-Statement ¶ 220.

[63] Counter-Statement ¶ 230.

[64] Counter-Statement ¶¶ 232-36.

[65] Counter-Statement ¶ 240.

[66] Counter-Statement ¶ 237.

**ARGUMENT**

## I.     Summary Judgment Standard

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is a fact that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In making a summary judgment determination, the court must believe the evidence of the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

## II.     Legal Framework

### A.   Framework for Municipal Liability Under Section 1983 and *Monell*

Despite the stark disagreement between the parties regarding the facts at issue in this case, it is important to note that, generally, the parties agree on the legal framework for these claims. It is true that *Monell* claims require an underlying constitutional violation. Doc. 266-1 at 9 n.12 (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)). The City does not actually make specific arguments about the substantive constitutional violations alleged; it merely incorporates JCS' briefing on this matter. Doc. 266-1 at X. Plaintiff has set forth the evidence supporting the substantive allegations in the opposition to JCS's motion for summary judgment (at parts I, II, and III) and incorporates those arguments as appropriate here.

Under § 1983, the City is liable for its policies relating to governmental functions over which it has "authority and responsibility." Doc. 266-1 at 11 (citing *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1330 (11th Cir. 2003). Whether the City has final policymaking authority in a given area depends state law. *Pembaur v. City of Cincinnati*, 476 U.S. 469, 483 (1986).

The unconstitutional action must be traceable to a municipal policy, which includes "acts

14

which the municipality has officially sanctioned or ordered" with respect to the governmental function over which it has authority. *Pembaur*, 476 U.S. at 479–80; *see* Doc. 266-1 at 10–11 (citing *Monell*, 436 U.S. at 694). Municipal policies include those put in place by individuals or entities to which the municipality has delegated its authority and responsibility. Doc. 266-1 at 11 (citing *Grech*, 335 F.3d at 1331–32); *Pembaur*, 476 U.S. 483 n.12 (if a municipal entity delegates its power to establish final policy, the decisions made by the delegee "*would* represent county policy and could give rise to municipal liability").

Municipalities are also be held liable for widespread customs and practices in which they acquiesce with deliberate indifference to the risk of constitutional violations.

Finally, the policy or custom at issue must be a moving force behind the constitutional violation at issue. Doc. 266-1 at 9 n.12 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). A moving force is both a but-for cause and a proximate cause of the harm. Doc. 266-1 at 21; Plaintiffs do not carry the burden of showing irrefutable evidence in favor of the defendant's policy or custom foreseeably leading to the injury; they need only provide "sufficient evidence of a 'causal link' between the policy and the injuries to get the case to a jury." *Williams v. DeKalb Cty.*, 327 F. App'x 156, 163–64 (11th Cir. 2009) (reversing district court decision finding "no evidence" of a causal link between the alleged policy and the injury, noting that while the evidence there might not be "overwhelming evidence" it was enough to bring the case to a jury).

### B. Under Alabama Law, the City of Montgomery Had the Authority to Provide Probation Services.

As noted above, whether a given official has final policymaking authority over a particular government function depends on state law, including positive written law and custom or usage having the force of law. *See Pembaur*, 476 U.S. at 483; *McMillian v. Monroe Cty.*, 520 U.S. 781, 786 (1997) (noting that inquiry regarding "actual function of a government official" is "dependent

on an analysis of state law," including "the definition of the official's functions").

Under Alabama law, *judicial* power is vested in various courts, including "such municipal courts as may be provided by law." Ala. Code § 12-1-2. Such courts "have all authority provided by law . . . provided by rule." *Id.* The municipal courts are also provided with specific authority over "probation"—namely, they may "suspend execution of sentence and place a defendant on probation for varying periods of time, not to exceed two years." *Id.* § 12-14-13(a). The courts can also, among other things, set and modify the conditions of probation, investigate and report on probation cases, extend the period of probation, and issue warrants and cause defendants to be arrested for violating the conditions of probation. *Id.* § 12-14-13(d), (e), (g), (i). This Court has found certain determinations, at least when made on a case-by-case basis, to be judicial acts taken on behalf of the State and not subject to City control. *McCullough v. City of Montgomery*, No. 2:15-CV-463 (RCL), 2019 WL 2112963, at *5 (M.D. Ala. May 14, 2019) (noting that the "City does not have authority or control over the strictly *judicial* actions of its municipal court"); *but see Teagan v. City of McDonough*, No. 18-11060, 2020 WL 624695, at *5 n.3 (11th Cir. Feb. 11, 2020) (leaving open "whether a municipal court judge acts on behalf of a municipality when he or she exercises judicial authority with respect to local ordinances enacted by the municipality").

However, there is no authority granted to the municipal courts in this section or any other section of Alabama law to provide "probation services[;]" that power is explicitly provided to the municipality. Ala. Code § 12-14-2. And similarly, the municipal court has not been granted power to enter into contracts. Ala. Code § 12-14-31; *Ray v. Judicial Corrections Services, Inc.*, No. 2:12-cv-02819-RDP, 2017 WL 660842, at *11 n.17 (N.D. Ala. Feb. 17, 2017). That power too resides with the City, which is vested with the authority to "contract and be contracted with . . . for any municipal purpose authorized in this title." *Id.* § 11-40-1; *see also Wilkins v. Dan Haggerty &*

*Assocs., Inc.*, 672 So. 2nd 507, 509–10 (Ala. 1995). The municipality also has the power to "contract with a private firm to aid in the collection of delinquent municipal court fines[;]" the municipal court has no such power. *Wilkins*, 672 So. 2d at 510. That is why, as this Court has previously recognized, "[t]he City, rather than the Municipal Court, chose to use JCS, signing the contract that allowed for the allegedly unconstitutional payment system and policies taken by JCS. This was an administrative act over which the City has control under Alabama law. The decision to use JCS was a city policy and practice." Doc. 206 at 6.

The City's power to regulate probation services is consistent with its Municipal Court's power to take "strictly *judicial* actions" in particular cases—to sentence individuals to probation, determine the amount of time an individual is on probation, set conditions for an individual's probation, and determine if that individual has violated the conditions set for their probation. City policymakers have the non-judicial power to create *generally applicable policies* regarding how *all* probationers can or must be treated. With respect to that non-judicial function (be it characterized as administrative, executive, or legislative), City policy can be made by the Mayor (as in the formation of the City's contract with JCS) or by the presiding judge of the Municipal Court (as when Judge Hayes issued the 2013 standing order). In either event, that power rests solely with the municipality, and, concomitantly, the power to make final policy for such determinations also rests with the municipality. Plaintiff's claims stem from policies the City of Montgomery made with respect to who could provide probation services and how those services would operate on a system-wide basis. The City's policies include those put in place by those to whom it delegated its authority.[67]

---

[67] At a minimum, the City and the Court share policymaking authority over the provision of probation services, a type of arrangement recognized by the Supreme Court. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (noting that "there will be cases in which policymaking responsibility is shared among

If the City were correct that only municipal courts have authority over probation services, JCS could have contracted directly with the Municipal Court rather than the Mayor of Montgomery. But that isn't what happened. Instead, the actions of both JCS and the City make clear they understood that the municipality, not the court, had authority over probation services— including the power to outsource them. JCS, for its part, marketed its services to city councils.[68] And 112 municipalities in the State of Alabama alone entered into contracts with JCS between 2009 and 2014.[69] JCS's standard contract provided that "the City, through its duly elected or appointed officials, is authorized to enter into a binding contract with a qualified vendor to provide probation supervision and related services for the benefit of the City and Court."[70] Consistently with this, before Montgomery contracted with JCS, it had used a different private probation provider.[71] And after JCS's departure, the City (not the court) implemented a payment plan instead of another supervised probation program.[72]

---

more than one official or body," and that if applicable law does not make the decisions of either reviewable by the other, "one would have to conclude that policy decisions made [by] either . . . would be attributable to the city itself"). The Eleventh Circuit has recognized that state law can grant policymaking authority to multiple actors, and that a City with authority to directly regulate a given government function can be held responsible for "acquiescing" in unconstitutional practices established by other policymakers with authority over that government function. *Walker v. City of Calhoun*, 901 F.3d 1245, 1256 (11th Cir. 2018) ("The district court did not clearly err, then, in finding that the City could directly regulate bail if it wished to and so may be held responsible for acquiescing in an unconstitutional policy and practice by its Municipal Court and its police."); *see also Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168 (5th Cir. 2010) (noting that "[a]n official may be a policymaker even if a separate governing body retains some powers"). Judge Proctor recognized this possibility in *Ray v. Judicial Corr. Servs., Inc.*, No. 2:12-CV-02819-RDP, 2017 WL 660842, at *10 (N.D. Ala. Feb. 17, 2017) ("In some cases, though, multiple officials or governmental bodies can share final policymaking authority." (citing *McMillian v. Johnson*, 88 F.3d 1573, 1578 (11th Cir. 1996))), but did not address its implications.

[68] Counter-Statement ¶ 2.

[69] Counter-Statement ¶ 1.

[70] Counter-Statement ¶ 6.

[71] Counter-Statement ¶ 3.

[72] Counter-Statement ¶ 237 (testimony of City Attorney Fehl).

In sum, even if the City could provide *some* basis for its insistence that the municipal court has power under state law to provide probation services, despite the plain language of Alabama law,[73] the custom and practice of both the City of Montgomery and the other municipalities throughout Alabama demonstrate that municipalities have always been the entities that make decisions and enter into contracts with probation service providers.[74] And the evidence in the record, construed in the light most favorable to Plaintiff, shows that the City has consistently acted as though it had authority over probation services and debt collection.

In sum, under Alabama law (including custom and practice having the force of law), the City had "authority and responsibility" for the provision of probation services, including selecting the provider of probation services and establishing system-wide policies and procedures pertaining to probation. *Grech*, 335 F.3d at 1330; *accord McCullough v. City of Montgomery, Alabama*, No. 2:15-CV-463 (RCL), 2019 WL 2112963 (M.D. Ala. May 14, 2019) ("[I]t was the City, not the municipal court, who contracted with JCS for probation services," and the contract was "signed by Mayor Todd Strange, a final policymaker for the City"). Such a construction is consistent with

---

[73] Indeed, such an argument would effectively render section 12-14-12 of the Alabama code superfluous, in violation of the rule against surplusage. *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." (quotation marks omitted)); *United States v. Alabama*, 778 F.3d 926, 938 (11th Cir. 2015) (same, interpreting Alabama statute); *Scott v. State*, 163 So. 3d 389, 436 (Ala. Crim. App. 2012) (same).

[74] As the Supreme Court explained in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989), municipal policymakers may be designated not only through positive (written) law, but also through custom or usage. *See id.* at 737; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 n.1 (1988); *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996) ("We must look to state and local positive law, as well as custom and usage having the force of law."), *aff'd sub nom. McMillian v. Monroe Cty., Ala.*, 520 U.S. 781 (1997); *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989). However Alabama's written law purports to allocate policymaking authority, custom or usage with the force of law may give the City policymaking authority over certain aspects of probation in practice, overriding any contrary written law. *See, e.g.*, *Atkinson v. City of Mt. View*, 709 F.3d 1201, 1215–16 (8th Cir. 2013) (first recognizing that positive law designated a mayor and board of aldermen as "the" final policymakers, but then going on to consider whether the city nevertheless had a custom of delegating final policymaking authority to its police chief). Thus, even if there were positive state law designating a state official or entity as a final policymaker in a given area, it could still be the case that, as a matter of custom or usage, that authority has been wielded on behalf of the City.

Alabama law's reservation of certain *case-by-case* judicial decisions concerning probation, including whether to sentence a particular individual to probation, and the terms and conditions of their probation, for Municipal Court judges acting on behalf of the State. Thus, Plaintiff has adduced evidence that establishes the first prong necessary to hold the City liable for the unconstitutional harms he suffered under Section 1983.

### III. The City is Liable for the Policies and Practices That Were a Moving Force Behind Plaintiff's Constitutional Harms

The prior section identified the evidence that supports Plaintiff's allegation that the City had final "authority and responsibility" over probation services. The next question is whether the unconstitutional actions complained of are traceable to the City, either because City policymakers—be they City officials or JCS employees exercising policymaking authority delegated by the City—expressly sanctioned or ordered the act, or because City policymakers exhibited deliberate indifference to the risk of constitutional violations by acquiescing in widespread, unconstitutional practices of non-policymakers. And each policy or practice must also then be a moving force behind the constitutional violation at issue, which requires both but-for causation, as well as proximate causation. *See* Doc. 266-1 at 21. For the reasons set forth below, the evidence establishes that several policies and practices traceable to the City of Montgomery were moving forces behind the constitutional harms suffered by Plaintiff.

### A. The City is Responsible for Putting the Contract in Place, Which Was a Moving Force Behind the *Bearden* Constitutional Violations (Counts 1 and 9).

As noted above, state law gave the City policymaking authority over the provision of probation services, which it used to enter into a contract with JCS. *Accord McCullough v. City of Montgomery, Alabama*, No. 2:15-CV-463 (RCL), 2019 WL 2112963 (M.D. Ala. May 14, 2019) (noting that "it was the City, not the municipal court, who contracted with JCS for probation services," and that the contract was "signed by Mayor Todd Strange, a final policymaker for the

City"). The "decision to adopt that particular course of action" was thus made by the "government's authorized decisionmakers," which means "it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur*, 475 U.S. at 480-81.

The City raises two arguments to attempt to evade this straightforward conclusion; neither has merit.

### 1. The JCS-Montgomery Contract effectively bound the Municipal Court to use JCS probation and impose JCS's fees.

First, the City argues that the JCS-City Contract—even though the contract plainly lists both the City and "the City's Municipal Court" as parties, and even though the mayor signed the contract on behalf of *both* the City and its court—that the court was *not* actually bound because the contract was not "signed by the *Judges*" and thus "could not bind *them*." *See* Doc. 266-1 at 23 (emphasis added). This is what Judge Proctor held in *Ray*. The City also argues that the term stating that JCS would not charge its fee in connection with "indigent" defendants proves that there was no due-process-equal protection violation here. Doc. 266-1 at 24. But to accept the City's reasoning in this case, the Court would have to disregard substantial evidence in the record— evidence that was not present in *Ray*, and evidence that the Court is required to construe in the light most favorable to Plaintiff.[75]

First, the contract between the City of Montgomery and JCS *did* require the Municipal Court to use JCS *if and when* it determined that someone should be put on probation: "JCS **will** supervise all probated cases sentenced by the Court."[76] And it required the Municipal Court to

---

[75] The Court would also have to ignore Alabama law. As explained in part II.B, above, only municipalities— not courts—have authority to enter into contracts. Judge Proctor recognized that fact, yet he based his conclusion that the Childersburg Municipal Court was not bound by the contract on the fact that the judges were not parties to it—which necessarily assumes that the judges had authority to enter into contracts. *See Ray*, 2017 WL 660842, at *12.

[76] Counter-Statement ¶ 8.

charge an individual probation fees *if and when* it determined that someone should be put on probation: "In consideration of the probation services provided by JCS, . . . each Court Order **shall** provide for the following: 1. Probation fee of $40.00 per month flat fee . . . 2. One time probationer set-up fee of $10.00.").[77] The probation fees were thus JCS's sole contracted-for "compensation."[78] Had Montgomery's Municipal Court judges started waiving everyone's probation fees, the City would have been in violation of its contract. The monthly probation fees were an express and material term of that contract, and the clear language of the contract defeats the City's suggestion that the contract did not, in fact, require the Municipal Court to take any actions. *See* Doc. 266-1 at 13-14 (asserting that "[t]he contract provided a service which the judges of the municipal court could use or not use, but did not direct any aspect of that decision, and had virtually no effect on how the judges chose to use JCS's service").

Second, even if it is hypothetically true that judges had "discretion," Doc. 266-1 at 24 it is undisputed that the form probation orders JCS provided to Montgomery—which were uniformly used both by the Municipal Court judges and the court personnel who administratively assigned debtors to JCS without seeing any judge—included JCS's fees.[79] The city had admitted that no indigency determinations were made before defendants were placed on JCS probation.[80] Consistently with this, the evidence in the record shows that the judges never waived JCS's fees at sentencing.[81] And the vast majority of JCS probationers in Montgomery were assigned to JCS

---

[77] Counter-Statement ¶¶15, 17, 20 (Doc. 145-1 at 2, 4).

[78] Counter-Statement ¶ 15.

[79] Counter-Statement ¶ 159.

[80] Doc. 270-1 at 9.

[81] Counter-Statement ¶ 62 (testimony by Judges Hayes and Westry).

*not* by a judge, but pursuant to the administrative window procedure by a clerk who undisputedly had no authority to do *anything* but impose the fine for the scheduled offense and accept payment, offer a 30-day extension, or assign to JCS probation.[82] In practice, then, JCS's probation fees were automatic both for the judges and the clerks at the window. There was no difference.

Then, *after* sentencing, once a person was on JCS probation, JCS—not the court—was probationers' sole point of contact about their case. And JCS implemented three critical policies: First, JCS instructed all probationers *not* to go to the municipal court, that the court "will be unable to help you."[83] Second, JCS chose *not* to notify probationers they were entitled to waiver of the probation fees if they were indigent. And third, JCS chose *not* to notify the court of information indicating that probationers were indigent. In sum, JCS required the payment of fees as a critical term of the deal and then used its enormous discretion to ensure that they would never be waived.

The evidence in the record, construed in the light most favorable to Plaintiff, shows that the Municipal Court did what the contract told it to do. At a very minimum, the question of whether the contract limited the court's discretion is a disputed question of fact for a jury. Accordingly, because the City's contract set forth uniform policies that applied to the Court (and which the Court carried out), the City is liable for the unconstitutionality of those policies.

### 2. The City adopted a policy of using JCS-supervised probation to collect fines from all defendants who could not pay, not only from defendants who received suspended jail sentences.

The City's second argument is hard to decipher. The City appears to suggest that, even if the Contract could require the Municipal Court to take certain actions, the JCS-Montgomery Contract related only to cases involving *probation*, and Mr. Carter's case was not *probation*

---

[82] Counter-Statement ¶¶ 45-57.

[83] Counter-Statement ¶ 70.

because he did not have a suspended jail sentence. Doc. 266-1 at 23. Therefore, the argument goes, anything that happened to Carter (and presumably every other class member without a suspended sentence) as a result of his *non*-probation-probation could not have stemmed from the contract. The City's argument essentially seems to be, "That would have been unlawful; therefore, we can't possibly have done it." According to this theory, the City signed a contract using its authority to provide "probation services" to direct the Municipal Court to use a specific probation company; established that the company's "probation fees" would be borne by the individuals themselves; sat back for over five years while *thousands* of poor individuals who did not have suspended sentences were subjected to fees, supervision, and the risk of imprisonment; and took in *millions* of dollars in fines from people on pay-only probation without suspended sentences—all supposedly without knowing that any of this was happening. While Plaintiff agrees with the City that the JCS-Montgomery probation system was unlawful, the City's contention that this should entitle it to avoid liability is laughable.

First, the record demonstrates that Carter (and all JCS probationers) were in fact, on probation for all intents and purposes: they were subject to supervision by a probation company, obligated to comply with terms of probation and limitations on their freedom, required to report, subject to "revocation" of their probation, and at risk of arrest. Deciding not to call it probation after the fact does not change what happened to Carter and the putative class members.

Second, the record shows that approximately three fourths of all JCS probationers in Montgomery were put on JCS through the Window Procedure. The Mayor was aware of this by early 2009, when he was notified that citizens were being put on JCS probation by "the clerks working the windows" as part of the JCS program plan that had been "implemented as planned"

and was "proceeding better than expected."[84] Clerks at pay windows are, of course, not judges; they don't have authority to sentence anyone to jail. By definition, and as the City has confirmed, none of the people put on JCS through the window procedure had suspended jail sentences.

If the City believed JCS was collecting fines from people who were not lawfully on probation in violation of the contract (and Alabama law), why didn't it cancel the contract, insist on a change, and direct the immediate release of everyone who was put on JCS probation without a suspended sentence? Why did the Mayor instead renew the contract with JCS in 2010?

The answer is simple: the JCS program was being implemented exactly as it was intended. JCS's entire business model was the use of pay-only, supervised probation to increase collection of court fines—and both Defendants benefitted from that model. By putting Carter and other debtors on "probation," Defendants gained the ability to threaten them with revocation (which, of course, implies a suspended jail sentence that can be reinstated when probation is revoked), arrest, and jail. By the same token, if this was not probation, the Municipal Court had no authority to order Carter to appear at a "revocation" proceeding or issue warrants for his arrest for failure to appear at that proceeding; and the City's police officers had no authority to arrest and jail him. The entire scheme was designed to use the threat of law enforcement to extract money from people who were too poor to pay a traffic ticket. And City had no problem accepting millions of dollars in fines collected by JCS from people who the City now claims were never lawfully on probation.

\*     \*     \*

Construing the evidence in favor of Plaintiff, the JCS-City Contract was a moving force

---

[84] Counter-Statement ¶¶ 36, 57.

behind the constitutional violations.[85] Where a constitutional deprivation "flow[s] directly from, and [is] mandated by," a policy, there can be no "doubt that the policy caused the constitutional deprivation." *Barnes v. Dist. of Columbia*, 793 F. Supp. 2d 260, 291 (D.D.C. 2011). Accordingly, "proof of causation regarding an official policy requires only evidence of the policy statement itself." *Id.*

### B. Alternatively, a reasonable jury could find that the City's deliberate indifference to Plaintiff's constitutional rights was a moving force behind the *Bearden* violations.

As explained above, the evidence in the record, construed in favor of Plaintiff, supports the conclusion that the JCS-City Contract was a proximate cause of the *Bearden* violations at issue here. But even if the Contract had not enacted express City policy, the City would still be liable because it was aware of the problematic probation practices and chose to do nothing for several years.

The City was plainly on notice since at least 2012 that JCS's probation model was leading to "egregious abuses" both in Montgomery and in other Alabama cities.[86] Between 2012 and 2014, the City was the target of at least four lawsuits, all of which alleged similar violation to those at issue in this case. By 2014 the City had been forced to settle at least one lawsuit, which led to significant reforms of the municipal court. In addition to the extensive litigation, the City learned in March 2013 that JCS, the company to which it had delegated its authority over probation services had secretly started swindling probationers in order to raise its own revenues to cover its

---

[85] It is true that the scheme depended on the court's participation in order to function; in recognition of this, JCS required that the mayor sign its standard form contract on behalf of both the City and the court, and the mayor did so. *See* Counter-Statement ¶ 5 (Doc. 145-1). But that does not eliminate the City's role as a "moving force" in the deprivation of Plaintiff's rights, for the same reason it does not eliminate JCS's role. *See* Pl's JCS Opp. at part V.B.

[86] Counter-Statement ¶ 212; *see generally id.* at part XV.

litigation costs.[87] Yet in the face of overwhelming indications that the JCS system was constitutionally dubious, the City refused to intervene. A reasonable jury, based on all the evidence, could conclude that the increase in Montgomery's revenue from fines had something to do with this decision.[88] Finally, in June 2014, the City exercised its authority under Alabama law and cancelled its contract with JCS.[89]

In *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011), the court relied on a similar pattern of litigation to find that (1) the district was on notice of prison overdetention problems and acted with deliberate indifference; and (2) the district had acquiesced in a longstanding custom that constituted the standard operation procedure. *Id.* at 283–85. Based on those findings, the court held that the District was responsible for unconstitutional overdetentions of prisoners. The court explained that the plaintiffs did not have to demonstrate that the District "subjectively knew about the overdetention problem: the question is whether "the [District] knew or should have known of the risk of constitutional violations, an objective standard." *Id.* at 283. The court held that the existence of "litigation[] involving exactly the same issues [and] the same defendant . . . clearly put the District on notice that absent significant intervention on its part, a pattern of unconstitutional behavior would almost certainly continue" at the prison. *Id.* at 283-84. Here, too, the City was plainly on notice based on the pattern of "litigation, involving exactly the same issues [and] the same defendant" that unless it intervened, the constitutional violations would continue. *See id.* Plainly the City had the power to act to put a stop to the violations, as evidenced by the fact that the City cancelled its contract with JCS in June 2014. And yet the City did nothing

---

[87] Counter-Statement ¶ 95.

[88] Counter-Statement ¶¶ 35-38.

[89] Counter-Statement ¶ 22.

for at least two years. Accordingly, the City is liable for its deliberate indifference to known constitutional problems.

**IV.  The City Is Liable for the Constitutional Violations that Resulted from Its Delegation to JCS of Final Policymaking Authority Over the Provision of Probation Services.**

Because the City delegated policymaking authority to JCS to administer the probation system and then exercised no meaningful review over JCS's actions, the City is liable for JCS's constitutional violations that resulted from its exercise of policymaking authority, including JCS's *Bearden* due process-equal protection violations and procedural due process violations.

"If . . . a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). Accordingly, cities are liable for the policies and practices of those to whom they have delegated the relevant policymaking authority. *See, e.g.*, *Pembaur*, 475 U.S. at 484 n.12 ("[I]f the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability."); *Mandel v. Doe*, 888 F.2d 783, 794 (11th Cir. 1989) ("Because Hatfield had been delegated the final policymaking authority with respect to medical affairs at the prison, his acts of deliberate indifference can be attributed to the County so as to establish municipal liability."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 n.9 (11th Cir. 1985) ("[W]here a governmental entity delegates the final authority to make decisions then those decisions necessarily represent official policy.").

Whether a municipality has delegated policymaking authority over a given governmental function to another party depends chiefly on whether it exercises meaningful review of the party's performance of that function. *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997). There can be a delegation "even if the municipality retains 'the prerogative of the purse and final

legal control by which it may limit or revoke the authority of the official.'" *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168 (5th Cir. 2010) (citations omitted). "The mere existence of oversight . . . is not enough" to constitute meaningful review; "the oversight must pertain to the area of authority in question." *Id.* (quoting *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 603 (5th Cir. 2001)). Similarly, review that merely "rubber stamps" the alleged delegate's decisions does not count as meaningful, *Lopez v. Gibson*, 770 F. App'x 982, 992 (11th Cir. 2019) ((citing *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003)), nor does review that is available in principle but unavailable in practice, *see Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004) ("[I]n assessing whether a governmental decision maker is a final policy maker, we look to whether there is an *actual* 'opportunity' for 'meaningful' review." (emphasis added) (citing *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1295 (11th Cir. 2000)))); *Willingham v. City of Valparaiso Fla.*, 638 F. App'x 903, 908 (11th Cir. 2016).

Here, City officials repeatedly testified that they exercised *no* review over JCS's administration of its probation system, much less meaningful review. Mayor Strange admitted that he never caused the City to investigate JCS and claimed not to even know "whether they did a good job or a bad job."[90] And Ken Nixon said the City did not audit JCS's performance. By all accounts, the City was concerned solely with whether JCS was collecting and remitting money as per the contract.[91] *See also* Doc. 266-1 at 28 ("[T]he City was never involved in or sought to oversee JCS's activities"); Doc. 260 at 63 (City did not have "any continuing involvement" in JCS's probation system "beyond entry into the two contracts").

A grant of municipal policymaking authority can be either express or implied. *Ancata*, 769

---

[90] Counter-Statement ¶ 207.

[91] Counter-Statement ¶ 209.

F.2d at 706 n.11 ("[I]f, either expressly or by default, Broward County permitted others to decide or determine policy, it is liable for their actions if these policies prove unconstitutional."); *Zarnow*, 614 F.3d at 167 ("A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role." (quotation marks omitted)).

Here, the City granted policymaking authority to JCS by contracting with the company for the very probation services the City had the state-law authority to provide, and by making no provision for, much less actually exercising, any administrative review of the probation services JCS provided. The City's contract outlined certain terms of service but said nothing about supervision or review of JCS's implementation of those terms. The City thereby, "by its conduct and practice, encourage[d]" and "acknowledge[d]" the company "in a policymaking role." *Zarnow*, 614 F.3d at 167.

The delegation here is strikingly similar to that in *Mandel,* where the Eleventh Circuit upheld the district court's conclusion that a physician's assistant acted as the final policymaker for the County with respect to medical affairs in a prison. 888 F.2d at 794. There, the County had entered into a Memorandum of Understanding with the health department and established a policy that medical care for inmates at that prison would be provided by a physician's assistant. *Id.* "Although it was initially contemplated that the physician's assistant would be supervised by a medical doctor, the evidence revealed that a custom and practice developed so that the policy was that [he] was authorized to function without any supervision or review at all." *Id.*

Here, beyond the terms of its contract with the City, JCS was unconstrained in forming broader policies and practices that violated the rights of its probationers. As detailed in Plaintiff's brief in opposition to JCS's motion for summary judgment, JCS used its discretion over payments

and allocation to keep probationers paying monthly fees as long as possible and maximize its own fees. JCS positioned itself as probationers' sole point of contact for all information about their case—warning them, ***Do not contact the Municipal Court***, they will be unable to help you"—and as the court's sole source of information about probationers' compliance with the terms of their probation. JCS then concealed from probationers that they were entitled to an indigency determination and that they could not lawfully be jailed—and were entitled to a waiver of JCS's monthly probation fees—if they were too poor to pay. The company's "probation officers" terrorized probationers by threatening to have them arrested on the spot if they failed to show up with enough money; demanded that probationers who were unable to make satisfactory payments report several times a month; and imposed additional conditions of probation not on the probation order and not allowed by Alabama law, purely as a device to coerce payment. When probationers could not make their monthly payments, JCS forced them to report for an escalating number of appointments. Finally, when a probationer was no longer able to pay at all and JCS was no longer able to collect its monthly fees, JCS would petition to revoke her probation, telling the municipal court only that the person had failed to pay or report but saying nothing about the person's poverty or reasons for being unable to pay. JCS did all this knowing full well that once the probationer appeared in court—whether pursuant to a petition for revocation or an arrest warrant for failure to appear—probationers were likely to be have the fines they owed commuted to days in jail.

Because JCS established these policies in the City's stead and by the City's leave, they are City policies, every bit as much as they would be had they been established by City officials.

The City is also liable for any unconstitutional practices in which JCS acquiesced as its delegate. This is so even if City officials did not know of those practices. What matters is that JCS, acting as a City policymaker, knew or should have known of them. *See, e.g.*, *Webster v. City of*

*Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc) ("Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority."); *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (citing *Webster*). Here, however, as explained above in part III.B, City officials actually *did* know of certain of the company's practices—and still did nothing for years.

## V. The City Is Liable for the Due Process Violations that Resulted from Its Policies and Practices of Municipal Court Administration

Shortly after JCS began operations in Montgomery in Spring 2009, a new administrative procedure was implemented at the Municipal Court to allow clerks at the pay window to assign defendants to JCS probation without ever seeing a judge. This process was the Window Procedure.

### A. The Window Procedure policy by which pay window clerks were instructed to charge scheduled fines and put defendants on supervised probation without a court appearance violated due process.

The sentencing of probationers to supervised probation through the Municipal Court pay window violated probationers' due process rights because the magistrates in charge of imposing the sentence lacked authority to impose any sentence other than the dollar figure of the monetary fine for the underlying offense listed in Rule 20 of the Alabama Rules of Judicial Administration. As Court Administrator Ken Nixon explained, at the window, Municipal Court defendants could only plead guilty to scheduled offenses.[92] And though it was conceivable for a judge to jail people for a scheduled offense if the person pled not guilty to such an offense, the magistrate at the window would not have the authority under any circumstances to impose a jail sentence at the window.[93] Given magistrates' lack of authority to impose a jail sentence at the pay window, they necessarily lacked authority to sentence people to probation: Under Alabama law a sentence of

---

[92] Counter-Statement ¶¶ 47-48.

[93] *Id.*

probation can only be imposed if the sentencing judge also imposes a suspended jail sentence, Ala. Code § 12-14-13(a) provides, in pertinent part, and the magistrates lacked the authority to impose such a sentence. Because magistrates were barred from taking the precursor step to imposing a sentence of supervised probation, it follows that they lacked legal authority to sentence any defendant at all to supervised probation, even for an offense listed in Rule 20. Any probation sentence imposed by a magistrate was illegal in its own right, and also in excess of the statutory maximum that person could impose—the fine listed in Rule 20. And where there is a statutory upper limit to a punishment for a crime, due process requires that the sentence not exceed that statutory maximum. *United States v. Grier*, 475 F.3d 556, 573 (3d Cir. 2007); *Hunter v. United States*, 449 F. App'x 860, 862 (11th Cir. 2011) ("Case law . . . calls into serious question the constitutionality of imposing sentences beyond the statutory maximum . . .").

### B. Because the court personnel and judge who instituted the Window Procedure were acting in their administrative capacities on behalf of the City, not their judicial capacities on behalf of the State, the City is liable for constitutional violations caused by the Window Procedure.

As the Court has recognized, "Plaintiffs allege that the City exercised its administrative authority under Alabama law to contract with JCS as part of a scheme to increase revenue . . . ." Doc. 206 at 5–6. Pursuant to that scheme and in furtherance of the JCS-Montgomery contract, court personnel implemented the Window Procedure. First, a court operations supervisor sent a memo instructing court staff on a new procedure for processing people who could not pay fines onto JCS probation without any judicial process. Pursuant to the procedure, clerks at the "Pay Window," who were already authorized to accept payment of traffic tickets and other fines, were given the authority to assign people who couldn't pay, and who owed less than $1500, to JCS probation.[94] After the clerk placed a defendant on probation, the defendant went to JCS's room in

---

[94] *See generally* Counter-Statement part V.A., ¶¶ 45-57.

the courthouse where a JCS intake officer "prepare[d] the Order of Probation for the Defendant to sign."[95]

Clerks at the pay window were not authorized to impose a jail sentence (suspended or otherwise). They could only impose a fine based on the fine schedule laid out in Rule 20 of the Alabama Rules of Judicial Administration.[96] There were no instructions in the memo to advise defendants that they were entitled to counsel or an ability-to-pay determination, or that JCS fees could be waived for indigent defendants.[97] By 2012, about three quarters of all the debtors being put on JCS probation were going through the window procedure—many more than were sentenced by any of the four judges together.[98]

In 2013, Judge Hayes issued a standing order adopting the 2009 memo with a few minor alterations. As with Ms. Murphy's 2009 memo on the same topic, the standing order contained no instructions to advise defendants that they were entitled to counsel or an ability-to-pay determination, or that JCS fees could be waived for indigent defendants. And because both Murphy and Hayes were acting in their administrative (not judicial) capacity, the City is liable for the constitutional violations caused by the Window Procedure.

In *McCullough v. Finley*, 907 F.3d 1324 (11th Cir. 2018), the Eleventh Circuit held that "[t]he precise acts that the jailees allege that the judges performed—their probation procedure, indigency hearings, provision of counsel, sentences, and work program—are all judicial acts." *Id.* at 1331. In determining that the municipal judges' actions were judicial acts (and thus subject to judicial immunity from suit), the court relied on the fact that these acts "involve[d] a

---

[95] Counter-Statement ¶ 51.

[96] Counter-Statement ¶ 47.

[97] Counter-Statement ¶ 45, 48.

[98] Counter-Statement ¶ 68.

normal judicial function," *id.*; the events took place in the courtroom, *id.* at 1332; "the controversy centers around a case pending before a judge," *id.*; and "the confrontation arose from a visit to the judge in his official capacity," *id.* But the Eleventh Circuit explicitly "agree[d] that a judge is not entitled to judicial immunity for administrative acts performed in his capacity as presiding judge." *Id.* (citing *Forrester v. White*, 484 U.S. 219, 228 (1988)). And the court distinguished rather than disagreeing with a Sixth Circuit case "rul[ing] that a presiding judge's moratorium on writs during the holidays was not a judicial act," stating that "[t]he moratorium in *Morrison* was a 'general order, not connected to any particular litigation' and from which 'no direct appeal was available.'" *Id.* at 1331-32 (quoting *Morrison v. Lipscomb*, 877 F.2d 463, 466 (6th Cir. 1989)).

Thus, though the municipal court judges' decision whether to jail someone, conduct an indigency hearing, appoint counsel, etc., are plainly judicial acts under *Finley*, the 2009 memo and 2013 standing order constituted administrative, rather than a judicial, acts. Certainly, this is the case when it was just an order from a supervisor. But even when the presiding judge promulgated a standing order, it "was a 'general order, not connected to any particular litigation' and from which 'no direct appeal was available.'" *Id.*

Read in the light most favorable to Plaintiff, the evidence shows that the Window Procedure was implemented in furtherance of the JCS-City Contract, and that Judge Hayes was acting as a de facto city official when he promulgated the 2013 standing order. Far from acting in his judicial capacity, he was ratifying the implementation of a procedure that took cases out of the hands of judges and put them into the hands of *non*-judicial pay window clerks who had no discretion, no authority to do anything except take payments, offer debtors a 30-day extension (with permission from a supervisor), or assign them to JCS probation.[99] Accordingly, that order

---

[99] Counter-Statement ¶¶ 36, 45.

was the act of a municipal policymaker, and gave to *Monell* liability. *See O'Donnell v. Harris Cty.*, 892 F.3d 147, 155 (5th Cir. 2018) ("Though a judge is not liable when 'acting in his or her judicial capacity to enforce state law,' we agree with the district court that the County Judges are policymakers for the municipality. Texas law explicitly establishes that the Judges are 'county officers,' imbued with broad authority to promulgate rules that will dictate post-arrest policies consistent with the provisions of state law." (citations omitted)); *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) ("There are, to be sure, many actions of a county judge that may justifiably be considered to constitute or represent county 'policy' under *Monell*. In addition to his judicial duties, a Texas county judge is charged by the state constitution and statutes with the performance of numerous executive, legislative and administrative chores in the day-to-day governance of the county."); *see also Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir. 1988) (en banc) (holding that municipal judge was municipal policymaker when hiring and firing clerks because he had been given absolute authority over "employment matters in his court").

The City admits (as it must) that "some individuals" were placed on JCS at the window, but argues that but is careful to defend the Window Procedure as having been "accomplished pursuant to the Presiding Judge's directive and, later, a written order." Doc. 259 at ¶ 12 (citing testimony). But there is no 2009 written directive from any judge—only after-the-fact testimony. The procedure implemented pursuant to the 2009 memo was in effect for over three years and affected thousands of people. Then in 2012, the *Thurman v. JCS* lawsuit was filed, in which the plaintiffs alleged that people were being put on probation via a non-judicial process, without valid court orders.[100] Only then did Judge Hayes issue his standing order—which Nixon, the court

---

[100] Counter-Statement ¶213 Records from the Montgomery Municipal Court were subpoenaed, but Ken Nixon asked JCS to provide the court orders in response to the subpoena. *See id.* & Ex. 38.

administrator, then emailed to the lawyers representing JCS in the *Thurman* litigation. *See* Doc. 242-3 at 2; Doc. 242-4 at 6. Given these circumstances, the question of whether Judge Hayes actually directed the implementation of the Window Procedure in 2009 or instead issued an order to stamp it with judicial imprimatur is a disputed issue. And if the court staffer who issued the 2009 memo did so as an administrative act on behalf of the City—which the evidence supports— then the City is liable for the constitutional violations caused by the Window Procedure between 2009 and 2013, even if Judge Hayes' subsequent standing order was a judicial act.[101]

## VI.  The City is Responsible for Failing to Provide Adequate Indigent Defense Services (Count 5).

The City has an independent duty under Alabama law to provide counsel to indigent criminal defendants in municipal court. *See* Ala. Code § 12-14-9 ("A municipality which retains its court shall provide indigent defense services as otherwise provided by law."). "Having chosen to operate a municipal court system . . . , defendants are obligated to comply with the dictates of the Sixth Amendment . . . ." *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122, 1134 (W.D. Wash. 2013); *accord Bairefoot v. City of Beaufort, South Carolina*, 312 F. Supp. 3d 503, 511 (D.S.C. 2018). Yet, viewing the evidence in the light most favorable to Plaintiff, the City's provision of counsel fell woefully short of the effective assistance of counsel guaranteed by the

---

[101] Even if the Court concludes that Judge Hayes's 2013 standing order was a judicial act, the City is not entitled to summary judgment on the Window Procedure due process claim with respect to the violations that occurred between 2009 and 2013, because Ms. Murphy was acting in her administrative capacity on behalf of the City and the question of whether Judge Hayes or Ms. Murphy was behind the 2009 implementation of the Window Procedure is disputed. A genuine issue of material fact about whether a decision maker had sufficient authority to be a policymaker is sufficient to defeat summary judgment. *See, e.g., German v. Broward Cty. Sheriff's Office*, 315 F. App'x 773, 776 (11th Cir. 2009). And even if the 2009 memo did not constitute policy, the practices resulting from the memo constituted a custom under *Monell*, in which the City—including the Presiding Judge, in his capacity as City policymaker with respect to generally-applicable regulation of the provision of probation services—acquiesced. *See Walker v. City of Calhoun*, 901 F.3d 1245, 1256 (11th Cir. 2018) (City "acquiesc[ed] in an unconstitutional policy and practice by its Municipal Court and its police").

Constitution.

### A. Plaintiff's right to counsel had attached.

#### 1. The right to counsel attached at sentencing to JCS probation.

In *Alabama v. Shelton*, the Supreme Court held that there is a right to counsel when defendants are sentenced to probation with a suspended sentence of imprisonment. 535 U.S. 654, 662 (2002). This makes sense: As the Eleventh Circuit has explained, under *Shelton*, the right to counsel attaches whenever there is a "threat of imprisonment." *Howard v. United States*, 374 F.3d 1068, 1075 (11th Cir. 2004). Put another way, *Shelton* "require[es] counsel in proceedings which result in a sentence that contains only the possibility of imprisonment." *Id.* Here, placement on JCS probation always carried the "threat of imprisonment"—after all, probation can be revoked—and, in the experience of Carter and many members of the putative class, actual imprisonment. Thus, because a sentence to JCS probation carried a realistic "possibility of imprisonment," the right to counsel attached at sentencing.

For this very reason, in a related lawsuit with extremely similar facts, Judge Proctor held that the Sixth Amendment right to counsel attaches when defendants are placed on JCS probation in municipal court. *See Woods v. Judicial Correction Servs., Inc.*, No. 2:15-CV-00493-RDP, 2019 WL 2388995 (N.D. Ala. June 5, 2019). Even though one of the two named plaintiffs in *Woods*—Woods herself—was placed on JCS probation but never jailed in connection with this probation, *id.* at *4–5, the court ruled that "*because both of them potentially faced incarceration*, the court had an obligation to conduct an inquiry as to whether their waiver of counsel was knowing and voluntary." *Id.* at *20 (emphasis added). Accordingly, the court held that the plaintiffs had "presented a triable § 1983 conspiracy claim for the denial of their Sixth Amendment right to counsel." *Id.* at *21.

### 2. At the very least, there is a right to counsel before being jailed.

Even if the right to counsel did not attach at Plaintiff's initial sentencing to JCS probation, it certainly attached by the time that their fines were commuted to jail time. Though there is only a conditional right to counsel at probation revocation hearings, *see Gagnon v. Scarpelli*, 411 U.S. 788, 790–91 (1973), it is blackletter law that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense . . . unless he was represented by counsel at his trial." *Shelton*, 535 U.S. at 662 (quoting *Argersinger v. Hamlin*, 407 U.S. 25, 37 (1972)). The "constitutional line is 'between criminal proceedings that resulted in imprisonment, and those that did not.'" *Id.* (quoting *Nichols v. United States*, 511 U.S. 738, 746 (1994)). Because the commutation of fines to jail sentences resulted in incarceration, the right to counsel must have attached—at the latest— by the time of these hearings.[102] Put another way, if counsel is not provided at sentencing, then it must be provided at a commutation or probation-revocation hearing, for the Sixth Amendment cannot countenance "actual imprisonment" without the right to counsel attaching. *See id.*[103]

---

[102] In its brief, JCS claims probationers are only entitled to counsel at a revocation hearing if they request counsel and assert a colorable claim of innocence, or that there are complex reasons for justifying or mitigating the probation violations at issue. (Doc. 260 at 51.) But that reasoning doesn't apply here because—as JCS's own cited authority demonstrates—it assumes that probationers had (or validly waived) counsel at sentencing. *See Gagnon v. Scarpelli*, 411 U.S. 778, 781 (1973) (discussing Supreme Court precedent that probationers be represented at sentencing); *see also United States v. Jenkins*, 373 F. App'x 946, 946-47 (11th Cir. 2010) (affirming revocation of controlled release without counsel and rejecting comparison to *Shelton*, where defendant was denied counsel for his underlying conviction). If the probationers here had had counsel at sentencing, JCS's cases would be relevant. But absent that fact, they're not.

[103] For those with means, of course, the right to counsel is the right to retain the counsel of one's choice rather than the right to appointed counsel. *See, e.g., Luis v. United States*, 136 S. Ct. 1083, 1089 (2016). But the Bureau of Justice Statistics has estimated that over 80 percent of state criminal defendants in felony cases qualify for court-appointed attorneys. Caroline Wolf Harlow, *Defense Counsel in Criminal Cases* 1 (2000), https://www.bjs.gov/content/pub/pdf/dccc.pdf. Municipal court defendants are even more likely to be poor given that many of the offenses over which city courts have jurisdiction are crimes of poverty, such as driving with an expired license or car registration. It follows that all or almost all of the putative class members, who were placed on JCS probation because they were unable to pay a fine, qualify as indigent.

**B. Plaintiff's right to counsel was violated.**

The right to counsel is the right to the "effective assistance of counsel." *Evitts v. Lucy*, 469 U.S. 387, 395 (1985). When there has been either a complete or a constructive denial of this right, prejudice is presumed. *United States v. Cronic*, 466 U.S. 648, 659–60 (1984); *accord Strickland v. Washington*, 466 U.S. 668, 692 (1984).

### *1. Plaintiff was denied his right to counsel at sentencing.*

As an initial matter, in this case there was a complete denial of Mr. Carter's right to counsel at sentencing. All of the probationers who went through the "window procedure," for example, pleaded guilty and were sentenced to JCS probation without the assistance of counsel. The same is true of Carter, though he was first placed on JCS probation after appearing before a judge. Because this practice amounts to the total denial of counsel and the right to counsel had attached, it violates the Sixth and Fourteenth Amendments. *See Shelton*, 535 U.S. at 662; *Cronic*, 466 U.S. at 659; *Howard*, 374 F.3d at 1075; *Golden v. Newsome*, 755 F.2d 1478, 1483 (11th Cir. 1985).

The City may reply that there was no denial of counsel at sentencing because Carter waived his right to counsel. But there is no evidence to suggest that the court—let alone the clerks at the pay window—explained the right to counsel before placing people on JCS probation. The JCS probation orders used in the Municipal Court state at the bottom that "I have counsel or have waived my right to counsel for all proceedings to this date."[104] But this boilerplate language is far from sufficient to waive the right to counsel. Likewise, the form titled "Plea of Guilty/Waiver of Rights" that some defendants signed at the pay window does not satisfy the constitutional requirements for proper waiver of counsel.[105]

"[C]ourts indulge every reasonable presumption against waiver" and "do not presume

---

[104] *See* Doc. 253-14.

[105] *See* Doc. 163-15 at 12.

acquiescence in the loss of fundamental rights." *Moody v. Comm'r, Alabama Dep't of Corr.*, 682 F. App'x 802, 804 (11th Cir. 2017). (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). To be valid, a waiver of the right to counsel must be "knowing and voluntary." *United States v. Stanley*, 739 F.3d 633, 645 (11th Cir. 2014) (citing *Faretta v. California*, 422 U.S. 806, 834 (1976)). A defendant must "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (citation omitted). Moreover, the waiver must be made "at the time *pro se* representation is first permitted"—not after the person has been sentenced. *Stanley*, 739 F.3d at 646.

A single line on a form Probation Order that contains no explanation whatsoever of the probationers' right to counsel and is presented to probationers *after* they have pleaded guilty cannot replace a judge's inquiry to ensure a waiver is knowing and voluntary. *Cf., e.g.*, *United States v. Ramirez-Delores*, 445 F. App'x 274, 275-76 (11th Cir. 2011) (holding that a signed waiver of counsel was valid because it enumerated all rights including the right to appointed counsel and the judge verbally advised defendant of his right to counsel).

Furthermore, with respect to the Plea of Guilty/Waiver of rights form, "[T]he court must inform the defendant of charges, included offenses and possible range of punishment." *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995); *see also Ferguson v. Culliver*, 527 F.3d 1144, 1147 (11th Cir. 2008) ("[T]he trial court should inform the defendant of the nature of the charges against him, possible punishments, basic trial procedure and the hazards of representing himself.") The form fails to specify the possible range of punishments a defendant might suffer. Carter's form states only that if he "elect[s] to plead guilty" he will have to "pay a fine of $36.00 plus court costs of $0.00, for a total of $36.00." The omissions are glaring. The form does not list the costs Carter

would have to pay to JCS, nor the terms of Carter's probation, including deprivations of liberty like mandatory weekly check-in meetings with a JCS probation officer. But the most devastating omission is the possibility that Carter would face the ultimate liberty deprivation: jail. Because this form is constitutionally deficient on multiple dimensions, whatever Carter and other probationers purported to assented to when signing it was not knowing and voluntary. There was no waiver of the Sixth Amendment right to counsel at sentencing.

### 2. *Plaintiff was constructively denied his right to counsel at the commutation proceedings.*

Even when counsel was provided, a reasonable jury could conclude that the assistance provided was so inadequate as to amount to the constructive denial of counsel under *Cronic*. Viewing the evidence in the light most favorable to the plaintiff, the assigned counsel hired by the City in municipal court *never* took action to prevent their clients' unconstitutional jailing, and their crushing caseload prohibited them from effectively assisting any of their clients.

The contract to represent indigent defendants in municipal court was split between Branch Kloess and the firm of Barfoot & Schoettker.[106] Each worked every other weekday.[107] Kloess testified that he would represent everyone assigned to the municipal court's "jail docket," including those subject to probation revocation, as well as any other defendants who needed a lawyer.[108] He claimed, however, that this representation ended with the day's docket. ("[W]e're not assigned cases, we're assigned a day.").[109] Though Kloess was the only public defender to

---

[106] Counter-Statement ¶ 134.

[107] *Id.*

[108] Counter-Statement ¶ 135.

[109] Counter-Statement ¶ 136.

testify, he said this was also the way Barfoot & Schoettker handled their municipal-court work.[110]

A review of the municipal court's docket from January 3, 2012, to July 2, 2014, shows that there were 99,429 cases on the court's jail docket during this two-and-a-half year period—almost 40,000 a year.[111] Kloess alone was assigned 45,486 jail cases.[112] *Id.* That means that Kloess was assigned over 15,000 cases a year while working on a part-time basis. This figure dwarfs the American Bar Association's recommendation that a full-time public defender handle no more than 400 misdemeanor cases a year. ABA, *Ten Principles for a Public Defense System* n.19 (2002) (adopting the 1973 recommendation of the DOJ-funded National Advisory Commission on Criminal Justice Standards and Goals).

It thus comes as little surprise that Kloess testified that he did not recall *ever* filing a written request for a *Bearden* hearing, despite also testifying that his clients had been jailed for unpaid fines during most of his time as a public defender.[113] Kloess did claim that he had orally argued to the court that some defendants were indigent and should not have their fines converted into jail sentences, but a reasonable jury could disbelieve this claim given that he could not name *a single person* for whom he had done so.[114]

Carter's testimony further illustrates the quality of representation that the public defenders provided their municipal court clients. Taking the evidence in the light most favorable to the

---

[110] *Id.*

[111] Decl. of Alexandria Parrish ¶¶ 7-18 & exhibits. Some of these cases may be repeats, as some people may have appeared on the jail docket more than once for the same case. But this figure is also underinclusive: it does not include any individuals represented by the public defenders who were not on the jail docket. And while some defendants had multiple cases per day, recommendations as to case caps refer to the number of cases an attorney can reasonably handle—not the number of clients.

[112] Parrish Decl. ¶¶ 14-16 & exhibits.

[113] Counter-Statement ¶ 139.

[114] Counter-Statement ¶ 140.

plaintiff, the only thing that Kloess did is ask Carter whether he was "paying or staying."[115] Carter

Kloess did not ask whether Carter had enough money to pay his outstanding fines and fees, *id.*,

even though the undisputed evidence is that he did not. *See* Doc. 264, Kloess Statement of

Undisputed Facts ¶¶ 85, 93. Kloess also did not appear at Carter's side during the hearing at which

his fines were commuted and he was sent to jail.[116] And Kloess did not object to Carter's jailing

or ask that the court inquire into his means before jailing him.[117] In short, Kloess failed to play his

role as an advocate and thus failed to provide the assistance required by the Sixth Amendment.

*See Cronic*, 466 U.S. at 654–56. "To hold otherwise 'could convert the appointment of counsel

into a sham and nothing more than a formal compliance with the Constitution's requirement that

an accused be given the assistance of counsel.'" *Id.* at 654 (quoting *Avery*, 304 U.S. at 446)).

This type of caseload inexorably leads to the constructive denial of counsel under *Cronic*.

Thus, the district court in *Wilbur* concluded after a bench trial "that indigent criminal defendants

in [the cities of] Mount Vernon and Burlington are systematically deprived of the assistance of

counsel at critical stages of the prosecution." 989 F. Supp. 2d at 1124. Defendants were deprived

of the opportunity "to confer with appointed counsel in a confidential setting," there was "almost

no evidence" that counsel conducted investigations "in any of their thousands of cases, nor is there

any suggestion that they did legal analysis regarding the elements of the crime charged or possible

defenses or that they discussed such issues with their clients." *Id.* The court concluded: "The

appointment of counsel was, for the most part, little more than a formality . . . . This situation was

the natural, foreseeable, and expected result of the caseloads the attorneys handled." *Id.* Though

---

[115] Counter-Statement ¶ 143 (Carter's testimony that "That's all he said . . . , 'Pay or stay,' and that was that.").

[116] Counter-Statement ¶ 144.

[117] *Id.*

the number of cases alone does not automatically establish a constitutional violation, the overwhelming caseload faced by the contract attorneys resulted in "truncated case handling procedures that have deprived indigent criminal defendants . . . of private attorney/client consultation, reasonable investigation and advocacy, and the adversarial testing of the prosecutor's case." *Id.* at 1133.[118] State Supreme Courts have come to similar conclusions. *See Tucker v. State*, 394 P.3d 54, 63–64 (Idaho 2017); *Kuren v. Luzerne Cty.*, 146 A.3d 715, 736, 747–49 (Pa. 2016); *Hurrell-Harring v. State*, 930 N.E.2d 217, 222, 225 (N.Y. 2010).

A reasonable jury could conclude from the evidence in the record that the overwhelming caseload handled by the contract public defenders and their ensuing failure to move for indigency determinations constructively denied their clients' right to counsel under *Cronic*. Viewing the evidence in the light most favorable to Plaintiff, the public defenders' clients were systemically deprived of meaningful attorney-client consultation and meaningful advocacy. A lawyer who asks you only whether you're "paying or staying" and then does not object when a judge converts your unpaid fines into a jail sentence is no better than no attorney at all. The "[m]ere appointment of counsel . . . is not enough to satisfy the Sixth Amendment's promise of the assistance of counsel." *Wilbur*, 989 F. Supp. 2d at 1131.

### C.  The City is liable for this violation under *Monell*.

#### 1.  The City had a statutory duty to provide counsel.

The City argues that it cannot be held liable for the public defenders' inadequate representation because "[t]he appointment of public defenders is a judicial function and solely the duty of the Municipal Court judges." Doc. 266-1 2 n.3 (citing *Eggar v. City of Livingston*, 40 F.3d

---

[118] It bears noting that the caseloads of the attorneys in *Wilbur* were nowhere near the numbers carried by Kloess and the other contract attorneys in Montgomery municipal court: "Sybrandy and Witt, both of whom also had private practices . . . each closed approximately 1,000 public defense cases per year . . . and often spent less than an hour on each case." *Id.* at 1124.

312 (9th Cir. 1994); and *Johnson v. Moore*, 958 F.2d 92 (5th Cir. 1992)). But Alabama law requires cities to "provide indigent defense services as otherwise provided by law" in their municipal courts. Ala. Code § 12-14-9. It was Montgomery that hired the public defenders, *see* Doc. No. 253-1, and Montgomery that is responsible for adequately funding indigent criminal defense.

The District of South Carolina recently rejected a similar defense, relying on the fact that South Carolina, like Alabama, "makes municipalities responsible for providing for indigent defense in municipal courts." *Bairefoot*, 312 F. Supp. 2d at 510. Indeed, it is well-established that the government (and government officials) can be sued for systemically failing to provide adequate counsel to indigent defendants. *See Luckey v. Harris*, 860 F.2d 1012, 1018 (11th Cir. 1988); *see also, e.g., Wilbur*, 989 F. Supp. 2d at 1133; *Tucker*, 394 P.3d at 63–64; *Kuren*, 146 A.3d at 747–49; *Hurrell-Harring v. State*, 930 N.E.2d at 225.

The two cases that the City cites (Doc. 266-1 at 2 n.3) do not support its position. *Johnson* held that "a municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker" under *Monell*. 958 F.2d at 94. *Eggar*, likewise, held that "Judge Travis was performing a state judicial function and not acting as a final decision maker for the City when deciding . . . whether to appoint counsel." 40 F.3d at 314–15. But Plaintiff does not contend that the City is liable for any judicial decision in a particular case. They argue, rather, that the City is liable for violating the plaintiffs' right to counsel because—separate and apart from any duties the municipal court judges had—Alabama law requires cities to "provide indigent defense services as otherwise provided by law" in their municipal courts. Ala. Code § 12-14-9. Alabama law thus made the City responsible for ensuring that indigent defendants were not deprived of their right to counsel because of systematically inadequate defense services. By failing to meet that responsibility, the City violated Plaintiffs' Sixth Amendment rights.

## 2. The City's policies caused the constitutional deprivation

Because the City's contracts for indigent defense services guaranteed grossly inadequate staffing of its municipal court, a reasonable jury could conclude that the City policies enacted by those contracts were a moving force behind the constitutional violations, and thus that the City is liable under *Monell* for the resulting Sixth Amendment violations.

A § 1983 plaintiff must show that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). Each decision by a municipal policymaker "unquestionably constitutes an act of official government policy." *Pembaur*, 475 U.S. 469 at 480. And a written agreement, such as a contract with a service provider, is a type of official "municipal act." *See, e.g.*, *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1480 (11th Cir. 1991).

The City entered into contracts with Branch Kloess and Barfoot & Schoettker to represent indigent criminal defendants in municipal court. *See* Doc. 253-1. These contracts were signed by Mayor Todd Strange,[119] *see id.*, who is the City official authorized to sign contracts. City's Statement of Undisputed Facts ¶ 2, Doc. 259. These contracts specified that the firms would provide "an attorney to be present and prepared to provide competent, indigent defense services in each division of Municipal Court of the City and during each session of the Court." Doc. 253-1 at 1 § 2, 4 § 2. These contracts also capped the maximum monthly compensation for each firm, and provided that "in no event shall the City be required to pay more than the amount deposited in the

---

[119] The copy of Barfoot & Schoettker's contract provided by the City is not signed by Mayor Strange. But there is no indication in the record that he did not in fact sign this contract, and the City does not so allege.

Fair Trial Tax Fund for a particular month." *Id.* at 2 § 5, 5 § 5.

During the time period relevant to this case—2011 to 2014 or 2015—there was only one municipal courtroom.[120] Thus, Kloess and Barfoot & Schoettker took turns providing one attorney to handle all the clients in municipal court each day.[121] As discussed above, this resulted in a crushing caseload. Kloess, for example, handled almost 20,000 cases a year while working only part-time in municipal court. And, as also discussed above, this crushing caseload led inexorably to the constructive denial of counsel under *Cronic*. "This situation was the natural, foreseeable, and expected result of the caseloads the attorneys handled." *Wilbur*, 989 F. Supp. 2d at 1124.

Here, as in *Wilbur*, "the constitutional deprivations at issue . . . were the direct and predictable result of the deliberate choices of City officials charged with the administration of the public defense system." *Id.* at 1132. Mayor Strange chose to sign contracts providing only a single attorney to staff each day in Montgomery municipal court despite the fact that this was sure to result in caseloads that made it impossible for each attorney to provide competent representation. Though City officials denied playing a role in the court's day-to-day administration, the City received lump sum payments from the municipal court each month—money that JCS was collecting from defendants. Doc. 259 ¶ 21. The JCS-Montgomery Contract expressly provided that only debtors who could not "pay their entire fine and Court costs within one week of the sentencing date" would remain on supervised probation (and subject to monthly fees)," which means JCS was only collecting from those with the least means.[122] And, of course, Mayor Strange was well aware since 2009 that anyone who could afford to pay at the window was doing so to avoid going on JCS

---

[120] Counter-Statement ¶ 134.

[121] Counter-Statement ¶ 134.

[122] *See generally* Counter-Statement at part I.

probation.[123] City officials thus knew, or should have known, the volume of indigent defendants that came through the court's doors.

Yet, despite giving the public defenders an impossible task, the City took no steps to monitor their performance or ensure that defendants' constitutional rights were being protected. After Mayor Strange hired Kloess to work as a public defender in municipal court, the city gave him no instructions about how to represent people in municipal court and did not control or supervise his work. Doc. 264 ¶¶ 14, 68, 69; *see also* Kloess Dep. 173:9–173:12 ("Q: Was there any oversight or supervision or evaluation of your job as a public defender by the City? A: Not that I'm aware of."); *id.* 196:18–196:23. The City also did not conduct any written evaluation of his work or even require either him or Barfoot & Schoettker to keep any records other than records of their time in court. Kloess Dep. 174:2–174:17. The City continued to employ them as public defenders while imposing contractual limitations on them that predictably doomed them to deprive municipal probationers of their right to effective counsel. *See* Kloess Dep. 173:19–173:21 ("If I hadn't been doing an adequate job, I wouldn't still be there.")[124]

A reasonable jury could conclude from this evidence that, just like in *Wilbur*, "the combination of contracting, funding . . . , and monitoring decisions made by the policymaking authorities . . . directly caused the truncated case handling procedures that have deprived indigent criminal defendants" of their right to counsel. 989 F. Supp. 2d at 1133. Thus, viewing the evidence in the light most favorable to Plaintiff, the City is responsible for this constitutional deprivation. *Id.*

---

[123] Counter-Statement ¶ 36.

[124] *See generally* Counter-Statement part XI.

## VII. Plaintiff's claims are not barred by *Heck v. Humphrey* or *Rooker-Feldman*.

The City's *Rooker* and *Heck* arguments fail for the same reasons JCS's do. Plaintiff therefore incorporates the argument from his brief in opposition to JCS's motion.

## VIII. Plaintiff's claims are not barred by the Statute of Limitations.

Carter's claims against the City are not barred by the statute of limitations for the same reasons their claims against JCS are not barred. Plaintiff therefore incorporates the argument from his brief in opposition to JCS's motion.

## CONCLUSION

For the foregoing reasons, the City's motion for summary judgment on Counts 1 and 9 should be denied.

RESPECTFULLY SUBMITTED,

THE EVANS LAW FIRM, P.C.
PUBLIC JUSTICE
Attorneys for the Plaintiffs

/s/ Leslie A. Bailey

Leslie A. Bailey (admitted *pro hac vice*)
Brian Hardingham (admitted *pro hac vice*)
PUBLIC JUSTICE
475 14th Street, Suite 610
(510) 622-8150
Oakland, CA 94612
Email: lbailey@publicjustice.net
Email: bhardingham@publicjustice.net

G. Daniel Evans (ASB-1661-N76G)
Alexandria Parrish (ASB-2477-D66P)
Maurine C. Evans (ASB-4168-P16T)
THE EVANS LAW FIRM, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209

Telephone: (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February, 2020, I electronically filed the foregoing PLAINTIFF'S BRIEF IN OPPOSITION TO THE CITY OF MONTGOMERY'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Shannon L. Holliday, Esquire
Robert D. Segall, Esquire
Richard H. Gill, Esquire
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347

Micheal S. Jackson, Esquire
WEBSTER, HENRY, LYONS, BRADWELL, COHAN & BLACK, P.C.
P. O. Box 239
Montgomery, AL 36101-0239

F. Lane Finch, Jr., Esquire
Brian Richardson, Esquire
SWIFT CURRIE MCGHEE AND HIERS, LLP
2 North 20th Street, Suite 1405
Birmingham, Alabama 35203

Michael L. Jackson, Esquire
Larry S. Logsdon, Esquire
Wesley K. Winborn, Esquire
WALLACE, JORDAN, RATLIFF & BRANDT, L.L.C.
P.O. Box 530910
Birmingham, Alabama 35253

Wilson F. Green, Esquire
FLEENOR & GREEN LLP
1657 McFarland Blvd. N., Ste. G2A
Tuscaloosa, Alabama 35406

Kimberly O. Fehl, Esquire
CITY OF MONTGOMERY LEGAL DEPT.
Post Office Box 1111
Montgomery, AL 36101-1111

s/ Leslie A. Bailey
_____
Leslie A. Bailey