# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

**ALDARESS CARTER**, individually and
for a class of similarly situated persons,

      *Plaintiff,*

v.

**THE CITY OF MONTGOMERY**, et al.,

      *Defendants.*

    **Case No. 2:15-cv-555-RCL**

## <u>ORDER</u>

Pursuant to Federal Rule of Civil Procedure 60(a), the Court *sua sponte* corrects its Memorandum Opinion of July 7, 2020 (ECF No. 293), *nunc pro tunc*, by substituting the attached opinion. This correction replaces the docket number of an order cited on page 17 of the original slip opinion, which erroneously cited ECF No. 207 instead of ECF No. 203.

**IT IS SO ORDERED.**

Date:   7/17/20

                                  Royce C. Lamberth
                          United States District Court Judge

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**ALDARESS CARTER**, individually and
for a class of similarly situated persons,      )
)
*Plaintiff*,                                      )
)
**v.**                                           )            **Case No. 2:15-cv-555-RCL**
)
**THE CITY OF MONTGOMERY**, et al.,             )
)
*Defendants*.                                    )
_____)

## CORRECTED MEMORANDUM OPINION

For years, the Municipal Court in Montgomery, Alabama engaged in a systemic practice of jailing traffic offenders for failing to pay fines without inquiring into their ability to pay. In carrying out that system, the Municipal Court deprived offenders of their due process and equal protection rights not to be incarcerated for their poverty. *Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983). This case concerns the liability of the City of Montgomery and its contractors for their involvement in this system.

The City of Montgomery entered a contract on behalf of itself and its Municipal Court with Judicial Correction Services, Inc. ("JCS").[1] Under the contract, JCS supervised misdemeanor probation for those on Municipal Court-ordered probation from June 2009 through June 2014. The City also contracted with Branch D. Kloess to serve as a part-time public defender in the Municipal Court.

---

[1] In 2011, CHC Companies, LLC and Correctional Healthcare Companies, Inc. (together "CHC") and JCS engaged in a reverse triangular merger, by which JCS became a wholly owned subsidiary of CHC.

1

Plaintiff Aldaress Carter served probation with JCS when he was unable to pay his traffic tickets.  After Mr. Carter missed probation appointments and failed to make payments, JCS petitioned the Municipal Court to revoke his probation.  Without assessing his ability to pay, the Municipal Court "commuted" Mr. Carter's fines to jail time and imprisoned him.  Mr. Kloess represented Mr. Carter at his commutation hearing but was not physically in the courtroom for the hearing.

Mr. Carter spent four days in the city jail.  He earned a $50 credit against his fines for each day of incarceration and was released when his mother borrowed money to pay the balance of his fines.

Mr. Carter sued the City, JCS, its parent company CHC, and Kloess on behalf of himself and a purported class of similarly situated individuals.  His operative complaint seeks damages under 42 U.S.C. § 1983 and two state law causes of action.

The City (ECF No. 252), CHC (ECF No. 255), JCS (ECF No. 258), and Mr. Kloess (ECF No. 263) moved for summary judgment against Mr. Carter under Rule 56 of the Federal Rules of Civil Procedure.

Their motions present seven major questions:

1. Does the *Rooker-Feldman* doctrine deny the Court jurisdiction to hear Mr. Carter's claims?

2. Does *Humphrey v. Heck* deny Mr. Carter a cause of action under § 1983?

3. Is CHC liable for JCS's actions?

4. Are defendants potentially liable under § 1983?

5. Did Mr. Carter validly state a claim for false imprisonment under Alabama law?

6. Are Mr. Carter's claims time barred?

2

7.   Are any of the defendants entitled to qualified or quasi-judicial immunity?

For the reasons discussed below, the Court holds that:

1.   The *Rooker-Feldman* doctrine denies the Court jurisdiction to hear Mr. Carter's unjust enrichment claim but not his § 1983 and false imprisonment claims;

2.   *Humphrey v. Heck* does not deny Mr. Carter a cause of action under § 1983;

3.   CHC is not liable for JCS's actions;

4.   Defendants are potentially liable under § 1983, except that JCS and the City are not liable for conspiracy, JCS is not liable for failing to inform Mr. Carter of his rights, and the City is not liable for harms arising from the so-called "window procedure" or for harms arising before it was on notice of JCS's practices;

5.   Mr. Carter states a valid claim for false imprisonment under Alabama law, but only for imprisonment following his commutation hearing;

6.   Mr. Carter's claims are not time barred; and,

7.   None of the defendants are entitled to qualified or quasi-judicial immunity.

Upon consideration of the motions, briefs, statements and counter-statement of uncontested facts, and evidentiary submissions, as well as all other papers of record, the Court will:

- grant the City's motion as to Counts Three and Seven, grant the City's motion as to Counts One, Five, and Nine for all events before July 16, 2012, grant the City's motion as to Counts One and Nine for all claims alleging a conspiracy between the City and JCS and for claims basing liability solely on the JCS-City contract, grant the City's motion as to Count One for all claims related to operation of the magistrates' windows in the Municipal Court, and deny the City's motion as to Counts One, Five, and Nine in all other respects;

3

- grant CHC's motion;

- grant JCS's motion as to Counts Four, Six, Eight, and Twelve, grant JCS's motion as to Counts Two and Ten for all claims alleging a conspiracy between the City and JCS, grant JCS's motion as to Count Two for all claims alleging that JCS failed to inform Mr. Carter of his rights, grant JCS's motion as to Count Two for all claims alleging that JCS unlawfully charged probation fees, grant JCS's motion as to Count Fourteen for any claims arising from arrest or detention before commutation, and deny JCS's motion as to Counts Two, Six, Ten, and Fourteen in all other respects; and,

- deny Mr. Kloess's motion.

A separate order accompanies this memorandum opinion.

## I.   BACKGROUND

### A. Factual Background[2]

#### 1.  Fines and Probation in Montgomery

##### (i)  The Municipal Court

The City has a Municipal Court to adjudicate misdemeanors and traffic offenses. Ala. Code §§ 12-12-32, 12-12-51, 12-14-1. The Municipal Court is part of the state judiciary, *see* Ala.

---

[2] For convenience, the Court uses the following short forms throughout this opinion to cite to evidence in the Rule 56 record. Citations to "City Evid." refer to Evid. Submissions Supp. City's Mot. Sum. J. (ECF No. 253). Citations to "Carter Evid." refer to Evid. Submissions Supp. Pl.'s Opp'n to Mots. Summ. J. (ECF No. 278). Citations to "Cater MSJ Evid." refer to Pl.'s Evid. Submissions Supp. Pl.'s Partial Mots. Summ. J. (ECF No. 73). Citations to "Carter Class Evid." refer to Pl.'s Submission of Evid. Matters Supp. Mot. Class Certification (ECF No. 118). Citations to "Carter CHC Evid" refer to Pl.'s Evid. Submission Opp'n CHC's Mot. Summ. J. (ECF No. 272). Citations to "JCS Evid." refer to Evid. Submission Supp. JCS's Renewed Mot. Summ. J. (ECF No. 262). Citations to "JCS Class Evid." refer to Evid. Submission Supp. JCS's Opp'n to Pl.'s Mot. Class Certification (ECF No. 163). Citations to "CHC Evid." refer to Evid. Submission Supp. CHC's Mot. Summ. J. (ECF No. 257). Citations to Kloess Evid. refer to Evid. Submission Supp. City's [sic] Mot. Summ. J. (ECF No. 265). The Court cites to depositions and declarations without reference to the evidentiary compilation in which they appear; it references docket only in the first citation to a deposition or declaration.

Const. art. VI, § 145, so the City cannot control proceedings in the Municipal Court, *see* Ala. Const. art. III, § 42(c). But the City appoints the judges, Ala. Code § 12-14-30; the mayor appoints the presiding judge, *id.,* and the mayor may remit fines and costs payable to the City, *id.* at § 12-14-15. And the City must "provide appropriate facilities and necessary supportive personnel for the municipal court and may provide for probation services, clerks and municipal employees designated as magistrates." *Id.* at § 12-14-2. The City must also provide indigent defense in its Municipal Court. *Id.* at § 12-14-9. At the same time, the Municipal Court sets its own internal procedures, including those for processing traffic tickets.

During the time JCS operated probation service in Montgomery, the Municipal Court processed traffic tickets in one of two ways. When a person received a traffic ticket, the ticket required him to appear in the Municipal Court on a given date. *See* Nixon Dep. 42:16–23 (Apr. 18, 2014) (ECF No. 73-1) ("2014 Nixon Dep."). If the offense had a pre-set (scheduled) fine, court staff directed the appearing defendant to a magistrate's window. *Id.* at 45:16–21. The defendant could plead not guilty and receive a hearing before a judge or could plead guilty and pay the fine. *Id.* at 46:11–47:3; *see also* Ala. R. Jud. Admin. 20. If the offense did not have a scheduled fine, court staff required the defendant to appear before a judge. 2014 Nixon Dep. 52:1–6. Once the defendant pleaded or was found guilty, the Municipal Court imposed a fine.

If a defendant could not afford to pay his fine, the Municipal Court could offer the defendant more time to pay. For small fines, Municipal Court policy authorized a magistrate to grant a thirty-day extension for fines of up to $250. 2014 Nixon Dep., Ex. 11. For defendants with higher fines or who needed more time to pay, the Municipal Court made payment plans available through JCS probation, *id.*, purportedly under its statutory power to suspend a sentence and place a defendant on probation for up to two years, *see* Ala. Code § 12-14-13. A magistrate

could place certain defendants — those who owed less than $1,500 and who were either not already on probation with JCS or in good standing with JCS — on JCS probation pursuant to a general order.[3]  2014 Nixon Dep., Ex. 11; *see also id.* at 140:13–16.  The Municipal Court required defendants who could not pay a fine of more than $1,500 to appear before a judge.  *Id.* at Ex. 11; *see also id.* at 151:1–7, 12–23.

### (ii) JCS Probation

JCS provided for-profit probation services for courts throughout Alabama.  Ray Dep. 57:19–21 (ECF No. 73-3).

During the years at issue here, the City contracted with JCS to provide probation to Municipal Court offenders.  City Evid., Ex. 11, 12; Carter Evid., Ex. 13 at 2.  Their contract ran for an initial term of one year and automatically renewed for subsequent one-year terms unless either party gave notice that it would not renew.  City Evid., Ex. 12 at 5.  The City's contract with JCS controlled the terms under which JCS could provide probation.  For example, it provided that JCS must maintain case files on probationers and specified a maximum staff-to-probationer ratio. *Id.* at 3.  The contract, though, did not facially require the Municipal Court to use JCS for probation services.  And other than a provision that mandates JCS to "supervise indigent cases when determined by the [Municipal] Court" without charging probation fees, the contract is silent as to indigency determinations. *Id.* at 2.

JCS does not charge courts or cities for their probation.  *Id.* at 4.  Rather, JCS operates on an offender-paid model.  Under the City-JCS contract, JCS charged probationers $40 per month in addition to a $10 one-time fee at the onset of probation.  *Id.*

---

[3] The parties refer to magistrate-initiated probation as the window procedure.  The window procedure offered no formal opportunity for a determination of the probationer's ability to pay.  2014 Nixon Dep., Ex. 11.

JCS's services consisted "primarily" of facilitating extended payment plans. 2014 Nixon Dep. 139:2–3. JCS would not petition to revoke probation the first time a probationer missed a payment or an appointment. Ray Dep., Ex. 2 at p. 4.26. Instead, JCS would allow the delinquent probationers to continue on probation — and to continue accruing monthly fees — under more onerous conditions. JCS required probationers who made their monthly payments in full to appear at a JCS office once a month. City Evid., Ex. 12 at 3. For those probationers who could not keep up with monthly payments, however, JCS required them to appear more frequently — up to several times each week. *See* Carter Dep. 84:15–16 (Sept. 14, 2018) (ECF No. 163-14) ("2018 Carter Dep."); City Evid., Ex. 12 at 3. And when a probationer could not afford to make a payment in full, JCS determined how much of the partial payment to apportion to fines and to probation fees. *See* Carter Evid., Ex. 28 at 2.

Once placed on probation, a probationer made all payments through JCS. JCS provided the probationers with information about their cases and fines. And JCS instructed probationers when they first reported for probation not to "contact the Municipal Court" because "they will be unable to help you." Carter Evid., Ex. 23.

Over the term of its contract with the City, JCS collected more than $15.5 million in fees. *See* Carter Evid., Ex. 32. It also collected more than $14.6 million in fines for the City. *See id.*

### (iii) Revocation and Commutation

When a probationer could not make payments or missed appointments, JCS would petition the Municipal Court to revoke probation. JCS's standard-form petition did not allege that the probationer *willfully* failed to pay. Carter MSJ Evid., Ex. 10. And despite JCS's claims that it never asked the Municipal Court to revoke a probation, the standard-form petition "respectfully requests that the probation of the Defendant be revoked and that this Honorable Court issue a

7

warrant for the arrest of said defendant, if necessary . . . ." *See, e.g.*, City Evid., Ex. 23. Once JCS filed a petition, either JCS or the Court would serve the probationer with a notice to appear at an initial revocation hearing. Nixon Dep. 233:16–23 (Sept. 16, 2019) (ECF No. 278-20) ("2019 Nixon Dep.").

If a probationer appeared at his revocation hearing, the Municipal Court would determine whether to revoke his probation. Hayes Dep. 22:8–16 (ECF No. 73-2). When the Municipal Court revoked a probation, it would "commute" the probationer's fines into a jail term: the offender would "sit out" his fine at the rate of $50 per day. *See id.* at 9:16–10:3. If a probationer failed to appear, the Municipal Court would issue a warrant for his arrest. *See* Nixon Decl. at ¶ 85 (ECF No. 253-3). Once the police executed that warrant and arrested the probationer, they would bring him before the Municipal Court for a commutation hearing. *See id.* at ¶¶ 88, 91, 99. Commutation hearings and revocation hearings proceed in similar ways — the judge determined whether to transform the fine into a jail sentence — except that JCS did not directly participate in commutation hearings. *See* Hayes Dep. 18:9, 13–14 ("The end result is the same.").

At revocation and commutation hearings, the Municipal Court routinely failed to inquire as to whether a defendant could pay his fines before sentencing him to jail time. *In re Hayes*, No. 49, slip op. at 2–3 (Ala. Ct. Judiciary Jan. 5, 2017). Though the Alabama court system has created a standard form to allow defendants to show their indigency, the Municipal Court did not use that form. 2014 Nixon Dep. 88:4–12. And the Municipal Court judges did not tell defendants that they could not be jailed if they could not afford to pay their fines. *See* Hayes Dep. 40:10–14. The Municipal Court's conduct was so egregious that the Alabama Court of the Judiciary suspended Municipal Court Presiding Judge A. Lester Hayes III from the bench for eleven months for failing to conduct indigency hearings and for other ethics violations stemming from the Montgomery

8

probation system. *In re Hayes*, slip op. at 2–7. In addition, the Municipal Court judges agreed in settling a lawsuit challenging its traffic ticket procedures to refrain from incarcerating defendants for inability to pay. *See Mitchell v. City of Montgomery*, No. 2:14CV186-MHT, 2014 WL 11099432, at *2–3, 5–10 (M.D. Ala. Nov. 17, 2014). They also agreed to train themselves, court staff, and public defenders to protect defendants' rights not to be jailed for inability to pay. *Id.*

Likewise, JCS did not formally assess whether a probationer could afford to pay his fines. Hamby Decl. at ¶ 33 (ECF No. 163-2). But JCS kept records of its probationers' employment statuses, including when probationers were unemployed or relied on government benefits as their sole source of income. Carter Class Evid., Ex. 13. At least 217 probationers whom JCS listed as unemployed, disabled, or receiving Supplemental Security Income benefits served jail time after the Municipal Court revoked their probation. *Compare id.* (listing probationers' sources of income) *with* Carter Class Evid., Ex. 10 (listing probationers who served jail terms).

*(iv) The City's Knowledge*

The parties dispute when the City became aware of JCS's allegedly unlawful conduct.

Mr. Carter suggests several points at which the City became aware or should have become aware of how JCS operated:

- On May 9, 2009, when Municipal Court Administrator Ken Nixon, who also served in the Mayor's Cabinet, informed the Mayor that the JCS probation program had been "implemented as planned." Carter Evid., Ex. 15 Mr. Nixon reported both to the Presiding Judge of the Municipal Court and the Mayor. 2014 Nixon Dep. 35:11–14. He claims that he only shared and received information with the Mayor; Mr. Nixon testified that the Mayor did not supervise him. *See* 2019 Nixon Dep. 45:6–11, 46:19–23 (ECF No. 253-27).

- On July 16, 2012, when Mr. Nixon received an email from JCS notifying him of a lawsuit challenging JCS's probation operations for the Harpersville Municipal Court. Carter Evid., Ex. 38. The complaint alleged that JCS engaged in many of same the practices in Harpersville and Montgomery including petitioning for probation revocation for indigent probationers. *See id.*

- On January 16, 2013, when Mr. Nixon received a subpoena from the plaintiffs in *Thurman v. Judicial Correction Services* for Municipal Court probation orders. Carter Evid., Ex. 38. The *Thurman* complaint alleged that JCS unlawfully collected probation fees in Montgomery. *See* Am. Compl. 10–14 (ECF No. 4), *Thurman v. Judicial Correction Services*, No. 2:12-cv-724-RDP (M.D. Ala. 2012).

In contrast, the City claims not to have been aware of how JCS operated until shortly before it terminated its contract with JCS. *See* City's Reply Br. 19 (ECF No. 283).

The City did not supervise JCS's operations. Strange Dep. 100:1–8 (ECF No. 278-35).

*(v) Public Defenders*

Alabama requires municipalities that operate municipal courts to provide counsel to indigent defendants. Ala. Code § 12-14-9. The City purported to meet that obligation through a pair of contracts — one with Mr. Kloess and one with a small Montgomery law firm. See Second Am. Compl., Ex. 2 (ECF No. 145-2); Kloess Dep. 67:9–14 (ECF No. 265-1). Each public defender worked in the Municipal Court every other day, Kloess Dep. 79:23–80:4, representing every defendant who had been jailed prior to his court appearance, *see id.* at 104:16–19. The City paid the defenders an hourly rate. *Id.* at 69:4–6. It received invoices from the defenders every two weeks, listing the number of hours the defenders worked but not the number of clients or cases they handled. *Id.* at 72:19–23.

10

The defenders handled an enormous caseload. Over the course of 2012, Mr. Kloess handled 16,436 cases over 127 days in court. Parrish Decl. at ¶ 14 (ECF No. 278-1). Many defendants appeared for multiple cases, so Mr. Kloess represented fewer individuals than cases. *Id.*

Although many of Mr. Kloess's clients were poor, he does not provide evidence that he routinely asked the Municipal Court to consider their inability to pay fees. Mr. Kloess testified that he has requested indigency determinations for some clients, but he was unable to name a single client for whom he had requested such a hearing. Kloess Dep. 163:1–11. He does not remember ever filing a written motion for an indigency hearing. *Id.* at 171:18–21.

### 2. Mr. Carter

In May 2011, a Montgomery police officer arrested Mr. Carter on outstanding warrants for failure to appear in the Municipal Court on several traffic tickets. 2018 Carter Dep. 68:7–10. Mr. Carter spent a night in jail and then appeared in court. *Id.* at 70:21–22. He could not afford to pay his fines, so the judge offered him a choice between further incarceration and JCS probation. *Id.* at 72:1–2. Mr. Carter elected to go on probation with JCS. *Id.* at 73:14–15. The probation order required Mr. Carter to pay $140 per month. Carter MSJ Evid., Ex. 17 (ECF No. 73-17). Mr. Carter made his first monthly payment in full but was never again able to pay the full amount due in any month. 2018 Carter Dep. 118:9–12. Over nineteen months on probation with JCS, Mr. Carter made a total of $833 in payments. Pl.'s Reply to CHC's Opp'n to Mot. Class Certification, Ex. 3 at 10–11 (ECF No. 174-3). JCS allocated $460 of those payments to fines and kept the rest as probation fees. *Id.* During those nineteen months Mr. Carter attended sixty-six JCS appointments and missed fifty-seven. *Id.* at 8–10. Eventually his payments slowed and, in November 2012, he missed several meetings and did not make a payment. *See id.* at 8, 10.

In December 2012, JCS petitioned the Municipal Court to revoke Mr. Carter's probation for failure to make payments and attend meetings. Carter MSJ Evid., Ex. 10. JCS claims that it gave Mr. Carter notice of the revocation hearing, *see* Pl.'s Reply to CHC's Opp'n to Mot. Class Certification, Ex. 3 at 2; Mr. Carter claims he never received the notice, 2018 Carter Dep. 125:16–19. Regardless, Mr. Carter did not attend his revocation hearing. City Evid., Ex. 23. He claims that he believed he had completed his probation because a JCS employee told him "You're done Mr. Carter" when he came in to make a payment in late December 2012 or January 2013. *See* 2018 Carter Dep. 124:2–13. Because Mr. Carter did not appear, the Municipal Court revoked his probation and issued warrants for his arrest. City Evid., Ex. 23.

In January 2014, Mr. Carter was arrested during a traffic stop on ten warrants for failing to appear in court. 2018 Carter Dep. 126:4–6. Seven of the warrants were tied to tickets for which Mr. Carter had been sentenced to JCS probation. Nixon Decl., Ex 5 at 205. Mr. Carter spent the weekend in jail and then appeared before Judge Hayes. *See id.* at 205–206.

At the revocation hearing, Mr. Kloess nominally represented Mr. Carter. On the day of the hearing, Mr. Kloess represented sixty-seven individuals over three and one-half hours. Kloess Dep. 133:16–18; Parrish Decl. Ex. C at 9 (ECF No. 278-4). And Mr. Kloess was not in the courtroom at all for Mr. Carter's hearing. Kloess Dep. 132:2–11. Mr. Carter alleges, however, that Mr. Kloess consulted with him briefly and asked him if he would "pay or stay." 2018 Carter Dep. 136:4:15. Mr. Carter told Mr. Kloess that he would pay. *Id.* at 136:17.

But Mr. Carter could not pay his fines at the revocation hearing. His girlfriend brought $120 — all but $20 of Mr. Carter's liquid assets — to the Municipal Court. *Id.* at 137:11–22; Carter Dep. 352:20–22 (Nov. 7, 2019) (ECF No. 262-3) ("2019 Carter Dep."). Judge Hayes rejected that proffered payment and sent Mr. Carter back to jail. *Id.* at 138:1–15. Judge Hayes

never asked Mr. Carter why he had not paid his fines. 2019 Carter Dep. 373:3–7. If he had inquired, he would have learned that Mr. Carter could not afford to pay much: when he appeared before Judge Hayes, he netted $300 per week from his job. 2018 Carter Dep. 221:10–11.

Municipal Court paperwork indicates that Judge Hayes commuted to jail time the fines from tickets underlying the seven JCS warrants; he gave Mr. Carter additional time to pay the tickets underlying the other three warrants. Nixon Decl., Ex 5 at 204–05. Four days after his arrest (and one day after his commutation), Mr. Carter was released from jail when his mother borrowed enough money to pay his remaining fines. *Id.* at 206; 2018 Carter Dep. 138:22–23.

### 3. The JCS-CHC Merger

In September 2011, CHC and JCS engaged in a reverse triangular merger. Carter MSJ Evid., Ex. 21. CHC formed a new, wholly owned subsidiary Judicial Merger Sub, Inc., which merged with JCS. *Id.* JCS survived the merger with the subsidiary, and, as part of the transaction, CHC paid cash to acquire all outstanding shares of JCS stock. *Id.* at 9–11.

While CHC planned to integrate JCS into CHC, that integration never occurred. *See* Houston Dep. 35:16–36:2 (ECF No. 73-16).

### B. Procedural History

This action has been pending for nearly five years. Mr. Carter filed this lawsuit in August 2015 against the City and Mr. Kloess. *See* Compl. (ECF No. 1). He subsequently amended the complaint, naming JCS and CHC and alleging fourteen causes of action under the Racketeer Influenced and Corrupt Organizations Act and § 1983. All four defendants moved to dismiss the complaint. The Court dismissed Mr. Carter's RICO causes of action but allowed his § 1983 claims to proceed. *See Carter v. City of Montgomery*, No. 2:15-CV-555 (RCL), 2017 WL 957540, at *5–

6 (M.D. Ala. Mar. 10, 2017). The Court then granted Mr. Carter's motion to file a second amended complaint. Order (Aug. 28, 2018) (ECF No. 143); Second Amended Complaint (ECF No. 145).

That filing is the operative complaint for these motions. It initially alleged fifteen causes of action:

- Count One: denial of due process under § 1983 against the City and Kloess;

- Count Two: denial of due process under § 1983 against JCS and CHC;

- Count Three: violation of the Fourth Amendment under § 1983 against the City;

- Count Four: violation of the Fourth Amendment under § 1983 against JCS and CHC;

- Count Five: violation of the Sixth Amendment under § 1983 against the City;

- Count Six: violation of the Sixth Amendment under § 1983 against JCS and CHC;

- Count Seven: violation of the Eighth Amendment under § 1983 against the City;

- Count Eight: violation of the Eighth Amendment under § 1983 against JCS and CHC;

- Count Nine: denial of equal protection under § 1983 against the City;

- Count Ten: denial of equal protection under § 1983 against JCS and CHC;

- Count Eleven: money had and received against the City;

- Count Twelve: money had and received against JCS and CHC;

- Count Thirteen: false imprisonment against the City;

- Count Fourteen: false imprisonment against JCS and CHC; and,

- Count Fifteen: declaratory and injunctive relief to invalidate the City-JCS contract against the City and JCS.

Second Am. Compl. 28–79. Mr. Carter moved for partial summary judgment on count fifteen (ECF No. 164); the Court denied that motion and ordered the count dismissed for lack of subject-matter jurisdiction. *See* Order 15 (Mar. 29, 2019) (ECF No. 203). The City moved for judgment on the pleadings (ECF No. 200) and to dismiss counts eleven and thirteen (ECF No. 148); the Court held that the *Rooker-Feldman* doctrine barred it from considering Mr. Carter's unjust enrichment claim against the City, Order 15 (Mar. 29, 2019) (ECF No. 203), and that the City is immune from claims for intentional torts, *see Carter v. City of Montgomery*, No. 2:15-CV-555 (RCL), 2019 WL 1440284, at *5 (M.D. Ala. Mar. 29, 2019). Accordingly, the Court dismissed counts eleven and thirteen. *See* Order (Mar. 29, 2019) (ECF No. 207). But it also held that Mr. Carter had plausibly alleged that the City was the moving force behind his injuries and denied the City's motion for judgment on the pleadings. *Carter*, 2019 WL 1440284, at *4. JCS has moved for summary judgment once before (ECF No. 183). The Court denied that motion without prejudice, allowing time for further discovery. Order 2 (ECF No. 214). Accordingly, Counts One through Ten, Twelve, and Fourteen are currently before the Court.

Finally, the Court denied without prejudice Mr. Carter's motion for class certification, reserving the question until after it has addressed dispositive motions. Order 1 (Mar. 29, 2019) (ECF No. 204). And so, although the Court notes that the parties have conducted wide-ranging discovery, only Mr. Carter's individual claims are before the Court.

## II.   LEGAL STANDARDS

The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant bears the burden of showing its entitlement to summary judgement; the movant, however, must simply show that the non-movant has not produced enough evidence to meet his burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

In determining whether material facts are in dispute, the Court construes facts and makes inferences in favor of the non-moving party. *Scott v. Harris*, 550 U.S. 372, 379 (2007). "[W]hen conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (emphasis omitted). Facts, however, are disputed only if a reasonable jury could believe either side of the dispute. *See Scott*, 550 U.S. at 380. A fact is material if it is necessary to the Court's decision. *See United States v. Gilbert*, 920 F.2d 878, 883 (11th Cir. 1991).

## III.   ANALYSIS

### A.   *Rooker-Feldman* Doctrine

The City and JCS argue that the *Rooker-Feldman* doctrine deprives the Court of jurisdiction to adjudicate Mr. Carter's claims.

*Rooker-Feldman* is a narrow jurisdictional doctrine that prohibits federal district courts from reviewing of state court judgements. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 293 (2005); *see also District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). Congress has conferred jurisdiction to review state court judgments only on the Supreme Court. *See* 28 U.S.C. 1257; *see also Exxon Mobil*, 544 U.S. at 283–84. Because of that jurisdictional limit, *Rooker-Feldman* deprives federal courts of jurisdiction over an issue that is "inextricably intertwined" with a state court judgment. *Alvarez v. Att'y Gen.*, 679 F.3d 1257, 1262–63 (11th Cir. 2012). An issue is inextricably intertwined with a state court judgment when the federal claim cannot succeed without "effectively nullify[ing]" the state court judgement or requiring the conclusion that the state court wrongly decided its case. *Id.* Federal trial courts, however, may review claims that are independent of state judgements, even if those claims have previously been litigated in state courts. *Exxon Mobil*, 544 U.S. at 293.

### 1. Unjust Enrichment Claim

JCS argues that the Court lacks jurisdiction to decide Mr. Carter's unjust enrichment claim. The Court previously ruled that the *Rooker-Feldman* doctrine deprived it of jurisdiction to adjudicate Mr. Carter's unjust enrichment claim against the City. *See* Order 3–5 (Mar. 29, 2019) (ECF No. 203). For the same reasons, Mr. Carter's unjust enrichment claim against JCS must fail.

### 2. Section 1983 Claims

The City argued in its motion for judgment on the pleadings that the *Rooker-Feldman* doctrine barred Mr. Carter's § 1983 claims. The Court rejected that argument, holding that "Mr. Carter's [§] 1983 claims do not challenge the merits of the Municipal Court's decisions nor the bases on which those judgments were reached. These claims challenge only the post-judgment probationary program." *Carter*, 2019 WL 1440284, at *1 n.1. Nevertheless, the City renews its argument here and JCS joins it.

Defendants' *Rooker-Feldman* argument could succeed only if Mr. Carter challenged the Municipal Court's judgment. But Mr. Carter does not. Rather, his claims rest on the judgment. Without that judgment and without the probation order, Mr. Carter would have no claim against the City or JCS. *Cf. VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 407 (6th Cir. 2020) (Sutton, J., concurring). Because Mr. Carter does not seek to overturn the Municipal Court's orders, *Rooker-Feldman* does not deprive the Court of jurisdiction to decide his § 1983 claims.

*Thurman v. Judicial Correction Servs., Inc.*, 760 F. App'x 733 (11th Cir. 2019), which held that federal courts may not adjudicate efforts to void the JCS-City of Montgomery contract and recover probation fees in restitution, *id.* at 737, does not deny the Court jurisdiction. In *Thurman*, the parties tried to invalidate the Municipal Court's orders, implicating *Rooker-Feldman*'s core concern. Here, the remaining claims assume that the Municipal Court's orders are valid and seek

damages arising from those orders and the policies they implemented. *Carter*, 2019 WL 1440284, at *1 n.1. If Mr. Carter won the full relief he seeks, nothing would disturb the validity of his convictions. Therefore, *Rooker-Feldman* does not deny the Court jurisdiction to hear the bulk of Mr. Carter's § 1983 claims.

To the extent, however, that Mr. Carter seeks through § 1983 to recover probation fees paid to JCS, the Court lacks jurisdiction to decide those claims for the same reason it may not decide his unjust enrichment claims. Mr. Carter cannot attack his probation order in federal court.

### 3. False Imprisonment Claim

JCS also argues that the *Rooker-Feldman* doctrine prevents the Court from considering Mr. Carter's false imprisonment claim. That argument fails for the same reason as JCS's § 1983 argument: Mr. Carter's false imprisonment claim depends on — rather than challenges — the Municipal Court's commutation order. Mr. Carter alleges that JCS harmed him because JCS acted in bad faith and persuaded the Municipal Court to jail him. Granting relief to Mr. Carter would censure JCS for its actions but not disturb the Municipal Court's order. Accordingly, *Rooker-Feldman* poses no barrier to the claim.

### B. *Heck v. Humphrey*

The City and JCS argue that Mr. Carter lacks a cause of action under § 1983 because the underlying state proceedings did not terminate in his favor.

A plaintiff lacks a cause of action under § 1983 if a judgment in favor of plaintiff would necessarily imply the invalidity of an otherwise valid state conviction. *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). *Heck* does not apply if a plaintiff's success on a claim would not "*necessarily* imply that the plaintiff's conviction was unlawful." *Id.* at 487 n.7. And the rule does not apply to procedural claims. *Harden v. Pataki*, 320 F.3d 1289, 1295 (11th Cir. 2003).

The City and JCS argue that Mr. Carter cannot bring his § 1983 claims because he cannot prevail without implying the invalidity of his Municipal Court convictions. That argument fails. Even if (1) Mr. Carter had been adequately informed of his rights and (2) properly represented and (3) the Municipal Court had conducted a *Bearden* hearing, Mr. Carter could have been found willfully in violation of his obligation to pay the fine and jailed. Moreover, Mr. Carter does not challenge the underlying conviction — his traffic offenses. Rather, he challenges the procedures used to impose probation and jail him. Therefore, *Heck* does not deny Mr. Carter a cause of action under § 1983.

JCS also points to Judge Tjoflat's concurring opinion in *Teagan v. City of McDonough*, 949 F.3d 670 (11th Cir.2020). In Teagan, a motorist sued McDonough and directly challenged orders the McDonough municipal court issued to imprison her in violation of her rights under the Fourth, Sixth, and Fourteenth Amendments. *Id.* at 674. Judge Tjoflat wrote separately to explain that he would have dismissed the plaintiff's claims under *Heck*.[4] *Id.* at 684 (Tjoflat, J., concurring). Judge Tjoflat's analysis would not apply to the plaintiffs' claims, which accept, rather than challenge, the Municipal Court's orders.

### C. CHC's Liability

Generally, when one company buys the assets of another, it does not assume responsibility for its debts and liabilities. 15 Fletcher Cyclopedia of the Law of Corporations § 7122 (2019). And a stockholder is generally not liable for the actions of a company in which it owns stock. 13 Fletcher Cyc. Corp. § 6213. But Mr. Carter seeks to hold CHC responsible for JCS's actions.

---

[4] The majority declined to reach the issue, believing that *Heck*'s applicability presented an open and unnecessary question. *Teagan*, 949 F.3d at 678.

CHC and JCS have not actually completed a merger. But Mr. Carter argues that CHC is liable for JCS's actions because JCS and CHC de facto merged and because CHC is a mere continuation of JCS. He also argues that JCS and CHC should be held jointly liable as a single employer. Finally, he argues that CHC is liable for JCS's actions because it controlled JCS. None of Mr. Carter's attempts to pierce the corporate veil succeeds.[5]

The Court must first determine which law governs. Alabama's choice-of-law rules govern state law questions. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). Under Alabama law, the law of the state of injury determines a tortfeasor's liability. *Lifestar Response of Ala., Inc. v. Admiral Ins. Co.*, 17 So. 3d 200, 213 (Ala. 2009). But because CHC is incorporated in Delaware, Delaware law governs whether CHC and JCS have merged.[6] *See Ex parte Bentley*, 50 So. 3d 1063, 1070 (Ala. 2010) (following internal affairs doctrine).

Under Alabama law, successor liability may be imposed on a purchasing corporation based on (1) express agreement, (2) de facto merger, (3) a fraudulent attempt to escape liability, or (4) "the transferee corporation [being] a mere continuation of the transferor." *Asher v. KCS Int'l, Inc.*, 659 So. 2d 598, 599 (Ala. 1995).

### 1. De Facto Merger

The de facto merger doctrine provides an exception to the general rule that an asset purchaser is not responsible for the asset seller's liabilities. Two companies have de facto merged when they effectively merge without meeting the statutory requirements for a true merger. "[T]he

---

[5] CHC argues that Mr. Carter forfeited his successor liability argument by not including it in the operative complaint. Mr. Carter alleged is his complaint that CHC "appears to be the successor of JCS, having purchased or otherwise acquired it, continuing to do business as JCS and operating the same." Second Am. Compl. 3. He further alleged that CHC was responsible for all of JCS's actions. *See id.* at 4. Those allegations suffice to put CHC on notice that Mr. Carter intended to pursue claims against it. *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012).

[6] The parties briefed Alabama law, which has a more permissive de facto merger doctrine, but the Court would reach the same outcome under Alabama law.

elements necessary to create a *de facto* merger under Delaware law are the following: (1) one corporation transfers all of its assets to another corporation; (2) payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation; and (3) in exchange for their stock in that corporation, the transferee agreeing to assume all the debts and liabilities of the transferor." *Xperex Corp. v. Viasystems Techs. Corp.*, No. CIV.A. 20582-NC, 2004 WL 3053649, at *2 (Del. Ch. July 22, 2004) (citing *Drug, Inc. v. Hunt*, 168 A. 87, 96 (Del. 1933)).

Mr. Carter cannot show that the JCS-CHC transaction meets the test's second element. CHC paid in cash not stock when it purchased JCS's assets. Carter MSJ Evid., Ex. 13 at 9–11. Therefore, JCS and CHC have not de facto merged.

### 2. Mere Continuation

A purchaser is a mere continuation of a seller if (1) "[t]here was basic continuity of the enterprise of the seller corporation, including, . . . a retention of key personnel, assets, general business operations and even the . . . name," (2) the seller ceases ordinary business operations and winds down, (3) the purchaser assumes all liabilities and obligations necessary to continue the seller's operations, *and* (4) the purchaser holds itself out as "the effective continuation" of the seller. *See Asher*, 659 So. 2d at 599–600. The second prong requires the seller to dissolve as an entity. *Id.* at 600.

Mr. Carter cannot point to evidence that JCS dissolved. JCS survived the reverse triangular merger and continued to operate. Indeed, Mr. Carter has repeatedly alleged that JCS exists. *See, e.g.*, Second Am. Compl. ¶ 8. Indeed, if JCS had dissolved in 2011, it would not be a proper party to this suit because a dissolved corporation may be continued for only three years to prosecute or defend suits. *See* Del. Code tit. 8, § 278. Because JCS still exists as a corporation, Mr. Carter's mere continuation theory of liability fails.

21

### 3. Single Employer Test

A third veil-piercing theory applies in the context of employee-employer disputes. Two nominally distinct entities may be treated as one under the single employer test if they exhibit "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir. 1999). The doctrine originated to ensure that companies cannot structure themselves to evade the National Labor Relation Board's jurisdiction by using different entities to artificially diminish their headcounts. *Sakrete of Northern California, Inc.*, 137 NLRB 1220, 1223 (1962). Courts apply the test to labor disputes, *see, e.g., Int'l Bhd. of Elec. Workers, Local 613 v. Fowler Indus., Inc.*, 884 F.2d 551, 553 n.3 (11th Cir. 1989), and employment discrimination claims, *see, e.g., Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244 (11th Cir. 1998). But the test has never been applied outside the context of an employee-employer dispute. *Ray v. Judicial Correction Servs., Inc.*, No. 2:12-CV-02819-RDP, 2018 WL 2130408, at *6 & n.8 (N.D. Ala. May 9, 2018). And Mr. Carter offers no reason to extend it. Indeed, none of the policies underlying the rule suggest it should apply: Mr. Carter can point to no adjudicator who would have jurisdiction or substantive rule that would apply if JCS and CHC were a single employer.

CHC and JCS are not a single employer for the purposes of this suit.

### 4. Control

Mr. Carter argues that CHC controlled JCS and is therefore liable for JCS's actions. Because Mr. Carter has not explained how control over JCS could subject CHC to liability, the Court will not reach the question of whether CHC controlled JCS. In the portion of Mr. Carter's brief articulating the control theory, he cites neither a single statute nor a single case for a legal proposition. See Pl.'s Response Br. to CHC's Mot. Summ. J. 29–33 (ECF No. 273). The only

plausible theory he could have offered is that JCS is an alter ego of CHC because CHC excessively controls JCS.

To pierce the veil between two corporations based on "excessive control," a plaintiff must show (1) complete control and domination, (2) misuse of that control, and (3) proximate cause. *First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1335 (Ala. 1991). Fraud or failure to abide by corporate formalities evinces misuse of control. *Econ Mktg., Inc. v. Leisure Am. Resorts, Inc.*, 664 So. 2d 869, 870 (Ala. 1994).

The record lacks evidence showing that CHC misused whatever control it had over JCS. Mr. Carter points only to evidence that could support the first and third prongs of the excessive control test.

Therefore, a jury could not conclude that JCS was an alter ego of CHC.

\* \* \*

Mr. Carter can offer no reason to hold CHC liable for JCS's actions. Therefore, CHC is entitled to summary judgment on all of Mr. Carter's claims against it.

### D. Section 1983 Liability

Mr. Carter seeks damages against the City, JCS, and Mr. Kloess under 42 U.S.C. § 1983. That statue provides a cause of action when a person acting under color of state law deprives another of a federally protected right, privilege, or immunity. The defendants seek summary judgment on the grounds that they are not subject to suit under § 1983 and that they did not violate Mr. Carter's rights.

The Court will (1) first determine whether the City, JCS, and Mr. Kloess are subject to suit under § 1983 and (2) then proceed to consider whether a jury could find that the defendants violated Mr. Carter's federally protected rights.

23

### 1. Applicability of § 1983

The City, JCS, and Mr. Kloess argue that they are not subject to liability under § 1983 because (a) they do not have a policy or custom of depriving traffic offenders of their rights and (b) they did not cause Mr. Carter's injuries. Mr. Kloess additionally argues (c) that he did not act under color of law. And the City and JCS argue (d) that they did not engage in a conspiracy to deprive Mr. Carter of his rights.

#### (i) Policy/Custom

As the Supreme Court held in *Monell v. Department of Social* Services, 436 U.S. 658 (1978), municipalities are liable under § 1983 for deprivations of rights if they (1) legislatively enact an official policy, (2) "acquiesce in a longstanding practice that constitutes the entity's standard operating procedure," or (3) ratify a delegated policy decision. *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016); *see Monell*, 436 U.S. at 694.

A plaintiff must point to an official or body responsible for the municipal policy, but final responsibility may rest in more than one source. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). Whether an official has policymaking authority depends both on state law and how the officials have acted in this case. *McMillian v. Monroe Cty.*, 520 U.S. 781, 785–86 (1997). Further, a municipality's omissions constitute a policy or custom if they evince "deliberate indifference" to its inhabitants' rights. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

In this Circuit, private entities "acting in the place of a municipality" in carrying out a traditional government function are subject to liability on the same basis as municipalities. *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).

*(a) JCS*

Mr. Carter has produced enough evidence to find that JCS had an established custom of asking the Municipal Court to revoke probation when it knew that a probationer had not willfully failed to pay fines and fees.

To demonstrate a custom, Mr. Carter must point to a "permanent and well settled" course of behavior. *Praprotnick*, 485 U.S. at 127. Courts in this Circuit routinely reject attempts to find customs in isolated incidents. *See, e.g.*, *Wakefield v. City of Pembroke Pines*, 269 F. App'x 936, 940 (11th Cir. 2008) (holding that two instances of excessive force against the same plaintiff did not demonstrate custom). But they have also found customs based on as few as three occurrences. *See Young v. City of Augusta ex rel. DeVaney*, 59 F.3d 1160, 1173 (11th Cir. 1995) (holding that plaintiff had produced enough evidence of custom to survive summary judgment when three separate jailers ignored her medical complaints). In determining whether a custom exists, the Court also looks to the time frame over which the incidents occurred. *See Nunez v. City of New York*, 735 F. App'x 756, 760 (2d Cir. 2018) And it looks to how similar the incidents are to one another. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005).

Mr. Carter points to a widespread pattern of unlawful incarceration. The record indicates that JCS asked the Municipal Court to revoke hundreds of probations, *see* Carter MSJ Evid., Ex. 10, and that the Municipal Court incarcerated offenders without assessing their ability to pay on "many occasions," *In re Hayes*, slip op. at 3. And a jury could find that JCS filed revocation petitions when it had reason to believe that probationers could not make their payments because JCS kept records of probationers' employment or lack thereof. *See* Carter Class Evid., Ex. 13. Those records included a log of when probationers received retirement and disability benefits. *See id.* More than 200 probationers whom JCS knew to be unemployed, disabled, or receiving

Supplemental Security Income benefits served jail time after the Municipal Court revoked their probation. *Compare id. with* Carter Class Evid., Ex. 10. These hundreds of revocations followed the same pattern and occurred over less than four years. This case centers around a systemic practice in Montgomery: the unlawful incarceration of indigent defendants for failing to pay traffic fines. In filing revocation petitions, JCS fed the system. If among a single city's probationers 217 instances of a practice over less than four years would not allow a jury to find that a custom exists, the Court cannot imagine what would.

A jury could find an established custom on this record.

### (b) City

"[A] municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the misconduct." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (quotation marks omitted).

The City argues that § 1983 does not subject it to liability for (a) depriving Mr. Carter of his *Bearden* rights, (b) depriving Mr. Carter of his right to counsel, and (c) rights violations related to the window procedure. The City is correct about the window procedure and about some elements of Mr. Carter's *Bearden* claims. But it must allow a jury to determine whether it is liable on the other claims.

### (1) Liability for Bearden Violations

The City correctly argues that it cannot be held liable for the Municipal Court and JCS's actions just because it funds the court and probation services. Under state law, the City must "provide appropriate facilities and necessary supportive personnel for the municipal court and may provide for probation services, clerks and municipal employees designated as magistrates." Ala.

Code § 12-14-2.  Municipalities may contract for probation and debt collection services.  *Wilkins*

*v. Dan Haggerty & Assocs., Inc.*, 672 So. 2d 507, 509–10 (Ala. 1995).  Those responsibilities alone

do not provide policymaking authority to satisfy *Monell*.  *Cf. Turquitt v. Jefferson Cty.*, 137 F.3d

1285, 1289–90 (11th Cir. 1998) (holding that a county's duty under Alabama law to provide jail

facilities and fund jail operations does not create *Monell* liability).

The City-JCS contracts, however, would allow a reasonable jury to conclude that the City

had final responsibility for JCS, either because it acquiesced to JCS's standard operating

procedures or because it ratified decisions about how to provide probation that it delegated to JCS.

*See Hoefling*, 811 F.3d at 1279.  Under the contract, the City set the terms under which JCS

provided services.  City Evid., Ex. 12 at 2–3.  And in addition to any duty it may have had to

rescind the contract upon learning of JCS's practices, the City had a contractual right to terminate

the agreement each year.  *Id.* at 5.  After the City became aware of how JCS funneled indigent

prisoners into jail regardless of their ability to pay, its failure to stop those practices constituted

acquiesce or ratification of them.

The City argues that only the Municipal Court and its judges made policy that led to Mr.

Carter's incarceration.  It correctly notes that Municipal Court judges had discretion about how to

sentence defendants, whether to assign defendants to JCS, and whether to conduct *Bearden*

hearings.  It correctly cites state law that assigns responsibility for supervising Municipal Court

judges to the Alabama Supreme Court.  But multiple officials can bear final policymaking

authority.  *See Praprotnik*, 485 U.S. at 126.  The City does not dispute that it had the power to

enter and terminate the JCS contract.  This case, therefore, is unlike cases where municipal court

employees act wholly outside the control of their municipalities.  *See, e.g.*, *Woodard v. Town of*

*Oakman*, 855 F. Supp. 2d 1216, 1232 (N.D. Ala. 2012).  Once the City became aware that JCS

and the Municipal Court systemically violated probationers' rights, it bore policymaking responsibility for the contract's foreseeable consequences until it terminated the contract.

Carter has produced evidence that would allow a reasonable jury to conclude that the City should have known about JCS's practices as early as July 16, 2012 or January 16, 2013 when it received notice of litigation challenging how JCS supervised probation. Carter Evid., Ex. 37; Carter Evid., Ex 38; *see Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009) (holding that city is on notice if it "is aware that a pattern of constitutional violations exists"). In turn, the City argues that its officials may not have known about the conduct underlying lawsuits against JCS. While the City may be able to prove at trial that it lacked knowledge, a reasonable jury could conclude otherwise based on the Rule 56 record. The City is not entitled to summary judgment on claims arising after July 16, 2012. Mr. Carter, however, has produced no evidence that the City was aware of JCS's practices before July 16, 2012 except for a single email informing the Mayor that the JCS "program" had been successfully implemented. Carter Evid., Ex. 15. And until the City was on notice to how JCS operated, it cannot be held liable for its deliberate failure to intervene to protect Carter's rights. *See Canton*, 489 U.S. at 389. Therefore, the City is subject to liability for Carter's claims arising on or after July 16, 2012, but not for those before.

### (2) Liability for Failure to Provide Adequate Counsel

The City attempts to evade liability for failing to provide adequate counsel to Municipal Court defendants. Those attempts are unavailing.

The Court first addresses the City's three threshold objections to liability.

First, the City argues that the operative complaint fails to allege that Mr. Carter was denied counsel. The complaint alleges that "the City failed to provide adequate counsel for the 'offenders.'" Second Am. Compl. 35. And it alleges that the public defenders engaged in a

systemic practice of not requesting indigency hearings. *Id.* at 46. The City's forfeiture argument thus fails.

Second, the City argues that the Court may not consider evidence about its failure to provide counsel contained in a declaration (and attached exhibits) filed by Mr. Carter's attorney Alexandria Parrish. Yet Ms. Parrish's declaration lays foundation for the court to consider documents produced in discovery and public court records. The City does not contest the authenticity of those documents, and attorneys may use affidavits to place discovery documents before the Court on motions for summary judgment, *see Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016). The City effectively seeks to strike the declaration by casting Ms. Parrish as an advocate. *See* City's Reply Br. 28 (ECF No. 283) (citing Ala. R. Prof. Cond. 3.7). But Alabama ethics rules govern an attorney's ability to represent clients not her ability to testify. If Ms. Parrish's testimony proved necessary at trial, the City could seek to disqualify her but not to exclude her testimony because of her service as Mr. Carter's attorney.

Third, the City also objects generally under Rule 56(c)(2) to Ms. Parish's declaration and exhibits. The City fails explain why the evidence is inadmissible, and, thus, the Court overrules the objection. *Cf. Campbell v. Shinseki*, 546 F. App'x 874, 880 (11th Cir. 2013)

The City fares no better in its substantive objection. The record would allow a jury to conclude that the City was deliberately indifferent to its public defenders' failure to adequately represent Municipal Court defendants. The City received billing records from its public defenders so it knew how few hours they spent in court. Based on the sheer volume of cases in the Municipal Court, a jury could find that the City knew its public defenders systemically failed to provide adequate defenses in violation of the Sixth Amendment. *See, e.g.*, Kloess Dep. 133:16–18; Parrish Decl. Ex. C at 9 (Mr. Kloess represented sixty-seven clients in three and one-half hours; on the

day of Mr. Carter's commutation hearing, he would have been able to devote barely three minutes to each client).   Accordingly, because a jury could conclude that the City was on notice of the inadequacy of Municipal Court public defense, it could conclude that the City was deliberately indifferent to the Sixth Amendment violations and hold it liable under § 1983.

### (3) Liability for the Window Procedure

Mr. Carter has not produced any evidence that that the City was responsible for the Municipal Court's operation of the window procedure.   The City's responsibility to provide court facilities does not provide policymaking authority to satisfy *Monell*.   *Cf. Turquitt*, 137 F.3d at 1289–90.   And unlike with the JCS contract, Mr. Carter does not point to any authority the City had to stop the window procedure.   Therefore, the City is not liable for harms directly related to the window procedure.

### (c) Mr. Kloess

Mr. Kloess also attempts to invoke *Monell*'s standards to shield himself from § 1983 liability.   *See* Kloess's Br. 14 (ECF No. 264) (citing *Doe v. Claiborne Cty.*, 103 F.3d 495 (6th Cir. 1996) (applying *Monell*)).   But *Monell* does not apply to Mr. Kloess because Mr. Carter sued him as an individual.   *See Brandon v. Holt*, 469 U.S. 464, 472–73 (1985).   His argument, thus, fails.

### (ii) Causation and Moving Force

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.   Rather, the municipality must be the factual and proximate cause of the plaintiff's injury.   *Smith v. City of Oak Hill*, 587 F. App'x 524, 527 (11th Cir. 2014).   A plaintiff must demonstrate that a municipality is the "moving force" behind his rights violation: he must show that the municipality is culpable for and caused the violation.   *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).   If municipal decision makers have notice that a program systemically

causes rights violations and fails to correct it, they may be held to have culpably caused the violation. *Id.* at 407–08.

Because the torts Mr. Carter alleges took place in Alabama, the Court looks to Alabama law to define the relevant causation standards. *Williams v. Bennett*, 689 F.2d 1370, 1389 (11th Cir. 1982). In determining whether factual cause exists, Alabama courts ask whether the plaintiff's injury would have occurred but for the defendant's act or omission. *Springer v. Jefferson Cty.*, 595 So. 2d 1381, 1383 (Ala. 1992) (citing *Prosser and Keeton on Torts* § 41 (5th ed. 1984)). For proximate cause, they ask whether the plaintiff's injury must naturally and probably result from the defendant's act or omission. *Mobile Gas Serv. Corp. v. Robinson*, 20 So. 3d 770, 780 (Ala. 2009). Though a proximate cause may not depend on the intervention of an independent cause, *id.*, more than one act or omission can concurrently cause an injury, *Lemley v. Wilson*, 178 So. 3d 834, 842 (Ala. 2015). And "a *foreseeable* intervening [act] does not break the causal relationship between the defendants' actions and the plaintiffs' injuries." *Mobile Gas*, 20 So. 3d at 780–81 (quoting *Ala. Power Co. v. Moore*, 899 So.2d 975, 979 (Ala. 2004)) (emphasis and alteration in original).

### (a) JCS

Taking the facts in the light most favorable to the non-movant, the Court holds that Mr. Carter has produced enough evidence for a jury to find that JCS was the but-for and proximate cause of his injuries.

Without JCS's petition, the Municipal Court would not have revoked Mr. Carter's probation. JCS therefore factually caused Mr. Carter's probation revocation.

And JCS proximately caused the revocation. JCS's petition naturally resulted in the Municipal Court's decision to revoke Mr. Carter's probation. The Municipal Court intervened in

31

the causal chain but did not break it. Because its intervention was foreseeable — indeed the natural consequence of a petition asking for revocation — JCS cannot shift its responsibility for Mr. Carter's injuries onto the Municipal Court. *See Springer*, 595 So. 2d at 1384. Moreover, given the Municipal Court's established practice of not holding indigency hearings, JCS could have foreseen the Municipal Court's decision to jail Mr. Carter without an indigency hearing. Finally, a jury could find that JCS was culpable for Mr. Carter's injuries because it sought to revoke his probation when it knew or should have known that he was unable to pay.

JCS roots its argument to the contrary in a decision of the District Court for the Northern District of Alabama. *See Ray v. Judicial Corr. Servs., Inc.*, 270 F. Supp. 3d 1262 (N.D. Ala. 2017). In *Ray*, the City of Childersburg and its municipal court entered a contract with JCS for probation services. *Id.* at *1273–74. That contract was materially identical to the contract between JCS and the City of Montgomery. *See id.* Despite the factual similarities between the cases, JCS's citations to *Ray* do not support its argument. *Ray* granted summary judgment to JCS on plaintiffs' *Bearden* claims because it found insufficient support for the claims in the record. *See id.* at 1299. While *Ray* notes in dicta that "[a] judicial act generally severs the chain of liability where a judge misapplies the law after another state actor has informed the judge of all the material facts," *id.* at 1298, it did not reach — much less agree with — JCS's causation arguments. The case provides JCS with no support to escape § 1983 liability here.

### (b) City

Just as a jury could find that the City was on notice of rights violations for purposes of proximate cause, a jury could find the City liable for Mr. Carter's claims arising on or after July 16, 2012.

The City can be the moving force behind Mr. Carter's injuries even without an overt act. Rather, the City's choice not to act may constitute deliberate indifference to JCS's customary practices. *See Knight ex rel. Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 820 (11th Cir. 2017). Mr. Carter must show that the City rejected an alternative course of action. And he does. The fact that the City failed to terminate its contract with JCS would allow a jury to find a deliberate choice not to act. The City had the power to intervene and it failed to do so.

The City disagrees pointing to *Ray v. Judicial Correction Service.* No. 2:12-CV-02819-RDP, 2017 WL 660842 (N.D. Ala. Feb. 17, 2017).   But *Ray* helps the City no more than JCS. While *Ray* may present similar facts to this case, Mr. Carter offers different theories of liability. *Ray* held that Childersburg could not be liable under § 1983 based on their contract. 2017 WL 660842 at *16–17. The *Ray* court, however, reached that holding because it refused to treat Childersburg as the proximate cause of the plaintiffs' injuries and because it refused to hold Childersburg liable for acts JCS undertook as Childersburg's agent. *See id. Ray* considered neither a deliberate indifference theory of liability nor whether Childersburg could have foreseen JCS's unlawful conduct.   Accordingly, *Ray* does not conflict with this decision.   And even if it did, one district court has no power to bind another, and the Court does not find *Ray*'s logic persuasive.

While Mr. Carter may proceed to trial against the City on most of the § 1983 claims based on a theory of deliberate indifference, the City is entitled to summary judgment on Mr. Carter's other claims.

First, Mr. Carter does not contest that the City is entitled to summary judgment on his causes of action alleging violations of the Fourth and Eighth Amendments. Accordingly, the Court does not reach the question of whether the City is liable for arrests its police department made pursuant to facially valid warrants.

Second, while the Court will allow Mr. Carter's claims to proceed under a deliberate indifference theory of liability, the record does not contain evidence to support his argument that the City could have foreseen the unlawful acts of JCS and the Municipal Court when it entered the contract. Neither the contract on its face nor the evidence from City officials indicate that the City contemplated mass *Bearden* violations before July 2012. Because the City did not proximately cause any harms before it became aware of JCS's practices, Mr. Carter cannot base the City's liability on the contract alone.

### (c)  *Mr. Kloess*

Mr. Kloess argues that he did not cause Mr. Carter's injuries. His arguments fail.

First, Mr. Kloess argues that he could not have prevented Mr. Carter from obtaining an indigency determination because he was not in the courtroom for the hearing. Mr. Kloess's absence, however, is precisely the point. Mr. Carter alleges that Mr. Kloess totally deprived him of adequate counsel. An attorney who is not in the room cannot adequately counsel his client at a hearing. Mr. Kloess need not act affirmatively to violate Mr. Carter's rights, and Mr. Kloess's omission here would permit a jury to hold him liable.

Second, Mr. Kloess argues that Mr. Carter cannot show that the Municipal Court would have declared him indigent had Mr. Kloess requested an indigency hearing. But Mr. Carter's injury stems from a deprivation of liberty without due process — the lack of a *Bearden* hearing injured him. All Mr. Carter must show is that the Municipal Court would have considered his ability to pay if Mr. Kloess had presented the claim. And the record does not foreclose that possibility. *See* Hayes Dep. 37:7–15.

34

As for proximate cause, Mr. Kloess should have foreseen that his total absence from the court and failure to present evidence of indigency would deprive Mr. Carter of his rights to counsel and due process.

Thus, a jury could find that Mr. Kloess factually and proximately caused Mr. Carter's injuries.

### (iii) Under Color of Law

Mr. Kloess also contends that he cannot be held liable under § 1983 because public defenders are not state actors. Generally, that argument holds true: "a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981). But a public defender may be a public actor when performing some administrative functions. *See id.*; *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 612 (6th Cir. 2007). And legal activities cross the line into administrative functions when they become systemic. A public defender's systemic inaction "carries the imprimatur of administrative approval." *See id.* at 612–13.

Ordinary policies may not subject a public defender to liability under § 1983. When, however, a public defender engages across the board in a practice that systemically deprives defendants of their constitutional rights, "the adversarial relationship between the State and the Public Defender—upon which the *Polk County* Court relied heavily in determining that the individual public defender there was not a state actor—has broken down such that the Public Defender is serving the State's interest in exacting punishment, rather than the interests of its clients, or society's interest in fair judicial proceedings." *Id.* at 613.

Mr. Carter alleges that kind of breakdown: that Mr. Kloess served the City's interest rather than his own as part of an unconstitutional a "pay-or-stay" scheme. Mr. Kloess testified that he

has requested indigency determinations in the past, but he also testified that he could not name a single defendant for whom he requested such a hearing. *See* Kloess Dep. 163:6–11. Whether Mr. Kloess actually sought such hearings is a question of credibility that must go to a jury. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). If a jury chooses not to credit Mr. Kloess's assertion that he has requested indigency determinations, it could conclude that Mr. Kloess systemically deprived defendants of indigency hearings.

Therefore, Mr. Kloess is not entitled to summary judgment on the grounds that he is not a state actor.

### (iv) Conspiracy

The City and JCS argue that Mr. Carter also has not offered enough evidence to allow a reasonable jury to conclude that that JCS and the City engaged in a conspiracy to deprive Mr. Carter of federal protected rights. They prevail on that argument.

To prove § 1983 conspiracy, a plaintiff must show both an understanding or agreement between parties to deprive him of his rights and an affirmative act to do so. *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283–84 (11th Cir. 2002).

While Mr. Carter alleges a conspiracy at several points in his operative complaint (Second Am. Compl. at 32–33, 36–37, 39, 44, 49, 58, 59, 61, 64, 66–67, 69), he provides no evidence of any agreement between JCS and the City except their contract. And the contract does not commit the parties to any rights violations. Thus, to the extent that Counts One, Two, Nine, and Ten allege a conspiracy between JCS and the City, Mr. Carter cannot prevail.

\* \* \*

Section 1983 requires a plaintiff to prove proximate cause because governments should not be liable for torts that they can neither foresee nor control. But conversely, § 1983 holds

governments accountable for those deprivations of rights that they can predict and prevent. Section 1983 doctrine curtails municipal liability, but it does not gut it. JCS ran a business premised on the fact that many traffic offenders in Montgomery could not afford to pay their fines. They extracted as much cash as they could from probationers — some of whom they knew to be disabled, unemployed, or dependent on government benefits — and then tossed them back to the Municipal Court. That court, in turn, routinely jailed traffic offenders without inquiring into their ability to pay their fines. And if the City knew what was happening and did nothing to stop it, the City is liable as well. They cannot point the finger at the Municipal Court and feign innocence. For JCS and the City to walk out of the casino professing shock that gambling was occurring while pocketing millions in winnings beggars belief. Perhaps JCS and the City can convince a jury that they were powerless to stop and ignorant of the Municipal Court's conduct. But the record strongly suggests that they knew that they were perpetuating a cycle of debt and unlawful imprisonment. And § 1983 provides a remedy for that kind of misbehavior.

Accordingly, Mr. Carter may proceed against all three defendants for harms stemming from *Bearden* violations. And he may proceed against the City and Mr. Kloess for depriving him of his *Bearden* rights and right to adequate counsel. He may not proceed on his claims for conspiracy or for harms stemming from the window procedure or the JCS-City contract standing alone.

### 2. Substantive Rights

Mr. Carter alleges that defendants violated three sets of his substantive rights; the defendants disagree.

*(i)* Bearden *Rights*

Mr. Carter alleges that the City, JCS, and Mr. Kloess caused the Municipal Court to jail him unlawfully for his inability to pay fines and fees.  That claim will succeed at this stage.

A court violates the Due Process and Equal Protection Clauses if it fails to inquire into whether a probationer has made a bona fide effort to pay a fine before revoking probation or if it fails to consider alternative punishments to imprisonment for an indigent probationer.  *Bearden*, 461 U.S. at 672–73.  Requiring an indigent defendant to choose between immediate payment of a fine or a fixed jail term is unconstitutional.  *Frazier v. Jordan*, 457 F.2d 726, 726 (5th Cir. 1972).

Here, the Municipal Court made no inquiry into Mr. Carter's ability to pay.  And it sentenced Mr. Carter to jail without regard to his alleged indigency.  The Municipal Court' violated Mr. Carter's *Bearden* rights.  If a jury finds that the City, JCS, and Kloess caused the violation, they are liable.

*(ii) Failure to Inform*

Mr. Carter also alleges that that JCS violated his due process rights by failing to inform him of his *Bearden* rights.  That claim fails because JCS owed Mr. Carter no duty to inform him of his procedural rights.

Mr. Carter correctly notes that when procedures for redress are not publicly available, a governmental entity must inform a person of those procedures before depriving him of a protected interest.  *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 12–14 & n.14 (1978).  But he fails to address a major limit to the *Memphis Light* requirement: where procedures are publicly available, the Constitution does not require the government to inform a person of his remedial rights.  *See City of West Covina v. Perkins*, 525 U.S. 234, 241–42 (1999) ("While *Memphis Light* demonstrates that notice of the procedures for protecting one's property interests may be required

when those procedures are arcane and are not set forth in documents accessible to the public, it does not support a general rule that notice of remedies and procedures is required."). Here, the existence of *Bearden* rights is a matter of public record. Thus, JCS had no duty to inform Mr. Carter of his rights.

### (iii) Right to Counsel

Mr. Carter alleges that the City and Mr. Kloess deprived him of his right to adequate counsel.

The Sixth Amendment requires the state to provide adequate counsel to an indigent defendant in a proceeding that may result in his immediate imprisonment. *Alabama v. Shelton*, 535 U.S. 654, 662 (2002). Total denial of counsel at a "critical stage" of a criminal proceeding presumptively prejudices the defendant and violates the Sixth Amendment. *Golden v. Newsome*, 755 F.2d 1478, 1483 (11th Cir. 1985) (citing *United States v. Cronic*, 466 U.S. 648, 659 (1984)).

Here, Mr. Carter had a Sixth Amendment right to appointed counsel because his commutation hearing could — and did — lead to his immediate imprisonment. And Mr. Kloess's absence from the courtroom during the hearing totally denied Mr. Carter representation. Therefore, Mr. Kloess deprived Mr. Carter of his Sixth Amendment right to counsel.

### E. False Imprisonment

JCS argues that Mr. Carter's claim for false imprisonment fails as a matter of law because JCS itself did not arrest or imprison him. That argument is unavailing.

"False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6-5-170. A person responsible for instigating a detention may be held liable only if he persuades or influences officials to imprison the victim and if he acts in bad faith. *Dolgencorp, Inc. v. Pounders*, 912 So.

2d 523, 528 (Ala. Civ. App. 2005) (citing Restatement (Second) of Torts § 45A, cmt. C (1965)). Under Alabama law, arrest and imprisonment cannot be false if made pursuant to a lawful warrant. *Goodwin v. Barry Miller Chevrolet, Inc.*, 543 So. 2d 1171, 1176 (Ala. 1989).

Mr. Carter cannot succeed on his claims for false imprisonment that he bases on his being arrested, transported to jail, and detained prior to his commutation hearing. Police officers made those arrests and held Mr. Carter pursuant to facially valid warrants. Alabama law does not treat arrest and imprisonment pursuant to a valid warrant as false. *See Goodwin*, 543 So. 2d at 1176.

The same cannot be said for Mr. Carter's imprisonment following his commutation hearing. At the commutation hearing, the Municipal Court issued an order revoking Mr. Carter's probation — as JCS had requested — and sentencing Mr. Carter to a jail term. Mr. Carter's post-hearing imprisonment was thus not pursuant to a warrant and does not fall within the warrant exception. Accordingly, JCS would be liable if it persuaded or influenced the Municipal Court to jail Mr. Carter in bad faith. Mr. Carter has produced enough evidence for a reasonable jury to conclude that JCS persuaded the Municipal Court to jail him because JCS "request[ed] that the probation of [Carter] be revoked," Carter MSJ Evid., Ex. 10, and because JCS knew (or should have known) that Mr. Carter could not pay his fine and would be jailed if the Municipal Court revoked his probation, *see* JCS Class Evid., Ex. T (showing Mr. Carter's payment history and reasons for missed payments including obligations to his newborn child). And Mr. Carter has produced enough evidence for a reasonable jury to conclude that JCS acted in bad faith in petitioning the court to revoke probation when it knew that probationer had not willfully failed to pay fines and fees.

JCS is not entitled to summary judgment on Mr. Carter's false imprisonment claim.

### F. Statute of Limitations

All of the defendants argue that Mr. Carter's § 1983 claims are time barred.

The statute of limitations for § 1983 actions brought in Alabama is two years from when the plaintiff "knew or should have known of his injury and its cause." *Burt v. Martin*, 193 F. App'x 829, 830 (11th Cir. 2006); Ala. Code § 6-2-38(l).  The statute of limitations, however, may be extended if the defendant engages in a pattern of unlawful conduct.  "The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Robinson v. United States*, 327 F. App'x 816, 818 (11th Cir. 2007).

Mr. Carter filed suit on August 3, 2015; therefore, he may sue under § 1983 for injuries that accrued before August 3, 2013.  Here, Mr. Carter has offered enough evidence for a reasonable jury to conclude that JCS, the City, and Kloess engaged in a continuous series of violations that occurred before and continued past August 3, 2013.

### G. Immunity

#### 1. Quasi-Judicial Immunity

JCS argues that it is entitled to quasi-judicial immunity for all of its actions.  The City argues that it is entitled to quasi-judicial immunity for claims arising from Montgomery police actions undertaken pursuant to facially valid warrants.

"Quasi-judicial immunity grants protection from suit to officials who are intimately associated with the judicial phase of the criminal process." *Washington v. Rivera*, 939 F.3d 1239, 1243 (11th Cir. 2019) (quotation marks omitted).

As the Third, Fifth, Sixth, and Eighth Circuits have concluded, quasi-judicial immunity is not available in official capacity suits. *See VanHorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir.

2007) (collecting cases); *see also Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (holding that in official capacity suits only defenses available to the entity *qua* entity are available).  While judicial immunity for individual judicial officers flows from deep-rooted tradition, there are not comparable traditions of immunity for municipalities or their equivalent contractors. *Cf. Owen v. City of Independence*, 445 U.S. 622, 637–38 (1980) (comparing lack of qualified immunity tradition for municipalities with tradition of absolute immunity for judges).  That distinction also makes sense as a matter of policy.  Courts worry that imposing individual liability on government officials may cause them "to act with an excess of caution," *Forrester v. White*, 484 U.S. 219, 223 (1988), but the same concerns do not exist for governments qua governments especially when a plaintiff must overcome *Monell*'s requirements to proceed, *see Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985).

As they cannot point to a statutory or common law entitlement to quasi-judicial immunity, JCS and the City are amenable to suit.

### 2.  Qualified Immunity

JCS and Mr. Kloess argue that they are entitled to qualified immunity from Mr. Carter's suit.  Neither is immune.

A government official sued in his individual capacity for performing a discretionary function is immune from civil liability unless his actions violated clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once a defendant shows that he acted within his discretionary authority, the plaintiff bears the burden of showing that the relevant law has been clearly established. *Leslie v. Hancock Cty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013).  Law is clearly established if a reasonable actor would have "fair warning" that his actions were unconstitutional. *Id.* (emphasis omitted).  A plaintiff may point either to a "materially similar"

fact-bound precedent or to "a broader, clearly established principle" that is so clear that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.*

### (i) JCS

Under settled law in this Circuit, a private entity performing traditional municipal functions is not entitled to qualified immunity when sued in its official capacity. *Swann v. S. Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004), *abrogated on other grounds by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). Just as JCS cannot claim quasi-judicial immunity in an official capacity suit, it cannot claim qualified immunity either.

### (ii) Mr. Kloess

Mr. Kloess argues that he is entitled to qualified immunity because his decision about whether to seek an indigency hearing was a "judgment call." Kloess's Br. 15–16.

Mr. Kloess fails to contest that the rights he violated were clearly established. He does not speak to the legality of his actions in the context of qualified immunity until his reply brief. *See* Kloess's Reply Br. 3–6 (ECF No. 291). And in the reply brief, he expressly "stands on his initial brief" on "whether [he] is entitled to assert qualified immunity. *Id.* at 2. Even if Mr. Kloess's efforts in his reply brief to contest the merits could be read to argue that Mr. Carter's rights were not clearly established, "[a] party normally waives its right to argue issues not raised in its initial brief." *McGinnis v. Ingram Equip. Co.*, 918 F.2d 1491, 1496 (11th Cir. 1990).

Moreover, assuming that Mr. Kloess had properly raised the argument, his actions violated Mr. Carter's clearly established rights. A defense attorney may not absent himself from a critical stage in his client's proceedings. *See Golden*, 755 F.2d at 1483; *see also supra* Section III.2.D.(iii). Case law has settled that point. *See Cronic*, 466 U.S. at 654 ("If no actual 'Assistance' 'for' the

accused's 'defence' is provided, then the constitutional guarantee has been violated.").   No reasonable attorney could believe that he adequately represented his client by absenting himself from a hearing at which a court jailed his client.   Although no case in this Circuit has held an attorney liable under parallel facts, Mr. Carter need not point to fact-bound case precedent when cases have clearly established the broader right to counsel.   *See White v. Pauly*, 137 S. Ct. 548, 551 (2017); *Leslie*, 720 F.3d at 1345.   And to the extent that Mr. Kloess's reply brief can be read to argue that existing case law has not clearly established a public defender's liability for depriving a defendant of his right to counsel, such an argument misses the point.   Qualified immunity analysis asks if a right has been clearly established not if another court has applied the same remedy to vindicate a violation of that right.   That distinction accords with qualified immunity's core rationale — preventing public officials from discharging their duties with undue timidity.   The doctrine avoids chilling a public official taking acts that *might* violate another's rights.   When, however, an action *will* violate another's rights, tort liability should deter a public official from taking that action regardless of whether the official is certain that he can be sued.   The immunity is qualified and not absolute precisely because public officials should exercise restraint before knowingly violating a clearly established right.

Mr. Kloess is not entitled to qualified immunity because his actions, if proven, violated clearly established law.[7]  *See supra* Section III.D.2.(iii).

## IV.   CONCLUSION

Based on the foregoing, by separate written order the Court will:

---

[7] Mr. Carter argues that public defenders are not the type of public officials whom qualified immunity shields.  The Court need not answer whether a public defender may claim qualified immunity in these circumstances; assuming the doctrine applies, Mr. Kloess's actions violated Mr. Carter's clearly established Sixth Amendment rights.

- grant the City's motion as to Counts Three and Seven, grant the City's motion as to Counts One, Five, and Nine for all events before July 16, 2012, grant the City's motion as to Counts One and Nine for all claims alleging a conspiracy between the City and JCS and for claims basing liability solely on the JCS-City contract, grant the City's motion as to Count One for all claims related to operation of the magistrates' windows in the Municipal Court, and deny the City's motion as to Counts One, Five, and Nine in all other respects;

- grant CHC's motion;

- grant JCS's motion as to Counts Four, Six, Eight, and Twelve, grant JCS's motion as to Counts Two and Ten for all claims alleging a conspiracy between the City and JCS, grant JCS's motion as to Count Two for all claims alleging that JCS failed to inform Mr. Carter of his rights, grant JCS's motion as to Count Two for all claims alleging that JCS unlawfully charged probation fees, grant JCS's motion as to Count Fourteen for any claims arising from arrest or detention before commutation, and deny JCS's motion as to Counts Two, Six, Ten, and Fourteen in all other respects; and,

- deny Mr. Kloess's motion.

Date:   7/17/20

Royce C. Lamberth
United States District Judge

45