# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| ALDARESS CARTER, | ) | |
| Individually and on behalf of a class of similarly | ) | |
| situated persons, | ) | |
| | ) | |
| Plaintiff; | ) | CIVIL ACTION NO.: |
| | ) | |
| v. | ) | 2:15-cv-00555-RCL |
| | ) | |
| THE CITY OF MONTGOMERY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

G. Daniel Evans
Alexandria Parrish
Maurine C. Evans
THE EVANS LAW FIRM, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, AL 35209
(205) 870-1970
gdevans@evanslawpc.com

Toby Marshall
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
(206) 816-6603
tmarshall@terrellmarshall.com
(admitted *pro hac vice*)

Leslie A. Bailey
Brian Hardingham
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lbailey@publicjustice.net
(admitted *pro hac vice*)

Alexandra Brodsky
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net
(*pro hac vice* application forthcoming)

*Counsel for Plaintiff and the Proposed Classes*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ v

I.      PRELIMINARY STATEMENT ............................................................................. 1

II.     FACTS RELEVANT TO CLASS CERTIFICATION ........................................ 3

        A.    The City of Montgomery prosecuted traffic and minor misdemeanor
              offenses through its Municipal Court. ................................................... 3

        B.    JCS contracted with the City to collect Municipal Court debt from
              defendants who could not pay their fines or tickets in full. .................. 3

        C.    JCS collected fines and fees from probationers until they stopped paying. ........... 6

        D.    When probationers stopped paying, JCS petitioned to revoke probation,
              and the Municipal Court customarily commuted the probationer's fines to
              jail time without assessing ability to pay. ............................................. 10

        E.    JCS knew or should have known of the Montgomery Municipal Court's
              established commutation practices ........................................................ 16

        F.    The City's contract public defenders, including Branch Kloess, handled an
              enormous caseload in the Montgomery Municipal Court. ..................... 18

        G.    The City exerted no oversight over JCS and renewed its contract until July
              2014 even after it was on notice of alleged constitutional violations. ................. 20

        H.    Aldaress Carter was placed on JCS probation, then had his fines
              commuted to jail by the Montgomery Municipal Court without a *Bearden*
              determination or meaningful assistance of counsel after JCS petitioned to
              revoke his probation. ............................................................................. 24

        I.    JCS engaged in a common course of instigating unlawful detentions in bad
              faith. ....................................................................................................... 26

        J.    JCS, the City, and Branch Kloess had established policies, practices, or
              customs of causing members of the *Bearden* Classes to be jailed for
              nonpayment of fines and fees without due process. ............................... 26

        K.    The City and Branch Kloess had an established policy, practice, or custom
              of failing to provide meaningful assistance of counsel to defendants facing
              incarceration for nonpayment of Municipal Court fines. ....................... 30

III.  PROCEDURAL HISTORY ................................................................................. 31

IV.  ARGUMENT AND AUTHORITY ...................................................................... 32

    A.  Plaintiff has standing .......................................................................... 32

    B.  The proposed Classes are ascertainable. ........................................... 33

    C.  Plaintiff satisfies the requirements for class certification under Rule 23(a). ......... 39

        1.  Joinder of all members of the Classes is impracticable. ............................ 39

        2.  There are numerous common questions of fact and law ............................. 40

        3.  Plaintiff's claims are typical of the claims of members of the Classes .......................................................................................... 42

        4.  Plaintiff and counsel will fairly and adequately protect the interests of the Classes. ...................................................................... 44

    D.  Plaintiff satisfies the requirements for certification under Rule 23(b)(3) ............. 45

        1.  Common factual and legal questions concerning Defendants' conduct predominate over any individual issues. ..................................... 45

            a)  Predominance is satisfied as to Defendants' liability on the *Bearden* claim. ...................................................................... 47

            b)  Predominance is satisfied as to JCS's liability on the false imprisonment claim. ............................................................ 49

            c)  Predominance is satisfied on the Sixth Amendment claim ................. 52

            d)  Lost-liberty damages can be proven in one proceeding on behalf of all members of the proposed Classes .................................. 53

        2.  A class action is the superior means of adjudicating this controversy .................................................................................. 55

            a)  Given the complexity of the case, class treatment is more likely to benefit members of the Classes than individual actions. .............. 55

            b)  The lack of other litigation weighs in favor of class certification. ...................................................................... 57

            c)  Resolving the central issues in a single proceeding before this Court will serve efficiency and judicial economy. ........................... 58

            d)  This case presents no significant management difficulties ................. 59

      E.     Constitutionally-sound notice can be provided to members of the Classes...........63

V.     CONCLUSION................................................................................................................ 64

# TABLE OF AUTHORITIES

## Cases

*Alabama v. Shelton*, 535 U.S. 654 (2002)................................................................. 30, 52

*Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003)........................................ 47, 62

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997)................................................................. 55

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ......................................... 46

*Andrews v. State*, 975 So. 2d 392 (Ala. Crim. App. 2007)........................................................ 27

*Appleyard v. Wallace*, 754 F.2d 955 (11th Cir. 1985).................................................................. 43

*Argersinger v. Hamlin*, 407 U.S. 25 (1972)................................................................................ 30

*Augustin v. Jablonsky*, 819 F. Supp. 2d 153 (E.D.N.Y. 2011) .................................................... 60

*Ault v. Walt Disney World Co.*, 692 F.3d 1212 (11th Cir. 2012)................................................... 43

*Barnes v. Dist. of Columbia*, 278 F.R.D. 14 (D.D.C. 2011) ............................................. 41, 54, 60

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397 (1997) .................................... 28

*Bearden v. Georgia*, 461 U.S. 660 (1983) .......................................................... 1, 27, 47

*Betances v. Fischer*, 403 F. Supp. 3d 212 (S.D.N.Y. 2019) ................................................ 54, 56

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc)....................................... 33

*Braggs v. Dunn*, 317 F.R.D. 634 (M.D. Ala. 2016)................................................................ 39, 40

*Briseno v. ConAgro Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) ................................................ 35

*Brown v. Electrolux Home Prods.*, 817 F.3d 1225 (11th Cir. 2016) ................................ 46, 61, 63

*Buckner v. Toro*, 116 F.3d 450 (11th Cir. 1997)........................................................................ 29

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013).................................................................. 35

*Carriuolo v. Gen. Motors Co.*, 823 F.3d 977 (11th Cir. 2016)................................................ 33, 40

*City of Canton v. Harris*, 489 U.S. 378 (1989).......................................................................... 28

*City of Farmington Hills Employees Ret. Sys. v. Wells Fargo Bank, N.A.*,
  281 F.R.D. 347 (D. Minn. 2012)........................................................................................ 57

*City of Hialeah, Fla. v. Rojas*, 311 F.3d 1096 (11th Cir. 2002) .................................................. 32

v

*Covington v. Wallace*, No. 2:12-cv-123-DPM, 2014 WL 5306720 (E.D. Ark. Oct. 15, 2014) ................................................................... 54, 55

*Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir. 1986)................................. 40

*Cox v. Porsche Fin. Servs., Inc.*, 330 F.R.D. 322 (S.D. Fla. 2019) ........................... 35

*Crown Cent. Petroleum Corp. v. Williams*, 679 So.2d 651 (Ala. 1996)...................................... 52

*Daniel v. Hodges*, 125 So.2d 726 (Ala. Ct. App. 1960) ................................................ 53

*DeBremaecker v. Short*, 433 F.2d 733 (5th Cir. 1970) (per curiam) ...................................... 33, 35

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977)...................................................... 54, 55

*DL v. Dist. of Columbia*, 860 F.3d 713 (D.C. Cir. 2017)........................................... 41

*Doe v. Angelina Cty.*, 733 F. Supp. 245 (E.D. Tex. 1990) .................................... 28, 47

*Dolgencorp, Inc. v. Pounders*, 912 So.2d 523 (Ala. Civ. App. 2005)........................................ 26

*Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925 (11th Cir. 1983) ........................... 40

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973)........................................................ 27, 48

*Garcia v. E.J. Amusements of New Hampshire, Inc.*, 98 F. Supp. 3d 277 (D. Mass. 2015)...................................................................... 56

*George v. Academy Mortgage Corp. (UT)*, 369 F. Supp. 3d 1356 (N.D. Ga. 2019)........................................................................... 64

*Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017) (en banc)........................................................................... 62

*Grant v. Dolgen Corp.*, 738 So.2d 892 (Ala. Civ. App. 1998)............................... 26, 50

*Griffin v. Carlin*, 755 F.2d 1516 (11th Cir. 1985) ...................................................... 44

*Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001) ................................... 28

*H.C. by Hewett v. Jarrard*, 786 F.2d 1080 (11th Cir. 1986)........................................ 54

*Hoffer v. Jones*, 323 F.R.D. 694 (N.D. Fla. 2017) ...................................................... 43

*Hunter v. Beshear*, No. 2:16-cv-798-MHT, 2018 WL 564856 (M.D. Ala. Jan. 25, 2018)........................................................................... 36

*In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616 (N.D. Ala. 2009)........................................ 58

vi

*In re Nassau Cty. Strip Search Cases*, No. 99-cv-2844 (DRH), 2008 WL
    850268 (E.D.N.Y. Mar. 27, 2008) .................................................................. 57

*In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) ........................................... 35

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 123 (2d Cir.
    2001) ............................................................................................................... 61

*Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001).................................... 43

*J.W. v. Birmingham Bd. of Educ.,* No. 2:10-CV-03314, 2012 WL 3849032
    (N.D. Ala. Aug. 31, 2012) ............................................................................. 43

*Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945 (11th Cir. 2015)
    (unpublished) .................................................................................. 33, 34, 35

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) ..................................... 53, 54

*Kinard v. E. Capitol Family Rental, L.P.*, 331 F.R.D. 206 (D.D.C. 2019).................................... 56

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004), *abrogated in part
    on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553
    U.S. 639 (2008)......................................................................... passim

*Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332 (11th Cir. 1984) ................................. 43

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir.), *cert. denied*,
    140 S. Ct. 676 (2019)................................................................... 35

*Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594 (S.D. Fla. 1991)............................................ 40

*McClendon v. Cont'l Grp., Inc.*, 113 F.R.D. 39 (D.N.J. 1986) .................................................. 56

*McCullough v. Finley*, 907 F.3d 1324 (11th Cir. 2018) ............................................... 32

*Menocal v. GEO Grp., Inc.*, 882 F.3d 905 (10th Cir.), *cert. denied*, 139 S.
    Ct. 143 (2018) .................................................................................. 55

*Miranda v. Clark Cty.*, 319 F.3d 465 (9th Cir. 2003) ................................................ 30

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)................................................... 28

*Morrisey v. Brewer*, 408 U.S. 471 (1972)............................................................ 27

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)............................................ 64

*Mullins v. Direct Digital, LLC*, 795 F.3d 658 (7th Cir. 2015)...................................... 35

*Murray v. Auslander*, 244 F.3d 807 (11th Cir. 2001) ................................................ 43

vii

*Napoles-Arcila v. Pero Family Farms, LLC*, No. 08-80779-CIV, 2009 WL
    1585970 (S.D. Fla. June 4, 2009) ................................................. 40

*Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275 (N.D. Fla. 2017) ................................. 61, 62

*Ocwen Loan Servicing, LLC v. Belcher*, No. 18-90011, 2018 WL 3198552
    (11th Cir. June 29, 2018) ....................................................... 35

*Otero v. Dart*, 306 F.R.D. 197 (N.D. Ill. 2014) ........................................... 57

*Pannell v. Reynolds*, 655 So.2d 935 (Ala. 1994) ........................................... 52

*Papasan v. Dometic Corp.*, No. 19-13242 (11th Cir.) ....................................... 35

*Pettco Enters., Inc. v. White*, 162 F.R.D. 151 (M.D. Ala. 1995) ........................... 32

*Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592 (6th Cir. 2007) ................ 29, 30

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015) ................................ 35

*Roy v. Cty. of Los Angeles*, No. CV-1209012, 2018 WL 3436887 (C.D.
    Cal. July 11, 2018) ............................................................ 54

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs.,
    Inc.*, 601 F.3d 1159 (11th Cir. 2010) ........................................... 46

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992 (8th Cir.
    2016) ......................................................................... 35

*Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329 (5th Cir.
    2019) (unpublished) ........................................................... 35

*Smith v. Triad of Alabama, LLC*, No. 1:14-cv-324-WKW, 2017 WL
    1044692 (M.D. Ala. Mar. 17, 2017) ........................................ 57, 58, 59, 61

*Snipes v. State*, 521 So.2d 89 (Ala. Crim. App. 1986) ..................................... 27

*Taylor v. State*, 47 So.3d 287 (Ala. Crim. App. 1986) ................................... 27, 48

*Thompson v. Jackson*, No. 1:16-cv-04217, 2018 WL 5993867 (N.D. Ga.
    Nov. 15, 2018) ............................................................ 41, 63

*Turner v. Rogers*, 564 U.S. 431 (2011) .................................................. 27, 48

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ................................... 46

*United States v. Johnson*, 983 F.2d 216 (11th Cir. 1993) ................................. 27

*United States v. Mojica-Leguizamo*, 447 F. App'x 992 (11th Cir. 2011) ................... 27, 48

*Valley Drug Co. v. Geneva Pharm.*, 350 F.3d 1181 (11th Cir. 2003) ........................................... 44

*Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009) ................................................ 40, 46

*Violette v. P.A. Days, Inc.*, 214 F.R.D. 207 (S.D. Ohio 2003) ..................................................... 56

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................................. 41

*West v. City of Santa Fe*, No. 3:16-cv-0309, 2018 WL 4047115 (S.D. Tex. Aug. 16, 2018), *report and recommendation adopted*, No. 3:16-cv-00309, 2018 WL 5276264 (S.D. Tex. Sept. 19, 2018) ...................................................... 48

*Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122 (W.D. Wash. 2013) ............................. 30

*Williams v. Mohawk Indus. Inc.*, 568 F.3d 1350 (11th Cir. 2009) ......................................... 58, 59

*Winston v. Jefferson Cty., Ala.*, No. 2:05-cv-0497, 2006 WL 6916381 (N.D. Ala. June 26, 2006) ...................................................................................... 45, 57

**Statutes**

Ala. Code § 11-40-1 ..................................................................................................................... 29

Ala. Code § 11-45-9(b) ................................................................................................................... 3

Ala. Code § 12-12-32 ...................................................................................................................... 3

Ala. Code § 12-12-51 ...................................................................................................................... 3

Ala. Code § 12-14-1 ........................................................................................................................ 3

Ala. Code § 12-14-2 ...................................................................................................................... 29

**Rules**

Ala. R. Crim. Pro. 26.11(d) .......................................................................................................... 27

Fed. R. Civ. P. 23(a) ..................................................................................................................... 39

Fed. R. Civ. P. 23(a)(1) ................................................................................................................ 39

Fed. R. Civ. P. 23(a)(2) ................................................................................................................ 40

Fed. R. Civ. P. 23(a)(3) ................................................................................................................ 43

Fed. R. Civ. P. 23(a)(4) ................................................................................................................ 44

Fed. R. Civ. P. 23(b) ..................................................................................................................... 45

Fed. R. Civ. P. 23(b)(3) ........................................................................................................... 45, 55

Fed. R. Civ. P. 23(b)(3)(A) .......................................................................... 55

Fed. R. Civ. P. 23(b)(3)(B) .......................................................................... 57

Fed. R. Civ. P. 23(b)(3)(C) .......................................................................... 58

Fed. R. Civ. P. 23(b)(3)(D) .......................................................................... 59

Fed. R. Civ. P. 23(c)(2)(B) .......................................................................... 63

Fed. R. Civ. P. 23(g)(1).............................................................................. 44

**Treatises**

1 *Newberg on Class Actions* (5th ed. 2020).............................................. 33, 43

2 *Newberg on Class Actions* (5th ed. 2017).................................................. 55

2 *Newberg on Class Actions* (5th ed. 2020).................................................. 59

4 *Newberg on Class Actions* (5th ed. 2020)............................................. 61, 63

*Manual for Complex Litigation* (4th ed. 2004) ............................................ 33

## I.    PRELIMINARY STATEMENT

In July 2020, this Court found that the Montgomery Municipal Court "engaged in a systemic practice of jailing traffic offenders for failing to pay fines without inquiring into their ability to pay" and, in doing so, "deprived offenders of their due process and equal protection rights not to be incarcerated for their poverty." ECF No. 296 at 1 (citing *Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983)).[1] The Court recognized that Plaintiff Aldaress Carter was one of the people who experienced this unlawful treatment. *Id.* at 2. And the Court determined that Defendants Judicial Correction Services, Inc. (JCS), the City of Montgomery, and Branch Kloess must face trial to determine their liability for Plaintiff's injuries.

Plaintiff Carter incurred traffic-fine debt that he could not afford to pay to the City of Montgomery. As a result, the Montgomery Municipal Court placed Mr. Carter on "probation" with JCS, a private, for-profit corporation that contracted with the City to collect its court debt. JCS abused the probation order to extract money from Mr. Carter, a substantial portion of which JCS kept for itself. After bleeding Mr. Carter dry, JCS filed papers with the Montgomery Municipal Court seeking to revoke his probation. When Mr. Carter came before the court, he did so without meaningful assistance of counsel. The court failed to make the constitutionally-required ability-to-pay determination and instead "commuted" his fines to jail days and ordered Mr. Carter to "sit out" his fines in jail at the rate of $50 per day. As a result, Mr. Carter was jailed and lost his liberty (and more).

Plaintiff Carter is only one of hundreds of low-income people who were aggrieved by Defendants' common courses of conduct. Over and over again from March 2009 through July 2014, JCS endeavored, using its contract with the City and abusing court probation orders, to

---

[1] Citations, internal quotations, and alterations are omitted throughout unless otherwise indicated.

1

extract as much money as possible from traffic and misdemeanor defendants before returning them to the Municipal Court to be jailed in blatant violation of their core constitutional rights. Mr. Kloess and the other public defenders provided by the City carried caseloads that prevented them from providing meaningful assistance of counsel. The City allowed JCS's scheme to continue, pocketing a share of the funds collected, though it had ample notice of these unlawful practices and could have terminated the contract. And the City was deliberately indifferent to the failure of its public defenders to seek ability-to-pay determinations on behalf of clients. Because Defendants engaged in systemic practices that had common effects on the jailed probationers, Mr. Carter seeks redress on behalf of all similarly-situated individuals.

Plaintiff Carter respectfully asks the Court to certify the following four Classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure on the three theories of liability that the Court has set for trial in April 2021: *Bearden*, Sixth Amendment, and False Imprisonment:

(i)    **The City Class:** All individuals the Montgomery Municipal Court placed on JCS-supervised probation, who (1) had debt commuted to jail time in a JCS-supervised case after JCS petitioned the court to revoke probation; and (2) served any of that jail time on or after August 3, 2013;

(ii)   **The JCS *Bearden* Subclass:** All individuals in the City Class who served any of their post-commutation jail time on or after September 11, 2013; and

(iii)  **The Kloess Subclass:** All individuals in the City Class whose debt was commuted to jail time on a date when Branch Kloess was the public defender assigned to the jail docket or for whom Benchmark court records or other documents indicate the individuals were represented by Branch Kloess for the commutation.

2

(iv)     **The False Imprisonment Class:** All individuals the Montgomery Municipal

Court placed on JCS-supervised probation, who (1) had debt commuted to jail

time in a JCS-supervised case after JCS petitioned the court to revoke probation;

and (2) served any of that jail time on or after September 11, 2009;

Plaintiff Carter also asks the Court to appoint him as representative of the Classes and to

appoint The Evans Law Firm, Public Justice, and Terrell Marshall Law Group PLLC as counsel

for the Classes. As set forth below, each of the requirements of Rule 23(a) and 23(b)(3) has been

met, and Mr. Carter's requests should be granted.

## II.     FACTS RELEVANT TO CLASS CERTIFICATION

### A.     The City of Montgomery prosecuted traffic and minor misdemeanor offenses through its Municipal Court.

At all times relevant to this action, the Montgomery Municipal Court adjudicated

criminal misdemeanors and traffic violations. ECF No. 73-1 (2014 Nixon *Cleveland* Dep.) 31:5–

8;[2] ECF No. 93-3 at 2; Ala. Code § 11-45-9(b); *id.* § 12-12-32; *id.* § 12-12-51; *id.* § 14-14-1. The

court handled approximately 80,000 traffic cases and 8,000 misdemeanor cases each year. ECF

No. 73-1 (2014 Nixon *Cleveland* Dep.) 32:9–20. Judge Lester Hayes served as the Presiding

Judge. ECF No. 93-3 at 2. Defendants routinely were sentenced to pay fines and court costs in

connection with their convictions or guilty pleas. *Id.*

### B.     JCS contracted with the City to collect Municipal Court debt from defendants who could not pay their fines or tickets in full.

In March 2009, Montgomery entered into a contract with JCS to use supervised probation

to collect Municipal Court debt. ECF No. 253-11. The JCS-Montgomery contract, which was

executed "on behalf of the City/Court of Montgomery" by the acting mayor and then renewed in

---

[2] The depositions, declarations, and documents cited in this brief—including both new exhibits and evidence in the existing record—are listed in Plaintiff's Submission of Evidentiary Matters in Support of Motion for Class Action.

2010 by Mayor Todd Strange, controlled the terms under which JCS operated its probation system in Montgomery. *Id.*; ECF No. 253-12. The 2010 contract stated that it would automatically renew each year unless terminated by either party upon thirty days' written notice. ECF No. 253-12 at 5.

The contract stated that JCS would "provide probation supervision and related services for the benefit of the City and Court." *Id.* at 1, 5. The services JCS offered consisted "primarily" of collecting court debt through extended payment plans. ECF No. 73-1 (2014 Nixon *Cleveland* Dep.) 138:18–139:6; *see generally* ECF No. 253-12. As stipulated by Judge Hayes to the Alabama Judicial Inquiry Commission, and adopted by the Alabama Court of the Judiciary, JCS "acted as a service to monitor defendants solely in connection with the collection of outstanding fines and costs." ECF No. 93-3 at 4. Accordingly, the contract provided that "[a]ll fines, surcharges, and other fees shall be payable to JCS who will disburse monies to the City as directed by the Court." ECF No. 253-12 at 3.

The City paid JCS nothing for its services. *Id.* at 4. Instead, JCS's system was "offender funded," meaning JCS made 100% of its revenue from fees paid by the probationers from whom it collected court debt. ECF No. 73-22 at 7; ECF No. 73-3 (2014 C. Ray *Ray* Dep.) 192:23–193:11. The JCS-Montgomery contract required that "JCS [would] supervise *all* probated cases sentenced by the Court." ECF No. 253-12 at 2 (emphasis added). The contract also provided that the Montgomery Municipal Court's probation orders would include JCS's fees. Specifically, the City agreed that "[i]n consideration for the services provided by JCS," its Municipal Court "shall" issue court orders requiring each probationer to pay JCS a "[p]robation fee of $40.00 per month" and a one-time "probationer set-up fee of $10.00." *Id.* at 4. JCS supplied the Montgomery Municipal Court with its standard form Probation Order, which included the JCS

fees, and the court used the order without altering the terms. ECF No. 93-3 at 4–5; ECF No. 73-17.

Most defendants who were placed on JCS probation did not have a jail sentence, even though under Alabama law only people who have suspended sentences are subject to probation. ECF No. 93-3 at 4–5. An inability to pay, rather than any penal purpose, determined both whether a Municipal Court defendant in Montgomery was placed on JCS-supervised probation in the first place and whether she was kept on probation. First, under Montgomery Municipal Court procedures, only defendants who could not afford to pay their fines within thirty days were placed on JCS probation (often by a clerk or magistrate at the court's pay window); those who *could* pay avoided probation. *See* ECF 73-1 (2014 Nixon *Cleveland* Dep.) 138:18–139:6; ECF No. 73-16 (2016 Houston *Ray* Dep.) 237:20–238:6; ECF No. 73-19; ECF No. 278-14 at 16 (JCS's Standard Operating Procedures for Montgomery state that defendants were assigned to JCS "[o]nce the court clerk has determined that a defendant cannot pay in full"); ECF No. 278-16; ECF No. 278-20 (2019 Nixon *Carter* Dep.) 137:21–133:11; ECF No. 278-21; ECF No. 73-16 (2016 Houston *Ray* Dep.) 237:20–238:6. Shortly after JCS began operations, Ken Nixon, the Court Administrator, reported to his boss, Mayor Strange, that "numerous citizens are electing to pay their tickets as opposed to going on a payment plan with JCS" and that the new system "should result in an increase in monthly revenues, in that citizens are only given extensions on a limited basis." EFC No. 278-15.

Second, inability to pay determined whether—and for how long—a person remained on probation. Under the JCS-Montgomery contract, only defendants who could not afford to "pay their entire fine and Court costs within one week of sentencing" were kept on probation, even if

the court had sentenced them to a longer term.[3] ECF No. 253-12 at 2. And once probationers paid off their debt to the City, their JCS probation was terminated and JCS could no longer collect fees. ECF No. 73-19; ECF No. 73-16 (2016 Houston *Ray* Dep.) 237:20–238:6.

### C.    JCS collected fines and fees from probationers until they stopped paying.

To monitor probationers and collect payments in Montgomery, JCS used uniform policies stemming from three sources: ProbationTracker, the JCS Training Manual, and the JCS Standard Operating Procedures for Montgomery.

ProbationTracker is JCS's proprietary software. The ProbationTracker database served as JCS's repository for all data on probationers throughout the state, including in Montgomery. ECF No. 73-3 (2014 C. Ray *Ray* Dep.)107:6–11. All JCS probation officers and managers had access to and training on how to use the program. ECF No. 73-3 (2014 C. Ray *Ray* Dep.) 65:3– 66:2; 79:4–7; 106:22–108:2. They used ProbationTracker to document events in each probationer's case and track the progress of JCS's collection efforts. ECF No. 118-19 (2014 Ennis *Ray* Dep.) 22:9–13; 94:6–95:3.

When the Municipal Court placed a defendant on JCS-supervised probation, a unique JCS Probation ID number for that person was assigned to track and report that probationer's experience within the ProbationTracker system. ECF No. 73-3 (2014 C. Ray *Ray* Dep.) 203:6– 23. JCS kept detailed records on probationers in its ProbationTracker database, including employment information, Petitions for Revocation and Notices to Show Cause, and commutation. The JCS Training Manual and the JCS Standard Operating Procedures specific to Montgomery directed JCS employees to document in ProbationTracker every action they took in relation to a case. ECF No. 73-4 at ECF p. 79 (§ 7.2); ECF No. 278-14 at 12 (JCS's Standard

---

[3] At some point JCS extended this one-week grace period to thirty days. ECF No. 278-14 at 2.

Operating Procedures for Montgomery instruct that "[e]verything the Case Manager does must be documented on the computer.") JCS employees also scanned hard copies of court records into ProbationTracker, and probationers' court records are linked to their ProbationTracker case files. ECF No. 73-3 (2014 C. Ray *Ray* Dep.) 170:10–171:23; ECF No. 73-9 (2014 Kidd *Ray* Dep.) at 107:21–108:21.

All JCS probation officers were trained to follow the JCS Training Manual. *See* ECF No. 73-3 at ECF pp. 104–194; ECF No. 73-4 at ECF pp. 1–106.[4] Colleen Ray, JCS's Alabama State Director, testified that every employee was trained on the manual and that a copy of it was kept at every JCS office. ECF No. 73-3 (2014 C. Ray *Ray* Dep.) 65:7–66:2; 106:22–107:19. The JCS Training Manual contains examples of the forms JCS employees generated using ProbationTracker, including Petitions for Revocation and Notices to Show Cause. ECF No. 73-4 at ECF p. 18 (§ 4.43); *id.* at ECF p. 20 (§ 4.45); *id.* at ECF p. 26 (§ 4.51).

After being placed on JCS probation, probationers made all payments through JCS. ECF No. 253-12 at 3–4. JCS, not the Municipal Court, set the amount each probationer was required to pay each month. ECF No. 163-4 (2014 Westry *Cleveland* Dep.) 110:11–14; ECF No. 278-14 at 17. The JCS Training Manual instructed that monthly payments were "not to be less than $135/$140/$145 monthly, unless a specified amount is ordered by the Judge." ECF No. 73-3 at ECF p. 116 (§1.8). JCS "Company policy" was to "try to never make payments less than $85 per month." *Id.*; *see also* ECF No. 73-3 (2014 C. Ray *Ray* Dep.) 87:16–88:5. JCS typically set the monthly payments of probationers at around $140 to start. ECF No. 163-4 (2014 Westry *Cleveland* Dep.) 104:6–22.

JCS's standard "Reporting for Probation" document, given to all probationers when they

---

[4] The JCS Training Manual is also in the record at ECF No. 185-1, but that copy is difficult to read.

were placed on JCS probation, warned them not to bring less than the amount of money JCS

demanded. ECF No. 278-23. The document also told each probationer that "all questions

concerning your case" should be directed to your JCS probation officer and warned: "***Do not***

***contact the Municipal Court***" because "they will be unable to help you." *Id.* (emphasis in

original).

It was common for probationers to be unable to keep up with their monthly payments.

JCS had two main policies in place to pressure probationers to keep paying. First, when

probationers fell behind on payments, JCS customarily required them to report more often. The

manual instructs that probationers who bring less than $135/$140/$145 to a monthly appointment

must have appointments set more frequently, with goals of paying "$70/$70/$75 bi-weekly" or

"$35/$35/$40 weekly." ECF No. 73-3 at ECF p. 174 (§ 4.8).

Second, JCS used verbal and written threats of arrest and jail to motivate probationers to

keep paying. Numerous probationers have testified that JCS probation officers told them they

would be taken to jail by a police officer if they showed up to an appointment without enough

money. ECF No. 163-14 (2018 Carter Dep.) 85:5–86:20; ECF No. 278-27 (2019 Mooney

*McCullough* Dep.) 161:5–162:2. A uniformed Montgomery police officer was customarily

stationed at JCS's Montgomery office; JCS employed off-duty officers for "security." ECF No.

262-1 (2019 Ennis Dep., *McCullough*) 184:6–186:16. JCS also directed probation officers to

send letters (1) warning probationers that a warrant would be issued for their arrest if they failed

to pay, and (2) instructing probationers to pay a certain amount of money in order to avoid being

arrested and brought before the court. *See, e.g.*, ECF No. 73-4 at ECF pp. 1–3 (§ 4.29–31)

(sample letters to probationers contained in JCS's employee Training Manual); *id.* at ECF pp. 10

(§ 4.35) (same); *id.* at ECF pp. 14–15 (§ 4.39–40) (same).

8

When probationers paid less than the full amount, JCS decided for itself how to allocate the money between fees and fines. *See* part II.H, *infra*. Rather than earmark most or all of partial payments for probationers' court debt, JCS consistently allocated, on average, more than half of each payment towards its own fees. JCS's financial records show that from 2010–2014, JCS kept more than half of all the money it collected from Montgomery probationers for its own profits. ECF No. 278-18 at ECF p. 117; ECF No. 278-32. During those years, JCS collected $15,514,655 in probation and startup fees for itself. *Id.* Over the same period of time, JCS collected $14,680,458.57 in fines for the City of Montgomery. *Id.* Under JCS's policy in Montgomery, as long as a balance of any amount was still owed to the City, JCS would continue tacking $40 in probation fees every month onto the probationer's debt. ECF No. 278-14 at 18–19. The less JCS allocated to probationers' underlying court debts, the longer JCS could keep defendants on probation and the longer it could continue collecting fees. It was thus to JCS's advantage to keep probationers from paying their fines off too quickly.[5]

JCS collected, recorded, and maintained detailed information about the employment status of the probationers whose City court debt it collected, as well as information about any disability benefits or means-tested benefits they were receiving. *See* ECF No. 118-13. When JCS representatives met with a new probationer, it was standard practice to ask about the person's employment. If the person was unemployed, disabled, or receiving SSI benefits, the probation officer would note that in the "Employment" field in ProbationTracker. *See* ECF No. 118-19 (2014 Ennis *Ray* Dep.) 178:12–181:10.

---

[5] While the training manual instructed that only 30% of probationers' payments should go towards fees, JCS surreptitiously sought "to increase the percentage of probation fees to a 50/50 split" after a hedge fund purchased its parent company. ECF No. 73-4 at ECF p. 32 (§ 4.57); ECF No. 278-28. And JCS's records show that it did in fact keep more than 50% of all the money it collected from Montgomery probationers. ECF No. 278-18 at ECF p. 117; ECF No. 278-32.

JCS's records show that many hundreds of probationers in Montgomery were unemployed, receiving government benefits, or both. ECF No. 118-13 (showing employment status records of many hundreds of probationers listed as "DISABLED VET," "SSI BENEFITS," "SSI AND DISABILITY," "UNEMPLOYED," "UNEMPLOYED—SSI," "UNEMPLOYED-DISABLED," etc.). JCS also kept track of which day of the month the probationer or family member (including children) would receive the expected benefits checks, and the expected amount in benefits that person would receive from the government. *See, e.g.*, *id.* at 1 ("$768.00 – 3RD/MONTHLY – DISABILITY"); *id.* at 5 ("DISABILITY CHECK FOR $606.00 ON THE 1ST OF EACH MONTH); *id.* at 11 ("RECEIVES AFDC AND SSI FOR HER DAUGHTER – 5TH OF EVERY MONTH).

JCS did not modify its collection efforts based on probationers' inability to work or reliance on protected benefits as their sole source of income. ECF No. 118-19 (2014 Ennis *Ray* Dep.) 178:12–181:19. Nor did JCS inform the Montgomery Municipal Court when petitioning to revoke probation that it had information showing a probationer was likely too poor to pay. ECF No. 73-3 (2014 C. Ray *Ray* Dep.) 160:21–161:12.

**D.    When probationers stopped paying, JCS petitioned to revoke probation, and the Municipal Court customarily commuted the probationer's fines to jail time without assessing ability to pay.**

When it could no longer extract fees from a probationer, JCS's policy was to urge the Municipal Court to revoke probation. ECF No. 73-1 (2014 Nixon *Cleveland* Dep.) 279:4–12; 280:22–281:5. The probationer would then appear before the Municipal Court, which—if the defendant was unable to pay—had an established practice of "commuting" the remaining fines and other court debt to days in jail without an ability-to-pay hearing or finding of willful failure to pay. JCS, the Montgomery Municipal Court, and the Montgomery City Jail all kept detailed records on JCS probationers whose fines were commuted to jail.

10

To set this chain of events in motion, he JCS employee would change the probationer's status in ProbationTracker to "VOP" (violation of probation). ECF No. 73-4 at ECF pp. 11–13 (§ 4.36–38) (step-by-step process for probation revocation). Next, JCS would initiate the revocation process with the court by preparing a Petition for Revocation using prompts contained in ProbationTracker. *Id.* at ECF pp. 16–18 (§ 4.41–43). Each step taken in the revocation process was recorded in the probationer's Case File Report in ProbationTracker: dated entries showing the change to "VOP" status and the generation of each document are visible, and there is a hyperlink to the Petition for Revocation itself. *Id.* at ECF pp. 11–24; *see, e.g.*, Ex. 2, Rubens Decl. Ex. A (an excerpt of Mr. Carter's Case File Report, showing VOP status and link to Petition for Revocation).

Each Petition for Revocation, which JCS purportedly mailed to the probationer, contained a statement that the probationer had violated probation by missing payments and appointments; a calculation of the amount of fines and fees still owed; and a "request[] that the probation of the Defendant be revoked and that this Honorable Court issue a warrant for the arrest of said Defendant, if necessary . . . ." ECF No. 73-7 at ECF pp. 41–71. The petitions did not assert—or include any evidence whatsoever—that the probationer's failure to pay was willful. *Id.*; ECF No. 73-3 (2014 C. Ray *Ray* Dep.) 160:21–161:12; ECF No. 73-9 (2014 Kidd *Ray* Dep.) 138:22–139:12.[6]

---

[6] In Montgomery, JCS employees sometimes initiated probation revocation proceedings by using ProbationTracker prompts to generate a Notice to Show Cause rather than a Petition for Revocation. ECF No. 253-5 at ¶ 21; ECF No. 73-4 at ECF p. 12 (showing option to select Notice to Show Cause in menu in step 8). The Notice to Show Cause functioned effectively like a Petition for Revocation: it scheduled a court date, threatened arrest, and instructed the probationer that the only way to avoid the court date was to pay the entire balance of fines and fees owed. *See* ECF No. 73-7 at 11; Ex. 19, Algia Edwards Notice to Show Cause. Both JCS and the Municipal Court treated the documents as being interchangeable. *See* ECF No. 253-5 at ¶ 21; ECF No. 163-4 (2014 Westry *Cleveland* Dep.) 115:2–7; ECF No. 93-3 at 4–5, ¶

Each JCS Petition for Revocation also included a date on which the probationer was to appear before the Municipal Court. *See* ECF No. 73-7 at 41–71. On that hearing date, JCS presented the petition to the court. If the person appeared, the JCS employee would demand payment in order to have the hearing dismissed. ECF No. 73-4 at ECF p. 24 (§ 4.49). The training manual does not allow for an alternative to incarceration for those who lack the ability to pay. *Id.* The choice is payment, jail, or payment and jail. *Id.*

If the probationer appeared but could not pay a sufficient amount for JCS to dismiss the hearing, the Municipal Court would hold a revocation hearing to decide whether to revoke probation. ECF No. 73-2 (2014 Hayes *Cleveland* Dep.) 22:8–16. JCS probation officers participated in revocation hearings. *Id.* at 18:9–14. The JCS Training Manual instructed probation officers to "stick to the facts of the case." ECF No. 73-3 at ECF pp. 110 (§ 1.2). These facts consisted of: the date the defendant was placed on probation, the number of months the defendant was on probation, the charges, the beginning balance, the amount paid and the amount owed (including fees to JCS), the date and amount of the last payment, missed appointments, and "any other information that would be pertinent to the case," which the manual defined as "any classes not attended by the defendant, community service not performed, etc." *Id.* at 115. The "facts of the case" did *not* include information pertaining to the defendant's income or ability to pay, nor did it include information about appointments the defendant had attended and payments they had made. *Id.* JCS thus trained its employees to withhold from the court relevant information that demonstrated inability to pay rather than willful refusal. *Id.* The JCS Training Manual provided an example of the kind of recommendation a JCS probation officer should

---

m. References herein to JCS's process of petitioning the Montgomery Municipal Court include the use of both form documents.

provide the court at a revocation proceeding: "Your Honor, I recommend the defendant serve 5 days in jail and pay at least $145 to be released." ECF No. 73-4 at ECF p. 24 (§ 4.49).

If the probationer did not appear on the date scheduled by JCS's Petition for Revocation or Notice to Show Cause, the Municipal Court would issue a warrant for her arrest. *See* ECF No. 253-3 (Nixon Decl.) at ECF p. 12 ¶ 85. The court did not revoke probation at this stage. Instead, the court signed the order at the bottom of the petition, which ordered that a revocation hearing be set and that JCS serve the defendant with notice of the hearing. *See, e.g.*, Ex. 2, Rubens Decl. Ex. A at 1. This JCS never did. There is no evidence in the record that JCS subsequently served any document setting a probation revocation hearing on a specific date. Instead, JCS employees were trained that when they petitioned the court to revoke probation and the probationer did not appear, a warrant would be issued for the probationer's arrest. ECF No. 73-9 (2014 Kidd *Ray* Dep.) at 134:10–12; ECF No. 73-3 at ECF p. 167 (§ 4.1) (flow chart for "Working a Typical Case").

When the police executed the warrants and arrested probationers, the probationers were taken to the Montgomery Jail and brought before the Municipal Court for commutation hearings, usually on the court's "jail docket." ECF No. 253-3 (Nixon Decl.) at ECF p. 13 ¶¶ 88, 91; *id.* at ECF p. 14 ¶ 99; *id.* at ECF p. 15 ¶ 103; ECF No. 73-2 (2014 Hayes *Cleveland* Dep.) 9:1–6. At the commutation hearings, Judge Hayes and the other judges of the Municipal Court demanded payment. ECF No. 73-2 (2014 Hayes *Cleveland* Dep.) 29:18–23 ("I tell the defendants, as well as anyone that may be with them, that I will give them a ballpark estimate in the event that their fines and costs are commuted; but that that can be paid, and subsequent to payment, they will be released.").

As Judge Hayes explained, when a probationer appeared before the Municipal Court on

13

unpaid tickets that had already been adjudicated—whether at a revocation hearing or a commutation hearing—the court followed substantially similar procedures. "The end result is the same": if probationers were unable to pay on the spot, the court "commuted" their unpaid fines into jail terms. ECF No. 73-2 (2014 Hayes *Cleveland* Dep.) 9:16–10:3; 18:9–14; 22:8–16; 70:17–21. Commutation meant the defendants had to "serve out" their fines in jail. *Id.* at 9:16–10:3. Prior to August 2012, people sent to jail received credit against unpaid fines and costs at the rate of $25 per day. ECF No. 278-36 (2019 Nixon *McCullough* Dep.) 48:5–48:8. People arrested on or after August 6, 2012, received credit at the rate of $50 per day. ECF No. 278-36 (2019 Nixon *McCullough* Dep.) 48:9–48:17; Ex. 14, July 31, 2012 email from Judge Hayes to Ken Nixon; Ex. 15, August 1, 2012 email from Angela Barnes to Municipal Court Staff.

The Municipal Court's established practice was to commute defendants' fines to days in jail without inquiring into their ability to pay and or whether nonpayment was willful. ECF No. 93-3 at 2–3. Although the court had access to the standard Alabama form designed to allow defendants to demonstrate indigency, it did not use it. ECF No. 73-1 (2014 Nixon *Cleveland* Dep.) 88:13–89:16. The court did not inform defendants that their ability to pay was relevant. ECF No. 73-2 (2014 Hayes *Cleveland* Dep.) 45:21–46:3. And the court failed to inform defendants that they could not lawfully be incarcerated for being unable to afford to pay their fines. *Id.* at 40:10–16. The City has conceded that commutation was the practice of *all* Montgomery Municipal Court judges even before the City contracted with JCS. ECF No. 259 at ¶ 36; ECF No. 278-20 (2019 Nixon *Carter* Dep.) 147:15–148:3.

When commuting sentences, the Municipal Court did not enter a signed order stating the reasons for the ruling. ECF No. 93-3 at 4–6. Nor do oral records containing such reasoning

exist.[7] *Id.* Instead, the bailiff or clerk created a "[J]ail [T]ranscript." ECF No. 278-20 (2019 Nixon *Carter* Dep.) 148:1–149:3. This document, which was created for the benefit of the jail, indicated, for each charge, the number of "mandatory" days (those days that were part of a criminal sentence) and the number of commuted days. ECF No. 93-3 at 5–6. The Jail Transcript reflected the fact of the commutation but not any findings supporting it. ECF No. No. 278-36 (2019 Nixon *McCullough* Dep.) 88:19–89:8; ECF No. 163-4 (2014 Westry *Cleveland* Dep.) 41:6–22; 44:2–45:5; Ex. 3, Rubens Decl. Ex. B. at 2 (Carter Jail Transcript).

Beginning in February 2012, all Jail Transcripts were scanned into Benchmark, the Montgomery Municipal Court's docket management program. ECF No. 253-3 (Nixon Decl.) at ECF p. 8 ¶ 58; Ex. 1, Rubens Decl. ¶ 10, 12–13 (discussing his review of Jail Transcripts in Benchmark). Benchmark contains dated docket entries of the court's cases and scanned images of documents associated with those entries. Ex. 1, Rubens. Decl. ¶ 12. Jail Transcripts for all JCS probationers whose fines were commuted to jail after February 2012 are accessible on the electronic system. Ruben Decl. ¶ 10, 12–14.

Defendants whose debt had been commuted to jail could be released from the Montgomery Jail once they met the dollar requirement of the commutation by some combination of (1) subtracting the daily rate of $25 or $50 from their total debt for every day spent in jail,[8] (2) subtracting an additional $25 from their debt for every day spent working in jail, and/or (3) paying off whatever balance was left on any given day, plus serving any mandatory time on the Jail Transcript. Once a defendant was released, an Order of Release was issued. *See, e.g.*, Ex. 2,

---

[7] In November 2014, when the City of Montgomery agreed to settled the *Mitchell* lawsuit, the City and the Municipal Court agreed that *Bearden* hearings would be conducted on the record and that "[t]he court record shall contain an explanation of any determination of non-indigence." ECF No. 253-3 at ECF pp. 23, 32–33.

[8] As explained above, starting in August 2012, a defendant was credited $50 towards his debt for every day spent in jail, whereas prior to that date the rate was only $25.

Rubens Decl. Ex. A at 3 (Carter Order of Release stating "PAID $452; CREDIT FOR 4 DAYS COMMUTED TIME @ $50 A DAY.")

The Order of Release contains two key pieces of information: (1) the release date; and (2) a "Reasons for release" field, which often contains information about whether someone paid off the cash balance of the commutation at some point, and so forth. *See, e.g., id.* Like the Jail Transcript, the Order of Release was scanned into Benchmark and is accessible electronically. Ex. 1, Rubens Decl. ¶ 12–13.

The Montgomery City Jail also kept records on JCS probationers whose fines were commuted to jail. Using a system called New World, which operated separately from the Benchmark database used by the Montgomery Municipal Court, the jail recorded the booking and release of former JCS probationers. Ex. 18 (2019 Norris *Carter* Dep.) 20:30–6; Ex. 1, Rubens Decl. ¶ 16. Among other things, database shows the name, booking number, social security number (redacted here), warrant number, and release date for every defendant. Ex. 1, Rubens Decl. ¶ 16; Ex. 4, Rubens Decl. Ex. C.

### E. JCS knew or should have known of the Montgomery Municipal Court's established commutation practices

The Montgomery Municipal Court's commutation practices long pre-dated the City's contract with JCS. Judge Hayes began commuting sentences when he first came onto the bench in 2000. ECF No. 73-2 (2014 Hayes *Cleveland* Dep.) 84:4–8. Other Municipal Court judges had similar longstanding commutation practices. ECF No. 278-20 (2019 Nixon *Carter* Dep.) 147:15–148:3. The court's commutation practices were "not a secret to the court staff…." *Id.* at 151:2–12. Nor were they a "kept secret" from "the police force or the jailers or . . . anybody within the City[.]" *Id.* at 160:21–161:21.

JCS understood the commutation process very well. JCS staff worked in the courthouse

every day. ECF No. 262-1 (2019 Ennis *McCullough* Dep.) 106:16–107:1. While JCS probation

officers did not directly participate in commutation hearings, they were customarily present in

the courtroom at proceedings where commutations occurred, and they were familiar with the

court's procedures. A JCS representative would typically sit next to the judge in the courtroom

when in session. *Id.* at 121:7–23; ECF No. 278-14 at 17 (JCS's Standard Operating Procedures

for Montgomery, stating "[t]he JCS Intake Officer will be in the courtroom sitting next to the

judge each time court is in session"). The JCS Training Manual instructed staff on procedures

they were required to follow while present in court during the judge's deliberations. ECF No. 73-

4 at ECF p. 24 (§ 4.49).

 JCS documented commuted sentences in hundreds of JCS ProbationTracker files,

beginning as early as February 2010. Ex. 1, Rubens Decl. at ¶¶ 23–24; Ex. 8, Rubens Decl. Ex.

G. Using the "Detailed Visit Notes" field in the ProbationTracker Case File Reports, JCS

recorded the fact that the Montgomery Municipal Court commuted the debt of over 400

probationers to jail time.[9] And in all of these cases, the commutation occurred after JCS issued a

Petition for Revocation or Notice to Show Cause with the same case number. Ex. 1, Rubens

Decl. ¶ 24. Most of these entries date from 2010 through early 2012. Ex. 1, Rubens Decl. ¶ 24;

Ex. 8, Rubens Decl. Ex. G.

---

[9] Many of these entries simply say "fines commuted to days" or "commuted to days". Others provide more detail into the proceedings:

11/17/2011SMARTIN C/C: THE DEFENDANT APPEARED FOR HIS NOTICE TO SHOW CAUSE HEARING -- PER JUDGE HAYES, THE DEFENDANT WAS COMMUTED TO DAYS FOR HIS FINES -- AS THE DEFENDANT WAS BEING LEAD TO THE JAIL, HE TRIED TO SAY THAT HE HAD JUST GOTTEN A JOB -- JUDGE HAYES DID NOT CHANGE HIS MIND -- THE DEFENDANT'S GIRLFRIEND NICOLE JOHNSON WAS WITH THE DEFENDANT -- IT WAS EXPLAINED TO HER THAT HE WAS BEING COMMUTED AND THAT IT WAS JUST HIS MONTGOMERY CASES BECAUSE PRATTVILLE HAD BEEN PAID OUT

Ex. 8, Rubens Decl. Ex. G at 8.

F.      **The City's contract public defenders, including Branch Kloess, handled an enormous caseload in the Montgomery Municipal Court.**

Under state law, Montgomery was required to provide counsel to defendants in its Municipal Court. Ala. Code § 12-14-19. Accordingly, the City entered into contracts with Mr. Kloess and Barfoot & Schoettker, a small Montgomery law firm, to serve as part-time public defenders representing defendants in the Municipal Court. ECF No. 253-3 ¶ 68; ECF No. 265-1 (2019 Kloess *Carter* Dep.) 67:9–14. Mr. Kloess worked in the Municipal Court every other weekday. *Id.* at 49:1–50:14. He testified that he would represent everyone assigned to the jail docket including people appearing at JCS probation revocation hearings, as well as any other defendants who needed a lawyer. *Id.* at 76:20–22, 104:16–19, 121:8–19, 171:5–11.

Mr. Kloess and the other part-time contract defenders handled enormous caseloads. Between January 2012 and July 2014, Mr. Kloess alone was assigned to more than 45,000 cases from the Montgomery Municipal Court's jail docket—an average exceeding 15,000 cases per year.[10] ECF No. 278-1 ¶ 17 (with calculation method explained in preceding paragraphs ¶¶ 7–16); ECF No. 278-2; ECF No. 278-3; ECF No. 278-4; ECF No. 278-5; ECF No. 278-6; ECF No. 278-7; ECF No. 278-8. During 2012, for example, Mr. Kloess handled more than 16,400 jail docket cases over 127 court days. *Id.* at ¶ 14. And Mr. Kloess testified that he only worked as a public defender every other day. ECF No. 265-1 (Kloess *Carter* Dep.) 49:14–50:4. The Montgomery Municipal Court had a jail docket five days a week. ECF No. 253-3 (Nixon Decl.) ¶ 103. That indicates that the total number of jail docket cases from January 2012 through July 2014 topped 90,000, over 36,000 a year.

---

[10] This figure dwarfs the American Bar Association's recommendation that a full-time public defender handle no more than 400 misdemeanor cases a year. ABA, *Ten Principles for a Public Defense System* n.19 (2002) (adopting the 1973 recommendation of the DOJ-funded National Advisory Commission on Criminal Justice Standards and Goals).

To present those numbers in the context of a single day and in the context of individual people (any of whom might have multiple cases), on the day of Mr. Carter's hearing—January 27, 2014—there were 67 individuals on the jail docket, all represented by Mr. Kloess. ECF No. 265-1 (2019 Kloess *Carter* Dep.) 133:9–18, 171:5–11, 176:20–177:3. Mr. Kloess's timesheet for that day shows that he worked three and one-half hours that day. ECF No. 278-4 at 9. This means that he spent a little over three minutes per jail docket client.

At the Municipal Court proceedings where the court commuted fines to jail, Mr. Kloess customarily failed to ask the Municipal Court to consider the inability of his clients to pay fines. ECF No. 265-1 (2019 Kloess *Carter* Dep.) 163:1–11, 171:18–21, 174:18, 181:12–18. Although his clients were regularly jailed for unpaid fines during his time as a public defender, Mr. Kloess could not recall ever filing a written request for a *Bearden* hearing and could not name a single person for whom he had requested a *Bearden* hearing. ECF No. 265-1 (2019 Kloess *Carter* Depo.) 163:1–11, 171:18–21, 174:18, 181:12–18.

Regardless of the defendant's legal needs, Mr. Kloess understood his representation of a client to end with the day's docket ("[W]e're not assigned cases, we're assigned a day."). ECF No. 265-1 (2019 Kloess Carter Dep.) 69:17–69:20.) Though Mr. Kloess was the only public defender to testify, he said this was also the way Barfoot & Schoettker handled their Municipal Court work. *Id.* at 91:11–94:1. Mr. Kloess denied having a duty to his Municipal Court clients beyond representing them for that day's court session, even disputing that they had entered into an attorney-client relationship. *Id.* at 91:11–96:3, 109:4–110:21; *see also id.* at 150:4–9 ("You say my clients.").

The City was on notice of the extremely high volume of cases handled by Mr. Kloess and the other firm doing contract public defender work. *Id.* at 133:16–18; ECF No. 278-4 at 9. The

public defenders sent invoices to the City every two weeks listing the number of hours worked, and the City paid the defenders an hourly rate. ECF No. 265-1 (2019 Kloess Carter Dep.) 69:4–6, 72:19–23. Based on the billing records the City received from the defenders, City policymakers knew how little time the defenders must devote to each case. And the City knew that Mr. Kloess never took his work home with him—or out of the courtroom at all for that matter. A review of Mr. Kloess's Municipal Court affidavits from January 1, 2012, through June 30, 2014, shows that Mr. Kloess never billed the City for out-of-court work. ECF. No. 278-1 ¶ 10; ECF. No. 278-2; ECF No. 278-3; ECF No. 278-4.

Mr. Kloess was not aware of any oversight or supervision or evaluation of his job as a public defender by the City. He said, "If I hadn't been doing an adequate job, I wouldn't still be there." ECF No. 265-1 (Kloess *Carter* Dep.) 173:9–12, 196:18–23. The City also did not conduct any written evaluation of his work or even require either him or Barfoot & Schoettker to keep any records other than records of their time in court. *Id.* 174:2–17. Mr. Nixon testified that if the public defenders spoke with the defendants outside the presence of the judge, but did not appear with the defendants when the defendant went in front of the judge, that would satisfy the public defender's contractual obligation with the city. ECF No. 73-1 (Nixon *Cleveland* Dep.) 72:1–9.

### G. The City exerted no oversight over JCS and renewed its contract until July 2014 even after it was on notice of alleged constitutional violations.

After it entered into the contract with JCS, the City did not oversee JCS's activities.[11] ECF No. 253-36 at ¶ 3. Mayor Strange never attempted to instigate a municipal investigation of JCS's activities, and he did not know "whether they did a good job or a bad job." ECF No. 278-35 (2019 Strange *McCullough* Dep.) 100:1–8. Mr. Nixon testified that, other than the judges, no

---

[11] Both Montgomery and JCS have conceded this. *See* ECF No. 266-1 at 28 (admitting that City "was never involved in or sought to oversee JCS's activities"); ECF No. 260 at 63 (City did not have "any continuing involvement" in JCS's probation system "beyond entry into the two contracts").

one at the Municipal Court supervised JCS staff, and the City never audited JCS's activity in Montgomery. ECF No. 278-20 (2019 Nixon *Carter* Dep.) 127:13–20, 392:18–22. Judge Westry testified that the judges likewise had "no involvement with JCS determination of policies and procedures of JCS. The only time that we get involved is if there is a revocation or a show cause that they have submitted to the Court." ECF No. 163-4 (2014 Westry *Cleveland* Dep.) 113:17– 114:10. The City simply expected JCS to do its job under the contract: "collect those moneys . . . and remit those collections." ECF No. 278-36 (2019 Nixon *McCullough* Dep.) 210:19–212:22.

Before JCS was hired, the City's revenues from fines and forfeitures hovered between $5.5 million and $6.8 million per year. ECF No. 278-18 at ECF p. 117. During the time JCS was operating, those revenues shot up to between $7.8 million and $9.8 million. *Id.* The benefits started immediately: in May 2009, Mr. Nixon reported to Mayor Strange that the JCS program was "proceeding better than expected" and that "numerous citizens" were paying their tickets in order to avoid going on JCS probation. ECF No. 278-15. And as of August 2011, fine collection under JCS had risen at least 20% per month. ECF No. 278-17.

Between 2012 and 2014, a series of civil rights lawsuits were filed against the City of Montgomery, its Municipal Court judges and other officials, and JCS. *See* Brad T. Bishop, *The Continuing Reform of Alabama's Municipal Courts*, 79 Ala. Law. 190, 194–95 (May 2018). The City had ample warning by the July 16, 2012 that JCS and the Municipal Court were systematically violating probationers' *Bearden* rights. On that date, JCS sent an email to Mr. Nixon, who reported directly to Mayor Strange, notifying him of a decision by the Shelby County Circuit Court in *Burdette v. Town of Harpersville*, a lawsuit challenging JCS's probation operations in the Harpersville Municipal Court, "including incarcerating certain probationers solely for their failure to pay court ordered fines and fees." ECF No. 278-37. The *Burdette* court

had concluded that the JCS system was full of "egregious abuses" and that Harpersville—which had entered into a contract with JCS substantially similar to Montgomery's contract—was essentially operating a "debtors prison" or "judicially sanctioned extortion racket." *Id.* at ECF p. 4. The court specifically noted that Municipal Court defendants were being jailed without receiving an ability-to-pay determination; ordered the mayor and all members of the City Council to attend a hearing on their responsibility for the violations; and entered an injunction requiring the Harpersville Municipal Court to comply with Rule 26.11 of the Alabama Rules of Criminal Procedure. *Id.* at ECF pp. 5, 7.

On August 12, 2012, *Thurman v. Judicial Correction Services*, M.D. Ala. No. 2:12-cv-00724 (RDP), was filed, alleging that JCS charged unlawful probation fees and coerced payments from Montgomery probationers. On September 20, 2012, Mr. Nixon emailed Wes Ennis at JCS about *Thurman*. Ex. 16, September 20, 2012 email from Ken Nixon to Wes Ennis; *see also* ECF No. 278-38 (Jan. 2013 email between Mr. Nixon and Mr. Ennis concerning the *Thurman* plaintiffs' subpoena seeking Montgomery Municipal Court probation orders).

In August 2013, the City, along with Judges Hayes and Westry, were sued for *Bearden* and Sixth Amendment violations in *Cleveland v. City of Montgomery*, M.D. Ala. No. 2:13-cv-00732, and *Watts v. Montgomery*, M.D. Ala. No. 2:13-cv-00733. *See Cleveland v. City of Montgomery*, No. 2:13-cv-732-MHT, ECF No. 56 (M.D. Al. filed Sept. 12, 2014). In March 2014, *Mitchell v. Montgomery* was filed, alleging that the City of Montgomery and its Municipal Court judges were liable under Section 1983 for numerous constitutional violations, including *Bearden* violations. M.D. Ala. No. 2:14-cv-00186 ECF No. 1 (filed Mar. 3, 2014). And on December 25, 2013, Mayor Strange, Mr. Nixon, and Mr. Ennis exchanged emails about a Fox News report describing JCS as contributing to the operation of "debtors' prisons" in Alabama.

Ex. 17, December 25, 2013 Strange, Nixon, Ennis email exchange.

There is no evidence that the City took any steps to address the problems with JCS and its Municipal Court once it was on notice of them. For example, there is no evidence in the record that the City Jail began immediately releasing defendants whose fines had been commuted to jail after a JCS Petition for Revocation of Probation were released, or that City prosecutors changed their practices with respect to revocation or commutation hearings.[12] Nor did the Mayor fire or discipline Presiding Judge Hayes. To the contrary, after Judge Hayes was removed by the Judicial Inquiry Commission for these and other actions, the City rehired him and then reappointed him as judge. ECF No. 245-2.

Most importantly, although the City had a contractual right to terminate the JCS contract at any time with 30 days' notice, the City renewed the contract every year until finally terminating it in July 2014. ECF No. 253-12 at 5; ECF No. 278-13. As a result of the lawsuits, most Alabama cities cancelled their contracts with JCS, and JCS left the state in 2015. Bishop, *supra*, at 196. Montgomery terminated its contract with JCS only after the City itself became a defendant in the *Mitchell* putative class action lawsuit. As part of the settlement in *Mitchell*, the City agreed (among other things) not to contract with any private probation company for at least three years. *See* ECF No. 253-3 at ECF pp. 22–33.

After JCS ceased operations in Montgomery, the City's collection revenues went back down to between $4.8 million and $5.3 million. ECF No. 278-18 at ECF p. 117.

---

[12] All prosecutions in the Montgomery Municipal Court were handled by the City Attorney or contract prosecutors hired and paid by the City. ECF No. 278-20 (2019 *Nixon Carter* Dep.) 58:2–11.

**H.**   **Aldaress Carter was placed on JCS probation, then had his fines commuted to jail by the Montgomery Municipal Court without a *Bearden* determination or meaningful assistance of counsel after JCS petitioned to revoke his probation.**

Aldaress Carter was arrested in May 2011 on outstanding warrants related to several Montgomery traffic tickets. ECF No. 163-14 (2018 Carter Dep.) 68:7–10. After spending the night in jail, he appeared before the Montgomery Municipal Court, where he was given the choice between paying all his fines in full, going back to jail, or going on JCS probation. *Id.* at 70:21–22; 72:1–2. Because he could not afford to pay all the fines, he chose JCS over jail. *Id.* at 73:14–15. JCS set Carter's monthly payments at $140. ECF No. 73-17. At Carter's initial meeting with JCS, JCS employees told him that if he didn't pay, they could send him back to jail. ECF No. 163-14 (2018 Carter Dep.) 92:6–93:22.

Carter was able to make his first monthly payment, but then he fell behind and could only afford to make partial payments. ECF No. 163-14 (Carter 2018 Dep.) 118:9–12. JCS then demanded that he report for increasingly frequent appointments and make payments weekly. *Id.* at 84:15–16. Carter paid what little he could, but he repeatedly told JCS he could not afford to make the payments. *Id.* at 98:1–11. On many occasions, JCS kept half of each payment, and some months JCS pocketed more than half of what Carter paid for its own fees.[13] *See* ECF No. 174-3 at ECF pp. 10–12. JCS probation officers responded to Carter's inability to pay by telling him that if he didn't "hurry up and pay," he would "go back to jail." ECF No. 163-14 (Carter 2018 Dep.) at 84:20–85:15; 98:1–11. Consistent with JCS's practice of hiring Montgomery police as security guards, a uniformed police officer was standing at the front door to JCS's

---

[13] In 2012, for example, JCS allocated nearly half of all Mr. Carter's payments to its own fees, which simultaneously prevented him from paying off his debt to the City and enabled JCS to keep him on probation long enough to extract more fees. *See* ECF No. 174-3 at 10–12 (in 2012 JCS allocated $200 towards the City and $193 towards its fees).

offices every time he reported. *Id.* at 85:14–86:15, 93:21–22. After attending 66 appointments and paying $833 in his nineteen months on JCS probation ($373 of which JCS kept for its fees), Carter ultimately stopped paying altogether. ECF No. 174-3 at ECF pp. 8–12.

In December 2012, JCS generated a form Petition for Revocation of Probation alleging that Carter had failed to pay and missed appointments and setting out the total remaining amount he owed. ECF No. 73-18. The Petition for Revocation did not allege that Carter's failure to pay was willful, nor did it contain any information about why Carter had been unable to make his payments. *Id.* The petition included a court date. *Id.* When Carter failed to appear at the Montgomery Municipal Court on that date, the judge signed the JCS Petition for Revocation Order and issued seven warrants for his arrest—one for each of the underlying adjudicated traffic tickets for which he had been put on JCS probation. ECF No. 73-18; ECF No. 163-15 at ECF p. 37. Carter was subsequently arrested in January 2014, spent the weekend in jail, and was brought before the Montgomery Municipal Court on the jail docket. ECF No. 163-15 at ECF p. 36–39.

Although Branch Kloess was the public defender assigned to the court's jail docket that day, he did not meet with Carter to inquire about his ability to pay his fines, did not request a *Bearden* hearing on his behalf, and did not appear in court with him. ECF No. 265-1 (2019 Kloess *Carter* Dep.) 132:2–11; ECF No. 163-14 (2018 Carter Dep.) 136:4–15. When Carter could only offer $120 towards his court debt, Judge Hayes commuted the fines Carter owed from the tickets underlying his JCS-related warrants to days in jail at the rate of $50/day and sent him back to jail. ECF No. 163-14 (2018 Carter Dep.) 137:11–22; ECF No. 262-3 (2019 Carter Dep.) 352:20–22; ECF No. 253-3 at ECF 204–05; ECF No. 163-15 at ECF p. 36. Carter remained in jail until four days after his arrest, when his mother borrowed enough money to pay for his release. ECF No. 253-3 at 207; ECF No. 163-14 (2018 Carter Dep.) 138:22–23.

25

**I.      JCS engaged in a common course of instigating unlawful detentions in bad faith.**

"False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6-5-170. An entity that instigates unlawful detentions is liable if it persuades or influences officials to imprison victims and does so in bad faith. *Dolgencorp, Inc. v. Pounders*, 912 So.2d 523, 528 (Ala. Civ. App. 2005). Bad faith exists when there is no objectively reasonable basis on which to instigate the detentions. *See Grant v. Dolgen Corp.*, 738 So.2d 892, 894 (Ala. Civ. App. 1998).

JCS engaged in a common course of instigating unlawful detentions of the Class members in bad faith. JCS petitioned to revoke probations despite being on notice that the Montgomery Municipal Court would jail probationers who were unable to pay without consideration of their financial circumstances or a finding of willfulness. *See* parts II.D and E, *supra*. Furthermore, JCS knew or should have known that at the time it petitioned to revoke their probation, Class members could not pay off their fines—after all, the basis for every petition was a failure to pay. *See* part II.E, *supra*. And despite having evidence demonstrating the probationers' inability to pay, JCS had a policy of petitioning to revoke probation without alleging—or providing any proof—that probationers had willfully failed to pay. *See* part II.D, *supra*. Indeed, when seeking revocation of probation, JCS routinely withheld evidence demonstrating that the probationers in question were unable to pay. *See id.* This was the natural result of JCS's scheme of funneling probationers back to the Municipal Court once JCS had extracted all they could afford to pay. In short, by petitioning for revocation, JCS knowingly and in bad faith set in motion the unlawful jailing of probationers who could not pay their fines.

**J.      JCS, the City, and Branch Kloess had established policies, practices, or customs of causing members of the *Bearden* Classes to be jailed for nonpayment of fines and fees without due process.**

The Fourteenth Amendment prohibits the incarceration of a person for nonpayment of

fines without due process. *Bearden*, 461 U.S. at 672–73; *see also United States v. Johnson*, 983 F.2d 216, 220 (11th Cir. 1993); *Snipes v. State*, 521 So.2d 89, 90–91 (Ala. Crim. App. 1986); Ala. R. Crim. Pro. 26.11(d). Before jailing someone for nonpayment of fines, a court must inquire into the person's ability to pay, efforts to secure resources to pay, and adequacy of alternatives to incarceration. *Bearden*, 461 U.S. at 672. The person may be lawfully jailed only if the court first determines that he had the means to pay but "willfully refused" to do so. *Id.* If the failure to pay was not willful, the court must find that alternative methods are inadequate to satisfy the government's interest in punishment or deterrence. *Id.*

Given the importance of the process required before jailing, the court must create a written record of the ability-to-pay determination. *See Turner v. Rogers*, 564 U.S. 431, 449 (2011) (contempt order issued without written findings violated due process); *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973) (when revoking probation, due process requires "a written statement by the factfinders as to the evidence relied on and reasons for" revocation) (quoting *Morrisey v. Brewer*, 408 U.S. 471, 489 (1972)); *see also Andrews v. State*, 975 So. 2d 392, 394 (Ala. Crim. App. 2007) (explaining that "a written statement by the factfinders as to the evidence relied on and reasons for revoking" probation is one of the "minimum constitutional requirements that must be met before [probation] may be revoked"). The government bears the burden of proving that nonpayment was willful. *See United States v. Mojica-Leguizamo*, 447 F. App'x 992, 996 (11th Cir. 2011) (reversing revocation of probationer's supervised release based in part on government's failure to prove willful failure to pay). That showing must also be cited in the court record. *Taylor v. State*, 47 So.3d 287, 290–91 (Ala. Crim. App. 1986) (finding reversible error where "court's order fails to make the specific determinations and findings, supported by the evidence," as required by *Bearden*).

A court's failure to undertake a *Bearden* inquiry and make findings of on the record regarding ability to pay and willfulness violates the Due Process clause regardless of what the outcome of the proceeding would have been:

> Due process . . . clearly requires the institution of some form of pre-incarceration legal process for determining the reasons for a party's failure to pay a fine. Absent such a procedure, a government entity that immediately converts a fine into a jail term when a party fails to pay that fine deprives the imprisoned party of liberty without due process of law. Government conduct of this sort is unlawful *whatever the economic status of the incarcerated person.*

*Doe v. Angelina Cty.*, 733 F. Supp. 245, 254 (E.D. Tex. 1990) (emphasis added); *cf.* ECF No. 296 at 34 (Mr. Carter is not required to "show that the Municipal Court would have declared him indigent," had the court held an indigency hearing, because his "injury stems from a deprivation of liberty without due process—the lack of a *Bearden* hearing injured him").

As explained above, the Montgomery Municipal Court customarily commuted class members' fines to days in jail without conducting the required *Bearden* hearings or making findings supporting commutation on the record. *See* part II.D, *supra*.

A municipality is liable under 42 U.S.C. § 1983 if it has a policy, practice, or custom that causes people to be deprived of constitutional rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978). A municipality's omissions constitute a policy or custom if they evince "deliberate indifference" to people's rights. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Where a city tacitly authorizes constitutional violations by failing to correct them, those omissions can rise to the level of a custom or policy. *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001). For example, if city policymakers are "put on notice" of systemic rights violations but the city fails to correct the program or policy that caused the violations, the city itself may be held to have culpably caused the violations. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). A private entity "acting in the place of a municipality"

in performing a traditional government function is also subject to liability under *Monell*. *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).

Under Alabama law, the authority to provide Municipal Court probation services belongs to the municipality. *See, e.g.*, Ala. Code § 12-14-2. Likewise, the power to enter into contracts with private companies belongs only to the municipality. *Id.* at § 11-40-1. Here, the City of Montgomery delegated the traditional government function of probation to JCS by entering into the JCS-Montgomery contract. *See* ECF No. 253-12.

As explained above, JCS had an established policy, practice, or custom of asking the Municipal Court to revoke probation despite being on notice that if members of the Classes could not pay, the Montgomery Municipal Court would jail them without consideration of their financial circumstances or a finding of willfulness. *See* part II.D. And the Municipal Court had a customary practice of incarcerating Class members without assessing their ability to pay. *See id.*

The City had final responsibility for JCS's conduct, either because the City acquiesced to JCS's standard operating procedures or because the City ratified decisions about how to provide probation that it delegated to JCS. As of July 16, 2012—and certainly no later than September 20, 2012—the City knew or should have known that JCS and the Municipal Court were systemically violating the rights of City Subclass members. *See* part II.G, *supra*.

A public defender such as Mr. Kloess is a state actor for purposes of section 1983 when he acts—or fails to act—in a way that systemically deprives the defendants he is charged with representing of their constitutional rights. *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 612–13 (6th Cir. 2007) (describing defendants' "alleged agency-wide policy or custom of routinely ignoring the issue of indigency in the context of non-payment of fines"). Under this circumstance, Mr. Kloess's actions, rather than serving the interests of his clients, "carrie[d] the

imprimatur of administrative approval." *Id*. Mr. Kloess customarily failed to gather the

information from his clients needed for a legitimate *Bearden* determination, and he failed to ask

the Montgomery Municipal Court to assess his clients' ability to pay at hearings where the court

commuted his clients' fines to days in jail. *See* part II.F, *supra*. In this way, Mr. Kloess "serv[ed]

the State's interest in exacting punishment, rather than the interests of [his] clients, or society's

interest in fair judicial proceedings." *See* ECF No. 296 at 35 (quoting *Powers*, 501 F.3d at 613).

### K. The City and Branch Kloess had an established policy, practice, or custom of failing to provide meaningful assistance of counsel to defendants facing incarceration for nonpayment of Municipal Court fines.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee

assistance of counsel to every person facing incarceration for nonpayment of fines and fees owed

in relation to a criminal case. *See Argersinger v. Hamlin*, 407 U.S. 25, 37 (1972); *Alabama v.*

*Shelton*, 535 U.S. 654, 673–74 (2002). These constitutional provisions also prohibit local

governments from adopting policies, practices, and customs that cause systemic deficiencies in

the funding, staffing, and assignment of cases to public defenders, where the result is that

defendants are actually or constructively deprived of court-appointed counsel. *See, e.g.*, *Powers*,

501 F.3d at 612 (holding public defender could be liable to class for systemic "policy of failing

to seek indigency hearings" for clients); *Miranda v. Clark Cty.*, 319 F.3d 465, 471 (9th Cir.

2003) (holding county could be liable for depriving right to counsel based on resource allocation

and case assignment policies); *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122, 1133

(W.D. Wash. 2013) ("The Court finds that the combination of contracting, funding, legislating,

and monitoring decisions . . . caused the truncated case handling procedures that have deprived

indigent criminal defendants [of Sixth Amendment rights].").

The Montgomery Municipal Court's revocation and commutation proceedings could—

and did—lead to immediate imprisonment for probationers. *See* part II.D, *supra*. Although the

City hired contract public defenders to represent Municipal Court defendants, the caseloads that the City's public defenders carried made it impossible for them to provide meaningful assistance of counsel to members of the City Subclass. *See* part II.F, *supra*. Likewise, the public defense caseload that Mr. Kloess carried made it impossible for him to provide meaningful assistance of counsel to members of the Kloess Subclass. *See id.* The evidence establishes that the City's public defenders, including Mr. Kloess, customarily failed to ask the Municipal Court to assess indigency or ability to pay when representing probationers at the proceedings where the court commuted their fines to jail. *See id.*[14]

Based on the number of cases and the billing records from public defenders showing how few hours they spent working in the Montgomery Municipal Court, the City was aware of the alarmingly high ratio of cases to defenders. *See* part II.F, *supra*. And the City was on notice of the fact that the Municipal Court was jailing JCS probationers without Bearden hearings. See part II.G, *supra*. Accordingly, the City knew or should have known that its public defenders systemically failed to request *Bearden* hearings for members of the City Subclass. *See id*. And based on the sheer volume of cases handled by Mr. Kloess, the City also knew or should have known that Mr. Kloess systemically failed to request *Bearden* hearings for members of the Kloess Subclass.

## III.   PROCEDURAL HISTORY

The claims in this case have been significantly narrowed since it was filed. Aldaress Carter filed this putative class action against the City of Montgomery and Branch Kloess on August 3, 2015 (ECF No. 1) and added JCS and its corporate affiliates as defendants on

---

[14] In November 2014, after the City cancelled its contract with JCS, the City committed to training the public defenders representing Municipal Court defendants on compliance with the requirements of *Bearden*. *See* ECF No. 253-3 at ECF p. 25.

September 11, 2015. ECF No. 18. The complaint alleged fifteen causes of action under 42 U.S.C. § 1983 and RICO. *See id.* Mr. Carter's operative Second Amended Complaint was filed on August 28, 2018, adding state-law claims. ECF No. 145.

Between 2017 and 2019, the Court denied the defendants' motions to dismiss and for summary judgment on Mr. Carter's constitutional claims, but dismissed his RICO causes of action, his claims for money had and received, his claim for declaratory and injunctive relief, and his false imprisonment claim against the City.[15] *See* ECF No. 97; ECF No. 203; ECF No. 207. The Court consistently ruled, however, that Mr. Carter's Section 1983 claims may proceed. *Id.*

On July 17, 2020, the Court denied in part and granted in part the defendants' motions for summary judgment. ECF No. 296. The Court ruled that Mr. Carter may proceed to trial against the City, JCS, and Mr. Kloess on *Bearden* violations (Counts 1, 2, 9, and 10); against the City and Mr. Kloess on Sixth Amendment violations (Counts 1 and 5); and against JCS on the state law tort of false imprisonment (Count 14). *Id.* at 3–4.

## IV.   ARGUMENT AND AUTHORITY

### A.   Plaintiff has standing.

"[A] plaintiff who wishes to bring a lawsuit on behalf of a class of individuals similarly situated . . . must have standing to bring the claim." *City of Hialeah, Fla. v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002). This means the named plaintiff must have sustained an injury that is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Pettco Enters., Inc. v. White*, 162 F.R.D. 151, 156 (M.D. Ala. 1995). As explained above, Plaintiff Carter was jailed as a result of Defendants' unlawful conduct. *See* part

---

[15] Mr. Carter's case was stayed for about a year at the City's request while the Eleventh Circuit considered an appeal in *McCullough. See* ECF Nos. 131, 142. The Eleventh Circuit held that certain parties who are not defendants in this case are entitled to immunity from suit. *McCullough v. Finley*, 907 F.3d 1324 (11th Cir. 2018).

II.H, *supra*; ECF No. 296 at 2 (summarizing Mr. Carter's injuries). Accordingly, he has standing to represent the Classes.

### B.      The proposed Classes are ascertainable.

**1.** "[A] plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016). This implicit Rule 23 requirement is satisfied if the "the class can be ascertained by objective criteria." 1 *Newberg on Class Actions* § 3:3 (5th ed. 2020); *see also Karhu v. Vital Pharm., Inc*., 621 F. App'x 945, 952 (11th Cir. 2015) (unpublished) (Martin, J., concurring) ("[C]ourts essentially focus on the question of whether the class can be ascertained by objective criteria"); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam) (rejecting proposed "class made up of residents of this State active in the peace movement" because of "patent uncertainty" and "broad spectrum of positions and activities which could conceivably be lumped under that term").[16] "[A] court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding." 1 *Newberg on Class Actions* § 3.3; *Manual for Complex Litigation* § 21.222 at 270 (4th ed. 2004) ("[T]he identity of individual class members need not be ascertained before class certification . . . .").

Here, the classes are easily ascertainable. As explained above, the False Imprisonment Class will include all individuals the Montgomery Municipal Court placed on JCS-supervised probation who (1) had debt commuted to jail time in a JCS-supervised case after JCS petitioned the Montgomery Municipal Court to revoke probation and (2) served any of that jail time on or after September 11, 2009. And the City Class and JCS *Bearden* Subclass have the same criteria,

---

[16] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit handed down before October 1, 1981.

with the only difference being timing. Their class periods start on July 1, 2013 and September 11, 2013, respectively.

Membership in these classes turns on three objective criteria: (1) whether someone was placed on JCS-supervised probation, (2) whether and when their fines or fees were commuted to jail time in a JCS-supervised case after JCS petitioned for revocation, and (3) whether they served that jail time during one of the relevant periods. To determine who meets those criteria, counsel need look no further than Defendants' own records. Combined, JCS's ProbationTracker database and the court records in Montgomery's Benchmark database contain the names of all people sentenced to JCS-supervised probation, the date of any JCS-issued Petition for Revocation or Notice to Show Cause, and documentation of any commutation and jailing that resulted from JCS issuing one of those two documents. All individuals in the Kloess Subclass are likewise ascertainable: that group is composed of members of the City Class whose debt was commuted to jail time on a date when Mr. Kloess was the public defender assigned to the jail docket or for whom Benchmark court records or other documents indicate the individuals were represented by Mr. Kloess for the commutation. The relevant dates and documents are in Defendants' records.

Ascertainability, then, is no obstacle to class certification.

**2.** That should be the end of the inquiry. But in 2015, an unpublished Eleventh Circuit opinion imposed a heightened ascertainability standard: the panel required the plaintiff to demonstrate that "class members [can] be identified in an administratively feasible way," and the panel affirmed the lower court's denial of class certification on finding the plaintiff had failed to do so. *Karhu*, 621 F. App'x at 947–48. The Eleventh Circuit has never endorsed the administrative feasibility requirement in a published opinion, *Ocwen Loan Servicing, LLC v.*

*Belcher*, No. 18-90011, 2018 WL 3198552, at *3 (11th Cir. June 29, 2018), and the requirement

is inconsistent with the Circuit's binding precedent. *Karhu*, 621 F. App'x at 952 (Martin, J.,

concurring) (explaining history of ascertainability standard in Eleventh Circuit); *DeBremaecker*,

433 F.2d at 734 (discussing ascertainability without reference to administrative feasibility). The

issue is currently on appeal from the Southern District of Florida, *Papasan v. Dometic Corp.*, No.

19-13242 (11th Cir.).[17]

The Court need not wade into this pending legal question because even if the

administrative feasibility requirement were applicable in the Eleventh Circuit, it would be no

obstacle to class certification here. Concerns over feasibility have relevance only in consumer

class actions that involve retail purchases of small-dollar products that are not tracked in the

defendants' records. Because manufacturers rarely have records of end-user sales, and

consumers rarely keep receipts, plaintiffs seeking to identify people who purchased a certain

product during the relevant time period face an uphill climb. *See, e.g.*, *Karhu*, 612 F. App'x at

948–49; *Carrera v. Bayer Corp.*, 727 F.3d 300, 308–09 (3d Cir. 2013).

This case could not be more dissimilar. Plaintiff Carter can identify members of the

Classes using a process that relies on data contained in Defendants' own records—the gold

standard of identification for those courts that have applied a heightened ascertainability

standard. *See, e.g.*, *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir.), *cert. denied*,

140 S. Ct. 676 (2019); *Cox v. Porsche Fin. Servs., Inc.*, 330 F.R.D. 322, 330–31 (S.D. Fla.

2019). As in other cases challenging abuses in the criminal legal system, members of the Classes

---

[17] The majority of federal appellate courts have rejected the heightened standard. *See In re Petrobras Sec.*, 862 F.3d 250, 265 (2d Cir. 2017); *Briseno v. ConAgro Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017); *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015); *Mullins v. Direct Digital, LLC*, 795 F.3d 658, 672 (7th Cir. 2015); *see also Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019) (unpublished).

are identifiable based on records of their criminal proceedings. *See Hunter v. Beshear*, No. 2:16-cv-798-MHT, 2018 WL 564856, at *4 (M.D. Ala. Jan. 25, 2018) ("[T]he class is ascertainable by reference to the circuit court orders committing criminal detainees to . . . custody").

All members of the City Class and JCS *Bearden* Subclass, as well as all members of the False Imprisonment Class whose debt was commuted in or after February 2012, are ascertainable through a straightforward process that is already well underway. First, an automated search of the JCS ProbationTracker system was conducted to identify people who the Montgomery Municipal Court had placed on JCS probation. Ex. 1, Rubens Decl. ¶¶ 3, 7, 8. Second, that group was reduced to those who JCS placed in VOP status and initiated probation revocation proceedings against by issuing a Petition for Revocation or a Notice to Show Cause. Ex. 1, Rubens Decl. ¶ 9, 19.

Third, using the Municipal Court case numbers associated with those VOP-status probations, a search of the Municipal Court's Benchmark system was conducted to identify JCS probationers who had a Jail Transcript and an Order of Release entered into the Municipal Court's Benchmark system on one or more of those cases in which JCS sought revocation of probation from the Municipal Court. Ex. 1, Rubens Decl. ¶¶ 5, 6, 10, 19.

Fourth and finally, the JCS Petitions for Revocation or Notices to Show Cause, Jail Transcripts, and Orders of Release for those probationers are being manually reviewed to confirm that the JCS-related cases resulted in commutation of debt into jail days. Ex. 1, Rubens Decl. ¶ 20. This manual review will enable Plaintiff to confirm the electronic search results and show, for each member of the Classes, (1) that JCS sought revocation of probation; (2) that the Municipal Court then commuted debt to jail on the same case or cases on which JCS sought revocation; (3) the precise date on which each person's debt was commuted to jail time; and (4)

36

the dates spent in jail attributable to the JCS-related case. Ex. 1, Rubens Decl. ¶¶ 14, 15, 17–21; *see* Ex. 3, Rubens Decl. Ex. B for an example of a manual review of a Petition for Revocation, Jail Transcript, and Order of Release.

The process for ascertaining members of the False Imprisonment Class whose debt was commuted to jail time before the City's Benchmark system was implemented in February 2012 is even more straightforward. During that period, JCS employees routinely used the Detailed Visit Notes field in each probationer's ProbationTracker file to log instances where probationers had their debt commuted to days in jail in relation to that particular probation and the Montgomery Municipal Court cases associated with it. Ex. 1, Rubens Decl. ¶¶ 23–25. The "commuted" notation was entered into the ProbationTracker files of more than 400 probationers during the pre-Benchmark period. In each of those cases, there is a record of JCS having previously initiated probation revocation proceedings by submitting a Petition for Revocation or Notice to Show Cause to the Montgomery Municipal Court. Ex. 1, Rubens Decl. ¶ 24; Ex. 8, Rubens Decl. Ex. G (listing hundreds of notations of "commuted" from JCS's ProbationTracker files, such as "Judge Hayes took him off of JCS and commuted his case" and "PER COURT CLERK, DEF SERVED DAYS IN JAIL FOR ALL OF HIS COMMUTED FINES"). This "commuted" entry in the Detailed Visit Notes enables anyone with access to ProbationTracker to identify people whose cases were commuted before Jail Transcripts and Orders of Release were routinely logged into the Benchmark system. *See* part II.C., *supra* (explaining how JCS employees documented events and information about probationers in ProbationTracker).

Finally, ascertaining the members of the Kloess Subclass is equally clear. That class is composed of all members of the City Class whose debt was commuted to jail time on a date when Mr. Kloess was the public defender assigned to the jail docket or for whom Benchmark

court records or other documents indicate the individuals were represented by Mr. Kloess for the commutation.[18] Mr. Kloess was paid based on time sheets he submitted to the Montgomery Municipal Court, and the sheets list each date he worked there. *See* ECF No. 278-1 ¶¶ 7; ECF No. 278-2; ECF No. 278-3; ECF No. 278-4. And Plaintiff has downloaded and recorded the dates of the relevant Montgomery Municipal Court jail dockets from the court's website. ECF No. 278-1 ¶ 12; ECF No. 278-5; ECF. No. 278-6; ECF No. 278-7. Finally, the date of commutation for any City Class member is on the face of the Jail Transcript. Ex. 1, Rubens Decl. ¶ 14; *see, e.g.,* Ex., 3, Rubens Decl. Ex. B. at 2 (dated Carter Jail Transcript). To determine whether a City Class member is a Kloess Subclass member, one need only cross-reference the jail docket dates with Mr. Kloess's timesheets to create a list of jail docket dates Mr. Kloess was working during the class period, then check the City Class members' Jail Transcript dates against that list. If the dates match, that City Class member is also a Kloess subclass member.

Because Mr. Kloess indicated that he would represent anyone who came through the Municipal Court who needed a lawyer, ECF No. 265-1 (Kloess *Carter* Dep.) 76:20–22, the subclass also includes City Class members whose Benchmark court records or other documents indicate they were represented by Mr. Kloess for the commutation, regardless of whether they appeared before the court on a jail docket. The Benchmark docket records for each case have two fields—"Attorney" and "Docket Text"—where the name of the assigned public defender regularly appears. Ex. 1, Rubens Decl. ¶ 29. Mr. Kloess's name appears in one or both of those docket fields in numerous cases where debt was commuted to jail time during the City Class period. *Id.* As new City Class members are identified, it is simple to check their Benchmark

---

[18] Mr. Kloess acknowledged that he represented every person on the Montgomery Municipal Court jail docket on days he was working. ECF No. 265-1 (Kloess *Carter* Dep.) 104:16–104:19, 170:20-171:11.)

records to see if Mr. Kloess's name appears in one or both those two fields.

Further, Mr. Kloess's testimony shows that his signature on the jail Booking Card of a Montgomery Municipal Court defendant means that he represented that person. ECF No. 265-1 (Kloess *Carter* Dep.) 106:16–107:5; *see, e.g.,* Ex. 9, Rubens Decl. Ex. H (Booking Card with dated Kloess signature). Mr. Kloess signed and dated those Booking Cards as the client was being brought from jail to court. So in cases where the client was then commuted at that court hearing, the date of Mr. Kloess's signature will match the date of the Jail Transcript. *Compare, e.g.,* Ex. 3, Rubens Decl. Ex. B at 2 *with* Ex. 9, Rubens Decl. Ex. H (Jail Transcript and Kloess-signed Booking Card both dated January 27, 2014). Booking Cards routinely appear in Benchmark case files, so it is simple to check the Benchmark file of any City Class member for a Booking Card bearing Mr. Kloess's signature with a signature date on the same date as the commutation.

In sum, the members of the proposed Classes are being identified using objective criteria and reliable processes, and thus the Classes are ascertainable under any standard.

**C.   Plaintiff satisfies the requirements for class certification under Rule 23(a).**

All class actions in federal court must meet the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Each is satisfied here.

*1.   Joinder of all members of the Classes is impracticable.*

Rule 23 requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[C]ourts look at numerosity in a fairly straightforward fashion: by assessing the practicability of joinder, in light of the number of people who fall within the definition of the class." *Braggs v. Dunn*, 317 F.R.D. 634, 654 (M.D. Ala. 2016).

"[A] plaintiff need not show the precise number of members in the class" in order to

satisfy the numerosity requirement. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983). Likewise, "[m]ovants for class certification do not need to present evidence showing—one by one, many times over—that individual putative class members can proceed on the class claims; requiring as much would largely defeat the efficiency benefits of class-wide adjudication, and is unnecessary in light of the commonality requirement." *Braggs*, 317 F.R.D. at 654.

Here, each of the classes is so numerous that joinder would be impractical. There are at least 100 members in the City Class. Ex. 1, Rubens Decl. ¶ 20. There are at least 100 members in the JCS *Bearden* Subclass. Ex. 1, Rubens Decl. ¶ 20. There are at least 50 members in the Kloess Subclass. Ex. 1, Rubens Decl. ¶ 29. And there are at least 600 members in the False Imprisonment Class. Ex. 1, Rubens Decl. ¶¶ 20, 24.

While there is no strict numerical threshold, numerosity is presumptively satisfied if more than forty individuals fall within the class definition. *See, e.g.*, *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1266–67 (11th Cir. 2009) (citing *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)); *see also Napoles-Arcila v. Pero Family Farms, LLC*, No. 08-80779-CIV, 2009 WL 1585970, at *6 (S.D. Fla. June 4, 2009) (class of 150 and subclass of 50 satisfied numerosity requirement); *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594, 599 (S.D. Fla. 1991) (class of 130 satisfied numerosity requirement). Given the minimum size of each of the proposed Classes, joinder would be impractical and the numerosity requirement is easily satisfied.

### 2. There are numerous common questions of fact and law.

The second prerequisite for class certification is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23 does not require that all the questions of law and fact raised by the dispute be common." *Cox*, 784 F.2d at 1557. Indeed, "even a single common question will do." *Carriuolo*, 823 F.3d at 984 (quoting *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 359 (2011)). But the common question "must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* (quoting *Dukes*, 564 U.S. at 350). This requirement is usually satisfied where the injuries to the class allegedly arise from the defendants' customary practices and policies. *See, e.g.*, *DL v. Dist. of Columbia*, 860 F.3d 713, 724–25 (D.C. Cir. 2017) (commonality satisfied where classes alleged standard policies and practices caused common harm to members); *Thompson v. Jackson*, No. 1:16-cv-04217, 2018 WL 5993867, at *8 (N.D. Ga. Nov. 15, 2018) (commonality satisfied where class alleged the "same practice and policy" injured members).

The members of the proposed Classes all incurred debt in the Montgomery Municipal Court, were placed by the court on JCS-supervised probation, had their debt commuted to a jail sentence after JCS petitioned the court to revoke probation, and served time on that sentence. Each member suffered a common injury—namely, the loss of liberty that is inherent to being unlawfully detained. *Barnes v. Dist. of Columbia*, 278 F.R.D. 14, 20 (D.D.C. 2011); *see also* ECF No. 296 at 34 (recognizing primary injury alleged in this case "stems from a deprivation of liberty"). And the common injury to members of the Classes arises from Defendants' customary practices and policies, which "perpetuat[ed] a cycle of debt and unlawful imprisonment." ECF No. 296 at 37.

Those standard practices and policies give rise to numerous questions of law and fact for which there are common answers that will drive the resolution of the litigation. Some of these questions and answers cut across all Classes. For example, the trier of fact will decide whether JCS engaged in a systemic practice of petitioning to revoke probation after extracting as much cash as possible from people who owed court debt and whether the Municipal Court engaged in a

41

systemic practice of jailing these people for nonpayment of court debt without inquiring into ability to pay.

Additional common questions are present with respect to each of the theories of liability. For the *Bearden* claims brought on behalf of the JCS *Bearden* Class, the City Class, and the Kloess Subclass, the trier of fact will determine whether and when the City became aware of the Municipal Court's systemic practice of jailing members for nonpayment without inquiring into ability to pay; whether the City was deliberately indifferent to that systemic practice; whether the City acquiesced in the systemic conduct of JCS or ratified decisions about how JCS provided probation, such that the City is jointly and severally liable for JCS's actions; and whether JCS, the City, and Mr. Kloess caused the due process violations that members of the Classes experienced.

For the Sixth Amendment claims brought on behalf of the City Class and the Kloess Subclass, the trier of fact will determine whether the City's public defenders, including Mr. Kloess, failed to provide meaningful assistance of counsel to members by systemically failing to request indigency hearings; whether the City was on notice of this failure; and whether the City was deliberately indifferent to this failure.

And for the JCS False Imprisonment Class, the trier of fact will determine whether the jailing of members without an inquiry into ability to pay was unlawful; whether JCS instigated the unlawful detentions; and whether JCS did so in bad faith.

Given the numerous common questions of law and fact, the commonality requirement is satisfied.

### 3. *Plaintiff's claims are typical of the claims of members of the Classes.*

The proposed classes meet the typicality requirement because Plaintiff Carter and the Class members share the same core claims. Class representatives' claims must be "typical of the

claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The purpose of the typicality

requirement is to "ensure that . . . the interests of the class representative are closely aligned with

those of the class." 1 *Newberg on Class Actions* § 3:31. It is "not [a] demanding" test. *Id.* § 3:29.

The court need only ask whether each named plaintiff's claim arises from "the same event or

pattern or practice and are based on the same legal theory" as the claims of the class members.

*Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *see also*

*Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985) (typicality depends on "whether

named representatives' claims have the same essential characteristics as the claims of the class at

large"), *disapproved of on other grounds by Green v. Mansour*, 474 U.S. 64, 67 (1985). Even

"substantial factual differences" do not destroy typicality so long as "there is a strong similarity

of legal theories." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).

Mr. Carter's claims are typical of the claims of the Classes because they all arise out of

the uniform conduct of JCS, Mr. Kloess, and the City towards the members of the Classes. *See,*

*e.g.*, *Ault v. Walt Disney World Co*., 692 F.3d 1212, 1216–17 (11th Cir. 2012) (typicality met

where "[a]ll claims . . . arise from the same policy" and "are all based upon" the same liability

theory); *Hoffer v. Jones*, 323 F.R.D. 694, 698–99 (N.D. Fla. 2017) (typicality met where inmates

challenged corrections department's "very same . . . policies and practices for treating [Hepatitis

C]"); *J.W. v. Birmingham Bd. of Educ.,* No. 2:10-CV-03314, 2012 WL 3849032, at *9 (N.D. Ala.

Aug. 31, 2012) (typicality met where "the proposed class and Plaintiffs' claims arise from the

same allegedly unconstitutional practices" and "are premised around the same injury . . . and the

same legal theory"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 698 (N.D. Ga. 2001)

(typicality met where "claims arise out of and involve application of the same" company-wide

policies and systems). As explained in part II.H, *supra*, Mr. Carter—like every other member of

the Classes—was placed on JCS-supervised probation by the Montgomery Municipal Court; JCS asked the court to revoke his probation; the court commuted the remaining fines on those JCS-related cases to days in jail, and he was imprisoned; his fines were commuted to jail on a date when Mr. Kloess was assigned to the jail docket; and he served some of that jail time during the relevant class periods. Accordingly, the typicality requirement is satisfied.

### 4.  *Plaintiff and counsel will fairly and adequately protect the interests of the Classes.*

The fourth prerequisite for certification is a finding that the named plaintiff will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see also* Fed. R. Civ. P. 23(g)(1). This analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm.*, 350 F.3d 1181, 1189 (11th Cir. 2003). Both prongs of the adequacy test are met here.

With respect to the first prong, the claims of Plaintiff Carter are coextensive with, and not antagonistic to, the claims asserted on behalf of the proposed Classes. For a conflict to bar class certification, it must be so "fundamental" that "some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* There are no such issues here as between Mr. Carter and the members of the Classes he seeks to represent. Furthermore, Mr. Carter is prepared to adequately pursue this case through resolution, and understands his responsibilities as class representatives, and has demonstrated a commitment to prosecuting this action vigorously on behalf of the Class. *See* Ex. 11, Parrish Decl. at 3.

Second, Plaintiff's counsel are "qualified, experienced, and generally able to conduct the proposed litigation." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). Mr. Carter has retained a competent and capable team of trial lawyers with significant experience litigating class

actions and matters involving civil rights and debtors' prisons. The lawyers at The Evans Law Firm, which has served as lead counsel since this case was filed, "are experienced class action attorneys who have successfully litigated major consumer class actions." *Winston v. Jefferson Cty., Ala.*, No. 2:05-cv-0497, 2006 WL 6916381, at *8 (N.D. Ala. June 26, 2006); *see* Ex. 10, Evans Decl.; Ex. 11, Parrish Decl. Likewise, Public Justice, a national public interest law firm, and Terrell Marshall Law Group both have extensive experience litigating complex debtors' prison cases and class actions. *See* Ex. 12, Bailey Decl.; Ex., 13 Marshall Decl. The attorneys representing Mr. Carter and the proposed Classes have been appointed as class counsel in numerous actions. *See* Ex. 10; Ex. 13. They have successfully litigated cases in both state and federal courts, often on behalf of thousands of persons. *See* Exs. 10, 11, 12, 13. And they have worked extensively to investigate the claims, are dedicated to prosecuting those claims on behalf of the Classes, and have the resources to do so. *See id.*

### D. Plaintiff satisfies the requirements for certification under Rule 23(b)(3)

A court may certify a class action if the proposed class meets all of Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation and "at least one of the requirements" of Rule 23(b). *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250–51 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). Under subsection (b)(3), certification is appropriate if "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

#### 1. Common factual and legal questions concerning Defendants' conduct predominate over any individual issues.

To determine whether the predominance requirement has been satisfied, a court first "identif[ies] the parties' claims and defenses and their elements" and then "classif[ies] these

issues as common questions or individual questions by predicting how the parties will prove them at trial." *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1234 (11th Cir. 2016) (citing *Klay*, 382 F.3d at 1254–55 & n.7). "[A] common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). An individual question is one where the proof "will vary from member to member." *Brown*, 817 F.3d at 1234.

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013). Rather, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even [if] other important matters will have to be tried separately." *Tyson Foods*, 136 S. Ct. at 1045. Predominance is a "qualitative" rather than quantitative concept. *Brown*, 817 F.3d at 1235.

Common questions of law and fact predominate if they "'ha[ve] a *direct impact* on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc*., 601 F.3d 1159, 1170 (11th Cir. 2010) (emphasis in original) (quoting *Vega,* 564 F.3d at 1270); *see also Klay*, 382 F.3d at 1255 ("Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to . . . monetary relief.").

The Eleventh Circuit has articulated the following test to determine whether common

questions predominate:

> [I]f common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered. Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important. If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

*Klay*, 382 F.3d at 1255.

Here, questions regarding Defendants' liability to the Classes predominate over all else. The elements of the claims turn on Defendants' policies, customs and practices, and the evidence supporting those claims is the same for every member of the Classes. Defendants' liability to the Classes will be determined based on common proof, such as documents and other information contained in Defendants' own systems and databases, without the need for testimony from any particular member. And while there are some differences with respect to the extent of damages among members of the Classes, "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Id.* at 1259 (quoting *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003)).

a)   <u>Predominance is satisfied as to Defendants' liability on the *Bearden* claim.</u>

As noted previously, "[a] court violates the Due Process and Equal Protection Clauses if it fails to inquire into whether a probationer has made a bona fide effort to pay a fine before revoking probation or if it fails to consider alternative punishments to imprisonment for an indigent probationer." ECF No. 296 at 38 (citing *Bearden*, 461 U.S. at 672–73). This inquiry must be made on the record and supported by evidence. *Taylor*, 47 So.3d at 290–91. The failure to conduct an ability-to-pay hearing is unconstitutional regardless of what the outcome of the hearing would have been. *Angelina Cty.*, 733 F. Supp. at 254) (failing to conduct ability-to-pay

hearing is "unlawful *whatever the economic status* of the incarcerated person") (emphasis added); *accord West v. City of Santa Fe*, No. 3:16-cv-0309, 2018 WL 4047115, at *9 (S.D. Tex. Aug. 16, 2018), *report and recommendation adopted*, No. 3:16-cv-00309, 2018 WL 5276264 (S.D. Tex. Sept. 19, 2018).

Moreover, a court must create a written record of the ability-to-pay determination. *See Turner*, 564 U.S. at 449; *Gagnon*, 411 U.S. at 786. The government bears the burden of proving that nonpayment was willful. *See Mojica-Leguizamo*, 447 F. App'x at 996 (reversing revocation of probationer's supervised release based in part on government's failure to prove willful failure to pay). That showing must also be cited in the court record. *Taylor*, 47 So. 3d at 290–91 (finding reversible error where "court's order fails to make the specific determinations and findings, supported by the evidence," required by *Bearden*).

Common evidence will establish that the Montgomery Municipal Court had a systemic practice of jailing people for nonpayment of court debt without considering their ability to pay. Judge Hayes already stipulated to this before the Alabama Judicial Inquiry Commission, which issued a final judgment determining that Judge Hayes and the other Municipal Court judges had a widespread practice of commuting fines and costs to jail time, failed to make ability-to-pay determinations when doing so, and did not record commutation hearings in any manner. Defendants' own records show that the commutations occurred and that members of the Classes lost their liberty as a result. Because Municipal Court judges did not record these proceedings, Defendants cannot argue that the question of whether someone received an ability-to-pay hearing is individualized. No such evidence exists.

Because the evidence proving these facts is the same for every member of the Classes, Plaintiff can establish in one proceeding that the Montgomery Municipal Court systemically

violated *Bearden* and the United States Constitution. As explained further below, Plaintiff can also establish at once each Defendant's role in and liability for those violations using evidence common to all members of the City Class, the JCS *Bearden* Class, and the Kloess Subclass. The evidence establishing that JCS factually and proximately caused the commutations—and thus is liable for the ensuing deprivations of liberty—is contained in JCS's own documents and records, such as the JCS training manual, ProbationTracker records, and form Petitions for Revocation and Notices to Show Cause. Evidence establishing the City's liability for the scheme is contained in the JCS-Montgomery contract, the statutes that establish the City's relationship to the Municipal Court, and the documents in the City's possession demonstrating that the City was on knowledge of JCS's unlawful practices as of at least July 16, 2012. And as explained in more detail below, additional evidence regarding the liability of the City as well as Mr. Kloess is similarly common to all members of the Classes. None of this evidence will vary from one member to the next.

    b) <u>Predominance is satisfied as to JCS's liability on the false imprisonment claim.</u>

There are three elements to the false imprisonment claim: (1) an unlawful detention that deprived a person of his personal liberty; (2) the instigation of that detention by another; and (3) a determination that the other party acted in bad faith. ECF No. 296 at 39.

The same common evidence Plaintiff will use to prove the *Bearden* claim also establishes the "unlawful detention" element of the false imprisonment claim. Thus, the only remaining questions are whether Plaintiff can adduce common proof of the "instigator" and "bad faith" elements. As with the *Bearden* claim, proof of these elements turns on JCS's policies and practices and does not require individualized inquiry.

Common evidence will show that JCS instigated the unlawful detention of Plaintiff

Carter and members of the False Imprisonment Class by issuing Petitions for Revocation and

Notices to Show Cause. The same evidence applies equally to the claims of every Class member

because JCS operated according to uniform procedures and used form pleadings that varied only

with respect to the dates of appointments allegedly missed and amounts due. *See* parts II.C and

D, *supra*.

As this Court recognized on summary judgment, Plaintiff has amassed enough evidence

for a jury to conclude that once probationers could no longer pay fees, JCS systematically

funneled them back to the Montgomery Municipal Court, which, in keeping with its established

practice, commuted Plaintiffs' fines to jail time. ECF No. 296 at 37. That resolves the instigation

element.

Common evidence will also establish that JCS instigated the Class members' detentions

in bad faith. In a false imprisonment case, bad faith exists where the defendant lacked a

reasonable basis for instigating the detentions. *See Grant*, 738 So.2d at 894. As the Court has

recognized, a reasonable jury could find that JCS acted in bad faith by petitioning to revoke the

probation of Plaintiff Carter when it "knew (or should have known) that Mr. Carter could not pay

his fine and would be jailed if the Municipal Court revoked his probation." ECF No. 296 at 40.

Because the evidence establishes this was part of a systemic course of conduct by JCS, the jury

can reach the same conclusion for all members of the False Imprisonment Class.

First, common evidence will show that JCS was aware of the Montgomery Municipal

Court's notorious commutation policy. *See generally* part II.E, *supra*. With each request to

revoke probation, JCS set a Municipal Court hearing date and urged the court to issue an arrest

warrant if necessary. It was thus foreseeable to JCS that these probationers would be brought

before the court. And given the court's well-known commutation practice, it was foreseeable to

JCS that if probationers could not pay, the court would jail them without consideration of their financial circumstances or a finding of willfulness. Thus, by seeking revocation, JCS knew or should have known it was setting in motion the unlawful jailing of probationers who could not pay their fines in full. That's the definition of bad faith.

Second, common evidence will show that JCS knew or should have known that the Class members were unable to pay their fines in full when it petitioned to revoke their probation. *See* parts II.B and C, *supra*. Under the Montgomery Municipal Court's standing orders, only people who could not pay their tickets or fines in full within thirty days of sentencing were placed on JCS probation. *See* part II.B, *supra*. When probationers could make only partial payments, JCS had a policy of (1) increasing the number of appointments they had to attend, (2) adding monthly probation fees to probationers' balances no matter how little the probationers owed to the City, and (3) allocating more than half of all the money it collected from Montgomery probationers to its own fees. *See* part II.C, *supra*. These three policies enabled JCS to keep people on probation so long as they were making payments, even if partial, in order to extract as much money as possible before sending them back to the Municipal Court. Only when it could no longer collect probation fees from a probationer would JCS ask the court to revoke probation. Based on this evidence, and without the need for testimony by individual class members, a jury could reasonably find JCS knew or should have known that Class members were unable able to pay off their fines at the time JCS sought to revoke their probation.[19]

Third, JCS routinely initiated judicial proceedings but then withheld evidence from the

---

[19] In addition, JCS kept records of hundreds of probationers' means-tested government benefits, unemployment, and other indicia of indigence. *See* part II.C, *supra*; ECF No. 118-13. While Plaintiffs do not rely on this evidence to establish classwide liability, the fact that JCS petitioned to revoke even these Class members' probations certainly corroborates Plaintiff's argument that the company instigated unlawful jailings in bad faith.

Municipal Court in its possession that demonstrated the probationers' inability to pay. *See* part II.D, *supra* (describing JCS training to provide the court with only specific "facts"). The Alabama Supreme Court has held that an instigator acts in bad faith where, as here, the instigator fails to "state[] all material facts within his or her knowledge" or obtains an indictment "by fraud, by suppressing facts, or by other misconduct." *Crown Cent. Petroleum Corp. v. Williams*, 679 So.2d 651, 655 (Ala. 1996) (quoting *Pannell v. Reynolds*, 655 So.2d 935, 938 (Ala. 1994)). That is exactly the kind of bad faith in which JCS regularly engaged: JCS urged the Municipal Court to revoke probation without any allegation or proof that the probationer had *willfully* failed to pay—and without disclosing material facts showing the opposite.

Finally, Plaintiff can meet the bad faith element by using common proof to establish that JCS conducted its entire operation in bad faith—namely, for the purpose of extracting as much money as possible from defendants before tossing them back to the Municipal Court. *See* parts II.C & I, *supra*; ECF No. 296 at 26. The evidence for this will turn on JCS's uniform policies and practices and the jury's determination of JCS's intent in operating the probation scheme. Individualized evidence from Class members is not necessary to establish the overarching bad faith of JCS's probation scheme.

Because Plaintiff can prove each element of the false imprisonment claim using common evidence, he will be able to establish in one proceeding JCS's liability to all members of the False Imprisonment Class.

c)   Predominance is satisfied on the Sixth Amendment claim.

The Sixth Amendment guarantees assistance of counsel to every person facing incarceration for nonpayment of court debt. *Shelton*, 535 U.S. at 662. Common evidence will establish that the City's public defenders, including Mr. Kloess, failed to provide meaningful assistance of counsel to members of the City Class and Kloess Subclass by systemically

depriving them of indigency hearings. This evidence, which does not vary from one member to the next, includes documentation of caseloads so high as to make it impossible for the public defenders to engage their clients to the extent necessary to gather information necessary for a proper ability to pay determination. It also includes testimony from Mr. Kloess establishing that he customarily failed to ask the Municipal Court to assess the indigency or ability to pay of clients to whom he was assigned. *See* part II.F, *supra*. Finally, it includes the evidence (already discussed above) that will establish the Municipal Court did not inquire into ability to pay when commuting fines to jail time. *See* part II.D, *supra*.

When put together, this evidence will prove that the City was on notice of but deliberately indifferent to the systemic failure of its public defenders, including Mr. Kloess, to raise *Bearden* as a defense to incarceration. This will allow the trier of fact to conclude that the City is liable to the City Class members and that Mr. Kloess is liable to the Kloess Subclass members on the *Bearden* and Sixth Amendment claims.

> d) Lost-liberty damages can be proven in one proceeding on behalf of all
> members of the proposed Classes.

As demonstrated above, Plaintiff will establish Defendants' liability in relation to each claim using evidence that is common to the Classes. Plaintiff will likewise use common evidence to establish a category of general damages for all members of the Classes—specifically, the compensatory "damages recoverable for loss of liberty for the period spent in wrongful confinement." *Kerman v. City of New York*, 374 F.3d 93, 125 (2d Cir. 2004); *see also Daniel v. Hodges*, 125 So.2d 726, 728 (Ala. Ct. App. 1960) (recognizing that one who is unlawfully detained incurs "damage sustained by the loss of time and liberty"). These damages "are separable from [other] damages" that may arise from wrongful confinement, including damages "for such injuries as physical harm, embarrassment, or emotional suffering." *Kerman*, 374 F.3d

at 125. Indeed, "[a] loss of time, in the sense of loss of freedom, is inherent in any unlawful detention and is compensable as 'general damages' for unlawful imprisonment without the need for pleading or proof." *Id*. at 130; *see also H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1088 (11th Cir. 1986) (holding that in cases involving unlawful detentions arising from constitutional violations, "real injury can be inferred from the facts").

Numerous courts have recognized that when a class comprises people who lost their liberty because of a defendant's common course of unlawful conduct, aggregate compensatory damages may be awarded to the class for that injury without the need for individualized evidence. *See, e.g.*, *Dellums v. Powell*, 566 F.2d 167, 208 (D.C. Cir. 1977) (Leventhal, J., concurring) (approving process by which jury awarded approximately 1,200 class members "damages for false arrest and false imprisonment on a variable scale:" $120 for each member detained 12 hours or less, $360 for each member detained 12 to 24 hours, $960 for each member detained 24 and 48 hours, and $1,800 for each member detained 48 and 72 hours); *Barnes*, 278 F.R.D. at 20 (applying "*Dellums* method" to "determin[e] general damages for the class"— namely, "the injury to human dignity that is presumed when a person is . . . overdetained"); *Betances v. Fischer*, 403 F. Supp. 3d 212, 238 (S.D.N.Y. 2019) (holding that "a class-wide daily damages value may be assessed for each day of incarceration or other restraint of liberty"); *Roy v. Cty. of Los Angeles*, No. CV-1209012, 2018 WL 3436887, at *3 (C.D. Cal. July 11, 2018) (recognizing "general damages may be available on a class-wide basis in § 1983 cases based upon unlawful detention"); *Covington v. Wallace*, No. 2:12-cv-123-DPM, 2014 WL 5306720, at *2 (E.D. Ark. Oct. 15, 2014) (certifying class of people detained without due process and concluding it is "both fair and legally adequate" to measure damages "by the number of days each class member was unlawfully detained"). Such damages are typically applied based on a

variable-scale or per-diem approach, both of which account for the value of time lost by any given class member. *See, e.g.*, *Dellums*, 566 F.2d at 208 (Leventhal, J., concurring) (variable scale); *Covington*, 2014 WL 5306720, at *2 (per diem). Once those figures are determined, the calculation of aggregate damages for lost liberty can be accomplished through basic math.

### 2. A class action is the superior means of adjudicating this controversy.

Rule 23(b)(3)'s second prong considers whether "a class action is superior to other available methods for the fair and efficient adjudication of the [claims]." Fed. R. Civ. P. 23(b)(3). The focus of this inquiry is on "the relative advantages of a class action suit over whatever other forms of litigation might realistically be available to the plaintiffs." *Klay*, 382 F.3d at 1269. Courts consider four main factors: (A) whether the class members have an "interest[] in individually controlling the prosecution . . . of separate actions"; (B) "the extent and nature of any litigation concerning the controversy already begun by . . . class members"; (C) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (D) any "likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Here, all four factors strongly favor class certification.

### a) Given the complexity of the case, class treatment is more likely to benefit members of the Classes than individual actions.

The first factor, Class members' interest in bringing separate proceedings, plainly supports class certification. *See* Fed. R. Civ. P. 23(b)(3)(A). This factor is met where the court determines that a class action will "allow[] for the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 915 (10th Cir.), *cert. denied*, 139 S. Ct. 143 (2018) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)). "[T]he class action device is especially pertinent to vulnerable populations." *Id.* (quoting 2 *Newberg on Class Actions* § 4:65 (5th ed. 2017) ).

First, it is extremely unlikely that the members of the proposed Classes in this case—who were jailed because they lacked the means to pay Municipal Court fines—could bring Section 1983 claims against these large, well-funded defendants individually. Under similar circumstances, courts routinely hold that a class action is superior to individual litigation. *See, e.g.*, *Kinard v. E. Capitol Family Rental, L.P.*, 331 F.R.D. 206, 215 (D.D.C. 2019) (in Fair Housing Act case on behalf of low-income tenants, class action superior because "most members would not pursue their claims outside of a class action, since the costs of individually prosecuting this litigation would outweigh an individual class member's potential damages"); *Betances*, 304 F.R.D. at 432 (class action superior where "the class consists of individuals who have been imprisoned for felonies, [and] it is unlikely that many if not most of these individuals would ever commence litigation on their own behalf to vindicate their rights"); *Garcia v. E.J. Amusements of New Hampshire, Inc.*, 98 F. Supp. 3d 277, 292 (D. Mass. 2015) (class action superior where "[m]any of the class members are low-income, uneducated, and lack the resources to litigate their own claims"); *Violette v. P.A. Days, Inc.*, 214 F.R.D. 207, 220 (S.D. Ohio 2003) (class action superior where "plaintiffs are of low income and lack the resources to secure representation and see the litigation through to completion," so a class action could "allow[] for recovery by individuals who otherwise would not have been compensated for [the defendant's] alleged wrongdoings").

Second, "the complexity and expense of these cases suggest that individual class members have an interest in a single adjudication." *McClendon v. Cont'l Grp., Inc.*, 113 F.R.D. 39, 45 (D.N.J. 1986). To prevail on the constitutional claims against JCS and Montgomery individually, each person would need to build an evidentiary record sufficient to support *Monell* liability and defeat myriad defenses such as qualified immunity, *Rooker-Feldman*, and *Heck v.*

*Humphrey.* Under such circumstances, "class members who may not otherwise have the means to litigate their claims will likely benefit greatly from a class action, and a class action will ensure that class members who are otherwise unaware that they possess a claim will have their rights represented." *City of Farmington Hills Employees Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 357 (D. Minn. 2012); *see also Otero v. Dart*, 306 F.R.D. 197, 207 (N.D. Ill. 2014) (holding that "[a] class action is the superior procedure for litigating [unlawful jailing] claims because the Court can determine the legality of the alleged practice and procedure in one proceeding" and because "[t]he proposed class might include hundreds, if not thousands of members, many of whom are unlikely to pursue their claims on their own."); *Winston*, 2006 WL 6916381, at *12 (certifying class whose members would have "little . . . ability to prosecute their claims against [the government d]efendant through individual actions").

Finally, Plaintiff's counsel are unaware of "any individual suits hav[ing] been filed despite the amount of time that has passed since this action was commenced"—or indeed, since Montgomery cancelled its contract with JCS—which confirms that as a practical matter, members of the Classes have "little interest in individually controlling separate actions." *In re Nassau Cty. Strip Search Cases*, No. 99-cv-2844 (DRH), 2008 WL 850268, at *7 (E.D.N.Y. Mar. 27, 2008).

b)  <u>The lack of other litigation weighs in favor of class certification.</u>

The second factor, on other litigation, also supports class treatment. *See* Fed. R. Civ. P. 23(b)(3)(B). Aside from *McCullough*, Plaintiff's counsel know of no other pending litigation arising from the jailing of JCS probationers in Montgomery. *See Smith v. Triad of Alabama, LLC*, No. 1:14-cv-324-WKW, 2017 WL 1044692, at *15 (M.D. Ala. Mar. 17, 2017) (class action superior where "[t]he court has not been made aware of any other [relevant] litigation . . . and concentrating this dispute in a single forum will help bring the matter to a uniform conclusion

57

that neither prejudices nor privileges [the defendant] or particular class members"). Additionally,

counsel for the Plaintiffs in *Carter* and *McCullough* believe that consolidating the cases for trial

is appropriate and will only increase the superiority of the class action procedure for resolving

the claims fairly and efficiently for all members of the Classes. *See* ECF No. 303 at 1–2.

        c)  <u>Resolving the central issues in a single proceeding before this Court will</u>
<u>serve efficiency and judicial economy.</u>

The third factor—the desirability of concentrating the litigation in a single forum—favors

class certification because the legal and factual questions at the heart of this case are common to

all members of the Classes. *See* Fed. R. Civ. P. 23(b)(3)(C). "[A] finding that common issues

predominate over individual issues leads to an inescapable conclusion that a class action presents

the more desirable vehicle for adjudicating the plaintiffs' claims." *In re HealthSouth Corp. Sec.*

*Litig.*, 261 F.R.D. 616, 646 (N.D. Ala. 2009) (citing *Williams v. Mohawk Indus. Inc.*, 568 F.3d

1350, 1358 (11th Cir. 2009)). In contrast, "[h]olding separate trials for claims that could be tried

together would be costly, inefficient, and would burden the court system by forcing individual

plaintiffs to repeatedly prove the same facts and make the same legal arguments before different

courts." *Klay*, 382 F.3d at 1270. It would also risk conflicting outcomes. *See Smith*, 2017 WL

1044692, at *15 ("[C]oncentrating this dispute in a single forum will help bring the matter to a

uniform conclusion that neither prejudices nor privileges [the defendant] or particular class

members.").

    Furthermore, this Court is already deeply familiar with the parties, claims, and issues in

this litigation and has issued numerous rulings in both *Carter* and *McCullough*. Accordingly,

judicial economy and efficiency weigh strongly in favor of certifying the Classes and

adjudicating all the claims in this forum. *See Klay*, 382 F.3d 1271 ("[I]t is desirable to

concentrate claims in a particular forum when that forum has already handled several

preliminary matters."); 2 *Newberg on Class Actions* § 4:71 (5th ed. 2020) (class action is "particularly appropriate when that court has already made several preliminary rulings" and when "other similar actions have been consolidated before the court").

>    d)   This case presents no significant management difficulties.

The final factor under Rule 23(b)(3)—manageability—also weighs in favor of class certification. *See* Fed. R. Civ. P. 23(b)(3)(D). The Eleventh Circuit has stated that concerns about manageability "will rarely, if ever, be . . . sufficient to prevent certification of a class." *Klay*, 382 F.3d at 1272; *see also id.* at 1273 ("[e]ven potentially severe management issues have been held insufficient to defeat class certification"); *Winston*, 2006 WL 6916381, at *12 (noting "strong presumption against denying class certification for management reasons"); 2 *Newberg on Class Actions* § 4:72 (noting "presumption against dismissing a class action on manageability grounds"). The manageability inquiry is not "whether this class action will create significant management problems, but instead . . . whether it will create relatively more management problems than any of the alternatives." *Klay*, 382 F.3d at 1273. "[W]here a court has already made a finding that common issues predominate over individualized issues, [the Eleventh Circuit] would be hard pressed to conclude that a class action is less manageable than individual actions." *Id.*; *see also Williams*, 568 F.3d at 1358 (noting "manageability is ordinarily satisfied so long as common issues predominate over individual issues"); 2 *Newberg on Class Action* § 4:72 (noting "the very concerns that might make a class suit difficult to manage also infect the procedural alternatives"). This is particularly true where most if not all class members live in the forum state. *Smith*, 2017 WL 1044692, at *15.

Plaintiff proposes a trial plan with three phases. In Phase I, Plaintiff will use common evidence to prove on a class-wide basis both Defendants' liability and the aggregate damages to which members of the Classes are entitled for their lost liberty. For purposes of establishing

these damages, Plaintiff suggests the Court allow each side to call a non-random sample of twelve members from across the Classes, who will testify to the details of their unlawful detentions but not to other injuries suffered or their individual backgrounds (such as occupations, education levels, criminal histories, family situations, and similar personal facts). *See Barnes*, 278 F.R.D. at 20–21 (finding this to be "just and expeditious method of trying [general] damages" on class-wide basis); *see also Augustin v. Jablonsky*, 819 F. Supp. 2d 153, 162 (E.D.N.Y. 2011) (noting juries can determine category of general damages on class-wide basis so long as "care [is] . . . taken to ensure that the amount awarded . . . excludes all elements of special damages"). Plaintiff further suggests that in order "[t]o assist the jury in assigning values" for lost liberty damages, "the Court . . . allow expert testimony that is limited to explaining the range of general damages that have been awarded by judges or juries in similar cases." *Barnes*, 278 F.R.D. at 21.

Because the issues to be resolved in Phase I are common to the members of the Classes, those issues predominate over any issues that will remain after Phase I. Indeed, if Defendants are absolved of liability, the case will be over. But if Plaintiff establishes that Defendants are liable, then injuries other than loss of liberty that flow from Defendants' unlawful conduct will have to be proven separately. In Phase II, which (assuming liability is established) will occur immediately after Phase I, the jury from Phase I will determine the damages to which Plaintiff Carter—and the named plaintiffs in *McCullough*, if the cases are consolidated for trial—is entitled for his additional injuries. At that point, the case will move into Phase III, whereby any additional damages to which members of the Classes are entitled will be determined.

Plaintiff acknowledges that the damages to be resolved in Phases II and III—which will compensate for injuries such as emotional distress and lost wages—are individualized. But such

damages do not defeat predominance because the resolution of common issues in Phase I will "have a direct impact on every class member's effort to establish liability and on every class member's entitlement to . . . monetary relief" for lost liberty. *Klay*, 382 F.3d at 1255. Indeed, "it would be neither efficient nor fair to anyone, including Defendant[s], to hold [hundreds of] trials to hear the same evidence and decide the same liability issues." *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1309 (N.D. Fla. 2017); *see also Allapattah*, 333 F.3d at 1261 (holding that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"); *Smith*, 2017 WL 1044692, at *14 (explaining that resolution of individualized damages for hundreds of class members "shrinks in comparison to the burden of conducting a full-blown trial on every issue contained in every cause of action, for every class member," so those damages "do not sink the putative class"); 4 *Newberg on Class Actions* § 11:8 (5th ed. 2020) ("The efficiencies of the class suit can be accomplished by trying the defendant's liability once in the aggregate proceeding while working out the subsequent damages, if necessary, either through similar classwide proof or through some kind of more individualized procedure.").

As the Eleventh Circuit has recognized, "[d]istrict courts have many tools to decide individual damages" issues. *Brown*, 817 F.3d at 1239. These include "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damage proceedings; [and] (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages" in separate cases after the liability trial. *Id.* (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 123, 141 (2d Cir. 2001)); *see also Klay*, 382 F.3d at 1273 (noting "[t]here are a number of management tools available to a district court to address any

individualized damages issues that may arise in a class action"). In *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017) (en banc), the Court of Appeals approved a three-phase approach similar to the one Plaintiff proposes here. "In Phase I, a jury decided issues common to the entire class, including general causation" and "defendants' common liability to the class members." *Id*. at 1175. "In Phase II, the [same] jury determined the liability of the [defendants] to three class representatives" and awarded compensatory damages to those representatives. *Id*. In Phase III, the class was decertified, and former members were allowed to pursue individual damages claims in separate lawsuits. *Id*. at 1175, 1178. Importantly, each member "retained the findings of liability by the jury from Phase I," and those findings had "res judicata effect" in the subsequent trials. *Id*. at 1178.

The appeal in *Graham* arose from a verdict in favor of a former class member who brought an individual wrongful death action after decertification. *Id*. at 1174–75. The Eleventh Circuit, sitting en banc, held that giving preclusive effect to the findings of the jury in Phase I did not violate the due process rights of the tobacco companies in the subsequent action. *Id*. at 1181–86; *see also Navelski*, 261 F. Supp. 3d at 1219 (holding "the Seventh Amendment will not be violated by bifurcation of causation and damages in [class action] case"). In reaching its conclusion, the Eleventh Circuit recognized that "courts, both state and federal, frequently manage class actions by splitting them into separate phases." *Graham*, 857 at 1184. Indeed, the court noted this was "not the first time that defendant's common liability was established through a class action and given binding effect in subsequent individual damages actions." *Id*.; *see also Allapattah*, 333 F.3d at 1257 (holding defendant's liability to class members "was decided properly on a class-wide basis," but damages suffered by those members would have to be determined "on an individual basis").

At this point, there is no way of knowing how many members of the Classes, if any, will step forward to prove injuries that are individual to them—that is, injuries suffered as a result of Defendants' conduct beyond the common loss of liberty all members experienced. The numbers may be such that the Court can handle those proceedings efficiently, whether by itself, with other district court judges, or through the appointment of a magistrate judge or special master. *See Brown*, 817 F.3d at 1239. But if the numbers prove substantial, the Court has the option of decertifying the Classes after the liability trial and providing notice to members concerning how they may pursue separate cases to establish their individual damages. *See id*. Of course, there is always the possibility of settlement after the liability phase, and in that case, "a settlement-claiming program" can substitute for Phases II and III. 4 *Newberg on Class Actions* § 11:9. The bottom line is that "individual damages assessments do not defeat predominance" because the issues of liability and damages for lost liberty can be resolved at once for all members of the Classes, and the Court has various tools to resolve any other damages issues that may remain. *Thompson*, 2018 WL 5993867, at *11–12 (relying on *Brown* in certifying class action brought for unlawful detentions).

### E.      Constitutionally-sound notice can be provided to members of the Classes.

To protect the rights of the members of the Classes, the Court must provide them with the best notice practicable when it grants certification under Rule 23(b)(3), including individual notice to all members who can be identified through reasonable effort. Fed. R. Civ. P. 23(c)(2)(B). "The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." *Id*. Ultimately, the best notice practicable is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The ProbationTracker database JCS maintained includes the names, social security numbers, and at least one street address for all proposed members of the Classes. Ex. 1, Rubens Decl. ¶ 3. It is thus possible to obtain current addresses and send notice directly via First Class mail to all members of the Classes. *See, e.g.*, *George v. Academy Mortgage Corp. (UT)*, 369 F. Supp. 3d 1356, 1368 (N.D. Ga. 2019) (discussing process by which administrator used names and social security numbers to conduct "skip tracing" to locate current address information). If necessary and appropriate, notice can also be published in a local paper, through targeted internet postings, or on a website established to provide members of the Classes with information that will allow them to stay apprised of the status of the case and to access the notice form and other key documents. *See Manual for Complex Litigation* § 21.222 at 288. In short, it will not be difficult to provide the best notice practicable to the members of the Classes. If certification is granted, Plaintiff will submit a detailed notice plan and form to the Court.

## V.    CONCLUSION

For the reasons stated above, Plaintiff respectfully asks the Court to certify the Classes described in this motion.

Dated:  September 14, 2020            RESPECTFULLY SUBMITTED,

Respectfully submitted this September 14, 2020,

s/ Leslie A. Bailey
Leslie A. Bailey (admitted *pro hac vice*)

THE EVANS LAW FIRM, P.C.
PUBLIC JUSTICE
TERRELL MARSHALL LAW GROUP PLLC
*Counsel for Plaintiff and the Proposed Classes*

G. Daniel Evans (ASB-1661-N76G)
Alexandria Parrish (ASB-2477-D66P)
Maurine C. Evans (ASB-4168-P16T)
THE EVANS LAW FIRM, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, AL 35209
(205) 870-1970
gdevans@evanslawpc.com
ap@evanslawpc.com
mevans@evanslawpc.com

Toby Marshall (admitted *pro hac vice*)
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
(206) 816-6603
tmarshall@terrellmarshall.com

Leslie A. Bailey (admitted *pro hac vice*)
Brian Hardingham (admitted *pro hac vice*)
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lbailey@publicjustice.net
bhardingham@publicjustice.net

Alexandra Brodsky (*pro hac vice*
    application forthcoming)
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net

65

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of September 2020, I electronically filed the foregoing
PLAINTIFF'S SUBMISSION OF EVIDENTIARY MATTERS IN SUPPORT OF MOTION
FOR CLASS CERTIFICATION with the Clerk of the Court using the CM/ECF system, which
will send notification of such filing to the following:

Shannon L. Holliday, Esquire
Robert D. Segall, Esquire
Richard H. Gill, Esquire
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347

Micheal S. Jackson, Esquire
WEBSTER, HENRY, LYONS, BRADWELL, COHAN & BLACK, P.C.
P. O. Box 239
Montgomery, AL 36101-0239

Michael L. Jackson, Esquire
Larry S. Logsdon, Esquire
Wesley K. Winborn, Esquire
WALLACE, JORDAN, RATLIFF & BRANDT, L.L.C.
P.O. Box 530910
Birmingham, AL 35253

Wilson F. Green, Esquire
FLEENOR & GREEN LLP
1657 McFarland Blvd. N., Ste. G2A
Tuscaloosa, AL 35406

Kimberly O. Fehl, Esquire
CITY OF MONTGOMERY LEGAL DEPT.
Post Office Box 1111
Montgomery, AL 36101-1111

s/ Leslie A. Bailey
Leslie A. Bailey

66